UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| WALGREEN CO.,<br>200 Wilmot Road<br>Deerfield, Illinois 60015<br><br>                   Petitioner,<br><br>    v.<br><br>HUMANA HEALTH PLAN, INC., HUMANA<br>INSURANCE COMPANY and HUMANA<br>PHARMACY SOLUTIONS, INC.,<br>500 West Main Street<br>Louisville, Kentucky 40202<br><br>                 Respondents. | Civil Action No. 1:22-cv-307 |

**WALGREENS' PETITION TO VACATE ARBITRATION AWARD**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

THE PARTIES........................................................................................................................... 5

I.     Petitioner ....................................................................................................................... 5

II.    Respondents ................................................................................................................. 6

JURISDICTION ....................................................................................................................... 6

FACTUAL BACKGROUND .................................................................................................... 6

III.    The Nature And Bifurcation Of The Arbitration .................................................... 6

      A.    The Agreements Between Walgreens And Humana .............................................. 8

      B.    Pharmacy Discount Programs And Walgreens' Prescription Savings Club........... 9

      C.    Walgreens' U&C Submissions To Humana ......................................................... 10

      D.    Walgreens' Understanding Of Its U&C Reporting Obligations To Humana
            Was Consistent With Undisputed Evidence Of Industry Understanding
            And The Views Of Humana's Own Director Of Pharmacy Audit ...................... 10

IV.    Walgreens' Claims Against Humana And Its Counsel.................................................... 12

      A.    Walgreens' Counterclaim Against Humana ....................................................... 12

      B.    Walgreens' Lawsuit Against Humana's Counsel, Who Previously Advised
            Walgreens On The Very Subject Matter At Issue In The Arbitration ................. 13

V.    The Interim Award........................................................................................................ 15

      A.    The Arbitrator Found Against Humana On Its Claims Of Fraud And
            Negligent Misrepresentation ........................................................................... 15

      B.    The Arbitrator Found That Walgreens Breached Its Obligations Under The
            Pharmacy Agreements By Not Taking PSC Prices Into Consideration
            When Reporting Its U&C Prices To Humana....................................................... 16

GROUNDS REQUIRING THE AWARD TO BE VACATED .................................................. 20

I.    The Arbitrator Exceeded His Authority By Supplanting the Parties' Agreed-Upon
    Definition Of "Usual and Customary Charge" With A Definition From A Federal
    Court Decision Issued Seven Years After The Parties Executed The 2009
    Agreement.................................................................................................................... 22

II.    Even If *Garbe* Were At All Relevant To The Arbitration, The Arbitrator Was Still
    Bound To Apply The U&C Definition In The 2009 Agreement Because It
    Materially Differed From The So-Called "Default" Definition Articulated In
    *Garbe* ........................................................................................................................ 26

REQUEST FOR RELIEF .......................................................................................................... 30

1.      Petitioner Walgreen Co. (Walgreens) submits this petition to vacate the portion of an interim arbitral award (Interim Award) (Ex. A) rendered against Walgreens and in favor of Humana Health Plan, Inc., Humana Insurance Company, and Humana Pharmacy Solutions, Inc. (Humana) (collectively, the Parties) in AAA Case No. 01-19-0002-5131 (the Arbitration). Although the Arbitrator found in favor of Walgreens on the vast majority of its claims, he ruled in Humana's favor on one claim for breach of contract (the Contract Claim) and scheduled further proceedings to determine what damages, if any, Humana can prove. In making an interim finding of liability on the Contract Claim, however, the Arbitrator ignored the clear language of the Parties' agreement and vastly exceeded the authority granted to him under the Parties' contract.[1]

2.      As set forth below, Walgreens was compelled to file this action to vacate the Interim Award before the arbitration proceedings have fully concluded to avoid waiving its right to seek judicial review of the liability finding in the Interim Award pursuant to Section 10 of the Federal Arbitration Act (FAA) (9 U.S.C. § 10). For the reasons set forth in Walgreens' accompanying motion to stay, Walgreens asks this Court to defer its review until the Arbitrator issues a final award in this matter to allow for the presentation and review of a full disposition of the Parties' dispute, to effectuate the Arbitrator's stated desire that the interim award not be subject to review at this time, and to preserve this Court's time and resources.

**PRELIMINARY STATEMENT**

3.      During the Arbitration, the Arbitrator issued an Interim Award that contravenes basic principles of contract law. The ground for vacating the Arbitrator's error is straightforward:

---

[1] The Arbitrator is also deciding the merits of Walgreens' counterclaim against Humana, pursuant to which Walgreens alleges that Humana breached its duty of good faith and fair dealing under the Parties' contract by asserting its now-dismissed fraud claims in bad faith and for an improper purpose. The Arbitrator's interim rulings relating to the counterclaim are not the subject of this petition to vacate.

the Arbitrator predicated his decision not on the express language found in the Parties' 2009 agreement, but on a court decision issued in 2016: seven years *after* the Parties negotiated their 2009 agreement. *See PMA Cap. Ins. Co. v. Platinum Underwriters Berm. Ltd.*, 400 F. App'x 654, 656 (3d Cir. 2010) (affirming district court judgment vacating arbitral award when the arbitrators "went beyond the scope of their authority" by "rewriting material terms of the contract they purported to implement").

4.      Humana (an insurance company) contracted with Walgreens (a national pharmacy chain) in 1998 and again in 2009 to reimburse Walgreens for prescription drugs dispensed by Walgreens to persons insured by Humana.

5.      In 2019, Humana first asserted that Walgreens should have reported its special prices for its pharmacy club members as its "usual and customary" (U&C) prices on reimbursement claims submitted to Humana. Walgreens responded that it properly reported its retail cash prices, rather than its special club prices, as its U&C prices, in accordance with its contractual obligations.

6.      The Parties' dispute on this issue led to the Arbitration, which the Arbitrator bifurcated into two phases: liability and damages. On November 8, 2021, the Arbitrator issued the Interim Award rejecting most of Humana's claims, finding, *inter alia*, that Walgreens did not commit fraud or engage in negligent misrepresentation.[2] As to the single claim for which the Arbitrator found in favor of Humana—a breach of contract claim—the Interim Award is fatally flawed because the Arbitrator ignored the plain contractual language. Instead, he supplanted the Parties' agreement with a "default" definition of "usual and customary" created by a court decision issued seven years *after* the Parties reached their agreement, even though the facts of that case

---

[2] The Arbitrator had previously dismissed Humana's claim for unjust enrichment.

materially differed from those before the Arbitrator, and even though that court's definition bore no resemblance to the Parties' contractually chosen definition. In ignoring the express terms of the Parties' agreement, and by instead applying a standard that did not exist at the time the agreement was formed (and in fact, contradicted evidence of the standard that did exist at that time), the Arbitrator exceeded his authority by dispensing "his own brand of industrial justice." *Republic of Arg. v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 357 (D.D.C. 2016) (quoting *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018). Section 10 of the FAA prohibits such conduct, and the Interim Award should therefore be vacated.

7.      Although the Arbitrator stated his intent that the Interim Award not be subject to judicial review, challenges to arbitral awards must typically be brought within three months of their filing or delivery, 9 U.S.C. § 12. Some authority suggests that this deadline applies even to interim awards, *see, e.g., Cox v. Dex Media, Inc*., No. 18-cv-01817-KLM, 2021 U.S. Dist. LEXIS 57933, at *17-19 (D. Colo. Mar. 26, 2021) (appeal filed Apr. 27, 2021) (recognizing split in authority as to whether courts have construed interim awards to be "final" for purposes of the three-month requirement), although these decisions are either inapposite or poorly reasoned.[3]

8.      During a meet-and-confer discussion on December 2, 2021, Walgreens sought Humana's agreement to toll all deadlines applicable to either party's effort to seek vacatur or

---

[3] *See Hart Surgical, Inc. v. UltraCision, Inc.*, 244 F.3d 231, 232, 235 (1st Cir. 2001) (allowing judicial review of a liability finding bifurcated from a damages determination when "[t]he arbitrators, in turn, conclusively decided every point required by and included in this submission as their authority and responsibility demanded") (citation omitted); *Trade & Transp., Inc. v. Nat. Petroleum Charterers, Inc.*, 931 F.2d 191, 195 (2d Cir. 1991) (partial award on liability reviewable when that decision "was expressly intended to have immediate collateral effects in the judicial proceeding"); *Egan Jones Ratings Co. v. Pruette*, No. 16-MC-105, 2017 U.S. Dist. LEXIS 9388, at *8-10 (E.D. Pa. 2017) (partial award on liability reviewable because it "evidences the arbitrator's intent to resolve all liability issues"). Unlike the awards in these cases, the Arbitrator did not express an intent for the Interim Award to be reviewable, nor did the Interim Award fully resolve matters as to liability.

enforcement of the Interim Award.[4] Humana refused to consent, however, and instead stated that it viewed the Interim Award as "final."[5] In light of Humana's stated position, it seemed obvious that Humana would contend that any petition to vacate the Interim Award would be untimely if Walgreens did not bring it within three months.

9.    Before Walgreens intended to file the petition to vacate and accompanying motion to stay, Walgreens sought consent from Humana's counsel to accept service of these documents on behalf of its client. Humana's counsel consented. The evening before this filing, however, Humana's counsel unexpectedly stated it was open to "considering entering into a tolling agreement," but only if Humana received an advance copy of Walgreens' petition to vacate. *See* Ex. E, Email from S. Coleman to K. Harrison, et al. (Jan. 4, 2022). A tolling agreement is, of course, the same relief to Walgreens requested more than two months earlier, which Humana expressly rejected. Humana compelled Walgreens to expend considerable time and resources to

---

[4] Ex. B, Letter from F. Robinson, et al. to E. Gordon (Dec. 22, 2021). Courts routinely hold that these tolling agreements are permissible. *See, e.g.*, *3Cems. v. Perceptron, Inc.*, No. 14-14951, 2016 U.S. Dist. LEXIS 176098, at *12 (E.D. Mich. Dec. 20, 2016) ("Because the parties entered into an unambiguous agreement to toll the statute of limitations, the Court will enforce the Tolling Agreement as written") (citation omitted), *reconsideration granted on different issue*, 2017 U.S. Dist. LEXIS 47493 (E.D. Mich. Mar. 30, 2017).

[5] Ex. C, Email from A. Portnoy to S. Coleman, et al. (Dec. 21, 2021). Notably, Humana's stated position is inconsistent with Kentucky law, which provides that to prove breach of contract, the complainant must establish: (1) the existence of a contract, (2) a breach of the contract's terms, and (3) ***damages flowing from the breach of the contract***. *See Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). (Walgreens cites Kentucky law because the Arbitrator found that Kentucky law governed Humana's claims at the liability phase. *See* Interim Award at 11; *see also* 1998 Agreement § 9.13.) Here, in light of the bifurcation, the Arbitrator has yet to determine the existence of any damages. In any case, on December 29, 2021, once notified of Humana's refusal to enter into a tolling agreement, the Arbitrator emailed the Parties and stating, in pertinent part, that it was not his place to "say anything (beyond what already is set forth in the Interim Award) as to whether or not the Interim Award is subject to a motion to vacate, confirm, modify or correct" and "[t]hat it is for a court to decide in the event either party (or both) files such a motion." Ex. D, Email from E. Gordon to F. Robinson, et al. (Dec. 29, 2021).

protect its rights by preparing this action, and then engaged in eleventh-hour gamesmanship by seeking an advance copy of Walgreens' petition for the purported purpose of "considering" whether Humana would now reverse its position on a tolling agreement. As Walgreens advised Humana, the substantive grounds upon which Walgreens will seek to vacate the Interim Award have nothing to do with the question of when Walgreens needs to bring that action; Humana either agrees that neither party should move for judicial review until a final award or not. *See* Email from S. Coleman to K. Harrison, et al. (Jan. 4, 2022).  As Humana has still not agreed to enter into a tolling agreement, Humana left Walgreens no choice but to file this petition to vacate now.

10.     The Interim Award is fatally flawed and should be vacated. However, for the reasons set forth in Walgreens accompanying motion to stay—including that the Arbitrator asked that no judicial review proceed until he issued a final award, that the Arbitrator must still address key issues that may impact the Court's review of the Interim Award, and that a stay would serve the interests of judicial economy—Walgreens asks the Court to stay its review of this Petition until the issuance of a final award in the Arbitration.

**THE PARTIES**

I.     **Petitioner**

11.     Walgreens is an Illinois corporation and maintains its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015. Walgreens is one of the largest retail pharmacy chains in the United States. With a presence in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, Walgreens operates over 9,000 retail pharmacies and interacts with approximately 8 million customers in stores and online each day.

## II.     Respondents

12.     Humana Health Plan, Inc. is a health maintenance organization incorporated in Kentucky that maintains its principal place of business at 500 West Main Street, Louisville, Kentucky 40202.

13.     Humana Insurance Co. is an insurance company incorporated in Wisconsin that maintains its principal place of business at 500 West Main Street Louisville, Kentucky 40202.

14.     Humana Pharmacy Solutions, Inc. is a pharmacy benefits manager incorporated in Kentucky that maintains its principal place of business at 500 West Main Street, Louisville, Kentucky 40202.

## <u>JURISDICTION</u>

15.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity exists among the Parties and the matter in controversy exceeds $75,000.[6]

16.     Venue is proper within this district pursuant to 9 U.S.C. § 10 because the place of the arbitration was deemed to be in Washington, D.C., as set forth on page 3 of the Interim Award.

## <u>FACTUAL BACKGROUND</u>[7]

## III.    The Nature And Bifurcation Of The Arbitration

17.     On August 12, 2019, Humana filed a demand for arbitration (<u>Demand</u>) against Walgreens and Walgreens Boots Alliance claiming (i) breach of contract, (ii) negligent misrepresentation, (iii) unjust enrichment,[8] and (iv) fraud. Interim Award at 2.

---

[6] *See* Ex. F, Demand for Arbitration (Cover Sheet) (stating that the arbitration claim was for an amount "not less than hundreds of millions of dollars").

[7] In this petition, Walgreens sets forth the facts relevant to both its petition to vacate and its accompanying motion to stay.

[8] On May 11, 2021, the Arbitrator issued a ruling granting Walgreens' dispositive motion on Humana's claim for unjust enrichment. Interim Award at 3.

18.     On March 26, 2020, the Arbitrator bifurcated the proceedings into liability and damages phases. Interim Award at 2.

19.     On January 4, 2021, as discussed below, Walgreens sought (and received) leave to file a counterclaim against Humana because discovery had revealed that Humana had breached the implied covenant of good faith and fair dealing by asserting its fraud claim in bad faith and for an improper purpose. Interim Award at 2.

20.     A Phase I liability hearing took place from June 21-29, 2021.[9] Interim Award at 3.

21.     On November 8, 2021, the Arbitrator issued the Interim Award addressing Humana's claims for fraud, negligent misrepresentation, and breach of contract. In the final paragraph of the Interim Award, the Arbitrator stated: "The further determinations to be made at any subsequent hearing or based on written submissions shall be embodied in a Final Award. It is not intended that this Interim Award be subject to review pursuant to the Federal Arbitration Act, 9 U.S.C. §§9, 10 or any state arbitration act." Interim Award at 40.

22.     Since issuance of the Interim Award, the Parties have commenced Phase II of the bifurcated proceedings in the Arbitration, which will address Walgreens' affirmative defenses, Walgreens' counterclaim against Humana, and Humana's claim of damages. On December 10, 2021, the Arbitrator issued a Phase II scheduling order that includes deadlines for briefing and discovery related to Humana's damages claim and Walgreens' defenses thereto, and for briefing on Walgreens' counterclaim against Humana. The Arbitrator tentatively scheduled a Phase II hearing for the week of August 15-19, 2022. Pursuant to R-45 of the AAA Commercial Arbitration

---

[9] Due to the COVID-19 pandemic, per agreement of the Parties, the hearing was conducted via Zoom and for jurisdictional purposes, the hearing was deemed to have been conducted in Washington, D.C., the venue the Parties originally stipulated to for an in-person hearing. Interim Award at 3.

Rules, unless otherwise agreed by the Parties or specified by law, an award shall be made no later than 30 days from the date of closing the hearing.

### A.    The Agreements Between Walgreens And Humana

23.    The Humana-Walgreens reimbursement arrangement is governed by two different agreements. *See* Interim Award at 4.

24.    Claims submitted from January 1, 1998 to December 1, 2009, are covered by the Pharmacy Provider Agreement (the 1998 Agreement). Interim Award at 4; Ex. G, 1998 Agreement.

25.    Claims submitted from December 2, 2009 to the present are covered by the National Chain Pharmacy Provider Agreement (the 2009 Agreement). Interim Award at 4; Ex. H, 2009 Agreement.

26.    Under both the 1998 Agreement and 2009 Agreement (collectively, Pharmacy Agreements), one of the metrics that limited the reimbursement Humana would pay Walgreens for prescription drugs was Walgreens' U&C price. Interim Award at 4, 8, and 9; *see also* 2009 Agreement § 1.10.

27.    The 1998 Agreement does not define U&C; however, the 2009 Agreement expressly defines U&C as "the amount submitted by the Participating Pharmacy to a third-party payor, in the usual and customary field in the latest [National Council for Prescription Drug Programs] format, and charged to a cash customer by the Participating Pharmacy at the time of dispensing, excluding sales tax. The Parties agree the Usual and Customary Charge may vary by geography." 2009 Agreement § 1.27. Interim Award at 5 and 9.

28.    Although the 2009 Agreement's U&C definition does not refer to "discount card programs," which would encompass programs like Walgreens' pharmacy club, there is no dispute that the Parties' were aware that such programs existed, as the 2009 Agreement expressly

addresses the significance of "discount card programs" in at least three other places. 2009 Agreement § 1.19, Ex. I(4), and Ex. I(14).[10]

29.     The 2009 Agreement requires that, in the event of arbitration, the arbitrators must enforce the contract's clear and unambiguous terms and conditions, stating that "[t]he arbitrators shall be bound by the terms and conditions set forth in the Agreement when such terms and conditions are set forth clearly and without ambiguity." 2009 Agreement § 12.7.1.

**B.     Pharmacy Discount Programs And Walgreens' Prescription Savings Club**

30.     In late 2006, Walmart began charging all of its cash customers $4 for a 30-day supply of over 300 common generic prescription drugs. Those prices were well below the prices of Walmart's competitors and, in many cases, were less than the customers' co-payments under their respective health plans. Walmart's announcement was market-changing, causing competitors to respond and catching the attention of insurers around the country. *See* Interim Award at 5-6, 26.

31.     Before Walmart launched its $4 program, Walgreens already had piloted its pharmacy club, the Prescription Savings Club (PSC): a fee-based membership program that Walgreens designed to assist the uninsured and underinsured. PSC membership allows Walgreens customers who pay out-of-pocket for prescriptions—either because they have no insurance or because they have limited prescription-drug coverage—to access lower prices as long as they paid an annual membership fee of $20 per individual or $35 per family, met certain criteria, and agreed to abide by the terms and conditions of participation such as agreeing to purchase drugs covered by PSC without the use of insurance. Customers who did not join PSC, or who did not pay the

---

[10] Further, an enormous amount of evidence was produced in the Arbitration that showed Humana was well aware of these types of discount programs, which was noted by the Arbitrator. Interim Award at 26.

membership fee and otherwise abide by all of the applicable terms and conditions, would continue to pay Walgreens' retail cash prices rather than club prices. *See* Interim Award at 6.

32.     A full description of PSC was at all relevant times (and still is) available on the Walgreens website, including the membership fee that customers must pay to join and the lower prices of certain medications available to PSC members. This information was readily available to the public, and to insurers like Humana, since PSC launched. *See* Interim Award at 36.

### C.     Walgreens' U&C Submissions To Humana

33.     Walgreens reported its retail cash prices as its U&C prices on claims submitted to Humana for reimbursement. *See* Interim Award at 6. These are the prices paid by customers who do not present insurance or take an affirmative step to obtain a lower price for a prescription drug, such as by joining PSC or presenting a third-party discount card. Consistent with the undisputed evidence of how the pharmacy and pharmacy benefits industries understand the term of art "cash customer," *see infra* at ¶¶ 35-40, these are the prices that Walgreens "charge[s] to a cash customer."

34.     Walgreens' store-level retail cash prices are separate and distinct from the club prices available only to PSC members. The national PSC price list, which Walgreens sets entirely independently from its retail cash prices, is available only to club members who elect to enroll, agree to the club's terms and conditions, and pay the annual membership fee. That is, PSC prices were not Walgreens' retail cash prices, nor were they discounts to its retail cash prices: they were unique prices available only to club members. *See* Interim Award at 6.

### D.     Walgreens' Understanding Of Its U&C Reporting Obligations To Humana Was Consistent With Undisputed Evidence Of Industry Understanding And The Views Of Humana's Own Director Of Pharmacy Audit

35.     Walgreens interpreted the 2009 Agreement to require it to report its retail cash prices as the prices it charged to "a cash customer," not its special prices for club members. This interpretation was entirely consistent with undisputed evidence submitted during the Arbitration

of broad industry understanding of the term of art, "cash customer," and with the views of Humana's own director of pharmacy audit. *See* Interim Award at 22-25.

36.     The pharmacy benefit managers (<u>PBMs</u>) that process reimbursement claims for prescription drugs that adjudicate claims with respect to the great majority of prescriptions dispensed nationwide have uniformly attested in litigation arising from disputes regarding U&C pricing that club prices or other prices that require the customer to take an affirmative action in order to obtain are not U&C prices. *See* Interim Award at 22-25.

37.     Accordingly, Walgreens introduced undisputed evidence at the Arbitration from PBMs confirming Walgreens' view that club prices are not U&C prices, and that the industry does not understand "cash customer" to refer to club members, such as PSC members. Below are highlights of that testimony from two of the nation's largest PBMs: [11]

- *Caremark, Inc.* testified in Walgreens litigation that "paying cash" refers to a customer "that did not have a funded benefit or an unfunded benefit," with a funded benefit referring to a benefit where a third party, pays for part or all of the claim, and an unfunded benefit included "consumer card program[s] that members enroll in to get a particular . . . set of benefits, one being discounts on the prescription drugs." As to whether a PSC customer was a "customer who was paying cash," Caremark testified that it "did not consider that a cash-paying customer."[12]

- *Express Scripts, Inc.* testified in Walgreens litigation that the U&C price is understood as "the cash price that any patient or consumer would pay, absent presenting a benefit or participating in some type of program" and testified that another term for U&C price is the "retail price." Express Scripts also testified that the term "cash transaction" is "synonymous with U&C, meaning the price that a patient or consumer would pay, if they accessed a retail pharmacy without utilizing either their insurance benefit or some type of other program,"

---

[11] Testimony that Walgreens cited in support of its position from the nation's third largest PBM, Optum, is provided under seal.  *See* Ex. I, Excerpts of Corporate Dep. of Optum (Johnson) at 71:8-15; 192:24-193:135, *Forth v. Walgreen Co.*, No. 1:17-cv-02246 (N.D. Illinois).

[12] Ex. J, Excerpts of Corporate Dep. of Caremark (Correia) in *Forth* case at 77:12-76:3; 197:14-22.

> including a pharmacy club like PSC. Express Scripts would not consider a club price to affect U&C, because it "requires some type of action to participate[.]"[13]

38.     As the Arbitrator acknowledged, Humana offered no evidence during the Arbitration to rebut this evidence of industry understanding as to the meaning of the term "cash customer" in the context of U&C pricing. Interim Award at 23, n.20 ("Humana did not introduce any contrary testimony or declarations from representatives of PBMs regarding their interpretation of the Pharmacy Agreements, which can be construed as at least a tacit admission that it would be unable to dispute the purported industry understanding (at least the PBM industry) proferred [sic] by Walgreens.") (emphasis omitted). This uniform industry evidence fully supports Walgreens' interpretation of its U&C reporting obligations.

39.     Indeed, consistent with this unanimous industry understanding—and as the Arbitrator acknowledged—Humana's own director of pharmacy audit shared Walgreens' understanding that U&C prices did not include club prices. *See* Interim Award at 35.

40.     Consistent with unanimous industry understanding and the understanding of Humana's own director of pharmacy audit, Walgreens did not consider club members to be "cash customers" and did not consider its PSC prices in reporting its U&C prices to Humana.

## IV.    Walgreens' Claims Against Humana And Its Counsel

### A.    Walgreens' Counterclaim Against Humana

41.     On January 4, 2021, after Walgreens had expended significant financial resources to defend against Humana's fraud claim, Walgreens sought leave to file a counterclaim against Humana because discovery had revealed that Humana had breached the implied covenant of good

---

[13] Ex. K, Excerpts of Corporate Dep. of Express Scripts, Inc. (Barnes) in *Forth* case at 67:21-68:3; 68:14-20; 98:20-99:4, *Forth v. Walgreen Co.* (No. 1:17-cv-02246).

faith and fair dealing by asserting its fraud claim in bad faith. *See* Interim Award at 2 and 40. Specifically, the counterclaim asserted that:

a.   Humana's fraud allegation was unsustainable because Humana knew about Walgreens' PSC as early as 2009; Humana knew, willfully ignored, or recklessly disregarded that, for approximately a decade, Walgreens was not reporting its PSC prices as its U&C prices; and Humana took no action to address that fact, even though Humana was fully capable of doing so, and in fact did so with respect to other pharmacies;

b.   The evidence that Humana itself produced in the Arbitration from its own files showed that Humana knew, willfully ignored, or recklessly disregarded that it could not sustain its fraud claim as a matter of fact and law at the time it commenced the Arbitration; and

c.   Nevertheless, Humana asserted a claim for fraud in an attempt to circumvent a provision of the 2009 Agreement that would have otherwise limited Humana's ability to recover. *See* 2009 Agreement, § 5.3.

42.   The Arbitrator permitted Walgreens to bring its counterclaim, which is proceeding in Phase II of the Arbitration. *See* Interim Award at 2 and 40.

**B.   Walgreens' Lawsuit Against Humana's Counsel, Who Previously Advised Walgreens On The Very Subject Matter At Issue In The Arbitration**

43.   On February 9, 2021, during a review of documents in a separate legal proceeding, Walgreens' counsel identified a document revealing that in 2008 Walgreens had retained Crowell & Moring LLP (Crowell & Moring) (Humana's counsel in the Arbitration) to provide it with legal advice regarding potential legal issues related to discount cards and PSC, including the very issue at the heart of the Arbitration, i.e., whether these programs have any impact on U&C prices.

44.   On February 19, 2021, Walgreens commenced an action in Superior Court for the District of Columbia against Crowell & Moring demanding access to its client files about the prior

representation, which Crowell & Moring had refused to produce voluntarily. *See* First Am. Compl., ¶ 68 (Apr. 6, 2021), *Walgreen Co. v. Crowell & Moring LLP*, No. 2021 000861 B (Sup. Ct. D.C.) (<u>Superior Court Action</u>). On March 9, 2021, after Crowell & Moring finally began to produce Walgreens' client files, Walgreens filed a First Amended Complaint, asserting that Crowell & Moring had breached its fiduciary duty of loyalty to its former client Walgreens, in violation of District of Columbia Rules of Professional Conduct 1.9 and 1.10, by representing parties directly adverse to Walgreens—including in its representation of Humana in the Arbitration—in matters that are exactly the same as the subject of Crowell & Moring's prior representation of Walgreens. *See* First Am. Compl., ¶¶ 2, 73 (Dec. 6, 2021), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021 000861 B (Sup. Ct. D.C.).

45.     On June 17, 2021, the Superior Court denied Crowell & Moring's motion to dismiss Walgreens' First Amended Complaint, finding that Walgreens had pled sufficient facts to defeat Crowell & Moring's motion. *See* Order (June 17, 2021), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021 000861 B (Sup. Ct. D.C.).

46.     The Superior Court Action is in discovery and dispositive motions are scheduled to be decided by October 3, 2022.

47.     Walgreens noted on the record before the commencement of the Phase I liability hearing in the Arbitration that by participating in the Arbitration, Walgreens was not waiving any of its rights relating to Crowell & Moring's violation of its ethical duties to its former client. These issues will be decided by the District of Columbia Superior Court in the Superior Court Action, and that court's decision may also affect a review of the Interim Award or a final award.

## V.      The Interim Award

### A.      The Arbitrator Found Against Humana On Its Claims Of Fraud And Negligent Misrepresentation

48.      In issuing the Interim Award, the Arbitrator concluded that Humana failed to prove that Walgreens engaged in fraud or negligent misrepresentation in violation of Kentucky law. Interim Award at 39-40.

49.      The Arbitrator rejected Humana's fraud claim, concluding that Humana had failed to establish—as is required to prove fraud or negligent misrepresentation under Kentucky law— that Humana had reasonably relied on Walgreens' reported U&C charges as reflecting its PSC prices. Interim Award at 36-37.

50.      The Arbitrator explained that "[w]hile there is no requirement that a recipient of a fraudulent misrepresentation conduct an in-depth investigation into the truth of the representation, one claiming fraud 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" Interim Award at 33 (quoting *Hildebrandt v. Hukill*, No. 2018-CA-000968-MR, 2019 Ky. App. Unpub. LEXIS 335, *20-21 (Ky. Ct. App. May 10, 2019) (citing Restatement (Second) of Torts § 541 cmt. a (1977))).

51.      The Arbitrator found that the evidence showed that "even if there were not blaring sirens, there was sufficient information in Humana's possession that it became incumbent upon it to at least make a 'cursory examination or investigation' as to whether Walgreens was submitting its PSC prices as its usual and customary charge" and chronicled several pieces of evidence in support of that conclusion. Interim Award at 33-35.

52.      The Arbitrator also found that Humana "always had the ability to ascertain from publicly available information and its own claims data that it was not getting the benefit of

Walgreens' PSC prices, or at a minimum that there was a good possibility that it might not be. And it could have conducted just such an assessment at *any* time during the decade between the launch of PSC and the time it finally did so." Interim Award at 36 (emphasis in original) (citation omitted).

53.     Finally, the Arbitrator rejected "Humana's repeated incantation that it was so incapacitated in its ability to investigate Walgreens' U&C pricing that it was left with no choice but to blindly rely on the pharmacy's submissions for a decade," finding that "[t]he evidence simply does not support Humana's self-depiction—despite it being a multi-billion dollar health care company and a provider of pharmacy benefits to 17 million Americans—as a helpless naïf." Interim Award at 36.

54.     Thus, the Arbitrator concluded that "[d]espite ample warning signs and knowledge on its part, Humana failed to take the 'opportunity to make a cursory examination or investigation,' despite having both the authority and means to do so." Interim Award at 36.

55.     Accordingly, the Arbitrator concluded that "Humana failed to prove . . . that it *reasonably* relied on Walgreens's claim submissions" and, therefore, found Walgreens not liable for fraud or negligent misrepresentation under Kentucky law. Interim Award at 36-37.

**B.     The Arbitrator Found That Walgreens Breached Its Obligations Under The Pharmacy Agreements By Not Taking PSC Prices Into Consideration When Reporting Its U&C Prices To Humana**

56.     With respect to a single claim—Humana's Contract Claim—the Arbitrator erroneously found that Walgreens had breached its agreements by failing to consider PSC prices when it reports its U&C prices to Humana. *See* Interim Award at 12-29, 39.

57.     Rather than beginning his analysis with the express language of the U&C definition agreed upon by the Parties and reflected in the 2009 Agreement, the Arbitrator initially focused on

a federal court decision—*United States ex rel. Garbe v. Kmart Corporation*,[14]—a case involving different parties and different facts, issued seven years *after* the Parties negotiated the 2009 Agreement. *See* Interim Award at 12 ("[B]efore proceeding to the arguments raised by the parties with respect to the breach of contract claim, it is necessary to engage in a review of what [*Garbe*] did—and did not—hold and what applicability it may have to determining the meaning of the language in the Pharmacy Agreements").

58.     By way of background, *Garbe* involved allegations that Kmart violated the federal False Claims Act and analogous state laws by not reporting its own pharmacy club prices as U&C to government payers.[15] *Garbe*, however, expressly recognized that relevant U&C definitions in contractual agreements would control the parties' U&C reporting obligations. Indeed, the district court in *Garbe* stated that, "[i]t would be nonsensical to find that [contractual] definitions would not control the specific contracts or agreements with these specific payers." *Garbe*, 73 F. Supp. 3d at 1015-16. In the absence of a controlling U&C definition that would support a different result, the *Garbe* court determined that because Kmart's club prices were "the lowest prices for which its

---

[14] *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002 (S.D. Ill. 2014), *on reconsideration in part* 2015 U.S. Dist. LEXIS 193688 (S.D. Ill. Jan. 9, 2015), and *amended by* 2015 U.S. Dist. LEXIS 73520 (Jan. 12, 2015), and *aff'd in part, rev'd in part and remanded*, 824 F.3d 632 (7th Cir. 2016).

[15] Among the significant factual differences between the discount programs at issue in *Garbe* and the Arbitration, *Garbe* found that Kmart's pharmacy club prices accounted for ***at least 89% of its self-pay transactions***, *Garbe*, 73 F. Supp. 3d, 1018 n.11, whereas PSC transactions accounted for only approximately ***7% of Walgreens' self-pay transactions in 2018*** (one of the two years of Walgreens' self-pay transaction data requested by Humana in Phase I of the Arbitration). *See* Interim Award at 6. In other words, in stark contrast to *Garbe*, PSC claims were ***a fraction of Walgreens' self-pay transactions***. Moreover, entirely absent from the record in *Garbe* was the undisputed evidence introduced during the Arbitration of unanimous industry understanding that the term "cash customer" is understood in the PBM industry not to include members of pharmacy clubs. *See Garbe*, 73 F. Supp. 3d at 1015-20.

drugs were widely and consistently available," Kmart's pharmacy club prices represented its U&C prices. *Garbe*, 824 F. 3d at 645.

59.     Although *Garbe* was decided seven years *after* the Parties negotiated the U&C definition set forth in the 2009 Agreement, the Arbitrator reasoned that *Garbe* "established what can best be described as a 'default' rule: the usual and customary price is the lowest price made widely and consistently available to the general public, unless the parties 'further define' the definition of U&C contractually." Interim Award at 15. The Arbitrator then set out to evaluate Humana's Contract Claim by determining "whether the parties negotiated to 'further define' usual and customary and thereby exclude PSC prices from the calculation of the usual and customary price for prescription drugs." Interim Award at 15. In other words, the Arbitrator began his analysis not with the express definition of U&C set out in the 2009 Agreement, but with the purported "default" rule from *Garbe*. The Arbitrator then proceeded directly into a review of various pieces of parol evidence in an effort to determine whether in 2009 the Parties negotiated out of *Garbe*'s so-called "default" rule (which, again, was not issued until seven years later). In other words, rather than seeking to determine the Parties' intent in 2009, the Arbitrator decided that a 2016 judicial opinion—which did not discuss Kentucky law, even though the Arbitrator applied Kentucky law, nor have any binding effect outside of the Seventh Circuit—somehow dictated what the Parties must have meant when they negotiated the Pharmacy Agreements in 2009 and 1998. The Arbitrator found the "default" rule applied unless the Parties expressly negotiated their way out of a judicial decision that none of them would have known about for another seven years.

60.     The Arbitrator's "default" rule contravened industry understanding, particularly in 2009, outlined above in ¶¶ 35-40, when the Parties negotiated the contract. Yet, the Arbitrator discounted that evidence of industry understanding, *see* Interim Award at 16-21, even though he

was required as a matter of law to review evidence of the meaning of the term of art "cash customer" before reviewing any parol evidence regarding the Parties' negotiating history. *Life & Casualty Ins. Co. v. Metcalf*, 42 S.W.2d 909, 910 (reciting the "general rule at common law 'that all words and phrases should be construed and understood according to the common and approved usage of language but technical words, phrases and such others as may have acquired popular and appropriate meaning should be construed and understood according to such meaning'"). The undisputed industry understanding of this term of art demonstrated that "cash customer" refers to a retail cash customer who paid the very same retail cash prices that Walgreens reported to Humana as its U&C prices.

61.     The Arbitrator then concluded that "[w]hile *Garbe* acknowledges that the parties can negotiate out of the default rule, the evidence, viewed in its entirety, does not support an argument that this occurred." Interim Award at 28. Finding that "Walgreens did not negotiate *out* of the default rule established in *Garbe*"—which, again, post-dated the 2009 Agreement by seven years—the Arbitrator concluded that "Humana ha[d] proven by a preponderance of the evidence that Walgreens breached the Pharmacy Agreements." Interim Award at 29 (emphasis in original).

62.     It was irrational for the Arbitrator to have determined that Walgreens (1) was subject to a default rule that did not exist at the time the Parties executed the 2009 Agreement (and which was the opposite of the rule understood by the industry at that time), and (2) could have known to contract out of such a rule at that time. *See Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 295 (3d Cir. 2010) ("[Courts] review the form of the relief awarded by the arbitrators to determine if the form of the arbitrators' award can be rationally derived either from the agreement between the parties or from the parties' submissions to the arbitrators") (citation, internal quotations, and alteration omitted).

63.     Pursuant to the plain language of the 2009 Agreement, however, the Arbitrator was bound to enforce the clear and unambiguous terms and conditions in the 2009 Agreement, not the pronouncements of a much-later court decision. 2009 Agreement § 12.7.1 ("The arbitrators shall be bound by the terms and conditions set forth in the Agreement when such terms and conditions are set forth clearly and without ambiguity"). Walgreens' U&C submissions conformed to the *actual,* agreed U&C definition in the 2009 Agreement, which aligned with the unanimous and undisputed evidence of industry understanding of the term of art "cash customer," the sworn testimony of Humana's own Director of Pharmacy Audit as to the meaning of the term "cash customer," and Humana's course of performance over the course of more than a decade, which showed Humana knew or had reason to know Walgreens did not report its PSC prices as U&C and raised no objection, and which the Arbitrator found fatal to Humana's fraud claim.

## GROUNDS REQUIRING THE AWARD TO BE VACATED

64.     An arbitration award can and should be vacated in appropriate circumstances, including when an arbitrator ignores the operative contract, as occurred here. "Federal courts are empowered under section 10 of the United States Arbitration Act to vacate arbitration awards if any of several specified conditions are met," *Davis v. Chevy Chase Fin., Ltd.*, 667 F.2d 160, 164 (D.C. Cir. 1981) (footnote omitted); *see also Safeway Stores, Inc. v. United Food & Com. Workers Union, Loc. 400,* 621 F. Supp. 1233, 1237 (D.D.C. 1985) ("The courts' deference to arbitration awards . . . does not grant to arbitrators unrestrained authority."); *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 488 (8th Cir. 2010) ("An arbitrator's broad authority . . . is not unlimited"); *PMA Cap.*, 400 F. App'x at 655 (instructing that "the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators") (quoting *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996)); *Universidad Interamericana v. Dean Witter Reynolds, Inc.*, 208 F. Supp. 2d 151, 153 (D.P.R. 2002) ("The considerable deference due

an arbitrator's decision does not grant carte blanche approval to any decision that the arbitrator might make.") (citation and internal quotations omitted).

65.     Specifically, § 10(a)(4) of "[t]he FAA authorizes vacatur of an arbitration award 'where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'" *AWG Grp.*, 211 F. Supp. 3d at 357 (quoting 9 U.S.C. § 10(a)(4)). A party can "succeed in vacating an award under § 10(a)(4)" if it "demonstrate[s] that the 'arbitrator strayed from interpretation and application of the agreement and effectively dispensed his own brand of industrial justice.'" *Id.* (quoting *Stolt-Nielsen*, 559 U.S. at 671) (alterations omitted). When an arbitrator does so, the "arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [his] powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Stolt-Nielsen*, 559 U.S. at 672. Moreover, "[f]ederal courts can vacate arbitration awards where the tribunal's decision disregards or modifies unambiguous contract provisions and thus exceeds its authority." *Mesa Power Grp., LLC v. Gov't of Can.*, 255 F. Supp. 3d 175, 186 (D.D.C. 2017) (collecting cases) (internal quotations and alterations omitted); *see also PMA Cap.*, 400 F. App'x at 656 (affirming district court judgment vacating arbitral award when the arbitrators "went beyond the scope of their authority" by "rewriting material terms of the contract they purported to implement"). Further, an award can be vacated under § 10(a)(4) if it is "completely irrational." *Ario*, 618 F.3d at 295 ("The 'irrationality' standard comes from the fourth ground, the 'exceeded their powers' provision [of the FAA]") (citations omitted).

I.      **The Arbitrator Exceeded His Authority By Supplanting the Parties' Agreed-Upon Definition Of "Usual and Customary Charge" With A Definition From A Federal Court Decision Issued Seven Years After The Parties Executed The 2009 Agreement**

66.     The Arbitrator exceeded his authority by ignoring the plain language of the Parties' agreed definition of U&C and instead evaluating the evidence against a materially different definition from a court decision that post-dated the Parties' agreement by several years.

67.     It is axiomatic that "[i]n construing contracts the primary purpose of the Court is to determine the ***intention of the parties*** at the ***time and place the contract was made***[.]" *Hanger v. Hanger*, 205 S.W. 2d 321, 324 (Ky. App. 1947) (emphasis added); *see also Vorherr v. Coldiron*, 525 S.W. 3d 532, 543 (Ky. App. 2017) ("Importantly, in construing a contract or written instrument, the goal 'is to effectuate the intentions of the parties.'") (quoting *Cantrell Supply Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002); *United States v. W. Elec. Co.*, 592 F. Supp. 846, 859 n.47 (D.D.C. July 26, 1984) (relating that "the overriding purpose in construing a contract is to give effect to the mutual intent of the parties at the time the contract was made") (quoting *White v. Roughton¸* 689 F.2d 118, 120 (7th Cir. 1982)). The starting point for determining the Parties' intentions at the time of contracting is the plain language of the contract itself. *Ford v. Ratliff*, 183 S.W.3d 199, 202-03 (Ky. App. 2006) ("[I]f the language of a contract is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.") (citation and internal quotation omitted) . And here, the 2009 Agreement expressly required the Arbitrator to enforce the Parties' clear and unambiguous agreed terms and conditions. 2009 Agreement § 12.7.1 ("The arbitrators shall be bound by the terms and conditions set forth in the Agreement when such terms and conditions are set forth clearly and without ambiguity").[16]

---

[16] This, of course, also would include the clear and unambiguous absence of the terms "discount card programs" or "most-favored nation" rates from the Parties' agreed-upon definition of U&C,

68.     Yet the Arbitrator's breach of contract analysis did not begin with the express language of the U&C definition agreed upon by the Parties and set forth in the 2009 Agreement. Instead, the Arbitrator ignored the Parties' contract and supplanted the agreed language with a federal court decision *issued seven years after the Parties entered the 2009 Agreement* that involved different parties and very different facts. *See* Interim Award at 12 ("[B]efore proceeding to the arguments raised by the parties with respect to the breach of contract claim, it is necessary to engage in a review of what [*Garbe*] did—and did not—hold and what applicability it may have to determining the meaning of the language in the Pharmacy Agreements").

69.     Reasoning that the 2016 decision in *Garbe* "established what can best be described as a 'default' rule: the usual and customary price is the lowest price made widely and consistently available to the general public, unless the parties 'further define' the definition of U&C contractually," Interim Award at 15, the Arbitrator adopted that "default" definition from *Garbe* retroactively, and then evaluated the evidence to determine whether the Parties *negotiated out of Garbe's* definition. *See* Interim Award at 15, 29 ("[I]t is necessary to next address the parties' evidence and arguments regarding the pricing provisions of the Pharmacy Agreements, and whether the parties negotiated to 'further define' usual and customary and thereby exclude PSC prices from the calculation of the usual and customary price for prescription drugs").

70.     In other words, rather than evaluating the evidence against the U&C definition agreed upon by the Parties in 2009—which reflected their intentions at the time of contracting— the Arbitrator eschewed his obligation to enforce the plain language of the Parties' agreed-upon U&C definition, and instead created a new standard of "industrial justice" by examining whether

---

despite express references to those terms elsewhere in the 2009 Agreement. *See* 2009 Agreement § 1.19, Ex. D, Ex. I(4), and Ex. I(14).

in 2009 the Parties somehow negotiated out of a "default" definition that would not be issued by a federal court until seven years later in a case involving different parties and different facts.[17] One of those key different facts includes that *Garbe* created the "default" rule for U&C in the absence of contractual language and would have applied a contractual definition of U&C had one existed. *See Garbe*, 73 F. Supp. 3d at 1016. Here, in contrast, a contractual definition of U&C exists.

71.     Critically, *Garbe*'s so-called "default" rule was the opposite of the true "default" rule when the Parties negotiated the terms of the 2009 Agreement. That rule, as the uncontroverted evidence Walgreens introduced in the Arbitration confirmed, was that club prices ***do not*** affect U&C prices. Humana offered no evidence challenging the unanimous, sworn industry testimony that uniformly explained that, in the context of U&C definitions, the term "cash customer" is a term of art in the pharmacy and PBM industries that does not refer to pharmacy club members, and instead refers to customers who pay the pharmacy's retail cash prices. *See* Interim Award at 22-23, 23 n.20; *see also supra* ¶ 37.

72.     Moreover, governmental authorities further demonstrate that, at least when the Parties were contracting in 2009, there was no "default" rule that required reporting club prices as U&C prices. For example, in August 2009—***three months before the Parties entered the 2009 Agreement***—the Department of Health and Human Services – Office of Inspector General (OIG) stated that "[i]f the pharmacy charges a fee to join their discount generic program, CMS [the Centers for Medicare & Medicaid Services, which is the federal agency that administers the Medicare program] ***does not have a stated policy*** as to whether the prices charged under that

---

[17] *See supra* at n.15.

program would meet the definition of a usual and customary charge[.]"[18] The OIG also made clear as early as April 2000 that usual-charge metrics should not include the charges for the types of uninsured and underinsured patients for whom pharmacies designed their pharmacy clubs.[19] As the OIG explained: "a provider need not even worry about [its "usual charges"] unless it is discounting close to half of its non-Medicare or non-Medicaid business."[20] Similarly, in October 2006, CMS informed plan sponsors that, although Walmart's prices to all customers were its U&C prices, other lower prices, such as a "one-time 'lower cash' price," would not affect U&C prices.[21] And CMS regulations have long distinguished between discount-card prices and U&C prices, which would make no sense if discount-card prices necessarily *are* U&C prices.[22] In short, the available legal authorities when the Parties negotiated the 2009 Agreement demonstrate a universal understanding that U&C prices did *not* include club prices. That is, even if the Arbitrator were correct that *Garbe* articulated a "default" interpretation in 2016, which he plainly was not, that still was not the "default" in 2009. Instead, the opposite was true.

---

[18] HHS-OIG, "A Comparison of Medicaid Federal Upper Limit Amounts to Acquisition Costs, Medicare Payment Amounts, and Retail Prices," at 7 n.26 (Aug. 2009) *available at* https://oig.hhs.gov/oei/reports/oei-03-08-00490.pdf (emphasis added).

[19] *See* Letter from Kevin G. McAnaney, Chief, Industry Guidance Branch, dated April 26, 2000, available at http://oig.hhs.gov/fraud/docs/safeharborregulations/lab.htm. A provider's or supplier's "usual charges" ***need not*** include "free or substantially reduced charges" to (i) uninsured patients or (ii) underinsured patients who are self-paying," and reaffirmed this policy after deciding not to issue a final regulation on "usual" charges. HHS-OIG, "Hospital Discounts Offered to Patients Who Cannot Afford to Pay Their Hospital Bills" at 2 (Feb. 2004).

[20] *See* Letter from Kevin G. McAnaney, Chief, Industry Guidance Branch, dated April 26, 2000, available at http://oig.hhs.gov/fraud/docs/safeharborregulations/lab.htm (quoted in Advisory Opinion 15-04 (Mar. 2015)).

[21] *See* CMS, "Memorandum to All Part D Sponsors: HPMS Q & A – Lower Cash Price Policy" (Oct. 11, 2006), at 1 n.1, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf.

[22] *See*, *e.g.,* 66 Fed. Reg. 37,563, 37,567 (July 18, 2001) (Medicare beneficiaries should receive the "lower of the discounted price available … or price the pharmacy would charge a 'cash' paying customer ( . . . . the Usual & Customary price)").

73. By ignoring the plain language of the U&C definition agreed upon by the Parties and supplanting that definition with a so-called "default" interpretation from *Garbe*, the Arbitrator exceeded his authority. *See PMA Cap.*, 400 F. App'x at 656 (affirming district court judgment vacating arbitral award that was "completely irrational because it wrote material terms of the contract out of existence" when the arbitrators "went beyond the scope of their authority" by "rewriting material terms of the contract they purported to implement"). In so doing, the Arbitrator improperly shifted the burden of proof to Walgreens to prove that it ***negotiated out of*** a judicial decision that was not issued until seven years *after* it entered the 2009 Agreement. *See* Interim Award at 28 ("While *Garbe* acknowledges that parties can negotiate out of the default rule, the evidence, viewed in its entirety, does not support an argument that this occurred"); *see also* Interim Award at 29 ("[T]he evidence supports a conclusion that Walgreens did not negotiate *out* of the default rule established in *Garbe*") (emphasis in original).

74. Because the Arbitrator's decision emanates not from the U&C definition set forth in the 2009 Agreement, but from a federal court decision issued many years later, the Interim Award must be vacated.

## II. Even If *Garbe* Were At All Relevant To The Arbitration, The Arbitrator Was Still Bound To Apply The U&C Definition In The 2009 Agreement Because It Materially Differed From The So-Called "Default" Definition Articulated In *Garbe*

75. Even if *Garbe* had any relevance to the Arbitrator's determination of whether Walgreens breached the U&C definition in the 2009 Agreement that it had negotiated seven years before that decision was issued, the Arbitrator was still bound to apply the actual U&C definition set forth in the 2009 Agreement because *Garbe*, by its own terms, expressly recognized that it would not supplant a pre-existing contractual definition. Rather, even under *Garbe*, relevant U&C definitions contained in payer agreements with pharmacies would control the parties' obligations.

76.     As the *Garbe* district court explained: "It would be nonsensical to find that [contractual] definitions would not control the specific contracts or agreements with these specific payers." *Garbe*, 73 F. Supp. 3d at 1015-16. The Seventh Circuit did not reject that portion of the district court's analysis in affirming the district court's ruling. *See Garbe*, 824 F.3d at 643-45. In other words, *Garbe*'s U&C definition does not control where there are specific contractual or statutory terms that provide a different definition of U&C. That is precisely the case here.

77.     The U&C definition in the 2009 Agreement bears no resemblance to the "default" U&C language from *Garbe*, which referred to the "***lowest price made widely and consistently available to the general public***." Instead, the U&C definition agreed to by the Parties in the 2009 Agreement refers to:

> ***the amount*** submitted by the Participating Pharmacy to a third-party payor, in the usual and customary field in the latest [National Council for Prescription Drug Programs] format, and ***charged to a cash customer*** by the Participating Pharmacy ***at the time of dispensing***, excluding sales tax. The Parties agree the Usual and Customary Charge may vary by geography.

2009 Agreement § 1.27 (emphasis added). That is, this U&C definition refers to the amount "***charged to a cash customer*** by the Participating Pharmacy at the time of dispensing," not the "lowest" price. Nor does the Parties' agreed U&C definition refer to "available" prices: it refers to prices "charged." Much less does this agreed U&C definition refer to prices that are "***widely and consistently available***." *Id*.[23]

78.     Moreover, the actual U&C definition the Parties agreed upon sets a temporal limitation that requires reference to the "time of dispensing," as opposed to *Garbe*'s indeterminate

---

[23] *See supra* n.15 (unlike in *Garbe,* where Kmart's pharmacy club prices accounted for at least 89% of its self-pay transactions, PSC transactions accounted for only approximately 7% of Walgreens' self-pay transactions in 2018: a fraction of Walgreens' self-pay transactions.)

reference to a time when a certain price is "widely and consistently available." Because the Parties' actual U&C definition provides a radically different definition than the one posited in *Garbe*—to the extent it could have any relevance to the Parties' intended meaning of a contractual provision executed seven years earlier—the Arbitrator was bound to base his decision on the Parties' actual U&C definition, not on the "default" U&C definition purportedly supplied in *Garbe*.

79.     Under the unambiguous terms of the 2009 Agreement—which, under blackletter principles of contract interpretation and § 12.7.1 of the 2009 Agreement, the Arbitrator was bound to enforce—Walgreens had no obligation to report any price as its U&C prices to Humana unless that was a price "charged to a cash customer by the Participating Pharmacy at the time of dispensing[.]" 2009 Agreement § 1.27. As confirmed by unanimous evidence of industry understanding and sworn testimony from Humana's own Director of Pharmacy Audit, the term "cash customer" has long had a well-understood meaning across the industry that does not include members of pharmacy clubs. *See, e.g.*, Correia Dep. at 197:14-22, *Forth v. Walgreen Co.* (No. 1:17-cv-02246) (Caremark's corporate designee testifying that Caremark did not consider a PSC member to be a "cash-paying customer"); *see also* Barnes Dep. at 67:21-25, *Forth v. Walgreen Co.* (No. 1:17-cv-02246) (Express Scripts' corporate designee testifying that Express Scripts understood U&C to be "the cash price . . . absent presenting a benefit or participating in some type of program"). Nor is there anything ambiguous about the term "Participating Pharmacy," which is defined to refer to a specific, individually licensed Walgreens pharmacy. 2009 Agreement § 1.13. And despite references to "discount card programs" and "most favored nation" rates elsewhere in the 2009 Agreement, no such terms appear in the Parties' agreed-upon definition of U&C. *See* 2009 Agreement § 1.19, Ex. D, Ex. I(4), and Ex. I(14).

80.     It was against *that* backdrop—*i.e.*, the actual language of the U&C definition agreed upon by the Parties, the industry understanding that revealed the meaning of the term of art "cash customer, and the actual discussion of "discount card programs" and "most favored nations" pricing elsewhere in the contract in contrast to their total absence from the U&C definition—that the Arbitrator had an obligation to evaluate the evidence and enforce the clear and unambiguous language of the Parties' contract.[24] The Arbitrator erred by ignoring that clear and unambiguous language, and instead consulting extrinsic evidence about things such as the Parties' negotiating history. Interim Award at 12-21; *see also Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016) ("In the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.") (citation and internal omitted); *see also* 2009 Agreement § 9.8 (integration clause recognizing that the 2009 Agreement constitutes the *entire* Agreement between the Parties relating to the provision of pharmacy services).

81.     By supplanting the Parties' agreed-upon definition of U&C with a "default" U&C definition, and then evaluating the evidence against the backdrop of a U&C definition that was materially different than that which the Parties' negotiated (and that did not even exist when the Parties were negotiation, it bears repeating), the Arbitrator misapplied *Garbe*—which should never

---

[24] Notably, the Arbitrator's obligation to enforce the unambiguous terms of the 2009 Agreement carries into the Phase II damages period of the Arbitration, which is ongoing. Although the Arbitrator determined that Walgreens breached the Pharmacy Agreements with Humana by failing to consider its PSC members to be "cash customers" for purposes of reporting U&C prices, there has yet to be any finding as to how the prices charged to PSC members should have been considered in the calculation of U&C prices or that any particular claim submitted to Humana contained an incorrect U&C prices. Therefore, pursuant to the unambiguous terms of the 2009 Agreement, even under the Interim Award, only prices **actually charged** to a PSC member for a **specific drug** at a **specific pharmacy** at the **specific time of dispensing** could fall within the U&C definition set forth in the 2009 Agreement.

have been applied at all to a 2009 Agreement[25]—and exceeded his authority under the contract by evaluating the evidence against the wrong standard. Accordingly, the Interim Award on Humana's Contract Claim must be vacated.

### **REQUEST FOR RELIEF**

82.     Walgreens asks the Court to enter an Order vacating the portion of the Interim Award rendered in favor of Humana on its Contract Claim.

83.     The Arbitrator's determination on the Contract Claim is severable from the rest of the Interim Award. *See FBR Capital Mkts. & Co v. Hans*, 985 F. Supp. 2d 33, 35-38 (D.D.C. 2013) (supporting that an arbitration award can be partially vacated by denying a petition to vacate a partial award on other grounds).

84.     For the reasons set forth in Walgreens' accompanying motion to stay, however, including to effectuate the Arbitrator's intent that the Interim Award not be subject to judicial review at this time, to allow this matter to proceed to a final award on the same set of operative facts, and to conserve this Court's resources, Walgreens asks the Court to defer its review until issuance of a final award in this matter.

Dated: February 4, 2022                         Respectfully submitted,

                                                WALGREEN CO.

                                                By */s/ Frederick Robinson*
                                                Frederick Robinson (D.C. Bar No. 367223)
                                                Selina P. Coleman (D.C. Bar No. 991740)
                                                (D.D.C. application submitted)
                                                David A. Bender (D.C. Bar No. 1030503)
                                                T: 202-414-9200

---

[25] The Arbitrator likewise exceeded his authority under the 1998 Agreement, as one cannot credibly contend that the Parties intended in 1998—before pharmacy clubs programs even existed—for *Garbe* to have any impact, whatsoever, on the meaning of U&C under the 1998 Agreement.

REED SMITH LLP
1301 K Street N.W.
Suite 1000 – East Tower
Washington, D.C. 20005

*Counsel to Walgreens*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of February, 2022, a true and correct copy of this petition to vacate was filed via the Court's CM/ECF system, and, by agreement with Humana's counsel, will be served on Humana's counsel via email at the following email addresses:

Keith Harrison
kharrison@crowell.com

Aryeh Portnoy
aportnoy@crowell.com

Justin Kingsolver
jkingsolver@crowell.com

Michael Pine
mpine@crowell.com

/s/ *Frederick Robinson*
Frederick Robinson