# EXHIBIT A

## Final Award (March 28, 2023)
### (Corrected Version Issued April 5, 2023)

*Redacted Pursuant to Minute Order Issued May 17, 2023*

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**
**CASE NO. 01-19-0002-5131**

**HUMANA HEALTH PLAN, INC.,**
**HUMANA INSURANCE COMPANY,**
**and HUMANA PHARMACY SOLUTIONS, INC.,**

       **Claimants,**

**and**

**WALGREEN CO. and WALGREENS**
**BOOTS ALLIANCE, INC.,**

       **Respondents.**

---

## CORRECTED FINAL AWARD

**Counsel:**
Keith J. Harrison, Esq.
Aryeh S. Portnoy, Esq.
Kelly Hightower Hibbert, Esq.
Jed Wulfekotte, Esq.
Justin D. Kingsolver, Esq.
Roy Abernathy, Esq.
Tashena Middleton, Esq.
William Tucker, Esq.

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Robert B. Gilmore, Esq.
STEIN MITCHELL BEATO & MISSNER LLP
901 15th Street, N.W., Suite 700
Washington, D.C. 20005

Counsel for Claimants

Frederick Robinson, Esq.
Selina P. Coleman, Esq.
David A. Bender, Esq.
REED SMITH LLP
1301 K. Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005


Kristin B. Parker, Esq.
REED SMITH LLP
Three Logan Square
1717 Arch Street
Suite 3100
Philadelphia, PA 19103


Michael S. Leib, Esq.
Anthony R. Todd, Esq.
REED SMITH LLP
10 South Wacker Dr.
40th Floor
Chicago, IL 60606


Counsel for Respondents

**Arbitrator:**
Elliot K. Gordon, Esq.
JAMS
1925 Century Park East, Suite 1400
Los Angeles, CA 90067

**Place of Arbitration:** Phase I: Videoconference via Zoom (deemed to be in Washington, D.C.); Phase II: Washington, D.C.

**Date of Final Award:** March 28, 2023

The undersigned Arbitrator, having been designated in accordance with Article 12.0, *Dispute Resolution,* of the National Chain Pharmacy Provider Agreement effective December 2, 2009 (Ex.11), and having examined the submissions, proof and allegations of the parties, and having previously rendered an Interim Award, finds, concludes and issues this Final Award as follows:

# I.
## INTRODUCTION AND PROCEDURAL BACKGROUND

On August 12, 2019, Claimants (collectively, "Humana") filed a Demand for Arbitration asserting causes of action against Respondents (collectively, "Walgreens") for (1) breach of contract; (2) fraud; (3) negligent misrepresentation; and (4) unjust enrichment. Walgreens filed an Answering Statement on September 27, 2019 denying the allegations and asserting various affirmative defenses. The crux of Humana's claims in this Arbitration is that Walgreens breached the terms of two contracts between them entered into in 1998 and 2009 by failing to report its discounted Prescription Savings Club ("PSC") prices as its usual and customary (sometimes referred to herein as "U&C") charges that it reported to Humana for pharmacy claims submitted on behalf of Humana members. Humana further contends that by reporting its higher retail cash prices as its usual and customary charge rather than the lower PSC prices, Walgreens engaged in fraud or, in the alternative, negligent misrepresentation. Walgreens denies all of Humana's claims, asserting that based on the contractual language, bargaining history of the parties, industry standards and the parties' course of performance, it properly reported its retail cash prices as its usual and customary prices in its claims submissions to Humana. It further argues that (1) it did not engage in fraudulent and negligent misrepresentations because its claims submissions were truthful; (2) even if they were not, its interpretation of its obligations was "objectively reasonable"; and (3) Humana did not reasonably rely on Walgreens' representations as to its U&C charges. Walgreens argues in the alternative that even if Humana could succeed on any of its claims, it is barred from recovering damages for most of the period in dispute based upon a contractual limitations period. Walgreens also asserts that the affirmative defenses of the "voluntary payment" doctrine and failure to mitigate damages substantially limit any recovery by Humana. Finally, Walgreens asserts that regardless of the disposition of the substantive claims, there is no legal basis for the claims against Walgreens Boots Alliance, the parent company of Walgreen Co., which was not a party to the contracts.

Pursuant to leave of the Arbitrator, Walgreens filed a dispositive motion on February 17, 2020 seeking to dismiss all the claims on the grounds that Humana had failed to satisfy conditions precedent to commencing this Arbitration. Humana filed an opposition on March 2, 2020 and Walgreens filed a reply on March 9, 2020. A telephonic hearing was conducted on the motion on March 17, 2020. On March 26, 2020, the Arbitrator denied the motion on the grounds that (1) the provision in the 2009 agreement relied upon by Walgreens was permissive, not mandatory and to the extent it was a condition precedent, Humana's compliance was excused; and (2) the 1998 contract did not contain a condition precedent to arbitration. *Ruling on Walgreens' Dispositive Motion on Humana's Failure to Satisfy Condition Precedent Before Initiating Arbitration* (hereinafter the "*Condition Precedent Ruling*")*.* In addition, the Arbitrator,

upon another motion by Walgreens, ordered that the liability ("Phase I") and damages ("Phase II") phases of the Arbitration be bifurcated. *Ruling on Walgreens' Motion to Bifurcate Liability and Damages and Defer Damages Discovery*. What followed was a period of extensive discovery on liability issues, during which the Arbitrator was called upon to hear and resolve multiple discovery disputes between the parties. After the close of discovery, Walgreens sought leave to file a counterclaim against Humana alleging that it had asserted its fraud claim in bad faith and thereby breached the covenant of good faith and fair dealing. The Arbitrator granted the motion for leave but stayed proceedings on the counterclaim (other than written discovery) to avoid a delay in the evidentiary hearing on Humana's claims. *Ruling on Respondent Walgreen Co.'s Application for Leave to Submit a Counterclaim*.

Both Humana and Walgreens requested and were granted leave to file dispositive motions pursuant to then-AAA Rule 33. The parties each filed motions and supporting briefs on January 29, 2021, responsive briefs on February 19, 2021 and reply briefs on March 3, 2021. Each party argued that the contracts between them unambiguously favored its interpretation and that, to the extent the contracts were not unambiguous, its interpretation was supported by extrinsic evidence. On March 12, 2021, the Arbitrator conducted a lengthy hearing on the cross-motions and on April 23, 2021, the Arbitrator issued a ruling denying both parties' motions with respect to the first three causes of action on the grounds that there were material issues of fact requiring resolution following a full evidentiary hearing. *Ruling on Parties' Cross-Dispositive Motions*. On May 12, 2021, the Arbitrator issued a ruling granting Walgreens' motion for summary adjudication of Humana's claim for unjust enrichment on the grounds that under Kentucky law such claims are not cognizable where the express terms of a contract control. *Furlong Dev. Co. v. Georgetown-Scott Cty. Planning & Zoning Comm'n,* 504 S.W.3d 34, 40 (Ky. 2016). Walgreens' concurrent motion to dismiss Respondent Walgreens' Boots Alliance, Inc. was denied. *Ruling on Walgreens' Motion for Summary Adjudication of Humana's Unjust Enrichment Claim and All Claims Against Walgreens Boots Alliance*.

Due to the COVID-19 pandemic, the Phase I liability hearing was conducted, per agreement of the parties, via Zoom from June 21 to 29, 2021. For jurisdictional purposes, it was deemed by agreement of the parties to have been conducted in Washington, D.C., the venue originally stipulated to for an in-person hearing. In advance of the hearing, the parties submitted a set of Stipulated Facts. Each side presented multiple percipient and expert witnesses and introduced numerous documents into evidence, as well as transcripts of the depositions of party and third-party witnesses.[1] Following the hearing, Walgreens filed a motion to strike certain hearing testimony of two Humana witnesses. The Arbitrator denied the motion. *Ruling on Walgreens' Motion to Strike Hearing Testimony of Linda Van Hook and William Fleming.* The parties filed post-hearing briefs on August 12, 2021 and reply briefs on September 2, 2021. On November 8, 2021, the Arbitrator issued an Interim Award finding in favor of Humana and against Walgreen Co. on the breach of contract claim and in favor of Walgreens on Humana's fraud and negligent misrepresentation claims. *Interim Award.* The *Interim Award* also found that Humana had failed to prove its claims against Walgreen Boots Alliance, Inc. and dismissed the claims against that entity with prejudice. *Id.*

---

[1] A stenographic record was made of the hearing pursuant to AAA Rule 28 and identifies all the witnesses and exhibits admitted into evidence. Accordingly, it is not necessary to list them herein.

The *Interim Award* deferred ruling on the issue of the timeframe(s) for any award of damages until the parties could submit further briefing on that issue. Pursuant to a stipulation of the parties, both Humana and Walgreens submitted simultaneous opening briefs on that issue on January 13, 2022, responsive briefs on February 10, 2022 and reply briefs on February 24, 2022. Oral argument was conducted via Zoom on April 8, 2022. On April 26, 2022, the Arbitrator issued a *Ruling on Damages Timeframes*, concluding that the timeframe for recovery of damages for breach of contract (subject to a ruling on Walgreens' affirmative defenses, which was deferred to the Phase II damages hearing) was November 2007 to December 9, 2009 for the 1998 Pharmacy Agreement and December 19, 2015 to the Present (and ongoing) for the 2009 Pharmacy Agreement. On May 9, 2022, Walgreens filed a Motion for Reconsideration of the ruling and Humana filed its opposition on May 23, 2022. On May 31, 2022, the Arbitrator issued a *Ruling on Walgreen Co.'s Motion for Reconsideration of Ruling on Damages Timeframes*. The ruling denied the substance of the motion. However, the parties agreed that the original ruling contained a clerical error with respect to the end date of the damages period under the 1998 Pharmacy Agreement. The Arbitrator corrected that error and issued an amended ruling stating that the proper end date was December 1, 2009. *Ruling on Damages Timeframes (Amended)*.

Following issuance of the Interim Award and pursuant to a stipulated Phase II Scheduling Order, the parties also filed cross-dispositive motions on Walgreens' counterclaim. Opening briefs were filed on January 13, 2022, responsive briefs on February 17, 2022 and reply briefs on March 3, 2022. Oral argument on the cross motions was conducted via Zoom on April 19, 2022. On May 31, 2022, the Arbitrator granted Humana's motion on the counterclaim and denied Walgreens' motion, finding that as a matter of law Humana's filing of its fraud claim did not violate the covenant of good faith and fair dealing because at the time it filed the Demand for Arbitration and even thereafter it had a plausible claim, even if it was not a strong one. *Ruling on Parties' Cross-Dispositive Motions on Respondent Walgreen Co.'s Counterclaim* (incorporated herein by reference).

Pursuant to a stipulated scheduling order issued following Phase I, the parties engaged in extensive damages discovery, including the production of data and the exchange of expert witness reports and expert depositions, through the spring and summer of 2022. As was the case in Phase I, the Arbitrator was called upon to resolve discovery disputes between the parties. Humana and Walgreens exchanged their initial expert reports on May 26, 2022. Humana submitted a single expert report from Michael Petron ("Petron"), the Managing Director and President of Disputes, Compliance and Investigations for Stout Risius Ross, LLC. His report presented an opinion as to the damages Humana suffered and described the data and methodology used to calculate those damages. (Exh. 471). Walgreens submitted an alternative damages analysis prepared by its Phase I data expert Jed Smith ("Smith"), a Senior Managing Director at Ankura Consulting, Inc. (Exh. 472). Both Petron and Smith have substantial experience conducting damages analyses in healthcare disputes, and neither party challenged their respective qualifications to serve as an expert. In addition, Walgreens submitted an expert report by economist Kelly Lear Nordby, Ph.D. ("Nordby"), who also is a Managing Director at Ankura. (Exh. 474). Her report opined that the usual and customary price from which damages should be measured should include an allocated amount for the enrollment fee paid by PSC members. Finally, Walgreens submitted the expert report of its Phase I industry expert Donald Dietz. (Exh 473). Dietz opined that (1) even under the *Interim Award*, for the PSC price to be the

U&C price for a Humana transaction, there must have been a PSC transaction for the same drug, in the same strength, dosage form and quantity in the same Walgreens pharmacy on the same day; (2) the phrase "at the time of dispensing" in the 2009 Pharmacy Agreement means the day upon which a particular pharmacy charged the cash price; and (3) Humana could have mitigated its damages by "MACing" (meaning adjusting its maximum allowable cost) multisource generic drugs to match pharmacy club prices.

On June 23, 2022, Petron and Smith each submitted reports rebutting the other's initial reports. (Exhs. 475 (Petron) and 480 (Smith)). In addition, Humana submitted expert reports from two additional rebuttal witnesses: Dr. Kenneth Schafermeyer, Ph.D. ("Schafermeyer"), a Professor of Pharmacy Administration at the University of Health Sciences and Pharmacy in St. Louis (Exh. 476), and Bob Beckley ("Beckley"), an independent consultant who previously served, *inter alia*, as a Board member of NCPDP (Exh. 477).[2] Dietz and Nordby also submitted rebuttal reports. (Exhs. 478, 479). Beckley's report rebutted Nordby's opinion that the PSC price should be inclusive of an allocated amount to account for the enrollment fee and Dietz's opinion that the NCPDP defines the "U&C" amount as prices actually charged to customers at a given store on a given day. The Schafermeyer report contained three opinions rebutting various elements of the Dietz report. Following the submissions of the initial and expert rebuttal reports, the parties took the depositions of each of the designated expert witnesses. Walgreens also filed a motion to strike the Schafermeyer expert report and exclude his testimony on the grounds that his report and the Beckley report were redundant and cumulative. Following the filing of the motion, Humana withdrew Schafermeyer's third opinion rebutting Dietz's opinion that a damages award must add the cost of PSC membership fees to the PSC price whenever PSC prices should have been submitted as its U&C. After a review of the parties' briefing, the Arbitrator denied Walgreens' motion. *Ruling on Motion to Exclude Expert Witness Report and Testimony.* The expert reports did not stop with the initial and rebuttal reports. On July 29, 2022 both Petron and Smith submitted Supplemental Expert Reports (Exhs. 835, 836). Finally, on August 5, 2022, Smith submitted an Addendum to the Supplemental Expert Rebuttal Report (Exh. 854).[3]

The parties filed pre-hearing briefs on August 8, 2022. The Phase II hearing was conducted in person in Washington, D.C. from August 15-18, 2022. Each of the parties' experts testified in person or via Zoom (due to COVID-19 related issues). In addition, Walgreens presented the testimony of one lay witness, Henry Thompson, the senior director of Walgreens' consumer paid-prescription business. (Phase II Tr. 948:1-4). At the conclusion of the presentation of evidence in the Phase II hearing, the parties discussed with the Arbitrator the possibility that a Phase II ruling might not adopt the entirety of any of the expert reports and that it might not be possible for the Arbitrator to re-calculate the damages in such an event based on

---

[2] NCPDP is an accredited, non-profit organization that establishes and maintains the industry standard for electronic transmission and adjudication of pharmacy claims.

[3] Humana asked the Arbitrator to strike the Addendum because it was based on data Humana had requested during Phase I but which Walgreens refused at the time to produce. The motion was denied primarily on the grounds that Humana could have but did not seek to obtain the data during Phase II discovery. However, given the closeness of the data production to the Phase II hearing, the Arbitrator permitted Humana to either submit a responsive expert report before or during the hearing, or in the alternative submit a report after the hearing and present testimony related to the report at a later date. *Ruling on Humana's Motion to Strike Addendum to the Supplemental Expert Report of Jed Smith and Related Data.*

the evidence in the record, given the quantity and complexity of the reimbursement and cash transaction data relied upon by both side's experts in formulating their damages analyses. Accordingly, the parties agreed they would submit post-hearing briefs and present closing argument, after which the Arbitrator would prepare a ruling adopting the framework for the damages analysis. It was further agreed that after this framework ruling was issued, the parties' damages experts would then prepare new damages reports based upon that ruling.

On September 26, 2022, Humana submitted a Second Supplemental Report prepared by Petron. (Exh. 863)(hereinafter sometimes referred to as "Petron III"). It presented a revised damages analysis that purported to respond to critiques by Walgreens' expert Smith of Petron's earlier reports and hearing testimony. Walgreens objected to admission of this report.  On September 29, 2022, the Arbitrator conducted a telephonic conference with the parties. Thereafter, the Arbitrator issued an order admitting the Second Supplemental Expert Report into evidence except for the actual dollar calculations and directing Humana to deliver to Walgreens a letter identifying those issues it was no longer disputing with respect to the expert analyses.[4] *Order Regarding Humana's Second Supplemental Expert Report of Michael J. Petron and Post-Hearing Briefing and Argument.* On September 30, 2022, Humana complied with the order and agreed to follow Smith's methodology on certain issues, and on October 6, 2022 it revised its earlier letter to concede one additional issue.

On October 21, 2022, the parties submitted their opening post-hearing briefs and on November 8, 2022 the parties submitted their post hearing reply briefs, each in accordance with the agreed upon schedule and other terms for the post-hearing briefing. On November 15, 2022, closing argument for the Phase II evidentiary hearing was conducted in Washington, D.C..  On December 30, 2022, the Arbitrator issued the *Phase II Damages "Framework" Ruling* (hereinafter the *Damages Framework Ruling*), which determined based upon the expert evidence and parties' arguments the proper methodology for calculating damages. It adopted Humana's expert Michael Petron's "PSC Only" analysis contained in his Second Supplemental Report as the starting point for the calculation of damages and identified adjustments and offsets that should be made to the damages calculations. In so doing, it also resolved the affirmative defenses asserted by Walgreens to reduce the damages awardable based on the *Interim Award*. The ruling also directed the parties to submit expert reports containing updated damages calculations through March 17, 2023 based upon the findings and conclusions in the ruling and for the experts to meet and confer with each other both in advance of and after preparing their analyses for the purpose of attempting to reconcile any differences in the calculations produced.[5] In order to ensure a free flow of communication between the experts, the Arbitrator ruled with the parties' concurrence that the content of those communications would not be admissible evidence.

On January 20, 2023, the Arbitrator inquired of Humana as to whether it was still pursuing the relief sought in its Demand for Arbitration to be indemnified "for all fees, expenses

---

[4] This was ordered because the Second Supplemental Expert Report was unclear as to whether Humana was conceding certain points or was simply offering new calculations in the event the Arbitrator accepted Walgreens' criticisms of Petron's earlier analyses.

[5] On January 18, 2023, Walgreens requested leave to file a motion for reconsideration of the *Interim Award*, *Ruling on Damages Timeframes* and *Damages Framework Ruling*. Humana opposed the request. On February 6, 2023, the Arbitrator denied the request for leave. *Ruling on Walgreen Co.'s Request for Leave to File Motion for Reconsideration of Interim Award, Ruling on Damages Timeframes and Ruling on Damages Framework.*

and other losses suffered or incurred by Humana as a result of the above, including but not limited to Humana's reasonable attorney fees." (Demand for Arbitration at 38, ¶ 131(c)). On February 2, 2023, Humana filed an amendment to the Demand withdrawing Paragraph 131(c) and formally withdrawing its request for attorney fees, costs, and expenses for the arbitration proceeding.

On January 31, 2023, the parties submitted their opening post-*Damages Framework Ruling* expert reports. (Exhs. 869 (Petron) and 870 (Smith). Humana objected to portions of the Smith report on the grounds that rather than using the extrapolation methodology for the period of April 20, 2022 through December 31, 2022 contemplated by the *Damages Framework Ruling*, it used actual Humana transaction data from Walgreens' databases and applied an extrapolation methodology only for 2023 claims. After further argument on the issue by both sides, the Arbitrator overruled the objection. *Order Re Humana's Objection to the Phase II Damages Framework Expert Report of Jed Smith.* On February 10, 2023, the experts submitted their rebuttal reports. (Exhs. 871 (Petron) and 872 (Smith). Per the order of the Arbitrator, the experts also met and conferred while preparing their reports to better understand the bases for differences in their calculations and attempt to narrow or resolve them. On February 14, 2023, Humana objected to a portion of Smith's rebuttal report as it related to how both experts analyzed data on what purported to be "partial fills" of prescriptions. An "expert convocation" hearing was conducted on February 15, 2023 in Washington, D.C. at which the Arbitrator questioned the experts regarding their methodology and the reasons for any differences in their calculations. To avoid further delay in the proceedings, the Arbitrator also elicited testimony from the experts on the "partial fill" analysis subject to a later ruling on Humana's objections. (Feb. 15 Tr. 97:9-145:14). During the February 15 hearing, an issue also arose regarding whether Humana's damages calculations had removed certain transactions that Petron's rebuttal report purported to have eliminated. On February 17, 2023, Humana submitted a Phase II Damages Framework Restated Rebuttal Report correcting certain errors identified following the hearing. (Exh. 871A). On March 2, 2023 the Arbitrator issued a ruling overruling Humana's objection to the "partial fill" analysis in Smith's rebuttal report. However, per its offer to do so at the February 15 hearing, the Arbitrator ordered Walgreens to produce certain additional data relating to the partial fill analysis and allowed Humana to submit a supplemental report on that issue following receipt and review of that evidence. *Ruling on Humana's Objection to Walgreens' Expert Jed Smith's "Partial Fill" Analysis in February 10, 2023 Rebuttal Report.* Humana submitted the Post-Damages Framework Ruling Supplemental Expert Report of Michael Petron Responding to Partial Fill Data on March 17, 2023. (Exh. 874). That report also contained new damages and interest calculations through March 28, 2023, the revised expected date for issuance of the Final Award. Walgreens moved to strike the updated calculations or, in the alternative, for leave to file a responsive expert report. On March 23, ,2023, the Arbitrator ordered that the damages period would remain unchanged but gave leave to Walgreens to submit a responsive expert report on the revised prejudgment interest calculations. Walgreens submitted its report on March 26, 2023. Upon receipt of that report, the record was closed.

## II.
## <u>FACTUAL BACKGROUND</u>

Except where otherwise indicated with respect to certain factual disputes between the parties, the following is a statement of those facts found by the Arbitrator to be true and necessary to the Final Award. To the extent this recitation differs from any party's position, that is the result of determinations as to credibility, determinations of relevance, and the weighing of the evidence, both oral and written.

Humana is a managed care organization that provides health insurance coverage, including pharmacy benefits, to millions of Americans. It contracts with the federal government to provide Medicare Part D benefits, and 90% of its members are Medicare or Medicaid beneficiaries. (Stip., ¶¶ 1-2). Walgreens owns and operates one of the largest retail pharmacy chains in the United States with over 9,500 retail pharmacies and locations in every state. (Stip., ¶ 5). During the relevant time period, Humana and Walgreens were party to two provider agreements bearing on this dispute. The first Pharmacy Provider Agreement was effective from January 1, 1998 through December 1, 2009 (the "1998 Agreement") (Exh. 1). The second agreement, titled the National Chain Pharmacy Provider Agreement, was effective from December 2, 2009 up through the present (the "2009 Agreement")( Exh. 11). (The 1998 and 2009 Agreements will be referred to collectively as the "Pharmacy Agreements" hereinafter). The Pharmacy Agreements covered the terms of reimbursement from Humana for prescriptions filled by Walgreens on behalf of Humana members.

The 1998 Agreement included the following provisions setting forth what Walgreens would be reimbursed by Humana for prescriptions it filled:

- Section 1 of Exhibit D ("Provider Reimbursement") states that for brand medications, Walgreens agrees to accept as payment "The lesser of the Participating Pharmacy's usual and customary charge or Average Wholesale Price (AWP) for the package size used in dispensing minus A% . . ., plus a dispensing fee of B per prescription, minus applicable Member Copayment."

- Section 2 of Exhibit D states that for generic medications, Walgreens agrees to accept as payment "The lesser of either the Participating Pharmacy's usual and customary charge or Maximum Allowable Cost (MAC) plus a dispensing fee of E per prescription or Average Wholesale Price (AWP) for the package size used in dispensing minus C% plus a dispensing fee of D per prescription, . . . minus applicable Member copayment."

In other words, in terminology and in an approach to pricing commonly used in the pharmaceutical industry, the reimbursement provisions of the contract used a "lesser of" methodology under which the reimbursement level would be the lowest of the various pricing options. (Exh. 17 at 8)(Hayes Expert Report). Of relevance to this dispute, the contract used the

term "usual and customary charge" (hereinafter also referred to as "U&C charge") but did not
expressly define it. However, the 1998 Agreement did include provisions that Humana contends
supports its position regarding the meaning of "usual and customary," including the following:

- Section 4.1(A) of the 1998 Agreement states that claims for reimbursement "shall be
  transmitted in a standard version of the National Council for Prescription Drug Plans
  (NCPDP) acceptable to Humana."

- Section 6 of Exhibit C ("Participating Pharmacy Service Standards") states that claims
  "must be submitted electronically to Humana's designated claims administrator using
  NCPDP standards."

- Section 4 of Exhibit C states that "[a]ll claims submitted on-line must include the
  pharmacy's usual and customary charge. If the pharmacy's usual and customary charge is
  less than the Member's Copayment, the pharmacy may collect only the usual and
  customary charge from the Member."

Finally, the 1998 Agreement included language requiring compliance with laws and
regulations governing the activities covered by the contract:

- Section 2.5 states that Walgreens "shall comply with all federal, state and local laws,
  statutes, ordinances, orders and regulations which are applicable to the terms and
  conditions" of the 1998 Agreement.

- Amendment 9 to the 1998 Agreement, effective January 1, 2006, included Attachment 2,
  Exhibit F ("Medicare Prescription Drug Plan Provisions") which stated that it "is
  included to provide for compliance with the Centers for Medicare and Medicaid Services'
  ("CMS") Medicare Advantage laws, rules and regulations." It required Walgreens to
  comply with "all applicable Medicare programs rules and regulations" and further
  provided that in the event of any conflict between the terms of the 1998 Agreement and
  Exhibit F, the latter would control.

The pharmacy reimbursement landscape underwent significant changes starting in or
about 2006 with the implementation of the Medicare Part D program, which provides
prescription drug coverage for millions of Medicare beneficiaries. (Stip., ¶ 14). Prior to the
passage of Medicare Part D, Medicare did not cover outpatient prescription drugs. Concurrent
with this transformational expansion of the Medicare program, Walmart, Costco and Target
started offering steeply discounted prices for hundreds of popular prescription drugs. These
prices were made available to uninsured and insured customers alike, and generally speaking
when these companies reported their usual and customary charge on the claims of insured
members to Humana or other third-party payors, they identified these prices as the U&C charge

-10-

for those drugs. In 2006, Walgreens piloted the Prescription Savings Club ("PSC"), which it says was designed to capture some of the uninsured and underinsured market share that Walmart and the other stores were obtaining with their discount programs. Walgreens classified the PSC as part of its "consumer-paid prescriptions" business segment, as distinguished from its insurance segment. (Stip., ¶ 17). The PSC program was launched nationwide in November 2007. (Exhs. 5, 7 at 5, 101).[6] It offered prices for certain drugs that were less, and often substantially less, than Walgreens' so-called "retail" cash price. Although any member of the public could join the PSC (*see* Humana Phase I Post-Hearing Br. at 26 and citations therein), under the terms of the program only those who did so had access to the discounted prices. In order to become a member, customers had to pay a fee, generally $20 for individuals and $35 for a family per year, and were required to agree to the program's terms and conditions. (The fees were adjusted from time to time and were dropped to $5 per person and $10 per family for a period in 2012, leading to 500,000 new members in just one month).  To incentivize members to join, during much of the relevant time period Walgreens offered PSC members the opportunity to request a store credit if, by the end of the annual term, the membership fee exceeded what they otherwise would have spent for prescription drugs.

Customers without insurance who did not join the PSC would either pay what Walgreens referred to as its "retail cash price" or a rate based on other discount programs that Walgreens accepted (such as third-party discount cards or manufacturer coupons). Customers who had insurance with pharmacy benefits could join the club (except, for most of the relevant time period, if they were Medicare or Medicaid members), but they had to pay in cash and could not use their insurance benefits if they wanted to get the PSC prices. (Stip., ¶ 18). Unlike retail cash purchases, Walgreens used a PBM to process PSC drug purchases, which included confirmation of the customer's membership and the correct price. (Phase I Tr. 1674-75). Thus, with the advent of the PSC, Walgreens created a two-tiered pricing system for prescription drugs, with discounted prices offered to PSC members (or individuals with access to other discounts) and higher cash prices charged to so-called "retail" (*i.e.* non-PSC member) customers, which were also the prices it reported as U&C to Humana (and other third party payors and PBMs). Over the course of the relevant time period, retail cash purchases continued to constitute a substantial (but widely varying) percentage of what Walgreens refers to as "self-pay" transactions. According to Humana's expert, PSC transactions accounted for 29.6% of Walgreens' total self-pay transactions in 2012 and 7% of those sales in 2018. (Stip., ¶ 28).[7]

Walgreens has asserted that its motivation for implementing the PSC program was to provide uninsured and underinsured customers greater access to affordable prescription drugs. But it could have done so by following Walmart's model of offering that pricing to all customers, both insured and uninsured, and reporting those prices as its U&C prices to Humana (and other third-party payors). There is substantial evidence, however, that the underlying motivation for adopting a two-tiered pricing system instead was not entirely virtuous: as one Walgreens executive stated in an e-mail labeled "The Birth of PSC," the company decided that this approach "would allow us to have our cake and eat it too – keep our U&C for 3rd party

---

[6] *See* Section III(E)(1)(b), *infra*.

[7] During Phase I discovery, Walgreens objected to Humana's request for the production of all cash transaction data for the relevant time period of the Arbitration. As part of the resolution of that discovery dispute, the Arbitrator ordered Walgreens to produce cash transaction data for two sample years.

reimbursements while allowing us to attempt to capture cash patients." (Exh. 116). That was not an isolated comment. Other internal documents stated that "[a]s long as U&C is inflated for whatever reason, a drug discount program needs to exist to allow WAG to maintain high 3rd party reimbursements and provide a market for those paying cash for their prescription." (Exh. 8), that the "PSC was developed in 2006-07 to help cash paying customers afford medications without impacting Walgreens usual and customary pricing" (Exh. 136 at 3), and that the "[b]iggest dilemma in pricing [is] trying to maximize 3rd party reimbursement while retaining our price sensitive customers." (Exh. 55 at 6346). A PSC White Paper from 2012 stated that "PSC is essential to maintain a profitable U&C strategy (Cash & 3rd Party" and allows Walgreens to "meet the needs of the price sensitive customer without sacrificing 3rd party profits." (Exh. 7 at 2, 4). One financial analysis revealed the impact of abandoning the two-tier system and following Walmart's approach, concluding that if the company lowered its retail cash prices to PSC levels, it stood to lose over $3 billion in profits. (Exh. 7 at 4).[8] And what was the mechanism Walgreens deployed to achieve these twin goals? The PSC fee, which it described as what "allows the PSC retail to not be considered our usual and customary." (Exh. 55). *See also* Exh. 7 at 4 ("PSC pricing does not have any impact on 3rd party reimbursements because of the annual fee"). This two-tiered approach was described by one of the key officials responsible for the PSC's creation and rollout as the "Best of Both Worlds." *Id.*

In 2009, a few years after the implementation of Medicare Part D and the launch of the PSC, the parties negotiated and ultimately executed the 2009 Agreement. Although there are substantial disputes between the parties (discussed further in Section III(B)(2) *infra*) as to what transpired during the negotiations, certain basic facts are undisputed. In August 2009, Humana provided a first draft of the contract to Walgreens. (Ex. 44; Phase I Tr. 262). Although the contract template differed in important respects from the 1998 agreement, it essentially carried over the provisions of the prior agreement with respect to reporting usual and customary prices, including the reference to the NCPDP standards. *Id.* A few months later, Walgreens presented Humana with a counterproposal, which included the following express definition: "**Usual and Customary**" means the amount charged to a cash customer by the dispensing Participating Pharmacy at the time of dispensing, *exclusive of sales tax or other discounts*." (Exh. 9, § 1.32)(emphasis supplied). In other words, Walgreens proposed excluding "discount[ed]" drug prices from the definition of the usual and customary charge. The parties ultimately agreed to have face-to-face negotiations in Louisville (where Humana is headquartered) to resolve their many differences on the contract terms. The in-person session took place in the two days immediately preceding Halloween 2009. Present for Humana were the negotiating team's leader LindaVan Hook, as well as one of her direct reports, Laura White, William Fleming, the vice president of Humana's pharmacy division, and an attorney. Walgreens was represented by its lead negotiator Joseph Zavalishin, Scott Schuler, its Vice President, Pharmacy Contracting,

---

[8] Walgreens has argued that Walmart and the other big box stores could afford to offer their lowest prices to all customers, insured and uninsured, because the pharmacy business was only a small portion of their sales. By contrast, Walgreens asserts that being a pharmacy was the heart of its business and therefore following the Walmart model was financially untenable. (Dispositive Motion Hearing Tr. 5:24-6:13). The thrust of this argument appears to be that had Walgreens been required to reports its PSC prices as U&C, the PSC would not have been created (or would have been discontinued), thereby depriving uninsured and underinsured customers of access to more affordable prescription drugs. (Dispositive Motion Hearing Tr. 175:21-23). In fact, that is exactly what Walgreens told the Seventh Circuit Court of Appeals in 2016. *See, e.g.,* Walgreens' Motion for Leave to File Brief as Amicus Curiae in *United States ex rel Garbe v. Kmart Corp.* (June 17, 2016).

Pricing and Operations, and an in-house attorney and paralegal. Although the testimony at the hearing, primarily from Van Hook and Schuler, differed (unsurprising given the passage of twelve years since the negotiations and the natural motivation of witnesses to remember distant events in a way that fits neatly with their employer's litigation theory), they agreed that the issue of the definition of U&C reporting was a subject of discussion during the Louisville negotiating session. According to Van Hook, she told Walgreens that the exclusion for discounts in its proposed U&C definition was unacceptable and that it was a "red line" Humana would not cross. (Phase I Tr. 273).  According to Schuler, he explained to Humana that Walgreens' U&C was its retail cash price available to anybody "walking in off the street," that PSC was a club, and that if Humana wanted PSC prices, it would have to enroll its members in the PSC. (Phase I Tr. 1464). The parties were unable to resolve several of the key disputed drafting issues addressed in the Louisville meeting, so they agreed to meet in person again, this time at Walgreens' headquarters in Deerfield, Illinois. Following the meeting in Louisville, Humana sent a revised version of the contract which retained the definition that Walgreens had proposed but with one very significant change: it removed the language that usual and customary pricing would exclude discounts. (Exh. 45). In addition, the definition added a reference to claims being submitted in the the NCPDP format. *Id.* The exclusion for discounts that Walgreens had proposed in October was not reinstated in subsequent negotiations and the definition of U&C remained as it had been in Humana's counterproposal. In early December, the parties entered into the 2009 Agreement, which includes the following provisions relevant to resolution of this dispute:

- Exhibit D states that for brand medications, Walgreens agrees to accept as payment: "The lesser of the Participating Pharmacy's (i) Usual and Customary Charge OR (ii) Wholesale Acquisition Cost (WAC) for the package size originally purchased by the Participating Pharmacy and then subsequently used in dispensing, regardless of the dispensing package size, with applicable adjustment of A% for brand medications plus a dispensing fee of B per prescription, minus applicable Member Copayment."

- Exhibit D states that for generic medications, the reimbursement amount would be: "The lesser of either the Participating Pharmacy's (i) Usual and Customary Charge OR (ii) Maximum Allowable Cost (MAC) plus a dispensing fee of E per prescription plus Incentive Fee (if any) OR (iii) Wholesale Acquisition Cost (WAC) for the package size originally purchased by the Participating Pharmacy and then subsequently used in dispensing, with applicable adjustment of C% . . . plus a dispensing fee of D per prescription plus Incentive Fee (if any), minus applicable Member Copayment."

Thus, while the reimbursement language changed between the 1998 Agreement and the 2009 Agreement, the "lesser of" methodology for determining reimbursement amounts remained. In addition, the 2009 Agreement contained the following language regarding submission of claims and the U&C charge:

- Section 4.1.1 states that reimbursement claims "shall be transmitted in a standard version of the NCPDP claims format."

- Exhibit C states that "[i]n accordance with Article 4.0, *Reimbursement Processing*, all claims submitted must include the Participating Pharmacy's Usual and Customary Charge."

- The 2009 Agreement, unlike the 1998 Agreement, included the following express definition of U&C: "'Usual and Customary Charge' means the amount submitted by the Participating Pharmacy to a third party payor in the usual and customary field in the latest NCPDP format, and charged to a cash customer by the Participating Pharmacy at the time of dispensing, excluding sales tax. The parties agree the Usual and Customary Charge may vary by geography."

As is evident from the language, the 2009 Agreement does not *expressly* exclude or include PSC prices or other pricing discounts from the definition of "usual and customary."

Consistent with the 1998 Agreement, the 2009 Agreement also included language obligating Walgreens to comply with applicable laws, including those governing the Medicare program:

- Section 2.5 requires Walgreens to "comply . . . with all federal, states, local, and CMS instructions, statutes, ordinances, orders, rules and regulations that are applicable to the provision of Pharmacy Services" under the 2009 Agreement.

- Exhibit E ("Medicare Prescription Drug Plan Provisions") requires that Walgreens "comply with all applicable Medicare program rules and regulations" and provides that in the event of a conflict between the terms of the 2009 Agreement and Exhibit E, the latter would control as it relates to Medicare Part D.

Both the 1998 Agreement and the 2009 Agreement reference the NCPDP standards. At the time the 1998 Agreement was entered into, it described U&C as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other postage." (Exh. 2 at 27)(NCPDP Data Dictionary Quick Reference Manual Version 4 (July 1997)). In or about 2005, NCPDP slightly modified the descriptor of U&C to state that it is the [a]mount charged cash customers for the prescription exclusive of sales tax or other amounts charged."

Walgreens acknowledges that from the time it launched the PSC program through the present, it never reported PSC or other discounted prices as its usual and customary charge on claims it submitted to Humana, nor did it factor those prices into its calculation of U&C; rather, it consistently reported its standard "retail" cash price as its U&C charge. That amount was almost always higher, and sometimes much higher, than the prices charged to PSC or other discount program customers. There is also no dispute that at some point not long after Walgreens' launch of the PSC, Humana was aware of its existence. Indeed, although the parties

hotly contest exactly what was communicated during negotiations over the 2009 Agreement and what those communications meant, both parties presented evidence that the PSC was specifically discussed at that time. Humana contends that Walgreens was obligated under both Pharmacy Agreements to reports its PSC prices in the usual and customary field in its claims submissions and that it actively concealed the fact that it was not doing so. It points to various communications within Walgreens discussing its "U&C risk," the potentially significant adverse financial consequences if it could not maintain its two-tier pricing system and the possibility that third-party payors might demand that PSC prices be reported as the usual and customary prices in claims submissions if they learned it was not doing so. Walgreens in turn points to communications within Humana over a multi-year period in which various employees discussed U&C pricing, the impact of pharmacy clubs and Walgreens' U&C specifically as evidence that Humana both understood and accepted that PSC prices were excluded from the definition of "usual and customary charge." Walgreens further argues in the alternative that, at a minimum, these communications reveal that Humana was sufficiently on notice that PSC prices were not being reported as U&C and that Humana could not have reasonably relied on a belief to the contrary.

Whatever transpired between and within Humana and Walgreens prior to 2017, the issues now before the Arbitrator came to a head that year. In December 2017, Humana, through its legal department, wrote a letter to Walgreens expressing concern that Walgreens may have been overpaid based upon its failure to report PSC prices as the usual and customary charge for drugs dispensed to Humana members. (Exh. 15)(hereinafter sometimes referred to as the "Notice Letter"). The correspondence referred to other litigation against Walgreens relating to the PSC program and asserted that Humana had "reviewed and sampled its own claims data" and "compared Walgreens' published PSC lists of cash prices to those prices paid by Humana for certain prescription drugs. **In many instances, Walgreens' published prices were much lower than the U&C prices reported to Humana, and much lower than the reimbursements paid by Humana to Walgreens for drugs sold to Humana members.**" *Id.* (emphasis supplied). The letter went on to invoke the audit and dispute resolution provisions of the 2009 Agreement to allow Humana to verify the accuracy of the reported U&C prices. It requested substantial amounts of information and data, including records of transactions involving cash paying customers dating back to 2006. A member of Walgreens' legal department responded in a three-paragraph letter approximately one month later, stating that there was "no basis at all for [Humana's] suggestion that Walgreens should have reported PSC prices as Usual and Customary Prices." (Exh. 16). The letter neither provided the information and data that Humana had requested nor indicated Walgreens would do so. What ensued thereafter were ongoing communications between the parties as part of the contractual dispute resolution process.[9] After those discussions failed to yield an agreement, Humana filed its Demand for Arbitration.

---

[9] A more detailed description of the communications commencing in December 2017 can be found in the *Condition Precedent Ruling.*

# III.
# ANALYSIS

## A.  The Governing Law

To resolve this dispute, it is first necessary to determine what law governs the claims at issue. The 1998 Agreement contains an express choice of law provision, stating that it is to "be construed and enforced in accordance with the laws of the State of Kentucky, as to all matters of enforcement and interpretation." (1998 Agreement at § 9.13). For reasons that remain unexplained, the 2009 Agreement does not include a governing law provision. In the earliest stages of this Arbitration, the parties indicated that they disagreed as to whether the law of Kentucky (where Humana is headquartered) or Illinois (Walgreens' principal place of business) should apply. The resolution of that issue was deferred. In its dispositive motion, Humana argued that Kentucky law should govern not only its claims regarding the 1998 Agreement, but its other claims as well. In response to Humana's motion, Walgreens did not expressly concede that Kentucky law governs Humana's claims. But neither in its opposition to Humana's motion nor in its own cross-motion did it argue for application of Illinois law (or that of any other state). Furthermore, it repeatedly cited to Kentucky law in both its opposition and its motion. At the hearing, neither party presented any evidence regarding the choice-of-law issue. However, in post-hearing briefing, both parties argued their positions based upon Kentucky law. Nor has Walgreens contested the applicability of Kentucky law since issuance of the Interim Award applying Kentucky law to all of Humana's claims. Based upon the foregoing, and in the absence of any evidence of an intent of the parties to change the governing law to Illinois or any other state in the 2009 Agreement, the Arbitrator finds that Kentucky law governs Humana's claims.

## B.  Humana's Claim For Breach Of Contract

In the *Ruling on Parties' Cross-Dispositive Motions*, the Arbitrator rejected both parties' contentions that the Pharmacy Agreements unambiguously favored their respective contract interpretations. The ruling concluded that to find the contracts unambiguous, the Arbitrator would have to interpret the Pharmacy Agreements as containing adjectives describing the U&C charge that are nowhere to be seen: in the case of Humana, the words "lowest price widely and consistently available," and in the case of Walgreens, the word "retail." After evaluating extrinsic evidence regarding the contract negotiations, an alleged industry understanding of the term "usual and customary" and internal communications over the years at Humana and Walgreens, the Arbitrator determined that there were material issues of fact that precluded granting either party's motion. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (credibility determinations and weighing of evidence should not be made in resolving summary judgment motions, and all justifiable inferences are to be drawn in non-moving party's favor).

At the Phase I hearing, the parties presented substantially the same evidence submitted in connection with the dispositive motions, as well as additional witness testimony and exhibits. More specifically, the parties presented evidence that can be placed into four main categories: (1) evidence of the parties' bargaining history, specifically with respect to the 2009 Agreement; (2) the testimony from representatives of major pharmacy benefit management companies ("PBM") in the form of depositions and/or declarations from other U&C litigation around the country; (3)

the reports and testimony of the parties' respective expert witnesses; and (4) the conduct of and communications within the parties both preceding and following the negotiations of the 2009 Agreement (what Walgreens dubs, somewhat inaccurately, as "course of performance" evidence). Before reaching a conclusion as to the interpretation of the Pharmacy Agreements, these various categories of evidence will each be considered for their credibility and weight. In addition, the evidence must be viewed through the lens of the governing law, including federal court authority addressing similar claims involving other pharmacy chains.

### 1.  The *Garbe* Decisions

No resolution of this case can be reached without considering the key judicial opinion resolving a nearly identical issue, *United States ex rel Garbe v. Kmart Corp.,* 824 F.3d 632 (7th Cir. 2016) and related authority. Humana relies heavily on *Garbe* for its position with respect to the interpretation of the U&C language in the Pharmacy Agreements. Indeed, it is from language in this case that Humana derives its argument that "usual and customary" means "the lowest price" made "widely and consistently available." Walgreens has argued that, for a variety of reasons, *Garbe* does not dictate the outcome of this case. Therefore, before proceeding to the arguments raised by the parties with respect to the breach of contract claim, it is necessary to engage in a review of what that case did – and did not – hold and what applicability it may have to determining the meaning of the language in the Pharmacy Agreements.

*Garbe* was a *qui tam* action alleging that Kmart violated the federal False Claims Act and analogous state laws by "misrepresenting its 'usual and customary' prices for certain generic prescription drugs and thereby overcharging Medicare Part D programs" and other federal and state prescription drug programs. 73 F. Supp. 1002, 1006-07 (S.D. Ill. 2015). By way of background, in 2009 Kmart launched what it dubbed – coincidentally or not – its Prescription Savings Club (hereinafter the "Club"). Anyone who wanted to join the Club could do so upon payment of a ten dollar "enrollment fee" and Club members had access to discounts off the retail cash price for certain prescription drugs. Kmart filed a motion for partial summary judgment on the issue of the definition of U&C price, based upon its expert witness's opinion that the NCPDP "'definitions merely explain the format'" for claims submission, that "'NCPDP definitions are not mandatory'" and that NCPDP itself "makes clear that 'third-party specifications and trading partner agreements may require specific values for adjudication of claims.'" *Id.* at 1014.[10] The plaintiff argued that U&C was defined solely by the NCPDP and introduced evidence through an expert witness who served on the NCPDP. He asserted that the U&C charge is "'strictly defined by the NCPDP,'" that it "'must be followed without deviation'" and that "'cash price to the general public' is within the spirit of what the NCPDP is getting at . . . ." *Id.* at 1014. The court agreed with Kmart, finding that the NCPDP definition of U&C price "is not meant to be 'mandatory,' but to instead explain the format for how a pharmacy claim should be submitted." *Id.* The court then went on to ascertain how the industry used the term cash price. Based upon the testimony of multiple witnesses, the court concluded that "U&C price is generally referred to within the industry as the "**cash price to the general public,**' which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed. This definition

---

[10] As in *Garbe*, the NCPDP plays a prominent role in the parties' arguments in this case as well. And Walgreens' expert witness makes the same arguments put forth by Kmart's expert in that case. The NCPDP standards are discussed in more detail *infra.*

falls within the NCPDP definition." *Id.* at 1015 (emphasis in original). The court's definition was drawn directly from the quoted testimony of Kmart's expert. The court did not stop there, however. It went on to hold that "individual payers may further define U&C price specifically in their statutes or regulations or in their . . . contracts," giving as an example that in the Part D program "U&C is defined by the relevant contract and/or payer sheet of the PBMs or administrators handling the claims processing for those programs." *Id.* The court further noted that the evidence submitted to it, including contracts and state statutes, contained varying definitions of U&C, and found that it would be "nonsensical to find that these definitions would not control the specific contracts or agreements with these specific payers." *Id.* at 1016. The court then adopted what can best be described as a default rule: "the NCPDP definition (which reflects the industry standard) of 'cash price to the general public' controls *unless further defined* by an individual state statute or relevant contract and/or payer sheet." *Id.* (emphasis supplied).

Having reached the conclusion that U&C is deemed to be the "cash price to the general public," unless a contract (or law) provided otherwise, it then addressed Kmart's claim that its Club prices did not fall within that term because "the enrollment requirement for its discount programs took these discount programs out of the purview of the U&C price, since they were not offered to the 'general public.'" *Id.* (This is the same argument Walgreens makes in this case). As noted, that enrollment requirement including opting into the program through an online portal and paying an enrollment fee of ten dollars. The court found that because anyone could join the club, members are part of the "general public.'"

Kmart sought and obtained interlocutory appeal of the district court's decision, which also addressed several other legal issues not relevant to this Arbitration. 824 F.2d 632 (7th Cir. 2016). Notably, the district court did not identify the definition of "usual and customary" as one of the issues certified for interlocutory review, but the Court of Appeal added it *sua sponte. Id.* at 637.[11] In reviewing the facts, the Seventh Circuit observed that the defendant had instituted, in Kmart's own words, a "policy of setting low 'discount' prices for cash customers who signed up for one of its programs, while charging higher 'usual and customary' prices to non-program cash customers, 'to drive as much profit as possible out of [third party] programs.'" 824 F.2d at 636. This mirrors Walgreens' own internal descriptions of its PSC program and the underlying motivation for creating a "club" customers had to join to access lower prices. *See* Section II, *supra* at 11.

Relying primarily on dictionary definitions, Kmart argued that contrary to the district court's finding, the ordinary meaning of "general public" excludes customers who join a discount program. 824 F.2d at 643. The court rejected this argument, finding that (1) there was no meaningful selectivity for who joined the program; rather, the opportunity to join was open to anyone; (2) discounts were offered in exchange for "nothing more than assent, demographic data the pharmacy already needed to fill a prescription, and a nominal fee"; (3) the barriers to entry were almost nonexistent, to the extent they were enforced at all; and (4) most of the pharmacy's customers received Club prices. *Id.* The court then noted that its "reading of 'general public' is

---

[11] One court has noted that the "Seventh Circuit's decision to address whether the district court correctly identified the 'usual and customary price' suggested the issue was one 'as to which there is substantial ground for difference of opinion.' 28 U.S.C. § 1292(b)." *United States ex rel Schutte v. SuperValu, Inc. et al.,* 2020 WL 3577996 (C.D. Ill. July 1, 2020), *aff'd,* 9 F.4[th] 455 (2021), *cert. granted,* 143 S. Ct. 644 (2023).

consistent with the regulatory structure that gave rise to the 'usual and customary price term." *Id.,* citing 42 C.F.R. § 423.100 and 447.512(b). In the words of the Seventh Circuit, "Medicare, Medicaid and their corresponding regulations mandate that state plans ensure that "'payments for services be consistent with efficiency, economy, and quality of care" and that "program funds which are utilized for the acquisition of drugs be expended in the most economical manner feasible." 42 C.F.R. § 447.512(b). Finally, the court cited the CMS Medicare Manual, which states that "'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary price' rather than a 'one-time lower cash price,' even where the cash purchaser uses a discount card." 824 F. 3d at 644. The court then concluded its analysis as follows: "Allowing Kmart to insulate high 'usual and customary' prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.' Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." *Id.* at 645. In essence, *Garbe* created a judicial answer to the question of how U&C should be determined when a pharmacy makes cash sales of the same drug at different prices to the general public, in the absence of a "further defin[ition]" of usual and customary in a contract or regulation.

The holding in *Garbe* was essentially reaffirmed by the Seventh Circuit in another False Claims Act case alleging that a pharmacy had improperly inflated its U&C charges by not reporting prices from its price-matching program. *United States ex rel Schutte v. Supervalu, Inc.,* 9 F.4th 455 (2021), *cert. granted,* 143 S. Ct. 644 (2023). In fact, the district court's decision in that case disposes of an argument raised by Walgreens in an effort to distinguish the facts in this case from those presented in *Garbe.* In *Schutte,* the defendant pharmacy argued that its price matching charges were not its usual and customary prices because those transactions "did not approach a majority of their cash transactions." 2019 WL 3558483 at *6. The court rejected the argument, noting that the standard established in *Garbe* was whether the prices charged were the lowest widely and consistently *available,* not the prices most frequently *charged.* Here, Walgreens similarly argues that even if the Arbitrator were to adopt the *Garbe* standard as governing the U&C provisions in the Pharmacy Agreements, it still prevails because unlike in *Garbe,* in which 89% of cash sales were through the Club, Walgreens' PSC purchases were not the most frequently charged price and in the aggregate retail cash transactions outnumbered other self-pay transactions. But the evidence in this case established that in 2012 (one of the two years for which Walgreens was ordered to produce cash transaction data), 29.6% of cash transactions were through the PSC. That number is barely distinguishable from the 26.9% of cash transactions that were made through Supervalu's club. Furthermore, despite being a smaller percentage of overall cash purchase in 2018, the club prices were still consistently and widely available nationwide in Walgreens pharmacies. Beyond that, Humana has presented evidence that in 2012 and 2018, a significant percentage of drugs *were* sold more frequently to PSC customers than retail cash customers when viewed on a drug-by-drug rather than aggregate basis. (Exh. 29 at ¶ 21)(Rao Rebuttal Report) and that in both years a majority of self-pay transactions

for many drugs *were* at prices lower than the reported U&C prices. (Exh. 18 at ¶ 42)(Rao Report).[12]

So what is the implication of *Garbe* for this case? In short, both the district court and Seventh Circuit opinions in *Garbe* (effectively reaffirmed in *Schutte*) established what can best be described as a "default" rule: the usual and customary price is the lowest price made widely and consistently available to the general public, unless parties "further define" the definition of U&C contractually. Thus, *Garbe* does not pose an insurmountable barrier to Walgreens' argument that the U&C price under the Pharmacy Agreements is the retail cash price. Accordingly, it is necessary to next address the parties' evidence and arguments regarding the pricing provisions of the Pharmacy Agreements, and whether the parties negotiated to "further define" usual and customary and thereby exclude PSC prices from the calculation of the usual and customary price for prescription drugs.

## 2.  **The Bargaining History**

The bargaining history between the parties is significant and relevant evidence that can aid in ascertaining the meaning of a contractual provision. The parties did not present any evidence regarding the negotiations around the 1998 Agreement, not surprising given that the PSC did not exist at the time it was negotiated. On the other hand, both parties introduced testimonial and documentary evidence regarding the negotiations around the definition of "usual and customary" contained in the 2009 Agreement. Humana asserts that those negotiations clearly establish the parties' understanding and intent that PSC prices would be included in determination of the reported U&C charges. Walgreens argues that the evidence as to those negotiations proves the exact opposite. Suffice it to say it comes as no surprise that memories differ (if they exist at all) among the participants in negotiations that occurred twelve years ago, or that the witness' recollections align neatly with the litigation positions of their employers.

As discussed in Section II, *supra*, this much is undisputed. In preparation for re-negotiation of their contract, Humana sent a template proposal to Walgreens in August 2009 that mirrored the 1998 Agreement with respect to the reporting of U&C prices. Walgreens responded by adding a specific definition of usual and customary that excluded "discounts" (but did not further define what that encompassed). This proposal to exclude discounts from the definition was the subject of in-person discussions in Louisville, after which Humana sent a counterproposal that removed the exclusion of discounts and added a reference to U&C submissions being in the NCPDP format. Humana's counterproposal was not further modified and was incorporated into the executed version of the 2009 Agreement.

At the hearing, the two key witnesses for each side regarding the 2009 negotiations, Van Hook and Schuler, offered differing – though not necessarily completely conflicting – accounts of the discussions around usual and customary pricing. According to Van Hook, following

---

[12] Walgreens also sought to distinguish *Garbe* by arguing that it "robustly" enforced its membership fee. But even if it may have been more effective in enforcing its fee than Kmart, there does not appear to have been a finding in *Garbe* that the fee for its PSC program was inadequately enforced or that stricter enforcement would have altered the court's ruling.

receipt of Walgreens' October draft, she had telephonic conversations with her Walgreens counterpart, Joseph Zavalishin about the counterproposal, including with respect to the proposed definition of U&C.[13] She testified that she told Zavalishin the exclusion of discounts was unacceptable to Humana and that she was willing to simply strike the definition altogether and revert back to the 1998 Agreement's provisions. (Phase I Tr. 270-72). Van Hook stated that Walgreens pressed the issue again at the in-person negotiations in Louisville and that in response, she described the issue as a "red line" that she would not cross. (Phase I Tr. 273). At the conclusion of the meeting, the parties agreed that Humana would prepare a new draft of the agreement and that they would meet again, this time at Walgreens' headquarters in Deerfield. (Phase I Tr. 275). Humana sent its revised draft the following day, which removed Walgreens' proposed exclusion for "discounts" and added a reference to U&C submissions being in the NCPDP format. (Phase I Tr. 275-76). According to Van Hook, the follow-up meeting was a contentious one and Schuler, in what she characterized as a bullying manner, was "adamant that the usual and customary charge was going to exclude discounts." (Phase I Tr. 277-79). She testified that while she was somewhat mystified as to the exact reason for Schuler's adamance on the topic – and that he did not explain why – she told Walgreens that the exclusion of discounts would mean that uninsured customers could be better off than its insured members, something Humana deemed unacceptable. (Phase I Tr. 281-82). Van Hook further testified that after the Deerfield negotiations, she followed up with Zavalishin and "asked him questions around U&C submitted for our claims versus U&C submitted for other payors versus U&C submitted for their program." (Phase I Tr. 287). He told her that that they were the same, in other words that "the usual and customary price for Humana members for the discount program and for other third party payors was the same." *Id.* On November 20, Van Hook wrote an e-mail to Zavalishin regarding the negotiations which, *inter alia,* confirmed her understanding of what he had told her: "Joe, thanks for confirming that Walgreens' submitted U&C amounts for Walgreens' Club Card transactions are the same U&C submitted amounts for all third party payer transactions." (Exh. 12).

Schuler was Walgreens' key witness regarding the 2009 negotiations with respect to usual and customary pricing. Consistent with Van Hook's recollection, he testified he was present at both the Louisville and Deerfield sessions, although he missed portions of the meeting in Louisville. (Phase I Tr. 1461). He stated that Walgreens proposed a definition of usual and customary because the "contract needed a definition as part of the logic of reimbursement" and he did not want the contract to be silent on the issue. (Phase I Tr. 1604-05). (Notably, some years later Walgreens created a contract language grid in which language that was "silent" on U&C reporting was considered to be the "worst" outcome, sharing that status with contracts that expressly defined U&C to include PSC prices). (Exh. 467). While he did not provide a blow-by-blow account of the negotiations, Schuler testified that during the Louisville meeting he told the Humana negotiating team that Walgreens' usual and customary price was the retail cash price for "anybody walking in off the street," that the PSC was a "club," and that if Humana wanted PSC prices it would have to sign up its members to be part of the club. (Phase I Tr. 1464-

---

[13] For reasons that were never explained, neither side called Zavalishin, the head of Walgreens' 2009 negotiation team (Phase I Tr. 1457:6-12), to testify in this Arbitration. Unfortunately, the record is therefore devoid of testimony from one of the most critical witnesses in the case with respect to the 2009 negotiations and the parties' agreement regarding usual and customary prices.

66).[14]However, he testified that he did not remember any discussions regarding the exclusion of discounts, though he acknowledged that it was in Walgreens' proposal, that Humana had "asked for discounts to be removed," and that it was ultimately eliminated from the 2009 Agreement. (Phase I Tr. 1521). Nor did he remember an expression by Humana of concern about Walgreens targeting certain groups with favorable pricing, even though those comments were reflected in documents in Walgreens' files. (Phase I Tr. 1615-16). And unlike Van Hook, he did not have any recollection of the issue of usual and customary pricing coming up at all during the Deerfield negotiation session. (Phase I Tr. 1467).

Walgreens, for obvious reasons, challenges the credibility of Van Hook's testimony in its entirety.[15] And it is not entirely without ammunition to do so. Walgreens makes a headlong attack on Van Hook's credibility on the grounds that the deposition testimony of Humana's corporate designee Bryan Duke about the negotiations (which was based primarily on what Van Hook had told him), Van Hook's declaration submitted in connection with the dispositive motion briefing (Exh. 75) and her hearing testimony were not fully aligned with each other. That is true. But they are not so inconsistent as to fully undermine the credibility of her testimony. *See Ruling on Walgreens' Motion to Strike Hearing Testimony of Linda Van Hook and William Fleming*. Moreover, the documentary record is in accord with the key elements of her testimony.[16] The evidence established that Humana rejected Walgreens' proposal to exclude discounts from the definition of usual and customary and removed it from the draft, and that the parties agreed to that final version (which also made reference to the NCPDP standard). Given that Humana rejected a proposal from Walgreens, it should hardly be surprising that it was a topic of discussion. In fact, notes from Walgreens' own files documenting the in-person negotiations *confirmed* that Humana explained, in connection with the usual and customary issue, that it did "not want to add the exclusion of discounts, they believe we may use it to prefer specific targeted groups (i.e. pubs)." (Exh. 10).[17]

Ironically, while Walgreens attacks Van Hook's credibility, even *Schuler's* hearing testimony supports key parts of Van Hook's version of events. For example, while her declaration stated that she specifically raised the issue of the PSC (Exh. 75), she appeared to backtrack from that assertion somewhat during the hearing. (Phase I Tr. 360). But *Schuler* was emphatic that they *did* discuss the PSC during the Louisville bargaining session, testifying that he told Humana's negotiating team that if Humana wanted PSC prices, it would have to pay for its members to join the club.[18] The problem for Walgreens is that there would have been no

---

[14] Schuler was more equivocal during his deposition, when he testified that he "believe[d]" he made such statements. (Exh. 174 at 49, 105). But assuming the truthfulness of his testimony, his comment barely made sense because the overwhelming majority of Humana's members were not eligible to join the PSC, a fact Schuler had to have known.

[15] At the hearing, Walgreens moved to strike her testimony altogether, and at the Arbitrator's direction followed that up with a written motion following the hearing. The Arbitrator denied the motion for the reasons set forth in the *Ruling on Walgreens' Motion to Strike Hearing Testimony of Linda Van Hook and William Fleming.*

[16] It is not necessary to believe Van Hook's reference to drawing a "red line" in order to accept her overall testimony regarding the positions she took during the negotiations on Walgreens' proposal to exclude discounts, testimony consistent with the documentary record.

[17] The author of these notes is unknown, so there is uncertainty as to what "pubs" refers to, though it could have been intended to refer to "clubs."

[18] Walgreens criticized Van Hook's and other Humana witness' testimony as "rehearsed." Of course it was. But Schuler himself was so anxious to tick off Walgreens' litigation talking points during his testimony that the Arbitrator had to stop him so his attorney could catch up.

reason for him to say that *sua sponte*. Thus, if Schuler's testimony is true, the most reasonable inference is that his statement was in response to comments from Van Hook that Humana was unwilling to exclude discounts from the definition of usual and customary prices.[19]

Where Humana's characterization of the evidence and Van Hook's testimony becomes more questionable is in its depiction of Van Hook's communications with Zavalishin outside the context of the in-person bargaining sessions. Humana argues that Zavalishin confirmed that Walgreens was reporting PSC prices as U&C prices. But the documentation does not back up that assertion. Van Hook's e-mail did not ask what would have been a straightforward question: was Walgreens submitting its PSC prices as the usual and customary prices for claims submitted on behalf of Humana members? What she *did* ask was a different question: "For Walgreens Club Card transactions, is U&C submitted amount equal to third party payer claims U&C submitted amount? (different U&C submitted price based on payer or card program.")." And the truthful answer to that question was "no." First, Walgreens submitted its PSC claims through a third-party processor and the evidence established that it put its retail cash price as the U&C price on those submissions. Second, Walgreens was not submitting different usual and customary prices to different third-party payors. And this appears to be exactly what Zavalishin confirmed for her, in Van Hook's words, that "Walgreens' submitted U&C amounts for Walgreens' Club Card transactions are the same submitted U&C amounts for all third-party payer transactions." It is impossible to conclude one way or the other whether Zavalishin was being coy or simply providing a straightforward answer to her question. But either way, his answer (assuming Van Hook properly described it) does *not* say what Van Hook or Humana claim it does. Moreover, there was no evidence that Zavalishin would have been so bold as to outright lie and tell Van Hook that Walgreens *was* submitting its club prices in the usual and customary field in its claim submissions to Humana at that time when it most assuredly was not.

Faced with the bargaining history described above, Walgreens now contends that none of it matters because PSC club members are not "cash customers" and the program does not provide "discounts." In other words, Walgreens' argument is that despite pushing for a contractual provision that excluded discounts from the definition of U&C and discussing the PSC in the context of that proposal, its failure to secure that provision was irrelevant to the issues before the Arbitrator because PSC prices would not be covered by that provision anyway. In Walgreens' telling, only those persons who pay the "retail" price are considered "cash customers." Therefore, the argument goes, PSC prices are excluded from the U&C calculation. But this argument is little more than a tautology: Walgreens unilaterally excludes PSC customers from the term "cash customer" because it contends that such prices are not "cash prices" and with some linguistic sleight of hand reassigns them to a separate category of other "self-pay customers."

---

[19] Walgreens also sought to challenge Van Hook's credibility because she did not say anything in her declaration (or, apparently, to Duke as he was preparing for his corporate deposition) about a second negotiating session in Deerfield. But Walgreens already knew, through Schuler, that such a session had taken place. And while Schuler did not recall the issue being discussed again in Deerfield, he did not deny it either. In any event, there was no substantive difference between Van Hook's testimony as to what was discussed in Louisville and what the parties talked about in Deerfield.

Aside from its tautological nature, there are at least two other problems with Walgreens' argument, on top of the fact that it directly conflicts with the conclusions reached by the Seventh Circuit in *Garbe*. First, some of Walgreens' own internal business documents expressly discuss the PSC program as being a "cash" program. As just one example, a "Prescription Savings Club Overview" referred to the PSC price as Walgreens' "best cash price." (Exh. 5).[20] *See also* Exh. 6 at 962-63; Exh. 7 at 5, Exhs. 49, 62; Phase I Tr. 864 ("cash" means an uninsured or underinsured patient who pays 100 percent out of their pocket"). Thus, under Walgreens' interpretation of the Pharmacy Agreements, customers who pay its "best cash price" are, strangely enough, *not* "cash customers."[21] Second, Walgreens argues that the removal of its proposed exclusion of discounts from the definition of usual and customary is irrelevant because the PSC was not really a "discount" program at all. (Walgreens' Phase I Post-Hearing Br. at 28). In fact, many pages of the Phase I hearing transcript were devoted to Schuler struggling to avoid conceding that PSC prices were discounted (Phase I Tr. 1518-22; 1554-58) despite numerous documents describing it as just that. *See, e.g.,* Exh. 47 at 021("PSC members are entitled to a discount off the list price); Exh. 136 at 959 ("Discounts on most generic and brand medications"); Exh. 139 at 154 ("special discounts on the cash price); Exh. 255 ("special discounts on 700+ value priced generics); Exh. 375 at 954 (PSC is a "discount program" that offers a "discount off of the cash price"). Schuler went so far as to disavow use of the term "discount" in documents authored by Walgreens employees describing the PSC. (Phase I Tr. 1560-65). And is it any wonder, given not only the background of the contract negotiations but the fact that the Kmart program *in Garbe* was also described repeatedly as a "discount" program? Walgreens' and Schuler's attempt to confine the term "discount" to a specified percentage off of the retail price has no persuasive evidentiary or legal support, much less support in common usage. If a department store advertises 20% off the marked price it's a discount, but if it advertises a $999 suit for $799 it's not? The Arbitrator would be hard pressed to find any shopper who would agree with that conclusion. But even absent the Walgreens documents describing the program as offering discounted prices, there is one compelling piece of evidence that undermines Walgreens' argument entirely, to wit, its agreement with the Department of Justice in the *Baker* litigation. In agreeing to pay sixty million dollars in settlement of a False Claims Act lawsuit relating to its usual and customary pricing, Walgreens *admitted* and *acknowledged* that "customers who enrolled in the PSC program . . . were eligible to receive *discounts* on thousands of generic and brand-name drugs. The specific drugs for which PSC program members were eligible to receive *discounts* were identified on the PSC program formulary." (Exh. 14 at 3)(emphasis supplied). Thus, while Schuler fought tooth and nail to avoid conceding that PSC was a "discount" program or offered "discount" prices, his employer admitted just that in an agreement with the United States of America.

There is yet one more aspect of Walgreens' evidence that further undercuts its position regarding interpretation of the 2009 Agreement. According to Schuler, the type of discounts that he considered addressed by contract exclusions related not to PSC or other clubs, but rather to "a senior day or some promotion for anybody walking in the store." (Phase I Tr. 1469). But he also

---

[20] It is also true that there are other documents that distinguish between "cash" customers and PSC members and indicate that internally Walgreens viewed them differently. *See, e.g.,* Exh. 378.

[21] Walgreens also argues that a retail customer is "a" cash customer, and since that is the relevant contract language, its interpretation was legitimate. But outside the world of Walgreens' own self-definition of the term, so is a PSC member. In any event, this argument proves too much: under Walgreens' interpretation, it could selectively charge much higher prices to a single customer and report them as usual and customary because they were charged to "a" cash customer.

testified that "Walgreens never did a senior day or some kind of promotional discount off of everything in prescriptions in the store to bring customers in." (Phase I Tr. 1469; *see also* Phase I Tr.1589)*.* If that were the case, one is left to wonder why Walgreens would be pushing hard (whether both in Louisville and Deerfield or just Louisville) to retain its proposed exclusion, unless it believed that failing to do so would imperil its position that it did not have to report PSC prices as usual and customary. Indeed, by Schuler's own account, the *only* kind of discount that was discussed during the 2009 negotiations appears to have *been* the PSC program. And is there any doubt that if Walgreens had *succeeded* in its effort to negotiate the exclusion of discounts in the definition of U&C, it would be arguing today that the PSC *was* covered by that exclusion? Zero.

In sum, considering the totality of the evidence and weighing the credibility of the witnesses, the most reasonable inference from the parties' bargaining history is that the parties, by virtue of agreeing to the removal of Walgreens' proposed exclusion for discounts, agreed to *include* discounted prices in the 2009 Agreement's definition of usual and customary, including PSC prices. The question now becomes whether the other evidence presented at the hearing warrants a different conclusion.

### 3.   The Expert Witness Reports and Testimony

Both Humana and Walgreens presented testimony through expert witnesses with substantial experience in the pharmacy industry. The crux of the testimony from Humana's expert, Susan Hayes, is that the purpose of usual and customary pricing is to ensure that an insured member will not pay higher prices for a drug than an uninsured individual who purchases the same drug in the same location on the same day. Humana's other witnesses all echoed this assertion. In principle, this makes sense. Why should individuals who are paying to receive pharmacy benefits pay more than those who do not have insurance? The problem is that this argument is refuted by, among other things, the *Garbe* decision itself. Both the district court and court of appeals emphasized that while the facts supported a conclusion that the Club's prices were its usual and customary charges, PBMs and pharmacies (or health plan sponsors and pharmacies) are free to negotiate different definitions of U&C. In fact, in response to the surge in U&C litigation, Walgreens contends that it has done just that. Thus, under *Garbe,* nothing barred Humana (or any other third party payers or PBMs) and Walgreens from entering into an agreement that excluded PSC prices from the definition of usual and customary, *even though* that would mean that insured members might be paying higher prices than PSC members. That is also consistent with Medicare Part D's non-interference clause, which bars the government from mandating the pricing provisions of pharmaceutical agreements. 42 U.S.C. § 1395w-111(i). In fact, as Walgreens points out, Humana was aware that its own members *could* find themselves in a situation where they were better off *not* using their insurance benefits. *See, e.g.,* Exh. 363 at Ch. 7, § 4.1 (Humana Annual Notice of Change advising members that "[s]ometimes when you are in the Deductible Stage or Coverage Gap Stage you can buy your drug at a network pharmacy for a price that is lower than our price" due to special promotions or discount cards); Exh. 226 (acknowledging that members' ability to get drug more cheaply through Rite-Aid $4 program "sometimes makes our coverage seem to be a hinderance (I can get a drug for $4 without insurance or pay $10 with insurance); Exh. 227 ("the member may not always pay the least possible price if they use their benefit"; "there could be instances where the member would actually get a lower cost if the[y] do not use their benefit."). In sum, while the principle upon

which Hayes' testimony was based makes intuitive sense, it conflicts with both the realities and legal contours of pharmacy pricing.

Hayes also opined that usual and customary prices should be defined as the lowest prices made consistently and widely available to the general public. Yet she struggled to answer a simple question about the source of that standard, finally landing, somewhat haltingly, on the *Garbe* decision. (Phase I Tr. 1311:10-20). In this regard, her opinion added little if anything beyond what is already set forth in the Seventh Circuit's ruling itself.

The testimony from Walgreens' expert Donald Dietz does not fare much better. Distilled to its essence, Dietz's opinion is this: the term "cash customer" does not include anyone who has to take some "affirmative action" to obtain a better price than the cash retail price. (Exh. 21 at ¶¶ 15, 32). There are at least two major problems with this opinion. First, as Dietz himself admits, his "affirmative action" standard is not rooted in any scholarly article, journal or treatise, any government regulation or report, or any contract he has ever seen. (Phase I Tr. 1381-83). In fact, it appears to be a product of reverse engineering: figure out what discounted prices Walgreens (and other pharmacies) excluded from its reporting of usual and customary prices and form a rational explanation for how to distinguish them from the retail cash price. Hence, the invention of the "affirmative action" standard, notwithstanding the fact that PSC members and retail cash customers alike had to supply Walgreens with personal information to fill their prescription and fork over cash or its plastic equivalent before getting their drugs. In fact, at least one PBM witness acknowledged that even though a U&C definition included "frequent shopper" and senior citizen discounts, eligible individuals might have to take some affirmative action (such as proof of age) to receive the benefit of the offer. (Exh. 343 at 70-75). Second, Dietz offers no persuasive explanation as to *why* some "affirmative action" on the part of the customer, no matter how *de minimis*, should be the determining factor as to whether or not a drug price is "usual and customary." This artifice is exactly what the *Garbe* court rejected, as did the court in *Supervalu*, which found that price-matching prices were the pharmacy's usual and customary prices even though customers specifically had to request them (what Dietz would presumably consider a form of "affirmative action"). 7 F.4th at 461.[22]

### 4.  Industry Standards

Walgreens submitted what it asserts is uncontroverted evidence that in the PBM industry, the term "cash customer" refers to what Walgreens calls its "retail cash" customers and does not encompass any discounts from the retail cash price.[23] More specifically, it presented deposition testimony and declarations from other litigation in which employees from PBMs representing a substantial majority of that industry testified to that effect. *See, e.g.,* Exhs. 341, 342, 343. Humana contests Walgreens' claim of a clearly understood and agreed upon industry standard on multiple grounds, not the least of which is the numerous claims asserted against Walgreens and

---

[22] Dietz also relied for his opinion with respect to the industry standard on the evidence presented from multiple PBMs that they did not consider pharmacy club prices to be the usual and customary prices for drugs. That evidence is addressed in Section III(B)(4), *infra*.

[23] One significant exception is a series of declarations from Bretta Grinsteinner, a former PBM executive who, following her retirement, retreated from previous declarations she had submitted in other U&C litigation around the country stating that her employer Prime Therapeutics did not consider pharmacy club prices to be usual and customary prices. (Exhs. 396, 397, and 398).

other pharmacies by third-party payors, consumers and both the federal and state governments expressly challenging this allegedly undisputed meaning. Humana also argues that federal courts "repeatedly have rebuffed such efforts to use PBM evidence to interpret pharmacy contracts with payors." (Humana Phase I Post-Hearing Br. at 29). But the cases cited by Humana don't quite say what it claims they do. In *Stafford v. Rite Aid Corp.,* 998 F.3d 862, 866 (9ᵗʰ Cir. 2021), the court was addressing the far more limited issue of whether Rite Aid could compel consumers to arbitrate claims regarding the false reporting of usual and customary prices to PBMs based on the contracts between the pharmacy and the PBMs, even though the customers were not parties to those agreements. The court did not address the merits of the issue here as to whether there was a common industry understanding on U&C reporting. Similarly, in *Corcoran v. CVS Health,* 779 F. App'x 431, 433 (9ᵗʰ Cir. 2019)*,* the Ninth Circuit did not state that PBM evidence (similar to what was introduced in this Arbitration) was not relevant or should not be considered. Rather, it held only that the district court erred in granting CVS' motion, because it impermissibly weighed competing evidence (including that from PBMs) at the summary judgment stage. And the district court in *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.,* 305 F. Supp. 3d 337, 345-50 (D. R.I. 2018), while permitting plaintiffs to bring RICO claims against PBMs relating to pharmacy reporting of usual and customary prices, was simply ruling on a motion to dismiss and did not hold that evidence of an industry understanding was irrelevant to ultimate determination of the claims. Having concluded that such evidence is at least worthy of consideration, the question becomes what weight to assign it.

It is important to note that all the evidence submitted with respect to the industry understanding was in the form of deposition excerpts and declarations in *other* litigation involving *other* contracts. Schuler himself testified at his deposition that "This [arbitration] is about our definition with Humana and our contract governs our relationship . . . . Every PBM contract is different . . . ." (Exh. 174 at 32:16-34:4) and that "[i]f I want to understand what the U&C definition in Humana/Walgreens contract is, . . . it doesn't matter what some other industry participants say the U&C prices is in their contracts." (Exh. 174 at 34:14-19). Schuler echoed the words from his deposition at the hearing, testifying that every contract with a PBM or payer "is a little bit like a snowflake. There's different terms in each of the contracts regarding U&C. It's specific to the payer." (Phase I Tr. 1452). Thus, in his view the terms of any other contract are irrelevant to interpreting the Pharmacy Agreements. (Phase I Tr. 1523). And even if his opinion is not shared by his employer Walgreens, the fact remains that no PBM testified that under the unique circumstances of the 2009 Agreement and the negotiations that led to the definition of U&C and in particular the exclusion for discounts, they still would not have considered PSC prices to be the pharmacy's usual and customary charges.[24]

Even considering the PBM evidence presented by Walgreens, there are good reasons not to accord it significant (if any) weight in resolving this dispute. For example, Humana's expert Hayes raised legitimate questions about the overall credibility of the PBM representatives' testimony by pointing out that "PBMs have a financial disincentive to push pharmacies to report lower U&C prices" because their "supposed value proposition is undercut when a pharmacy

_____

[24] On the other hand, Humana did not introduce any contrary testimony or declarations from representatives of PBMs regarding their interpretation of the Pharmacy Agreements, which can be construed as at least a tacit admission that it would be unable to dispute the purported industry understanding (at least the *PBM* industry) proferred by Walgreens.

submits U&C prices lower than the negotiated prices between the pharmacy and the PBM." (Exh. 186 at 10) (Hayes Rebuttal Report). *See also* Phase I Tr. 1246-49 (Hayes testimony that PBMs have financial incentive for usual and customary prices to be high). In response, Walgreens asserts that the incentive Hayes describes relates to "spread pricing," which it argues is inapplicable to Part D. But that misses the point. The "industry standard" Walgreens posits goes well beyond Part D programs, so the fact that the incentive might not be directly applicable to most Humana members does not undercut her larger point. In fact, in other usual and customary litigation brought against it by other third-party payors, Walgreens itself made the point that PBMs benefit from spread pricing. *BCBSM, Inc. et al. v. Walgreen Co.*, Dkt. 1152, at 11 (July 26, 2021). *See also Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 191 (D. R.I. 2021)(reciting allegations that PBMs profited from spread pricing and stood to lose hundreds of millions of dollars if CVS reported its club prices as its U&C charge).

The weight of the PBM evidence is also placed into question because the testimony and declarations fail to offer a persuasive explanation as to *why* lower but widely available prices were disregarded, thereby leading to higher costs for Medicare and other programs. It is, after all, the payors (and insured consumers, in the form of higher co-pays), not the PBMs, that bear the ultimate cost of prescription drug coverage. That failure is even more acute in the face of evidence that some of the PBM's pharmacy manuals – including that of Walgreens' Pharmacy Solutions, Walgreens' internal PBM that processed PSC transactions until 2010– described the usual and customary price as *including* various discount programs, language the PBMs apparently chose to ignore or narrowly interpret.[25] *See, e.g.*, Exh. 186 at 10-11 (Hayes compilation of PBM definitions); Exh. 440 at 220 (Express Scripts manual stating that absent a contrary contractual definition, usual and customary means "the usual and customary retail price . . . inclusive of 'loss leaders', frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered" as well as "any applicable discounts offered to attract customers."); Exh. 424 at 187 (Caremark provider manual stating that U&C includes "any applicable discounts offered to attract customers").  While Walgreens contends that in 2007 Caremark memorialized the exclusion of club prices from usual and customary, its witness was unable to offer a persuasive explanation as to why discounts available *only* to seniors would be deemed a pharmacy's usual and customary price, but discounts available only to club members would not be, even though clubs were available to the general public (and presumably seniors would have to go through the affirmative act of requesting the discount and/or providing evidence of their age). (Exh. 342 at 113-116). The only possible distinction was the nominal fee (which customers could easily, and during some periods be guaranteed, to recoup), a distinction squarely rejected by *Garbe.*

The facts described above also make it reasonable to infer that the PBMs have yet another incentive to provide testimony in litigation against Walgreens and other pharmacies that did not report club or other discount prices as their usual and customary prices. If pharmacies are found liable in pending U&C litigation, the PBMs that aligned themselves on the definition of U&C could potentially face their own liability from claims by third-party payor customers or

---

[25] The WHI pharmacy manual defined usual and customary as "the cash price including all applicable customer discounts, coupons or sale price which a cash paying customer would pay at the pharmacy." (Exh. 71 at 22).

consumers for failing (arguably knowingly, based upon their testimony and declarations) to require the pharmacies to report discounted prices as their U&C rates.[26] In fact, at least one pending lawsuit alleges that PBMs *were* part of a RICO conspiracy with a pharmacy with respect to U&C pricing, and the court in that case denied the PBMs' motion to dismiss them from the case. *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund, supra.*[27] And there is at least one other problem with the PBM testimony: Walgreens did not present evidence that when it created the two-tiered price system and decided that its club prices were not U&C, it actually was aware of any uniform PBM understanding on the issue and relied upon it in deciding not to report its PSC prices as its usual and customary prices to third party payors. In fact, that "understanding" appears to have followed rather than preceded the creation of those clubs.

Finally, Walgreens points to a jury verdict – literally handed down in the middle of the Phase I hearing in this matter – in which a jury accepted the argument that CVS's club prices were not its U&C prices under its PBM contracts, even though those contracts expressly referenced cash customers and included "applicable" and other discounts. (Walgreens' Phase I Post-Hearing Br. at 34-35). Insofar as the record in that case is not before the Arbitrator and the case involved claims brought under different legal theories (six states' consumer protection statutes), there is no basis upon which to accord that verdict any weight.

### 5.   The Parties' Post-Agreement Conduct

The conduct of the parties in the course of performing a contract can be highly relevant to interpreting the meaning of its provisions. Here, both parties point to various communications within Humana over many years from which inferences can be drawn in their favor. Unsurprisingly, Humana's witnesses testified that they understood and expected that PSC prices would be reported as Walgreens' usual and customary charges in its claim submissions. In addition to pointing to the 2009 negotiating history, Humana argues that a series of internal communications within the organization confirm that this was Humana's view. For example, in April 2010, just a few months after the 2009 Agreement became effective, Laura White, a member of the negotiating team, sent an e-mail to a colleague, Terry Spicer, that included what appear to be excerpts of advertising of the PSC, including a reference to over "400 generics prices at $12 for a 90-day supply." (Exh. 24). White wrote "FYI . . . . When you are looking at your data for Walgreens . . . . The uptick would be 90 day only for Savings Club claims submission with a $12 U&C . . . ." Unfortunately not even White herself, now eleven years later, was certain what she meant by the "uptick" comment. Nor is it clear what she meant by Savings Club claims submission, insofar as Walgreens did not submit PSC claims to Humana. Nonetheless, the communication clearly indicates that only months after execution of the 2009 Agreement White expected that what she would see from Walgreens would be usual and customary charges of $12 for drugs available at those prices through the PSC.

---

[26] Walgreens disputes Hayes' contention in part based on one example in which Express Scripts sought to exclude PSC prices, something it would not be expected to do if it had an incentive to maintain high prices. (Walgreens' Phase I Post-Hearing Br. at 36). However, Schuler's recollection was that such proposals by PBMs in the context of contract negotiations were not made until *after* the wave of U&C litigation (Phase I Tr. 1454-56) and thus could well have been the product of self-protection and/or pressure from third-party payors.

[27] The plaintiffs in that case also offered additional reasons why they contended it was in the interest of PBMs to align themselves with pharmacies and disregard club prices as being usual and customary prices.

Later in 2010, White and Spicer had yet another communication, in which White explained how the "lessor of" logic would work for Medicare members. (Exh. 145). In it, she described the "usual and customary price" as including "the advertised price for any prescription drug including the generic programs offered by Walmart, Kroger, Target, Walgreens and other National Chain providers for a designated flat cost of $4. Again, the reference to Walgreens reflects White's expectations that the discounted drug prices offered through the PSC would be the pharmacy's usual and customary prices.

Humana also points to an e-mail chain from August 2013 in which Director of Pharmacy Networks and Pricing Bryan Duke was responding to an inquiry relating to situations in which pharmacies offered discounted prices lower than a member's co-pay. (Exh. 144). Duke stated that Humana's lessor of logic "will allow any pharmacy to be reimbursed a U&C amount less than co-pay if they choose to offer such a program." As with White's 2010 communications, this is consistent with a belief that club program prices were usual and customary prices. Duke addressed this issue again in January 2017, in response to an inquiry about what Humana's view would be if a pharmacy charged a cash price lower than its U&C or contracted rate. Duke responded that "this would be frowned upon" and stated that Humana had terminated a pharmacy from its network for doing so. (Exh. 99).

In turn, Walgreens presented evidence of what it describes as the parties' "course of performance," which it contends supports the proposition that at least until 2017 when this dispute arose, the parties shared an understanding that under the Pharmacy Agreements, PSC and other discount program prices were *excluded* from the calculation of U&C.[28] This includes the following:

- Both before and after the negotiation of the 2009 Agreement, Humana was aware that (unlike Walmart and Target, which made their $4 generics available to everyone), Walgreens was not permitting customers to use their insurance benefits to pay for drugs at PSC prices and was not submitting claims of Humana members who purchased drugs through the PSC. (Exhs. 23, 223, 226, 238).

- Humana was aware that the percentage of Walgreens claims being paid at U&C prices was significantly less than that at Walmart, Kroger, or Target, which did not have "clubs" and charged the same prices to all customers. (Exhs. 224, 232).

- In January 2011, Humana was considering providing its members with links to various pharmacies' generic incentive programs, including the PSC. (Exh. 188). It was aware that there could be circumstances in which members could be better off using these programs than their Humana benefits.

---

[28] This is in substantial respect much of the same evidence that Walgreens points to in support of its arguments on Humana's fraud and misrepresentation claims, which are separately addressed in Section III(C), *infra*.

- In a meeting in November 2011 about Humana's "Supply Chain Strategy", CFO Mark McCullough "challenged" Jay Ecleberry to "ask [Walgreens] to enroll our members in their loyalty programs so that we get $4 pricing." (Exh. 237).

- In December 2011, Ted Nime, an employee in Humana's pharmacy division, conducted an analysis for Fleming comparing Walmart and Walgreens pricing, including an analysis of how costs would change if Humana were paying Walgreens' advertised $9.99 prices for generics. (Exh. 25).

- In May 2013, Humana's then Director of Pharmacy Audit Brian Wehneman was asked by McCullough about situations in which pharmacies were "advertising $0 drugs but charging the plan $$." Wehneman, who previously worked at Kmart and was a witness in the *Garbe* case, responded to McCullough by "wonder[ing] if those pharmacies offer the $0 for members of their 'clubs'? If so, I would expect the pharmacies to argue that the price is not available to the 'general public' and not their U&C." (Exh. 193).

- In December 2013, Humana's Special Investigations Unit raised an issue with Laura White about a pharmacy that had a savings club in which members had to pay $2 to enroll and could then get prescriptions for $4. However, SIU reported an allegation that "there were times when they ran out of the saving card so they would provide the $4.00 prescription to cash customers who had not received the savings card and had not paid for the benefit, then they would bill a member with insurance for the full cost of the medication." (Exh. 193). The concern was expressed that "if the pharmacy was billing the $4.00 prescriptions as usual and customary that they should be billed that way across the board and insurance should not be charged more than the $4.00." White forwarded the e-mail to Ecelberry, Duke and Wehneman with the simple notation, "This is interesting," to which Ecleberry responded "Very . . . ."  Then Wehneman weighed in: "Well, the allegation is pretty much the way that we expect chains try to get around the U&C requirements for $ lists, isn't it? How is the description different than what WAGs does?"

- In March 2017 (just months before Humana's letter to Walgreens), Duke wrote to several Humana executives in connection with a complaint from a member that it was cheaper to purchase drugs at a community pharmacy with a GoodRx discount card than through Humana's mail order pharmacy. In examining the situation, Duke stated that "Prices reflective in pharmacy "club"/"discount" programs appear to be reflected in GoodRx pricing, but are not being offered as U&C to health plans." (Exh. 199).

Before analyzing the competing evidence described above, it is important to address what the evidence did *not* show. First, Walgreens failed to offer proof that it *ever* disclosed to Humana that it was not reporting its PSC prices as usual and customary despite its agreement to remove the exclusion of discounts from the definition of U&C in the 2009 Agreement. To the contrary, doing so would have directly conflicted with its desire to minimize what it referred to as its "U&C risk." Second, despite many months of extensive document discovery and multiple depositions, Walgreens did not produce evidence that Humana clearly acknowledged that PSC prices were not being reported and affirmatively acknowledged (either to Walgreens or internally) that this was consistent with its understanding of the pharmacy's contractual obligations. *See, e.g., Dodd v. Dyke,* 2008 WL 1884081 at *6 (W.D. Ky. 2008) (plaintiff not found to have "acquiesced" to defendant's payment practices under contract where defendant did not notify plaintiff of deviation from contract terms and plaintiff never explicitly agreed to practice).

What, then, should be made of the evidence that was presented? It is, to say the least, a very mixed bag. There are communications that reflect a belief and expectation on the part of Humana that Walgreens should have been reporting its PSC prices as its usual and customary prices in its claim submissions to Humana. And there are communications that permit an inference that Humana understood (and some individuals may even have assumed) it was not doing so. Importantly, however, few of these communications are properly characterized as in the "course of performance" of the contracts at all. And some of those are quite ambiguous; as just one example, Humana seemed to suspect that Walgreens was not submitting claims for Humana members who used the PSC in order to save on administrative fees (despite risking its Pay for Performance bonus), not because it was not reporting those amounts as its usual and customary charge. Some of the documents involved Walgreens but were not specifically related to or in the context of its claims submissions and/or usual and customary charges. And some related to other pharmacies altogether. For example, the e-mail exchange in which Wehneman opines that "Wags" was not submitting its PSC prices as its U&C charges had nothing to do with Walgreens; his reference to that company appears to have been random and it was established at the hearing that he did not actually know the terms of the 2009 Agreement or what Walgreens was or was not submitting as its U&C prices. (Phase I Tr. 712-13). And both White and Duke, who were part of the exchange, made comments suggesting they were surprised by what SIU was reporting. (Exh. 193). The evidence presented by Walgreens suggests that Humana may have been asleep at the switch, or even that the left hand and the right hand were not coordinated. But in the end, to the extent the evidence reasonably can be considered "course of performance" evidence at all, it is sufficiently ambiguous that it cannot serve to mandate a different conclusion regarding the meaning of the contracts than that derived from the documentary and testimonial evidence (including but not limited to the 2009 contract negotiations) and the default rule established by and analysis of NCPDP standards set forth in the *Garbe* and *Supervalu* decisions. However, as discussed in Section III(C)(3), *infra*, these communications carry very different significance with respect to Humana's fraud and misrepresentation claims.

### 6. **The End Result**

*Garbe* and its progeny established a default rule that a pharmacy's usual and customary price is the lowest price made widely and consistently available to the general public. It applied that rule to find that the prices offered to members of a prescription savings club very similar to

the PSC (and indeed even sharing the same name) were Kmart's usual and customary prices. While *Garbe* acknowledges that parties can negotiate out of the default rule, the evidence, viewed in its entirety, does not support an argument that this occurred.

With respect to the 1998 Agreement, for which no negotiating history was presented and which does not contain an express definition of "usual and customary," *Garbe's* default rule (and its reasoning) controls and there is no evidence that Walgreens negotiated to exclude discount prices widely and consistently available to cash customers. While it is true that *Garbe* was not decided until nearly a decade after Walgreens launched the PSC, it set forth the law and applied it to Kmart's program. Despite Walgreens' efforts to do so, there is no meaningful basis to distinguish the facts or reasoning in *Garbe* (and its progeny) from those here to insulate it from the effect of that ruling. Indeed, the prospect that its two-tiered pricing could be challenged and found to be unjustified was just the "U&C risk" that Walgreens knew it was taking when it created the PSC. *See, e.g.,* Phase I Tr. 890, 907-13, 918, 922, 932; Exhs. 84, 107, 257. At least two other pieces of evidence discussed above are consistent with this conclusion. First, the pharmacy manual for Walgreens' own internal PBM defined "usual and customary" as "the cash price including all applicable customer discounts, coupons or sale price which a cash paying customer would pay at the pharmacy" during the period the 1998 Agreement was in effect. (Exh. 71). Second, while the 1998 Pharmacy Agreement is silent on the issue of discounts, internal Walgreens documents (albeit postdating that agreement) state that "silen[ce]" is in the same category as express inclusions for PSC discounts in terms of unfavorable language for the pharmacy. (Exh. 467). Walgreens was well aware that all that stood between it and having to report its PSC prices as its U&C charge was the nominal fee it charged and that even with that there was risk that argument would not fly at some point. *See, e.g.,* Exh. 378 at 204. *Garbe* explains why that fee is insufficient to insulate club pricing from U&C reporting, and there is nothing in this case that calls for a different conclusion under the 1998 Agreement than that reached by the courts in *Garbe.*

With respect to the 2009 Agreement, in addition to the above, the evidence of the bargaining history demonstrates an agreement to *include* discounts, including PSC prices, in the definition of usual and customary, notwithstanding positions Walgreens may have taken as part of the give and take of negotiations. While Walgreens presented expert, testimonial and documentary evidence that would permit a different inference (some of which, as discussed below, is highly relevant to the fraud and misrepresentation claims), the preponderance of the evidence establishes that during the 2009 negotiations the parties agreed to include discount prices, including PSC prices, in the definition of usual and customary.[29] And at a minimum, the evidence supports a conclusion that Walgreens did not negotiate out of having to report widely and available discounted prices as its U&C charge.

---

[29] The Arbitrator rejects Walgreens' alternative argument that there was no meeting of the minds and therefore under the *Restatement (Second) of Contracts*, Walgreens' interpretation of the agreement prevails. (Walgreens Phase I Post-Hearing Br. at 37-38). First, Walgreens should have understood Humana's position because it expressly rejected the exclusion of discounts. Second, Schuler's statement during the negotiations about the PSC was a *bargaining position*, not an *interpretation* of a contract provision. Third, to the extent there was no meeting of the minds (and the evidence demonstrates there was), it would be *Garbe's* default rule that controls the outcome in this case.

In sum, based upon the foregoing, because the PSC's discounted prices were widely and consistently available to the general public as of November 2007 (*see* Section III(E)(1)(b), *infra*) but were never reported as usual and customary, Humana has proven by a preponderance of the evidence that Walgreens breached the Pharmacy Agreements.

## C. Humana's Claims For Fraud And Negligent Misrepresentation

Having concluded that Humana established by a preponderance of the evidence that the Pharmacy Agreements required Walgreens to submit its PSC prices as its usual and customary charge (at least where they were lower than the retail cash price), it is then necessary to address Humana's claims of fraud and negligent misrepresentation. To establish a claim of fraud under Kentucky law, Humana must prove, by clear and convincing evidence, that (1) Walgreens made a material misrepresentation; (2) which was false; (3) Walgreens either knew the representation was false or made it recklessly; (4) Walgreens made the misrepresentation to induce Humana to act on it; (5) Humana relied on the misrepresentation; and (6) Humana was harmed. *United Parcel Serv. Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky. 1999). With respect to the reliance factor, Kentucky law further requires that a party prove that such reliance was *reasonable. Fiegles, Inc. v. TruServ Corp.,* 289 S.W.3d 544, 549 (Ky. 2009). Under Kentucky law, liability for negligent misrepresentation exists where a party "supplies false information for the guidance of others in their business transactions" as a result of a failure to exercise reasonable care or competence in communicating such information and the other party to the transaction suffers damages as a result of "justifiable reliance" thereon. *Presnell Const. Managers, Inc. v. EH Const., LLC,* 134 S.W. 3d 575, 580 (Ky. 2004) (adopting test set out in *Restatement (Second) of Torts* § 552). Here, Walgreens asserts that Humana's claims for fraud and negligent misrepresentation claims fail because:

- It properly reported its retail cash prices as its usual and customary price and therefore did not make material misrepresentations that were false.

- Even if incorrect, its U&C reporting practices were "objectively reasonable" and consistent with established industry understanding.

- Humana knew for years (or was at least on notice sufficient to require further investigation) that Walgreens did not report its PSC prices as its usual and customary prices and therefore could not have reasonably or justifiably relied on its pricing submissions as including PSC prices.

Each of these arguments is addressed in turn. In doing so, it is necessary to analyze the claims separately with respect to the 1998 and 2009 Agreements.

## 1. Did Walgreens' Submissions Of Its Retail Cash Prices As Its U&C Charge Constitute False Representations?

Walgreens argues that its U&C reporting practices are entirely consistent with its contractual obligations and consequently the U&C prices it submitted to Humana did not

constitute material misrepresentations of any facts. For the reasons set forth above, the Arbitrator finds that Walgreens was required to report its PSC prices, at least where they were lower than its retail cash price, as its U&C charge. Accordingly, by failing to do so, Walgreens falsely represented those retail cash prices as its usual and customary prices to Humana when submitting claims on behalf of Humana insureds.

## 2. **Was Walgreens' U&C Reporting Knowingly False Or Made With Reckless Disregard For The Truth?**

Walgreens also argues that it did not act with *scienter, i.e.,* that it did not make false representations regarding its U&C charges knowingly or with reckless disregard for the truth. It relies in substantial part on the Supreme Court's decision in *Safeco Ins. Co. of Am. V. Burr,* 551 U.S. 47, 68-70 (2007) for the proposition that "a defendant cannot have the necessary scienter to engage in 'reckless' conduct if it is acting with an objectively reasonable interpretation of its legal obligations." More recently the Seventh Circuit applied the *Safeco* doctrine to absolve a pharmacy of allegations under the False Claims Act that it was liable for falsely reporting its retail cash prices as its usual and customary reporting prices, rather than discounted prices charged as part of a price-matching program. *United States ex rel Schutte v. SuperValu, Inc. et al.,* 9 F.4th 455 (7th Cir. 2021), *cert. granted,* 143 S. Ct. 644 (2023). In that case, the district court relied on *Garbe* to conclude that the pharmacy had falsely reported its prices. However, the district court and Seventh Circuit both found that the FCA's *scienter* requirement (i.e. that party has actual knowledge of the falsity of the information, that it acted in deliberate ignorance of the truth or falsity of the information or that it acted in reckless disregard of its truth and falsity) was not satisfied because the pharmacy's position – at least prior to the *Garbe* decision – was an "objectively reasonable" one under all of the circumstances. The court in *Supervalu* went on to hold that to be "objectively reasonable" a party's interpretation of its obligations must be permissible and there must be no authoritative guidance warning it away from its interpretation. 9 F.4th at 468.

Humana argues that the "objectively reasonable" test does not apply to common law fraud claims but rather is limited to False Claims Act suits.[30] But the court in *Supervalu* found that the FCA definition of fraud was consistent with the common law definition, which includes knowledge or reckless disregard of the facts, in line with the definition set out by the Kentucky Supreme Court in *Rickert, supra.*[31] It is correct that there does not appear to be case law in Kentucky expressly adopting the *Safeco* standard. But neither is there any case law rejecting it. Accordingly, it is proper to evaluate the merits of Walgreens' defense that its interpretation of its obligations was "objectively reasonable."

With respect to the 1998 Agreement, the Arbitrator finds that Walgreens' position was "objectively reasonable." Humana, for obvious reasons, places heavy emphasis on repeated references in Walgreens' documents to the "U&C risk." However, that terminology by itself

---

[30] The Seventh Circuit's adoption of the "objectively reasonable" test in False Claims Act cases is now under review by the United States Supreme Court.

[31] Humana relies on a case decided by the Supreme Court of Kentucky one hundred years before *Rickert.* (Humana Phase I Post-Hearing Reply Br. at 18). To the extent there is any substantive difference between the standards, it is more appropriate to follow the far more recent articulation of the law.

does not necessarily mean that – at least prior to entering into the 2009 Agreement – Walgreens knew what it was doing was improper or recklessly disregarded the facts. It is possible to infer from the documents and testimony that Walgreens believed it had found the corporate holy grail, or in Walgreens' words a way to "have our cake and eat it too," *i.e.,* that by creating a "club" that people had to join in order to access prices less than its retail cash prices, and by charging them to gain access, it could market to uninsured and underinsured individuals who were especially price sensitive while excluding those prices from its usual and customary charges. (And it was hardly alone among large pharmacy chains in reaching such a conclusion). In fact, Walgreens documents reference the membership fee as necessary to being able to maintain its two-tiered pricing. The "risk" that Walgreens was taking could have been, as Humana suggests, that it knew (or recklessly disregard that) what it was doing was wrong. There is, to be clear, no document produced or admission by a witness acknowledging as much, though such a proposition is supported by the fact that Walgreens did not advise its contracting partners what it was doing.[32] But "U&C risk" could also mean that upon learning of its two-tiered pricing system, PBMs and/or third party payors would insist (either based on existing contracts or in the context of negotiations for new ones) that PSC prices not be excluded from the determination and reporting of usual and customary prices. *See, e.g.,* Exh. 84 (noting that "most likely not all Part D plans would immediately switch to using PSC as our U&C"). And finally, the "risk" Walgreens personnel spoke of could have been that, even if it believed what it was doing was lawful, others (be it PBMs, third-party payors or the government) would disagree and even file legal actions against it. But it is hardly unusual in the business world that companies pursue profit-maximizing strategies with the knowledge and understanding (often with the advice of lawyers) that though they may have defensible arguments for their conduct, their conduct could be viewed, and ultimately found, to be unlawful or a breach contractual obligations.[33] In short, knowing a plan of action has legal "risk" is not the same as knowing it is unlawful, or even recklessly (or negligently) disregarding the facts. In fact, Humana's expert Susan Hayes acknowledged that she had not seen evidence that Walgreens personnel did not actually believe that "'PSC pricing does not have any impact on third party pricing because of the annual fee.'" (Phase I Tr. 1295-96). Viewed from that perspective, Walgreens' conclusion that it could adopt its two-tiered approach to pharmacy pricing was "objectively reasonable."  First, the 1998 Agreement was entered into years before the PSC was even a gleam in Walgreens' eye. Second, even as of 2009, the Office of Inspector General punted on the question of whether pharmacy club prices available only to customers who paid a fee to join were considered usual and customary prices under Part D. (Exh. 358 at 7 n.26). And in its 2013 Guide to Pharmaceutical Payment Methods, the Academy of Managed Care Pharmacy ("AMCP") took the position that "lower of provisions would not apply in the case of a community pharmacy generic program available only to those subscribed to the pharmacy's 'generics club', a common requirement, because prices available to specified groups are not the pharmacy's 'usual and customary' prices." (Exh. 17 at 10). Third, *Garbe* and its default rule of "lowest price widely and consistently available to the general public" would not be decided until many years later, and there was certainly no other precedent clearly warning

---

[32] Humana has pointed more than once to Walgreens taking advantage of a lack of "pricing transparency," but the document it cites uses that term in the context of *pre*-Medicare Part D pharmacy pricing, not as something Walgreens was exploiting to hide fraudulent activity.

[33] For example, even Walgreens recognized there could be some charge for membership that was so low it would be unable to justify its two-tiered pricing system. *See, e.g.,* Exh. 378 at 204 (noting success of $5 per year membership promotion but warning that "there are long term U&C risks associated with running a similar promotion again.").

Walgreens away from its interpretation, self-serving though it may been. Thus, the findings of the Seventh Circuit in *Supervalu* as well as the district court's decision in *United States ex rel Proctor v. Safeway, Inc.,* 466 F. Supp. 3d 912 (C.D. Ill. 2020) (another FCA case involving a pharmacy not reporting its club prices as usual and customary) apply equally to the facts of this case for the period prior to the effective date of the 2009 Agreement: while ultimately found to be incorrect, Walgreens' position was "objectively reasonable." Moreover, even if the "objectively reasonable" standard does not apply under Kentucky law, the same set of facts support a conclusion that Walgreens did not make factual misrepresentations knowingly or with reckless disregard for the facts (or even negligently) given the dearth of definitive legal guidance prior to *Garbe*. Therefore, Humana did not prove by clear and convincing evidence that Humana engaged in fraud or negligent misrepresentation under Kentucky law with respect to the 1998 Agreement.

The foregoing conclusion, however, does not apply to Walgreens' conduct after the effective date of the 2009 Agreement. For the reasons set forth above, Walgreens entered into a contract under which it had agreed in the course of negotiations not to exclude the PSC's "discount" prices from the determination of its usual and customary rates. Thus, while absent that contractual obligation it might have legitimately maintained such a position (at least until *Garbe* was decided) its conduct and interpretation were not "objectively reasonable" following the 2009 contract negotiations. At a minimum, Walgreens negligently misrepresented its usual and customary charges by continuing not to report its PSC prices even after the 2009 Agreement went into effect. And even if Walgreens' misinterpretation of its contractual obligations was "objectively reasonable" (and it is not at all clear that this is a standard applicable in the contractual as opposed to False Claims Act context), as the district courts noted in both *Supervalu* and *Proctor,* it would not have been once *Garbe* was decided by the Seventh Circuit. Yet Walgreens continued to falsely report its usual and customary prices even after *Garbe* was decided (and despite the fact that the decision was from its home circuit). Accordingly, it is necessary determine whether Humana proved by clear and convincing evidence that it reasonably relied on Walgreens' representations that it was truthfully reporting its usual and customary prices under the 2009 Agreement.

### 3.   Did Humana Reasonably Rely On Walgreens' Representations That It Was Accurately Reporting Its U&C Charges?

For Humana to obtain relief for its claims of fraud or negligent misrepresentation, it must establish by *clear and convincing* evidence that it *reasonably* relied on Walgreens' representations that it was accurately reporting its true U&C charges. Under Kentucky law, "[r]eliance cannot be deemed reasonable when 'minimal investigation would have revealed the truth, or when the plaintiff closes its eyes and passively accepts the contradictions that exist in the information available to it.'" *Hildebrandt v. Hukill,* 2019 WL 2067366  * 6 (Ky. Ct. App. 2019)(quoting 37 Am. Jur. 2d *Fraud & Deceit,* § 231 (2019). Thus, "[w]hile there is no requirement that a recipient of a fraudulent misrepresentation conduct an in-depth investigation into the truth of the representation, one claiming fraud 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* (citing *Restatement (Second) of Torts* § 541 cmt. A (1977)).

Walgreens argues that Humana cannot establish the necessary element of reasonable reliance by clear and convincing evidence because it closely monitored the PSC program for over a decade and knew that Walgreens was not reporting its PSC prices as its U&C prices on claims submitted to Humana, or at least knew enough that it should have further investigated the matter. In support of its argument, it points to many of the same documents that it relies on in its argument regarding what it contends was the parties' course of performance in connection with the breach of contract claim. In response, Humana asserts that only in 2017, "when news began to surface about possible U&C fraud in the industry, were Humana's antennae raised . . . ." (Humana Phase I Post-Hearing Br. at 15). Unlike Humana's breach of contract claim, however, the "clear and convincing" standard establishes a substantially higher burden of proof Humana must satisfy, and its evidence of fraud and misrepresentation must be viewed through that lens.

While Walgreens exaggerates somewhat by stating that Humana was "closely monitor[ing] PSC for over a decade" (Walgreens' Phase I Post-Hearing Br. at 16), the evidence presented indisputably *does* show that over the years, and in various contexts, issues around PSC, or pharmacy U&C reporting and pricing more generally, were the subject of attention within various quarters at Humana. And it shows that even if there were not blaring sirens, there was sufficient information in Humana's possession that had it conducted a "minimal" or "cursory" investigation, it would have discovered that Walgreens was not submitting its PSC prices as its usual and customary charge.  This includes the following:

- Humana was well aware that its members could not use their pharmacy benefits if they wanted to purchase drugs through the PSC and that Walgreens was not submitting those claims to it. There was much internal discussion about this focused on members not being able to have those purchases count towards their out-of-pocket accumulation and Walgreens' failure to qualify for Humana's generic incentive programs. (Exh. 23). While Humana speculated as to a motive that had nothing to do with U&C reporting (Exh. 223), there is no evidence that Fleming ever followed up on the issue, as the document suggested he would do. Had he done so it is likely he would have learned the truth.

- Humana was aware that the percentage of Walgreens claims pricing at U&C was substantially lower than at Walmart, Kroger and Target, which did not have a two-tier pricing system. (Exh. 232). Again, this was a clue, apparently not pursued, that the reason was that Walgreens was not using its discount prices as its usual and customary charges.

- The notes of a meeting in November 2011 about Humana's "Supply Chain Strategy" (which focused primarily on MAC issues involving numerous pharmacies) suggest that at least Humana's CFO Mark McCullough was under the impression that Humana might not be getting the benefit of Walgreens' PSC prices. Although McCullough "challenged" Humana's Market Vice President for Pharmacy Networks, Jay Ecleberry, to "ask [Walgreens] to enroll our members in their loyalty programs so that we get $4 pricing"

Ecleberry never followed through (Tr. 662). Had he done so, he almost certainly would have learned that McCullough's assumption was correct.

- In December 2011, Fleming, the head of Humana's pharmacy division, sent an e-mail to Ted Nime seeking to "find the 'and' in a relationship b/w Walmart AND Walgreens with Humana's strategy long term." (Exh. 25). As part of that overall strategy analysis as to whether to expand the network of the "Humana Walmart PDP plan," Fleming asked Nime to answer two questions: "1. What is the delta in price (directionally) for drugs on WM's $ list and what it would cost at Wags" and "2. If you took one month of claims (or some reasonable time period) for the Humana Walmart PDP for claims filled at Walmart only and re-priced them . . . how much would Wags need to lower their costs by to make this even."[34] Nime responded a few hours later stating that he believed he could complete the analysis by the end of the following week and asking Fleming whether he wanted to perform the exercise two ways: "1. Reprice WM claims at Wag prices" and "2. Reprice WM claims at Wag prices assuming members joined their discount program." Nime reported that this would allow them to "see the value of joining the membership program." Fleming responded by saying he had not thought about the second piece of the analysis. As promised, Nime reported the results of his analysis, which covered two months of claims data, the following week. First, Nime reported that Walgreens' average costs per prescription was higher than that of Wal-Mart. Second, he stated that he "calculated the generic cost if we used Walgreen prices but for any drug that is on the Walgreen $9.99 list we used that price." Interestingly, Walgreens costs actually went *up* with that exercise, leading Nime to conclude that he was "ready to calculate a break even costs for us to pay for our members to enroll in the [PSC] program but it appears this program is not as good as Humana insurance." There was no evidence that Nime was aware of what had been negotiated in the 2009 Agreement, or that, insofar as his analysis was an aggregate one, whether he actually looked to see on a drug-by-drug basis whether Walgreens was reporting its PSC prices as its usual and customary charges. And given the small difference in results, it is possible that such a conclusion was not apparent. But at a minimum the analysis seemed to presume Humana members would get better pricing if they joined the PSC and demonstrates that Humana was on notice that it *might* not be getting the benefit of PSC prices in Walgreen's usual and customary reporting but did nothing to follow up.

- In December 2011, White requested a Walgreens MAC analyst to send her "a list of the drugs you advertise as part of Walgreens generic savings club in excel." (Exh. 81). White testified that she had no recollection as to why she made the request. However, two possible conclusions can be drawn: Walgreens refused to give it to her, which should have aroused suspicion as to why, or she got it, in which case she would have been even

---

[34] "Wags" was shorthand for Walgreens.

better equipped to determine whether Walgreens was reporting its club prices as its usual and customary charges.

- Wehneman, as Director of Pharmacy Audit, apparently carried with him from Kmart the belief he testified to in *Garbe* that "enrollment in a plan of any sort or a third-party plan, [or] discount card agreement" means the "prescription is no longer considered a cash customer prescription." (Phase I Tr. 768-70).[35] Accordingly, despite his auditing role at Humana, he failed to pursue an investigation into U&C pricing at pharmacy clubs despite two separate internal inquiries about the issue and his acknowledgment that he could do so if he had the "list of drugs, quantities and pharmacies." Instead, he brushed them off, and no one asked him to pursue an investigation. (Phase I Tr. 761).

These were not the only warning signs Humana ignored. Humana does not contend that it was anything specific to Walgreens that caused it to conduct the investigation that culminated in its December 2017 letter. Rather, it refers generally to learning about "possible U&C fraud in the industry." In other words, Humana asks the Arbitrator to believe that, despite being one of the largest Medicare Part D sponsors in the country, running its own pharmacy and emphasizing its responsibility as the "first line of defense" to prevent fraud, waste and abuse (Humana Phase I Post-Hearing Reply Br. at 17), it simply had no idea about the existence of the *Garbe* district court decision in January 2015 (nearly *three* years before Humana wrote to Walgreens) or the Seventh Circuit's decision the following year. Or the six decisions issued by the district court in the *Corcoran v. CVS* case issued in 2016 alone. But that assertion, to the extent it is credible at all, is belied by Humana's own interrogatory responses that "certain Humana employees" (in other words, not just Wehneman) became aware of the *Garbe* case as early as 2013. (Exh. 328 at 2). It apparently seeks to avoid the consequences of that knowledge by arguing that it wasn't aware that *Walgreens* was doing what Kmart (or CVS, or Rite Aid) had done. Nor, apparently, was it curious enough to investigate until years later whether Walgreens or the other pharmacies it is now suing might be doing the same thing.

In conclusion, Humana failed to avail itself of multiple opportunities to "make a cursory investigation or examination" of Walgreens' U&C pricing despite ample evidence that it might not be receiving the benefit of those prices in the pharmacy's claim submissions. And this despite the fact Humana routinely audited Walgreens for compliance with other contractual obligations. While it is true that Humana could not perform a complete audit of all claims from Walgreens with respect to U&C charges without obtaining cash transaction data, it did not need to in order to determine what Walgreens was up to.[36] Humana asserts that there was not a "shred

---

[35] Wehneman did not change this viewpoint until after reading the *Garbe* decision in connection with this proceeding.

[36] Humana's expert Hayes testified that in 25 years in the pharmacy industry, she had never conducted an audit to verify the accuracy of U&C submissions. But Humana obviously believed it had that right and indeed invoked the audit provisions (including but not limited to Section 5.3, discussed *infra*) of the 2009 Agreement in its December 2017 letter to Walgreens. Walgreens' subsequent stiff-armed refusal to cooperate in a U&C audit does not mean Humana did not have the right to conduct it. To the contrary, Section 5.3 of the 2009 Agreement expressly states that the parties agree to "make available to each other such information as is reasonably necessary for the party to determine whether any claims paid and reimbursement amounts made pursuant to this Agreement are in accordance

of evidence that Humana knew – or could have known – what prices Walgreens was actually charging non-Humana customers, as would be required to determine Walgreens' U&C prices. (Humana Phase I Post-Hearing Br. at 17). Not true. As its December 2017 letter proved, it always had the ability to ascertain from publicly available information and its own claims data that it was not getting the benefit of Walgreens' PSC prices, or at a minimum that there was a good possibility that it might not be. And it could have conducted just such an assessment at *any* time during the decade between the launch of the PSC and the time it finally did so. *See also* Phase I Tr. 1721-24 (Smith). The Arbitrator rejects Humana's repeated incantation that it was so incapacitated in its ability to investigate Walgreens' U&C pricing that it was left with no choice but to blindly rely on the pharmacy's submissions for a decade. The evidence simply does not support Humana's self-depiction — despite it being a multi-billion dollar health care company and a provider of pharmacy benefits to 17 million Americans – as a helpless naïf.

For all the foregoing reasons, Humana failed to prove by *clear and convincing evidence* that it *reasonably* relied on Walgreens's claims submissions. Despite ample warning signs and knowledge on its part, Humana failed to take the "opportunity to make a cursory examination or investigation," despite having both the authority and means to do so. Accordingly, Humana failed to prove that Walgreens is liable for fraud and negligent misrepresentation under Kentucky law.

### D.  Did Humana Establish That Walgreens Boots Alliance Is Liable For Walgreen Co.'s Conduct?

Humana asserts that Walgreen Co.'s parent company, Walgreens Boots Alliance, Inc. ("WBA") has successor liability for the conduct of Walgreen Co. Walgreens filed a dispositive motion seeking to have WBA dismissed from the Arbitration. That motion was denied on the grounds that there were material issues of fact. At the hearing, however, Humana, which has the burden of proving successor liability on the part of WBA, did not introduce any testimony at all on the issue. And it was completely silent on this issue in both of its post-hearing briefs. Accordingly, Humana failed to prove by a preponderance of the evidence that WBA has successor liability for the conduct of Walgreen Co.

### E.  For What Period Of Time Is Humana Entitled To Recover Contract Damages?

Having determined that Walgreens breached the Pharmacy Agreements, it is necessary to determine the time periods for which Humana can recover damages. A separate analysis is required for each of the two Pharmacy Agreements.

#### 1.  The 1998 Agreement

Humana argues it is entitled to damages pursuant to the 1998 Agreement from April 2006, when it claims the PSC program became widely and consistently available to the general public, through December 1, 2009, the final date that contract was in effect prior to being

---

with its terms and conditions." (Exh. 11). Whether or not that provision obligated Walgreens to produce a decade's worth of cash transaction data, it clearly was required to "cooperate with" Humana in an investigation regarding compliance with its U&C reporting obligations.

replaced by the 2009 Agreement. Walgreens contends that damages under the 1998 Agreement are entirely barred by the Kentucky statute governing audits of pharmacy records.[37] In the alternative, it argues that damages are limited to the period of August 2008 through the expiration of the 1998 Agreement because PSC prices were not "widely and consistently available" until that time.[38]

### a. The Kentucky Audit And Overpayment Collection Statutes

The statute of limitations for breach of contract claims under Kentucky law is fifteen years. KRS § 413.090. However, Walgreens argues that Humana's breach of contract claim is governed by what it contends is a separate statute of limitations embodied in a Kentucky pharmacy audit statute that became effective on June 25, 2009. That law provides that "[w]hen an audit of the records of a pharmacy is conducted by an auditing entity," the audit "shall be subject to" seventeen enumerated "conditions." KRS § 304.17A-741.[39] Among those conditions is the requirement that the "period covered by the audit shall not exceed two (2) years from the date the claim was submitted for payment except if a longer period is allowed by federal law or if there is evidence of fraud." The statute further provides that where the audit determines there has been an overpayment the auditing entity may either request a refund from the provider or make a recoupment.

Walgreens contends this law constitutes a two-year statute of limitations that runs from the conduct of an audit and that it effectively overrides Kentucky's more "general" statute of limitations for breach of contract actions. Its argument falls short. First, Walgreens does not cite any judicial rulings or legislative history confirming that the law was intended to create a two-year statute of limitations for breach of contract claims relating to pharmacy claims submissions. In fact, the only authority cited by either party is an opinion letter from the Maryland Attorney General reaching the opposite conclusion in connection with a similar pharmacy audit statute in that state, finding that "nothing in the [statute] prevents a carrier from . . . *bringing suit on a breach of contract* or other theory seeking to be compensated for the improperly paid claim," the law "only limits the time within which the self-help remedy of retroactive denial may be invoked," and the statute leaves other possible means of recovering overpayments "unaffected." 83 Md. Op. Att'y Gen. 174 (1998)(emphasis added). Second, the statutory language itself does not support the argument that it creates a two-year statute of limitations for breach of contract claims against pharmacies for inaccurate or improper claims submissions because (1) it expressly applies to "audits," not legal claims, and references only "requests for repayment" and "recoupment"; (2) there is no language obligating a health plan to conduct an audit and follow the steps set forth in the statute before it can pursue a breach of contract claim in court or arbitration; and (3) the statute prohibits any extrapolation absent a pharmacy's agreement but instead limits recoupment (a self-help remedy) to the "actual overpayment or underpayment,"

---

[37] No evidence was introduced supporting a finding that the two-year lookback period in Section 5.3 of the 2009 Pharmacy Agreement applies to claims arising under the 1998 Agreement. In fact, as the Arbitrator noted in an earlier ruling, the language of the 2009 Agreement supports the conclusion that it does not. *Ruling on Walgreens' Dispositive Motion on Humana's Failure to Satisfy Condition Precedent Before Initiating Arbitration* at 8.

[38] Walgreens takes that position without waiving its argument that the Pharmacy Agreements' definition of "usual and customary" cannot be interpreted to mean "widely and consistently available."

[39] Humana has not disputed that, if it were to conduct an audit governed by the Kentucky statute, it would qualify as an "auditing entity."

indicating that it is intended to govern audits, not lawsuits, because otherwise a health plan such as Humana would be foreclosed from recovering all mispriced claims in the case of systemic conduct unless it audited every single claim submitted by the pharmacy. Third, even if, as Walgreens points out, the statute prohibits auditing entities from *requiring* pharmacies to keep records for two years, that does not foreclose a health plan's ability to base a breach of contract claim on its own records or on records a pharmacy elects (or is obligated by other laws) to retain. Finally, the Kentucky statute of limitations for breach of contract enumerates what the legislature has determined to be exceptions to the fifteen-year limitations period, suggesting that where it intends to make an exception it has done so expressly.

The result is no different for the other Kentucky statutes relied upon by Walgreens. KRS 304.17A-714 relates to the "collection" of overpayments and addresses the timeframe within which insurers may unilaterally recoup overpayments by withholding such amounts from future provider payments. And KRS 304.17A-708 addresses only retroactive denials, a form of self-help on the part of an insurer. Finally, Walgreens points to KRS § 304.17A-726, which it dubs the "exclusivity statute." That law provides that "[a]n insurer shall not request or require a provider to pursue any other course of action regarding the payment of health care claims outside the provisions set forth in KRS 304.17A-700 to 304.17A-730. But as noted, the two statutes Walgreens relies upon within those enumerated laws do not bar Humana's action. Walgreens' only other argument with respect to the "exclusivity statute" turns the law on its head by asserting that bringing a breach of contract lawsuit and invoking a 15-year statute of limitations is one other course of action that Kentucky law prohibits an insurer from pursuing. But the law says *nothing* about what actions an insurer can take (beyond what is limited by the referenced statutes); it only talks about what "course of action" an insurer cannot request or require a *provider* to take. If anything, the language of the law reinforces the conclusion that the statutes relied upon by Walgreens place limits only on insurers' self-help remedies, not their right to bring legal actions against pharmacies for breaching their contractual obligations.

For all the foregoing reasons, the Kentucky pharmacy audit and insurance overpayment recovery statutes do not constitute statutes of limitations for breach of contract claims against pharmacies. Accordingly, Humana's claims under the 1998 Agreement are governed by Kentucky's fifteen-year statute of limitations for breach of contract claims.

### b. <u>When Did The PSC Program Become "Widely and Consistently Available" To The "General Public"</u>

At the Phase I hearing, there was substantial evidence presented regarding Walgreens' contemplation of and ultimate rollout of the PSC program. Based upon the findings above, to determine the timeframe for damages under the 1998 Agreement it is necessary to ascertain when Walgreens' PSC discount prices became widely and consistently available to the general public. Humana contends it was in April 2006, when Walgreens piloted the PSC program (in its original iteration as the "W" card). Walgreens argues (without conceding that the *Garbe* standard applies to this case) that it was in August 2008, when it launched a "media blitz" to advertise the program.

Humana's effort to peg the starting date as April 2006 is inconsistent with the evidence. The record demonstrates that Walgreens piloted the program in four cities at that time. That falls far short of what reasonably can be considered "widely and consistently" available for a national pharmacy chain with thousands of outlets across the United States.[40] Humana further argues, correctly, that the PSC program launched "chainwide" in July 2006. But that does not necessarily mean that the prices were "widely and consistently" available to the "general public" at that time. For example, Humana points to printed advertisements contained in an internal Walgreens PowerPoint deck about the program from *December* 2006. But that document does not prove this was an advertisement that was used at that time, how widely it was disseminated to advise the general public as to the availability of the program, or when the advertisements were first published. In fact, the ads in question appear to be mockups that Walgreens was presenting in connection with consumer surveys to determine what advertising would work best. Another exhibit relied upon by Humana specifically states that the July 2006 "soft launch" was *without* advertising. Thus, Humana has not proven that at the time of that launch PSC was marketed to the "general public" as opposed to select members. To the contrary, the exhibit relied upon by Humana contains a document suggesting that marketing was targeted, emphasizing that it was "NOT our Goal" to "offer this to our existing non-price sensitive cash patients." Rather, the objective was to attract new patients and "only present the option to existing patients who are price sensitive." (Walg_Hum_00193526, (00193532)(emphasis in original). But even within that more limited sphere of individuals being targeted, no evidence was presented substantiating that, absent any advertising, the program's prices were "widely and consistently available" to the "general public." In fact, another exhibit, a chain of emails entitled "The Birth of PSC," suggests the opposite, noting that for "at least the first year or two we had a program but the stores were told to only sell it as a last resort." (Exh. 116 at 00135961).

Based upon an analysis of the totality of evidence, the most appropriate date from which to measure damages under the 1998 Agreement is November 2007, when Walgreens revamped the PSC program and started advertising it to the general public in its stores across the country. According to the history of the program by Jay Bernstein, who was intimately involved in it from the outset, it was at that time that Walgreens launched the program "chainwide" with a new formulary and advertising, including "front door posters, waiting room signs, brochures, health resource panel, register signs and roto." (Exh. 101). In fact, a PowerPoint deck from November 2007 contains not only a summary of the revamped program but a detailed description of the advertising campaign, including references to signage, reader-board messaging, in-store radio spots, tear-pads with lists of value priced generics and other forms of advertising the PSC program. (Exh. 5). *See also* Exh. 7 at 5 (chart showing negligible activity in PSC until late 2007). Accordingly, the preponderance of the evidence establishes that the PSC program and its discount prices were widely and consistently available to the general public starting in November 2007.[41]

---

[40] Even Humana's contention at oral argument that during the pilot program PSC prices were widely and consistently available "somewhere" is not confirmed by a preponderance of the evidence. It does not point to any documents or testimony demonstrating how many stores within those cities were part of the pilot, or how and to whom the offers to join the program were presented.

[41] The *Interim Award,* which deferred resolving the question of the damages timeframes pending additional briefing, briefly referenced a national rollout in or about August 2008, a finding that did not affect the rulings contained therein. *Interim Award* at 6. After closer examination of the evidence in connection with consideration of the damages timeframe issue and following the supplemental briefing, the preponderance of the evidence establishes

### 2.  The 2009 Agreement

  #### a.  Does The Two-Year Lookback Period In Section 5.3 Of The 2009 Agreement Establish The Limitations Period For An Award Of Damages?

Having found that Walgreens breached the Pharmacy Agreements but did not engage in fraud or negligent misrepresentation under Kentucky law, it is necessary to address the effect of Section 5.3 of the 2009 Agreement on Humana's ability to obtain contractual damages. This section creates a two-year limitations period for overpayment recoveries, subject to certain exceptions. Accordingly, Walgreens argues that even if Humana prevails (as it does) on its breach of contract claim, it is limited to recovering two years of damages. In response, Humana argues that the claims in this case do not fall within the provisions of Section 5.3 at all and that even if they do, the exception to the two-year lookback period for alleged fraud and misrepresentation applies.

Section 5.3 was negotiated as part of the contractual overhaul that culminated in execution of the 2009 Agreement. It is a lengthy and densely worded provision. In its simplest terms it creates a two-year lookback limit for the recovery of overpayments, subject to certain exceptions. The relevant portion of Section 5.3 states as follows:

> Notwithstanding the foregoing or any provision in this Agreement to the contrary, neither party may be obligated to pay any overpayment or underpayment to the other party that is not requested within two (2) years of the date that the original claim was submitted for payment. Any such claims payments not contested as set forth in this Section 5.3 within two (2) years of the date that the original claim was submitted for payment, [sic] shall be deemed to be final except in the following circumstances: (i) the overpayment or underpayment was obtained by alleged fraud or misrepresentation; or (ii) the original claim payment was incorrect because duplicate payment was made to the Provider.

Humana first argues that Section 5.3 does not even govern its claims because the provision applies to overpayments arising from "duplicate payments, incorrect payment amounts, billing errors or any other reason." It contends that the Arbitrator should apply the doctrine of *ejusdem generis* to limit the scope of the section to administrative types of overpayments rather than "fraudulently inflated prices." Even assuming this doctrine applies to contractual rather than statutory interpretation (an assumption Walgreens disputes), Humana reads the provision too narrowly. First, Section 5.3 expressly defines what types of overpayments (or underpayments) are *not* subject to the provision, namely those "identified via an on-site or desk-top audit as specified in Exhibit H" of the 2009 Agreement. Given that express carveout, it is more reasonable to interpret the phrase "any other reason" broadly rather than narrowly. Otherwise,

---

November 2007 as the time when the PSC program became widely and consistently available to the general public. Walgreens' argument that the date from which to measure damages under the 1998 Agreement is August 2008 is based on an incorrect assertion that PSC was only in a pilot stage until then and on unreliable testimony from a single PBM witness – based on a very (mis)leading question – as to when *he* first learned about the program. (Exh. 341 at 42:4-46:10).

the contract must be read to create some nebulous category of "overpayments" that is not encompassed either in Exhibit H *or* Section 5.3, despite the absence of any language supporting such a conclusion or evidence of an intention by the parties to do so. Second, Humana's argument that Section 5.3 was not intended to apply to "fraudulently inflated prices" makes little sense insofar as the two-year lookback provision has a specific exception for "alleged fraud or misrepresentation." If the parties intended that this provision would not apply to fraudulently induced overpayments, it would have made no sense to create such an exception. Accordingly, Humana's argument that its overpayment claims fall outside the scope of Section 5.3 is rejected.

The next issue requiring resolution is whether the "alleged fraud and misrepresentation" provision in Section 5.3 means that Humana's claims are not subject to the two-year limitations period for overpayment recoveries. There was little evidence presented by the parties relating to the negotiation over Section 5.3. Van Hook testified that Walgreens proposed the two-year lookback, and that Humana counterproposed and Walgreens accepted the addition of the word "alleged" before the words "fraud or misrepresentation." And she explained her purpose in doing so.  (Phase I Tr. 299-300). Walgreens contends that Van Hook's testimony on the issue is "inherently incredible." But it does not say why. Surely it can't be because the negotiations took place so long ago, as it proffered its own witness to testify about the content of those very same negotiations. It *is* reasonable to question Van Hook's credibility on this issue in light of her apparent failure to tell Duke about this when he was preparing for his corporate designee deposition and remained silent about it in the declaration she filed in support of Humana's dispositive motion. But the word is in the contract and therefore its significance for the case must be assessed. And the fact is that Van Hook's testimony is consistent with the documentary record and with the most reasonable interpretation of Section 5.3, albeit *not* the one that Humana has proffered. Van Hook testified that "Fraud is a legal term. It requires a process to determine if fraud exists. Alleged is just that. We alleged that there was fraud, so we used the – additional word alleged so that we could move forward if we identified concerns versus waiting for a legal process to run its course." *Id.* She added that "to prove fraud, you have to know. In our space, we know what Walgreens submits to us in the claims transactions. So, you know, we may not know the specifics. And so alleged fraud is we have concerns, but we don't have all of the specifics because, again, we're only aware of what they submit to us. So alleged fraud is the language that ultimately survived in the contract." *Id.*

Words in a contract should generally not be considered mere "surplusage." That is especially so here, when the word was added as an amendment to Walgreens' original proposed language. The most reasonable inference as to its meaning can be drawn from Van Hook's own testimony: that neither party would have to put the "fraud and misrepresentation" cart before the investigative horse. In other words, where fraud is suspected and alleged, it need not be proven in a legal proceeding *before* a party can "move forward" and follow the investigative and pre-arbitration dispute processes laid out in Section 5.3 and/or file a demand for arbitration. On the other hand, the language should not be construed so broadly as to be a "get out of the two-year limitations period free" card either, in which a mere allegation of fraud or misrepresentation, even if not ultimately proven (as in this case) nonetheless entitles a party to recover overpayments (or underpayments) in an arbitration subject to no time limit other than the statute of limitations on claims for breach of contract. Otherwise, the "alleged" fraud and misrepresentation exception would swallow the two-year rule. This result is fully consistent with

Van Hook's explanation that Humana "could move forward if we identified concerns versus waiting for a legal process to run its course. . . ." Accordingly, while Humana was entitled to pursue an investigation, allege overpayments and even file an arbitration demand seeking recovery beyond the two-year period (thus obviating prejudice as a result of "information imbalance" or "matters of proof") (Humana Phase I Post-Hearing Br. at 40), it cannot escape application of the two-year recovery limitations period in Section 5.3 in this case because it did not ultimately prove its claims of fraud and misrepresentation.

Because Humana did not prove Walgreens committed fraud or misrepresentation under Kentucky law, its recovery for breach of contract is limited to two years pursuant to Section 5.3. Therefore, it is now necessary to determine the date from which the two-year contractual limitations period runs under the 2009 Agreement.

### b. From What Date Does The Two-Year Limitations Period Under Section 5.3 Run?

Humana contends that the two-year lookback period starts on December 19, 2015, two years from the December 19, 2017 Notice Letter that it argues "contested" Walgreens' claims payments pursuant to Section 5.3. Walgreens responds that any damages recovery is completely foreclosed because Humana "has not contested any specific claim payments in the manner set forth in Section 5.3" and "has yet to request the refund of any specific claim . . . ." (Walgreens Damages Timeframes Br. at 7). Indeed, it argues that any "lookback period will not commence until the Arbitrator determines that: (a) Humana overpaid Walgreens on any particular claim; and (b) Humana requests repayment of any amounts it overpaid on such claims submitted for payment in the preceding two years." In the alternative, Walgreens contends that the earliest date for which Humana could recover any overpayments is August 13, 2017, two years before the filing of the Demand for Arbitration.

Contracts must be construed consistent with common sense, in a manner that avoids absurd results, and to effectuate the intention of the parties. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 545 (6th Cir. 2007); *Vorherr v. Coldiron,* 525 S.W.3d 532, 543 (Ky. App. 2017). At the initial stages of this proceeding, Walgreens argued forcefully that Humana could not even commence this Arbitration because it had failed to specify the amount of the overpayments it was seeking to recover. The Arbitrator rejected that argument in part because the limitations on the information in Humana's possession or to which it had access at the time as well as Walgreens' own conduct made it impossible for Humana to do so. *Condition Precedent Ruling* at 5-7. Now Walgreens appears to have done a 180, arguing that because Humana has not specified the claims for which it seeks to recover or the amount of such recovery, "the two-year lookback period in Section 5.3 should commence if and only if the Arbitrator first determines that Humana did, in fact, overpay Walgreens on any particular claims and Humana, in turn, requests repayment of any amounts it overpaid on such claims submitted for payment within the preceding two years of Humana's request." In other words, Walgreens first argued that Humana should not even be permitted to arbitrate this case because it had not specified the particular claims and amounts at issue pursuant to Section 5.3; now it argues that Humana cannot even make a valid request under that provision unless and until the Arbitrator rules on what claims if any were overpaid and if so in what amount. The import of Walgreens'

argument is that Section 5.3 was intended by the parties to make it impossible for either party to recover overpayments or underpayments where it lacks information sufficient to determine the totality of what is owed, *even if* its ability to do so is stymied by the other contracting party, unless and until a legal determination is made as to the owed amount. And even then it can only go back two years from when it makes a post-award request for payment. No arbitrator could reasonably conclude that is what the language of Section 5.3 means, much less that it was what the parties could possibly have intended under these circumstances.

The question now becomes whether Humana's position is consistent with Section 5.3 The Notice Letter was signed by Humana's Senior Counsel, Litigation and Investigations, and was addressed to Walgreens' Divisional Vice President of Health Law Transactions as well as, *inter alia,* Healthlawlegalnotices@Walgreens.com. (Exh. 15). The subject line was "Notice Regarding 'Usual and Customary' Charges Reporting Discrepancies." As argued by Walgreens and noted by the Arbitrator in the *Condition Precedent Ruling*, the letter did not "include notice of the amount of the recovery sought." Nor, for all the reasons set forth in that ruling, could it have. What the letter did do was put Walgreens on clear notice that Humana had reason to believe it was overpaying for claims based upon misrepresentations of U&C pricing. It referenced other litigation and government investigations regarding inaccurate reporting of U&C prices and expressed the belief that Walgreens may have improperly "discounted prices on thousands of drugs to cash customers as part of its PSC program, while still reporting the non-discounted price to Humana as the pharmacy's 'usual and customary' price." It represented that Humana had conducted its own sampling of claims and payment data and found that "[i]n many instances Walgreens' published PSC prices were much lower than the U&C prices reported to Humana, and much lower than the reimbursements paid by Humana to Walgreens for drugs sold to Humana members. This analysis appears to confirm that Humana may have been overcharged in connection with payments based on inflated U&C data." It sought information that would confirm – or potentially refute – that belief. A member of Walgreens' legal department responded in a three-paragraph letter about a month later. (Exh. 16). The letter did not express confusion about what Humana was asserting or ask for clarification. Rather, it stated succinctly and bluntly that there was "no basis at all for [Humana's] suggestion that Walgreens should have reported PSC prices as Usual and Customary Prices," thereby revealing that it understood full well Humana's "justification" for any overpayment recovery. *See Condition Precedent Ruling* at 2. The letter did not provide any of the information and data that Humana had requested, nor did it indicate that Walgreens would do so.

Walgreens argues that notwithstanding its failure to furnish the requested information, "Humana's purported lack of access to claims data did not preclude it from requesting repayment as early as 2017, or well before then." (Walgreens' Damages Timeframes Br. at 7).[42] But Walgreens did not prove that as of December 2017, Humana had access to PSC prices from earlier years, and even if it did, that it had access to *all* PSC prices for the entire damages time

---

[42] To the extent Humana could have sent the Notice Letter earlier, even years earlier, but did not, that already has redounded to Walgreens' benefit insofar as any claims for damages under the 2009 Pharmacy Agreement for payments more than two years from the Notice Letter are barred as untimely.

period. In fact, the opposite is true. *See Condition Precedent Ruling* at 5-6. [43] If Humana concluded that Walgreens was engaged in systemic mispricing for over a decade, there would be little reason for it to specify only a *portion* of the amounts it believed it was owed. Indeed, there is little doubt that had it done so Walgreens would be arguing today that any recovery would now be *limited* to that amount. As already concluded in the *Condition Precedent Ruling*, specifying such an amount would be a meaningless act. And as also found by the Arbitrator in that ruling, it was Walgreens that possessed all the information necessary for it to determine, if it turned out Humana was right, what it would owe.

The clear purpose of Section 5.3 is to provide a process for one party to put the other on notice if it believes it has made overpayments (or been underpaid) and to escalate those differences to senior management for possible resolution prior to the commencement of an arbitration. Humana effectively commenced the dispute resolution process with the Notice Letter. It expressly stated it was invoking Section 5.3's dispute resolution mechanisms (doing so in bold typeface) and that it intended to "resolve" any discrepancies that were found with respect to usual and customary pricing. The testimony of Walgreens' key witness also acknowledges that the pharmacy understood Section 5.3 had been invoked. Scott Schuler testified he was the "corporate designee" for purposes of the discussions among senior representatives called for in Section 5.3 prior to commencement of an arbitration, that he and Keith Dostal of Humana had discussions "as part of the dispute resolution [process] in our contract," and that this was "part of the protocol of the arbitration." (Phase I Tr. 1477-1483). Thus, Walgreens understood full well that the parties were following the process set out in Section 5.3. Schuler offered no testimony to the effect that he did not understand what the dispute was about or that Humana was contesting the pharmacy's U&C submissions as part of that process. (Walgreens does not even contend that application of the two-year lookback from the date of the Notice Letter is improper due to unfair surprise). And Walgreens has not produced any evidence that throughout the pre-arbitration dispute resolution process it *ever* requested the specification of the claims that Humana sampled and which it now claims is so essential, despite its contractual right under Section 5.3 to do so.

That the Notice Letter was couched in diplomatic language (befitting the parties' important and longstanding relationship) does not alter the fact that Humana was putting Walgreens on clear "notice" (a word used in the letter heading itself) that it believed it may have overpaid claims based on false reporting of usual and customary prices and that it would seek to recover overpayments if its suspicions proved true. Nor was it possible for Humana to quantify the overpayments because that would have required Walgreens to provide it with information it failed to provide (notwithstanding its obligation in Section 5.3 to "make available . . . such information as is reasonably necessary . . . to determine whether any claims paid and reimbursement amounts made pursuant to this Agreement are in accordance with its terms and conditions") and avoided providing even during Phase I as a consequence of its successful motion to bifurcate liability and damages. Walgreens' argument that Humana failed to quantify even the overpayments found through the sampling referred to in the Notice Letter carries no weight. That is not the totality of overpayments Humana seeks; thus, producing such an analysis (which Walgreens could have but never asked for) would be a completely meaningless exercise.

---

[43] The "thousands" of claims that Walgreens asserts Humana had from member reimbursement requests for their PSC purchases would cover only the tiniest fraction of submissions over the many years of the PSC program and those include claims well before the two-year lookback period as well.

Indeed, given the limitations on the information in Humana's possession or available to it, even an estimate of the actual overpayments would have had about the same odds of being accurate as those of a monkey at a typewriter reproducing the text of Section 5.3.[44] Walgreens' position is also belied by its own argument in Phase II, in which it contended (successfully, as discussed *infra*) that the PSC price it was obligated to report must contain an amount reflecting an allocation of the membership fee. It offers no explanation or argument as to how Humana could possibly have calculated such an allocation and thus determined the precise amount it was owed for any given claim, much less all of them.

Because Humana did not have – or have access to – all the information necessary to quantify its alleged overpayments (and was stymied until this Arbitration from obtaining some of that data), the Notice Letter was sufficient to constitute a "contest[ing]" of Walgreens' payments that commenced the two-year lookback period. There could not have been any question in the mind of Walgreens as to exactly what Humana was asserting. Section 5.3 cannot reasonably be interpreted to bar either party from commencing the two-year lookback period where it does not have – and has been denied access to by its contracting partner – the information necessary to quantify overpayments or underpayments. *See, e.g., PBI Bank, Inc. v. Signature Point Condominiums LLC,* 535 S.W.3d 700, 718 ("[T]he law will not permit [a party] to take advantage of an obstacle to performance which he has created or which lies within his power to remove."); *Gridiron Steel Co. v. Jones & Laughlin Steel Corp.,* 361 F.2d 791, 794 (6th Cir. 1966)("[O]ne cannot avoid his liability [under a contract] by making the performance of the condition precedent impossible or by preventing it."). Walgreens' attempt to use its refusal to furnish information as a sword cannot be countenanced.

In sum, the Arbitrator has been called upon to determine the parties' intent with respect to Section 5.3's two-year lookback period in a situation in which Humana concluded that Walgreens may have been systematically misrepresenting its U&C prices for over a decade and gave explicit notice of that concern to Walgreens' legal department but did not have the ability to "specify the amount of the recovery sought." In view of Humana's expressed belief it may have overpaid, the fact that it gave clear notice of its concerns to that effect and explained the "justification" for an overpayment recovery, its inability to specify the amount owed, and the parties' escalation of the dispute under the Section 5.3 dispute resolution process, the Notice Letter satisfied the requirement for a contesting of Walgreens' U&C pricing that triggered the two-year lookback period. As the Arbitrator concluded in the *Condition Precedent Ruling,* any other result would elevate form over substance.

Notwithstanding the foregoing, Walgreens argues that Section 5.3's two-year lookback period "is further confined by various state laws that limit the period in which a health insurer or pharmacy benefits manager can reopen claims submitted by a pharmacy absent fraud." (Walgreens' Damages Timeframes Br. at 10-14 and Exh. A). Assuming, *arguendo*, that Humana was obligated to comply with each of those laws, Walgreens' argument still fails. First, as discussed *supra* in connection with the Kentucky statutes, many of these laws govern *audits* and this proceeding is not an audit. Second, in addition to referencing audits (which this Arbitration is not), the laws also speak in terms of retroactive denials, adjustments or reductions of claims or

---

[44] In addition, any overpayment amount Humana might have put forth would immediately have been outdated insofar as the practice about which it was expressing concern was an ongoing one – and is so to this day.

reimbursements.  But commencing an arbitration in which the insurer has the burden of proof is not at all the same thing as a carrier's unilateral retroactive denial, adjustment, or reduction of a claim, much less its exercise of recoupment rights such as those found in the 2009 Agreement. *See, e.g.,* N.H. Rev. Stat. Ann. § 420-J:8-b(II); Va. Code. Ann. § 38.2-3407.15(B)(7) ("No carrier shall *impose* . . . any retroactive denial)(emphasis added). Third, some of those statutes make exceptions for claims that were "submitted fraudulently" or contained "material misrepresentations" or even where there is "suspected fraud and abuse." *See, e.g.,* W. Va. Code § 33-45-2(a)(7); N.M. Code R. § 13.10.22.12R.[45] Nothing in those statutes indicates an intent to incorporate the common law requirement in Kentucky of clear and convincing proof of reasonable reliance for those exceptions to apply. Finally, as with the argument regarding KRS § 304.17A-741*,* no legislative language or history has been presented stating that the time periods for audits or unilateral denials, adjustments or recoupments also govern claims brought in court or arbitration for breach of contract. As discussed above, the only legal authority addressing the question at hand found that the state pharmacy audit statute did *not* foreclose or govern recoveries under legal claims for breach of contract. *See* Section III(E)(1)(a)*, supra.* For all the foregoing reasons, Walgreens has not established that the ten identified state pharmacy audit statutes reduce Humana's recovery period above and beyond the two-year lookback period under Section 5.3.

For all the foregoing reasons, the preponderance of the evidence establishes that the two-year limitations period under Section 5.3 runs from December 19, 2017 and therefore, subject to any further limitations arising from Walgreens' affirmative defenses (discussed *infra*), Humana is entitled to recover damages under the 2009 Agreement from December 19, 2015.

## F.   **Do Walgreens' Affirmative Defenses Further Limit Humana's Recovery Of Damages?**

### 1.   **Does the Voluntary Payment Doctrine Bar The Recovery Of Any Otherwise Recoverable Damages?**

Walgreens argues that the "voluntary payment doctrine" bars Humana from recovering damages after January 2009, when CVS, a different pharmacy chain, purportedly told Humana that it was not reporting its club prices as its usual and customary charges and Humana became aware that it rarely paid either of those pharmacies' claims based on usual and customary prices. (Humana Phase II Post-Hearing Br. at 1). The voluntary payment doctrine has "ancient, common-law roots," and its contours have changed over the centuries. *Randazzo v. Harris Bank Palatine, N.A.,* 262 F.3d 663 (7th Cir. 2001). Although the case law is sparse, Kentucky courts recognize the doctrine, which provides that "[w]here one pays an illegal demand with full knowledge of the facts which render the demand illegal, without an immediate and urgent necessity therefor . . . the payment is voluntary." *City of Morganfield v. Wathen,* 261 S.W. 12, 14 (Ky. 1924).[46] *See also Causey v. Cohron,* 287 S.W. 544, 545 (Ky. 1926)("One cannot

---

[45] Yet another statute makes an exception for a provider's "pattern of inappropriate billing," something that falls within the findings herein. N.J. Stat. § 17B:27-44.2(d)(10).

[46] The *Wathen* case also involved a pharmacy (specifically, a pharmacy challenging a tax on the sale of whisky prescribed by physicians during Prohibition) but arose under what has been described as the "peculiar context of . . . illegal tax cases." *Restatement (Third) of Restitution and Unjust Enrichment, § 5, Comment g.*

voluntarily become the creditor of another so as to enforce his claim in a court."). According to Westlaw, with only a few exceptions, neither of these nearly century-old cases has been cited by another Kentucky appellate court since the 1950s, and even prior to then the body of case law considering the doctrine was meager. Nonetheless, last year the Kentucky Court of Appeals rejected entreaties to follow other states and abandon or narrow the doctrine and instead affirmed its vitality, citing and quoting from *Wathen and Cohron. Davis v. Norton Healthcare, Inc.,* 2021 WL 223528 at *1-2 (Ky. Ct. App. Jan. 22, 2021). Although presented with the opportunity to take the case up and toss the doctrine overboard, the Kentucky Supreme Court declined discretionary review of that decision. Walgreens also argues that the voluntary payment bars recovery when a plaintiff "'knows *or ought to know* the facts' and does not avail himself of the means which the law affords him to resist the demand . . . ." *Chris Albritton Constr. Co. v. Pitney Bowes, Inc.,* 304 F.3d 527, 532 (5th Cir. 2022)(emphasis supplied; internal citation omitted); *see also Ergo v. International Merchant Services, Inc.,* 519 F. Supp. 2d 765, 774 (N.D. Ill. 2007)(the "failure to recognize error in making a voluntary payment" does not overcome the doctrine "when the relevant facts were not obscured or inaccessible."). Walgreens acknowledges that the voluntary payment doctrine is an affirmative defense and that, as such, it bears the burden of proving the elements of that defense by a preponderance of the evidence. *St. Augustine Sch. v. Cropper,* 533 S.W.3d 186, 188 (Ky. 2017).[47]

The crux of Walgreens' argument is that for over a decade before it commenced this Arbitration, Humana knew, or at a minimum should and with minimal effort could have known, that the pharmacy was not submitting its PSC prices as its usual and customary charges and that by failing to take any action Humana should be found to have been voluntarily paying those claims. Walgreens goes even one step further, arguing that despite Humana giving notice of its intent to pursue the issue in December 2017 and filing its Demand for Arbitration in 2019, the voluntary payment doctrine bars its claims right up through today because Humana has continued to pay those claims rather than rejecting them and/or changing its maximum allowable charge ("MAC") to match Walgreens' PSC prices. In arguing for application of the voluntary payment defense, Walgreens relies primarily on the same evidence that formed its (unsuccessful) argument that the parties' course of conduct defeated Humana's contract claim and its (successful) argument that Humana had not met its burden of proving that it had "reasonably relied" on the pharmacy's representations regarding its usual and customary prices. (Walgreens Phase II Post Hearing Br. at 3-11; Walgreens' Oral Argument on Phase II Post-Hearing Briefing Demonstrative at 2-28). As discussed above, the evidence demonstrates that (1) over the years, and in various contexts, issues around PSC, or pharmacy U&C reporting and pricing more generally, were the subject of attention within Humana; (2) there was sufficient information in Humana's possession that had it made a "cursory examination or investigation" as to whether Walgreens was submitting its PSC prices as its usual and customary charge it would have discovered that it was not; (3) Humana ignored other warning signs such as the existence of the *Garbe* district court and Seventh Circuit decisions, and six decisions issued by the district court in the *Corcoran v. CVS* U&C overpayment case, despite that fact Humana employees were aware of the *Garbe* case as early as 2013 and despite Humana's status as one of the largest

---

[47] However, it also argues that once it does so, the burden shifts to Humana to prove that any of the exceptions to the doctrine apply. The Arbitrator agrees and Humana contends that it has met its burden. (Humana Phase II Reply Br. at 7)("Humana has proved both falsity and duress.").

Medicare Part D sponsors in the country, running its own pharmacy and emphasizing its responsibility as the 'first line of defense' to prevent fraud, waste and abuse; and (4) Humana always had the ability to ascertain from publicly available information and its own claims data that it was not getting the benefit of Walgreens' PSC prices and that it could have conducted just such an assessment at *any* time between the launch of the PSC and the time it finally did so. *See Interim Award* at 33-36.[48] In addition to the evidence introduced during Phase I, Walgreens now also argues that factual findings contained in an arbitration award in a case between Humana and CVS on issues similar to this case decided earlier this year demonstrates that CVS expressly informed Humana after forming its own pharmacy club that it did not consider its club prices to be its usual and customary charges and that Humana raised no objections. (Exh. 864 at ¶¶ 31-38). According to Walgreens, this information from CVS "should have caused Humana to investigate what other pharmacies were doing" but that instead, "it did nothing other than to continue to pay claims as submitted." (Walgreens Phase II Post Hearing Br. at 6).

Humana raises three primary arguments in response to the voluntary payment defense. First, it argues that under Kentucky law the voluntary payment doctrine does not extend to situations in which a party paying another should have known the demand was unlawful; rather, it is limited to circumstances involving *actual* knowledge, which it claims it did not have. Second, it contends that it did not have "full knowledge of the facts" rendering the pharmacy's claims submissions violative of the Pharmacy Agreements because it did not know the correct U&C price on *each* claim submission and thus whether or not any given claim was "unlawful." Third, it asserts that the "fraud" and "duress" exceptions to the voluntary payment doctrine preclude application of the doctrine in this case to deny it damages. Finally, and more generally, it argues that under the *Restatement (Third) Restitution and Unjust Enrichment*, the voluntary payment doctrine "must be treated with caution" in business settings and "its operation must be realistic rather than artificial." *Restatement § 6, Comment e.* Each of Humana's arguments is addressed in turn.

First, Humana contends that Walgreens improperly relies on certain out-of-state authorities for the proposition that the voluntary payment doctrine extends to situations in which a paying party *should have* known of certain facts. It argues that under Kentucky law, the doctrine applies only where there is actual knowledge. It further cites to the *Restatement*, which posits that the doctrine does not extend to payments that "were actually the consequence of negligence or inadvertence." But in *Davis,* which just two years ago reaffirmed Kentucky's recognition of the defense, the Court of Appeals *expressly adopted* a standard that incorporated both actual *and* "constructive knowledge." 2021 WL 223528 at *1-2. "Constructive knowledge" has a clear and recognized meaning under Kentucky law: it is "a legal concept by which notice of some fact is imputed to one who, by his knowledge of other facts, should have expected the fact in question to be true, or at least have conducted further inquiry." *Village Square Shopping Center, LLP v. Hyde,* 2021 WL 4228482 at *3 n. 4 (Ky. Ct. App., Sept. 17, 2021)(*citing Bennett v. Nicholas,* 250 S.W.3d 673, 677 (Ky. Ct. App. 2007)). This definition was in effect at the time

---

[48] The *Interim Award* referred to it being "incumbent upon" Humana to conduct at least a cursory examination or investigation. This was not intended do and does not mean that Humana had an inherent legal obligation to do so. Rather, it means that because it would have discovered the misrepresentations had it done so, it could not satisfy the element of a fraud or misrepresentation claim that it reasonably relied upon Walgreens' false representations of its U&C charges.

that both the *Wathen* and *Causey* voluntary payment doctrine cases were decided. *See Mitchell v. First Nat. Bank of Hopkinsville,* 263 S.W. 15, 17 (Ky. Ct. App. 1924)("One who has reasonable grounds for suspecting or inquiring ought to suspect and ought to inquire, and *the law charges him with the knowledge which the proper inquiry would have disclosed.* If a person has knowledge of such facts as would led a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry, and he fails to do so, *he is chargeable with the knowledge which by ordinary diligence he should have acquired."*)(emphasis supplied). Accordingly, and contrary to Humana's argument, Kentucky law as articulated in *Davis* is in accord with the out-of-state authorities relied upon by Walgreens for the same proposition.[49] *See, e.g., Chris Albritton Constr. Co. v. Pitney Bowes, Inc.,* 304 F.3d 527, 532 (5th Cir. 2002)("When . . . the party paying knows or ought to know the facts and does not avail himself of the means which the law affords him to resist the demand, he has not taken due care.")

Second, Humana asserts that because it has not "taken the position that Walgreens overcharged Humana on every claim," the "Arbitrator would seem to have to analyze each claim, one-by-one, to determine whether payment on *that* claim was voluntary, with full knowledge." (Humana Phase II Post Hearing Br. at 43). That is incorrect. It is true that Humana did not suffer damages on many claims because under the lessor of formula they would not have been adjudicated at the PSC price. But that does not change the fact that Walgreens was contractually obligated to submit the correct U&C price on every claim, and thus *every* submission containing the standard retail cash price violated the terms of the Pharmacy Agreements regardless of whether it caused Humana damages. Once Humana knew (as defined under Kentucky law) that Walgreens was not submitting its PSC prices as its usual and customary prices, it possessed "knowledge of all the facts that render[ed]" Walgreens' claims submissions unlawful. And had it conducted a cursory investigation or examination based upon the information before it, it would quickly have discovered that Walgreens *never* submitted its PSC prices as its usual and customary charges and *always* submitted its standard retail prices instead.

The principle underlying the voluntary payment doctrine is that parties should raise issues when they know about them and not let damages accumulate. The consequence of failing to do so is losing the right to recover payments made that were not in fact due. The question then becomes when Humana had constructive knowledge of Walgreens' non-compliance with its contractual obligations. Walgreens argues that dates from approximately January 2009, when according to the findings of another arbitration in a similar case against CVS, Humana was informed by that pharmacy that its club program prices would not be its U&C prices. (Exh. 864). The Arbitrator declines to adopt as evidence in this proceeding factual findings in another arbitration, particularly those based on inferences drawn in the absence of direct evidence.[50] In any event, while it may well have behooved Humana at that juncture to see what other pharmacies were doing with their clubs, even if such information was conveyed to Humana by CVS, that does not by itself rise to the level of constructive knowledge as to Walgreens' activities.

---

[49] To the extent that the constructive knowledge standard adopted in *Davis* conflicts with the more generalized language of the *Restatement* regarding "negligence or inadvertence," the former must control.

[50] Walgreens' argument on this score suggests that it now wants to be rewarded for its own lack of transparency by bootstrapping itself onto what the arbitrator in the CVS matter found to be that pharmacy's fully transparent approach to the impact of its pharmacy club on U&C pricing.

There is no obvious "bright line" as to when Humana had enough information in its possession to rise to the level of constructive knowledge for purposes of the voluntary payment doctrine. As discussed in Section III(C), *supra*, there were hints as far back as 2009 that Humana could have followed up on. Had it done so, it would have obtained actual knowledge of what Walgreens was doing. (Exhs. 24, 224, 232, 244). However, there can be little question that by December 2011, it clearly knew or should have known it was not getting the benefits of its bargain. Between April 2010 and December 2011 (1) Humana's Director of Network Contracting, Laura White (who participated in the 2009 negotiations) emailed another employee regarding the fact that their review of Walgreens data should reflect PSC charges at a particular rate and in fact included a reference to the pharmacy's PSC price look up tool (Exh. 24); (2) Humana employee Ted Nime had conducted a pricing analysis to determine if Humana beneficiaries would get better pricing if they joined the PSC, something that would not have made sense if Humana and its members were already getting the benefit of those prices (Exh. 25); (3) Humana's CFO challenged Jay Ecleberry, Humana's Market Vice President for Pharmacy Networks, to ask Walgreens to enroll Humana's member in the PSC so that Humana could get the benefit of the PSC pricing (Exh. 237); and (4) Laura White requested that a Walgreens MAC analyst send her a list of drugs advertised through the PSC in Excel format. (Exh. 81). As discussed above, either Walgreens refused to give it to her, which should have aroused suspicions as to why, or she got it, in which case she would have been even better equipped to determine whether Walgreens was reporting its club prices as its usual and customary charges. Based on the totality of the evidence, Walgreens has proven by a preponderance of the evidence that as of December 9, 2011 (Exh. 25), Humana had constructive knowledge under Kentucky law of all the facts that rendered Walgreens' claims submissions to be in violation of its contractual obligations.[51] Not only did it possess enough information that would have led it to discover the truth had it engaged in a "cursory examination or investigation"; as of that time some of its key employees *believed* or at a minimum *assumed* they were *not* getting the benefits of PSC pricing but did nothing to confirm that or take action in response. (*supra* at ). And Humana always had the ability to ascertain from publicly available information that it was not getting the benefit of Walgreens' PSC prices or at a minimum that there was a good possibility that it might not be. *Id.* Yet it would be another six years – and only after Humana was approached with a tantalizing offer by a law firm that may have been what awakened it from its slumber – before it acted on that constructive knowledge. (Exh. 866).

Finally, Humana has failed to establish that the "fraud" and "duress" exceptions to the voluntary payment doctrine preclude its application on the facts of this case. There is even less judicial guidance in Kentucky on these exceptions than on the voluntary payment doctrine as a whole. Indeed, neither *Wathen, Causey* nor *Davis* even mention a fraud exception at all. The only Kentucky case cited by Humana for that proposition is *Amer. Nat. Assur. Co. of St. Louis, Mo. v. Ricketts,* 19 S.W.2d 1071 (1929), which described the voluntary payment doctrine as follows: "'[A] party cannot, by direct action . . . recover money voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to

---

[51] Insofar as that timeframe falls outside any damage periods in this case, it is not necessary to pinpoint the moment of constructive knowledge with greater specificity. However, by December 2015, the beginning of the damages timeframe under the 2009 Agreement (absent Walgreens' affirmative defense) there is no question Humana had constructive knowledge that Walgreens was not reporting its PSC prices as its usual and customary charges.

make such payment existed." A Westlaw search reveals that only three Kentucky cases have ever cited *Ricketts* in the nearly one hundred years since it was decided, and not one of them addresses the fraud exception. Nor have the parties provided any helpful judicial guidance.[52] In any event, Humana has *failed* to prove its claim of fraud. Therefore, that exception is not a barrier to application of the voluntary payment doctrine. Humana also argues that it was under duress to continue paying Humana's wrongfully inflated claims. More specifically, it contends that had it terminated its contract with Walgreens that could have led to it failing to satisfy its network adequacy requirements under the Medicare Part D program. But it offered no persuasive evidence supporting such an inference. It is conceivable that had Humana discontinued paying Walgreens' claims, as Walgreens suggests it should have to avoid the voluntary payment doctrine, it potentially could have led to Walgreens' termination of the 2009 Pharmacy Agreement. Section 8.7 of the 2009 Agreement provides that Walgreens had the right to terminate the contract on 30 days' notice if it "reasonably determines that Humana . . . has failed to timely pay claims for Covered Services," subject to a 30-day cure process. (Exh. 11). Thus, if Humana elected to cease paying claims or in Walgreens' view was underpaying them based on what Walgreens believed to be an inaccurate U&C, this could have had a significant adverse impact on its members who rely on it for prescription drug coverage. That may well be true, but it does not give Humana a pass to simply ignore the information in front of it and take no action at all. That is particularly the case here, where the 2009 Pharmacy Agreement spells out a process for addressing overpayment disputes, the very process Humana eventually followed starting at the end of 2017. Accordingly, the Arbitrator finds that the voluntary payment doctrine forecloses Humana from recovering damages between December 19, 2015 and December 18, 2017.[53] However, for the reasons set forth below, the voluntary payment doctrine does *not* bar Humana from recovering damages for the period after it commenced the dispute resolution process and availed itself of the very recourse the parties agreed to follow. *See, e.g., Chris Albritton Constr. Co., supra* (voluntary payment doctrine applies where party knew or ought to know the facts "*and does not avail himself of the means which the law affords him to resist the demand.*"). (Emphasis supplied).

On December 19, 2017, Humana sent Walgreens the Notice Letter expressing concern that the pharmacy may have been overpaid for certain claims based upon the pharmacy's failure to report PSC prices as its U&C prices on Humana transactions. (Exh. 15). There are two reasons why the voluntary payment doctrine does not bar recovery of overpayments made by Humana as of that time and through the present. First, Section 35(1) of the *Restatement (Third) Restitution and Unjust Enrichment Restitution* provides that if a party to a contract demands performance that is not in fact due under the applicable agreement (precisely the situation here based on the inflated U&C charges that form the basis for Walgreens' billings), under circumstances making it reasonable to accede to the demand rather than insist on an immediate test of the disputed obligation, the party on whom the demand is made may render such performance under protest

---

[52] Humana cites to *Flournoy v. Ameritech,* 814 N.E.2d 585, 589 (Ill. Ct. App. 2004). But that case does not help its cause. It did nothing more than hold that at the motion to dismiss stage a claim could not be defeated by the voluntary payment doctrine because the plaintiff had *alleged* fraud. If there is anything to be implied from the decision relevant to this case, it is that a party would ultimately have to prove fraud to avoid application of the doctrine.

[53] In so finding, the Arbitrator has been mindful of – and adhered to – the general principle set forth in the *Restatement (Third) Unjust Enrichment and Restitution* and quoted by Humana that the voluntary payment doctrine should be applied with "caution" in business settings.

or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement. The *Restatement* characterizes this as a "common-sense solution" that "promotes justice and efficiency."  That precisely describes the situation here. Aware that there appeared to be falsely inflated U&C charges but uncertain as to what the "true" U&C was (an issue not resolved until issuance of this ruling), rather than simply ceasing payments and risking disruption for millions of customers, "guessing" what the correct amount was on each transaction as it was submitted from the pharmacy,[54] or terminating the contract (with all the risks and adverse consequences associated with doing so) Humana utilized the contractual provision expressly designed to deal with disputes over overpayments. Pursuing this avenue to contest Walgreens' conduct is entirely consistent with the pharmacy's own statement that Humana "had to take *some* action to avoid voluntary payment," including "invok[ing] Section 5.3 of the 2009 Agreement . . . ." (Humana Phase II Reply Br. at 9).[55] In fact, while the voluntary payment doctrine is intended to accelerate the resolution of disputes rather than letting them linger, the 2009 Agreement provided for a dispute resolution procedure that would precede– and where the parties could reach agreement could completely avoid – the filing of an arbitration demand. Taking such an approach – continuing to pay claims while putting Walgreens on notice of the dispute – would avoid multiple risks attendant to the other alternatives suggested by the pharmacy as to the measures to be taken. Indeed, little would be gained in the eyes of the law by taking actions that would simply shift the identity of claimant and respondent, or at a minimum generate counterclaims for underpayments. And in all likelihood that is exactly what would have happened, insofar as far from acknowledging that it was violating the contract Walgreens not only rejected such a proposition but even refused to provide the cash transaction data that Humana sought to determine whether it was getting the discounts to which it was entitled. And Humana's action was not only reasonable from that standpoint. It also avoided a risk that millions of its members who relied on it for prescription drug coverage would get caught up in the dispute and possibly even be forced to find new pharmacies from which to obtain their prescription medications if Humana began to underpay claims or refuse to pay them altogether over years of litigation and Walgreens responded by terminating the 2009 Agreement. As the Restatement instructs, the application of the voluntary payment doctrine should be "realistic, and not artificial." That instruction rings very true here: Humana's decision as to how to proceed not only followed the instructions of the contract's dispute resolution process for alleged overpayments; it avoided a situation in which it would potentially be generating underpayment claims and even risking a termination of the contract with its attendant impact on millions of Humana members. Accordingly, the voluntary payment doctrine does not bar Humana from recovering overpayments made from December 19, 2017 forward.

---

[54] Humana's PBM presumably had to price claims in real time to determine a member's copayment or coinsurance at the point of sale.

[55] The letter expressly stated it was invoking Section 5.3's dispute resolution mechanisms (doing so in bold typeface) and that it intended to "resolve" any discrepancies regarding usual and customary pricing. As noted in Section III(E)(2)(b), *supra*, the Notice Letter put Walgreens on clear notice that Humana believed it may have overpaid claims based on false reporting of usual and customary prices and that it would seek to recover overpayments it its suspicions proved true.

For all the foregoing reasons, the voluntary payment doctrine bars Humana from recovering damages from December 19, 2015 through December 18, 2017.[56]

## 2. Should Humana's Damages Be Reduced Because It Failed To Mitigate Its Damages By "MACing" Certain Drugs?

Walgreens has asserted as one of its affirmative defenses that Humana failed in its obligation to mitigate its damages. Specifically, it asserts that Humana could have, but did not, change its Maximum Allowable Cost ("MAC") for multi-source generics to match Walgreens' PSC prices. (Walgreens Phase II Post Hearing Br. at 43-47; Exh. 473 at ¶¶ 52-61). Had it done so, Walgreens argues, as a result of the Pharmacy Agreements' "lesser of" methodology, Humana  would have reimbursed the pharmacy for certain claims based on its PSC prices rather than the higher retail cash prices that were submitted as the U&C charge. Walgreens argues that Humana's damages award should be reduced by the amounts it could have avoiding paying by "MACing" the drugs in question.

Kentucky law provides that an injured party is obligated take reasonable steps to mitigate its damages. *Jones v. Marquis Terminal, Inc.,* 454 S.W.3d 849, 852 (Ky. Ct. App. 2014); *Monties Resources, LLC v. Emeco Equip., LLC,* 2012 WL 95427 at *9 (Ky. Ct. App. 2012). A non-breaching party "'cannot stand idly by and permit the loss to accrue or increase, then hold him who breached it liable for the loss which he might have prevented by the use of reasonable efforts, expense, and diligence to prevent, or arrest, the loss.'" Conversely, the law does not require "enhanced or particularized efforts" and the injured party is not obligated to take "unduly risky, expensive, burdensome, or humiliating" steps to mitigate its damages. *Id.; Comprehensive Pharmacy Servs., LLC v. Highlands Hospital Corp.,* 2021 WL 1169897 (E.D. Ky. Mar. 26, 2021); *BB&T Co. v. Pac. Life. Ins. Co.,* 645 F. App'x 387, 391-92 (6th Cir. 2016). Failure to mitigate damages is an affirmative defense and therefore the burden of proof is on Walgreens.

---

[56] Following issuance of the *Damages Framework Ruling*, Walgreens sought leave to file a motion for reconsideration of, *inter alia,* the *Interim Award's* findings in favor of Humana on the breach of contract claim on the grounds that it was inconsistent with the finding on the voluntary payment defense. That request was denied. The rulings are not in conflict. The affirmative defense bars recovery of damages where a party voluntarily pays an "illegal demand." *City of Morganfield, supra,* at 14. In other words, the defense *presumes* a lack of entitlement to the payment sought – in this case claims submissions in violation of Walgreens' contractual obligation to submit its PSC prices as its U&C charge. Indeed, if the evidence in support of a successful voluntary payment defense is sufficient to defeat a breach of contract claim, there would be no need for the defense at all. The evidence relied on by Walgreens for its affirmative defense directly overlaps with the evidence relied on in its unsuccessful effort to defeat the contract claim. But in the context of that claim, the Arbitrator found that *totality* of the evidence was a "mixed bag" and that some documents reflected a belief that Humana *would* be getting the benefit of PSC prices while others could not even be considered "course of performance" evidence. Accordingly, the evidence was found insufficient to overcome the inferences drawn in favor of Humana's contract claim based on other evidence (and in particular the contract negotiations) and the governing law. While the Arbitrator finds that as of December 2011 Humana had "constructive knowledge" of Walgreens' failure to submit PSC prices (and thus some of its payments were considered "voluntary"), that is not inconsistent with the ultimate conclusion that evidence of post-agreement conduct was insufficient to defeat Humana's argument that it had negotiated for and was legally entitled to the benefit of PSC prices. In weighing the evidence, the Arbitrator is unpersuaded that the only additional piece of evidence not presented in Phase I, the letter from Humana's counsel (Exh. 866), is sufficient to alter the finding that the preponderance of the evidence established Walgreens was contractually obligated to report its PSC prices as its U&C charges. *See also* Humana's Response to Walgreens Application for Leave to Move for Reconsideration (Feb. 2, 2023) at 2-3.

*Jones v. Marquis Terminal, Inc.,* 454 S.W.3d 849, 852 (Ky. Ct. App. 2014)("The party committing the breach bears the burden of proving that the plaintiff failed to mitigate his damages."). Because (1) the mitigation of damages defense has an underlying premise that a party is aware it has been wronged; (2) the Arbitrator has found that Humana did not have actual or constructive knowledge of a breach until after expiration of the 1998 Pharmacy Agreement; and (3) this ruling has limited the time period for damages under the 2009 Agreement to the period from December 19, 2017 to the present, the question becomes whether Walgreens has proved that Humana failed to meet its mitigation duty as of that time and through the present.

In support of its affirmative defense, Walgreens argues that Humana had the ability to determine PSC prices for multi-source generics and then set its MAC to that amount (subject to a ▇▇▇▇▇ set forth in the 2009 Pharmacy Agreement). In fact, Walgreens presents evidence that Humana not only could have set its MAC at PSC prices (subject, again, to the contractual floor) but that it actually considered doing so. For example, in February 2009, the possibility of lowering MAC prices to move in line with U&C submitted prices by pharmacies with $4 generic programs was the subject of internal communications within Humana's pharmacy division. (Exh. 225). Two years later, Humana Pharmacy Solutions employee Ted Nime sent an e-mail in December 2011 musing about the possibility of MACing certain drugs at discount program prices if the drug "hits say 5 or more of these [9 national discount program] lists." (Exh. 25). In March 2017, Bryan Duke sent an internal email stating that "prices reflective in pharmacy 'club'/'discount' programs . . . are not being offered as U&C to health plans" and that Humana had the "potential opportunity to capitalize and drive MAC prices lower to ensure we are being offered similar discounts as advertised by these providers to the public through these discount programs." (Exh. 199). Walgreens' expert Dietz also noted that Humana's letter in December 2017 stated that it had compared Walgreens' published PSC lists of cash prices to those prices paid by Humana to Walgreens for certain prescription drugs and that its subsequent Demand for Arbitration also contained a comparison of PSC drug prices with reported U&C prices for the same drugs. (Exh. 473 at ¶¶ 54-55). And Dietz also pointed to internal Humana communications in 2017 with respect to the potential for setting MAC prices to address pharmacy club pricing. (Exh. 473 at ¶¶ 56-57). In fact, an August 2017 e-mail from Jay Ecleberry, Humana's Director of Pharmacy Networks, stated that the company was going through the process of updating MAC prices and in fact had already done so for K-mart and Rite Aid and was "working on others (CVS included) to make sure that we are setting MAC prices no higher than what we see published by these retailers in their programs." (Exh. 32). According to Dietz, re-setting MAC prices was a type of remedy "that PBMs routinely exercise if they believe they may be overpaying under their pharmacy contracts." (Exh. 473 at ¶ 61).

There is no real dispute that Humana had the contractual right, subject to the aforementioned price floor, to reduce its MAC on certain drugs. The question presented, however, is not whether it had the *right* to do so but rather whether by not doing so it failed to meet its legal *obligation* to mitigate damages and thereby relinquished the right to recover overpayments (in whole or in part) for multi-source generic drugs from Walgreens in this Arbitration. Based on the evidence presented, there are a number of reasons to conclude that Walgreens has failed to sustain its burden of proving this affirmative defense.

First, contrary to what Walgreens suggests, this Arbitration has proven that Humana had insufficient information to do what Walgreens said it should have. Walgreens relies on the fact that it advertised its value priced generic drugs publicly. But it did not establish that it placed new advertisements each time any VPG drug prices changed, thus allowing Humana to set a MAC at the then-applicable PSC price. In fact, Walgreens' expert Smith criticized the initial Petron damages analyses on the grounds that they used transactions for a calendar month, contending that this improperly caused damages to be based on mid-month price changes. Furthermore, the evidence established that the prices of many of the drugs covered by the PSC that might have been subject to "MACing" were not publicly advertised or available, at least until 2020. Walgreens provides no support for its proposition that Humana's mitigation obligation extended to utilizing the personal access information of Humana employees who just happened to be Walgreens PSC members in order to gain access to the so-called "look up tool" during periods when it was not publicly available. And while Walgreens claims Humana could have accessed its PSC prices through so-called Retail Pharmacy Price Surveys (Exh. 473 at ¶¶ 52-56), its expert witness Dietz conceded that such surveys would not include PSC pricing. (Exh. 481 at 195:16-23).

Second, some of the very internal documents that Walgreens relies upon for its mitigation defense support the proposition that a decision to MAC drugs at any particular price points was a complicated and multi-factored one and that as such Humana should not have been obligated to modify business practices that affected its relationships with numerous other pharmacies by setting universal MAC prices to address Walgreens' wrongdoing. For example, in 2009, an internal discussion revealed that there would be "pros [and]cons" to moving MAC prices in line with $4 U&C prices submitted by some pharmacies and that it was necessary to consider the submissions of multiple pharmacies, not just one, in order to assess where the overall market was. (Exh. 225). Furthermore, those decisions would have to be made on a drug-by-drug basis, not some overall adjustment for all drugs that were being priced at discounted rates. *Id.* Similarly, the Ted Nime email from 2011 that Walgreens repeatedly has pointed to also reflects the fact that the prices of multiple pharmacies must be taken into consideration in determining MAC prices. Beyond that, however, it went on to warn that there could be problems with taking such action, observing that the "strategy would only work if we could get retailers not to complain about the overall effective rate increasing when these highly discounted generics start hitting the guarantees because they moved from U&C to MAC." (Exh. 25). In fact, the 2009 Pharmacy Agreement itself states as follows: "Humana represents and warrants that it has one (1) MAC list applicable to all providers and that each retail pharmacy provider is reimbursed at the same reimbursement level under the MAC list . . . ." (Exh. 11, § 1.10). Thus, under the 2009 Pharmacy Agreement, Humana would have had to consider not only the impact of changes to its MAC on its relationship with and reimbursements to Walgreens, but that of all other retail pharmacies with which it did business as well. The pharmacy offers no support for the proposition that the obligation to mitigate extends to actions that would violate the contract between the parties by creating a stand-alone Walgreens MAC.[57] The complexity of making

---

[57]There was some limited evidence that in recent years Humana may have set separate MACs for certain other pharmacies. (Exhs. 32 and 740). But at the Phase I hearing, Bryan Duke testified that in 2017, as Humana was focusing on this issue, it considered but rejected adjusting its MAC pricing to address the problem it was identifying with Walgreens, at least in part based upon issues regarding the floor pricing. (Phase I Tr. 244:16-246:1). Walgreens did not refute this evidence or the reasonableness of such a decision.

decisions about what prices to set maximum allowable charges for with respect to prescription drugs was also acknowledged by Walgreens' own expert. Dietz agreed that there are multiple factors involved in establishing a MAC price and that a plan or PBM should "look at as many and wide factors as you can. And if there's areas where you can't do something because of state law, you don't do that." (Exh. 481: 175:17-176:9; 184:12-185:19). *See also* Exh. 205 (discussing the complex factors relating to MAC); Exh. 740 (anticipating adverse reaction from pharmacy to reduction in MAC).

Third, even assuming none of the aforementioned problems existed, the duty to mitigate obligates an injured party to take *reasonable* efforts, not necessarily the efforts that in retrospect the wrongdoer likes best. Walgreens' own expert Dietz acknowledged at the Phase II hearing that Humana took reasonable steps – consistent with the terms of the 2009 Pharmacy Agreement – to address the overpayment issue. Thus, while arguing that Humana could have mitigated its damages by "MACing" multi-source generics, he admitted that sending the Notice Letter to Walgreens in 2017 was a "reasonable step," albeit one he believed should have been taken sooner. (Phase II Tr. 829:9-830:9). Similarly (again with the caveat something should have been done sooner), Dietz also admitted that it was reasonable for Humana to follow the dispute resolution process outlined in the 2009 Pharmacy Agreement to address its concerns regarding Walgreens' U&C pricing and mitigate any damages. (Phase II Tr. 830:20-831:15). In fact, at his deposition he conceded that once the issue was raised with Walgreens and Walgreens rejected the position that its PSC prices were its usual and customary charges, the most appropriate approach would be to follow the dispute resolution process. (Exh. 481 at 207:24-208:14). At the hearing, Dietz confirmed that view, acknowledging that the more reasonable, better option than unilaterally MACing drugs would have been to go through the dispute resolution process; that, he said, was his "preferred choice." (Phase II Tr. at 837:3-7). Insofar as Humana's damages under the 2009 Pharmacy Agreement are limited to the period after the December 2017 notice (and Walgreens has not shown that Humana had actual or constructive knowledge of breaches of the 1998 Agreement until after its expiration) these admissions alone are sufficient to undermine Walgreen's affirmative defense.

Finally, Kentucky courts consider whether a mitigation defense should prevail where the breaching party "had an opportunity to mitigate damages itself." *Jones,* 454 S.W.3d at 852. *See also Monties, supra,* 2012 WL 95427 at *9. Here, Walgreens always had the ability to simply do what the contract required of it – report the correct U&C price under the terms of the Pharmacy Agreement to Humana and receive reimbursement accordingly. As of the date of Humana's letter of December 2017, Walgreens was plainly on notice that Humana was contesting its U&C reporting and thus could have avoided the damages now being awarded against it by modifying its U&C charge reporting practices. Instead, it elected to double down on its U&C risk not only by accepting the payments understanding that they were being contested in accordance with the Pharmacy Agreements but by continuing to earn money on those payments (or otherwise deploy them to Walgreens' benefit) during the pendency of the dispute resolution process. Under these circumstances, Walgreens' "failure to mitigate" affirmative defense falls flat.[58]

---

[58] It is also worth noting that Humana has done nothing to cause the damages to *grow* with respect to any transactions for which damages are awarded. For each claim submission, the damages amount is fixed, with the exception of the prejudgment interest Humana seeks to compensate it for the loss of the use of that money; use that Walgreens has enjoyed in the interim.

For all the foregoing reasons, Walgreens did not meet its burden of proving that Humana failed to fulfill its obligation to mitigate its damages.

### G.  What Is The Amount Of Damages Humana Is Entitled To Recover?

Under Kentucky law, Humana is entitled to recover the difference between the amounts it paid Walgreens and the amounts it would have paid had Walgreens complied with its contractual obligations and reported the proper U&C price on its claim submissions. *See, e.g., Comprehensive Pharmacy Services, LLC v. Highlands Hosp. Corp.,* 2021 WL 1169897 at * 5 (E.D. Ky. 2021)(damages should put injured party in position it would have been in had contract not been breached); *Hogan v. Long,* 922 S.W.2d 368, 371 (Ky. 1995)(same). Humana is not obligated to prove the quantum of damages with exact precision. Rather, the law requires that it prove its damages with "reasonable certainty." *Id; Pauline's Chicken Villa, Inc. v. KFC Corp.,* 701 S.W.2d 399, 401 (Ky. 1985)(applying Restatement (Second) of Contracts § 352); *Kellerman v. Dedman,* 411 S.W.2d 315, 317 (Ky. 1967)(where damages are not capable of "exact" proof evidence is sufficient to support an award of damages where it provides "a foundation which will enable the trier of facts to make a fair and reasonable estimate" and "the plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.")(citation omitted); *Illinois Valley Asphalt, Inc. v. Harry Berry, Inc.,* 578 S.W.2d 244 (Ky. 1979)(plaintiff seeking contract damages must provide sufficient evidence on which a reasonable inference as to the amount of damages can be based). Under *Restatement (Second) of Contracts*, followed by Kentucky courts, "[d]oubts are generally resolved against the party in breach," because "'[a] party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred." *Restatement (Second) of Contracts § 352, cmt. A*. By contrast, an award of damages cannot be based on evidence that is "too remote, conjectural, and speculative." *Insight Ky. Partners II, L.P. v. Preferred Auto Servs., Inc.,* 514 S.W.3d 537, 553 (Ky. Ct. App. 2016)(quoting *Ky. Utilities Co. v. Warren Ellison Café,* 21 S.W. 976, 978 (Ky. 1929)).

As of the time of the Phase II hearing, Humana calculated its damages (*before* prejudgment interest) as exceeding $1.5 billion dollars. By contrast, using a completely different methodology, Walgreens' expert opined that Humana's damages were $336,000. The *Damages Framework Ruling* (Sections I, II and III(A)-(E) of which are incorporated herein by reference) engaged in an extensive analysis of the competing damages models presented by the parties' experts. It reached the following conclusions:

- Based upon the *Ruling on Damages Timeframes (Amended)* as modified by the finding in Walgreens' favor in part on its voluntary payment affirmative defense, the periods for which Humana can recover damages are:

    o For the 1998 Agreement: November 1, 2007 – December 1, 2009
    o For the 2009 Agreement: December 19, 2017 – March 17, 2023

- Humana established that Walgreens' discounted PSC prices were widely and consistently available but did not prove that by a preponderance of the evidence as to other discounted cash prices. Therefore, the starting point for calculating damages should be the difference between what Humana paid Walgreens for a given transaction during the damages timeframes and what it would have paid for the same transaction had Walgreens reported its then applicable PSC price as its U&C charge instead of its retail cash price. *Damages Framework Ruling* at 18, 22-23, 43.

- Humana can also recover damages incurred by its members for overpayments (*i.e.* the difference between what the member paid out of pocket and what the member would have paid if Walgreens reported its PSC price as its U&C charge) for claims under the 2009 Pharmacy Agreement, with such amounts to be distributed to the members (and reverted to Walgreens for members who cannot be located or do not cash their checks). However, Humana does not have the right to recover damages incurred by members for transactions under the 1998 Pharmacy Agreement. *Damages Framework Ruling* at 28-30, 43.

- The Petron III PSC Only analysis contained in his Second Supplemental Report (Exh. 863) should serve as the foundation for calculation of damages, including but not limited to its use of Walgreens' formulary data to determine PSC prices for transactions for the period of January 1, 2018 through April 19, 2022 (the last date for which the experts were provided with transaction data prior to preparation of the Phase II expert reports) and cash transaction data for prior periods using a thirty day lookback period. *Damages Framework Ruling* at 22-23, 43.

- Damages should be reduced to account for changes in Humana's Retained Rx Quality Network Program withholdings that would have occurred if Walgreens had submitted the PSC price instead of its retail cash price as its U&C charge. *Damages Framework Ruling* at 16 and n.7.

- To the extent the Petron III damages calculations based on cash transaction data (rather than formulary prices) included multiple PSC prices to determine damages for a particular transaction or the prices used in the analysis were non-existent or otherwise inaccurate, the post-*Damages Framework Ruling* reports should include opinions as to the correct price(s) to use in the damages calculation. *Damages Framework Ruling* at 24, 43.

- The Petron III analysis should be adjusted to account for sales taxes to avoid using PSC prices reflecting a reduction for such taxes except with respect to Humana transactions in those taxing jurisdictions. *Damages Framework Ruling* at 23, 43.

- The usual and customary price should include an amount to account for the enrollment fees paid by PSC members, per Walgreens' expert's analysis. *Damages Framework Ruling* at 24-27, 43.

- Damages should be extrapolated for the period April 20, 2022 (the day after the last produced Humana transaction data) through March 17, 2023 using average monthly damages (less offsets) for the first quarter of 2022. *Damages Framework Ruling* at 43.

As discussed in Section I, *supra,* following issuance of the *Damages Framework Ruling* both experts submitted initial and rebuttal reports calculating damages based upon that ruling. (Exhs. 869 and 871)(Petron); (Exhs. 870 and 872)(Smith). During the February 15, 2023 expert convocation that followed submission of those reports, Smith testified that although Petron purported to exclude certain transactions from his calculations, he had not actually done so. Following the convocation, Petron re-visited his analysis and concurred that his earlier calculation inadvertently failed to exclude certain transactions he intended to eliminate. He thereafter submitted a "Restated" Rebuttal Report with corrected numbers, which had the effect of substantially narrowing the already small (on a relative basis) differences between the experts' damages calculations for the pre-April 20, 2022 damages period. (Exh. 871A). After the Arbitrator overruled Humana's objection regarding Smith's "partial fill" analysis, Petron submitted a revised report that further narrowed the differences between the experts' damages calculations. (Exh. 874). The following addresses the remaining differences between the experts' opinions and sets forth the conclusions as to the amount of damages Humana is entitled to recover.

### 1. <u>Damages Through April 19, 2022</u>

Petron's analysis concludes that based upon the *Damages Framework Ruling,* Humana's damages through April 19, 2022 were $550,278,709 and member damages for the same period were $21,301,980. (Exhs. 871A at ¶ 3(i) and 874 at ¶¶ 14-15). Thus, Petron calculates total damages through April 19, 2022 to equal $571,580,688. (Exh. 871A at ¶ 3(i)). Smith's final calculation of damages is $549,877,414 for Humana and $21,278,738 for members, for a total of $571,156,152. (Exh. 870 at ¶ 42). Thus, for the period through April 19, 2022, the difference between the experts is $424,536, a difference of less than one tenth of one percent.[59] Approximately three quarters of that gap is due to a disagreement between the experts on one issue: whether transactions at certain Rite Aid drug stores acquired by Walgreens should be included in the damages analysis.[60] The parties agree that pre-acquisition transactions at the Rite-Aid stores should not be included. According to Smith, Petron's damages calculations improperly include transactions involving Humana members at Rite Aid stores prior to March 28, 2018, the date Smith asserts was the date those stores transferred to Walgreens' ownership. (Exh. 870 at ¶ 9(d) and n. 18; Exh. 872 at ¶¶ 18-19). He based that conclusion on an article in *Forbes* that as of that date Rite Aid announced it had completed transferring stores and related assets to Walgreens.[61] Petron responds that the transfer of stores to Walgreens' control took place over the period between November 27, 2017 and March 28, 2018, relying on various Rite Aid press releases to that effect. (Exh. 871 at ¶ 22 n. 24-25)(reporting transfer of 97 stores in November 2017, 625 stores as of January 22, 2018 and 1,651 stores as of March 5, 2018). Petron

---

[59] In his Rebuttal Report, Petron removed certain transactions from his damages analysis in response to the experts' meet and confers without conceding that their inclusion in his original report was improper. (Exh. 871 at ¶ 9(iii)).

[60] Petron calculates the damages relating to this issue to be $309,594. (Exh. 871 at ¶ 21). Smith calculates the amount to be $309,510. (Exh. 872 at ¶ 19).

[61] The article in turn links to a press release by Rite Aid to the same effect.

further asserts that the data fields of the transactions he included from Rite Aid branded stores reflected ownership by Walgreens. Finally, Petron noted that both he and Smith identified these as Walgreens claims during a Humana arbitration against Rite Aid. (Exh. 871 at ¶ 22(v) and n. 29). The preponderance of the evidence establishes that Petron properly included transactions that took place in stores that Walgreens took over prior to March 28, 2018.[62] Therefore, the calculation in Petron's Restated Post-Damages Framework Ruling Rebuttal Report establishes Humana's and its affected members' damages with "reasonable certainty" under Kentucky law for the pre-April 20, 2022 damages period. Humana's damages for that period total $550,278,709 and member damages for the same period total $21,301,980.

### 2. Damages From April 20, 2022 through March 17, 2023

The difference between the experts was initially far greater for the period of April 20, 2022 through March 17, 2023. Over the course of the multiple expert reports submitted before the Phase II hearing and after the *Damages Framework Ruling*, two alternative approaches emerged. Prior to that ruling, both experts' reports used an extrapolation methodology to calculate 2022 damages through the date of the Phase II hearing. The primary difference between those approaches was that Petron initially extrapolated based upon damages incurred in the preceding year, whereas Smith proposed extrapolating based on data for the first quarter of 2022. After the *Damages Framework Ruling* was issued (and pursuant to that ruling), Petron adopted Smith's methodology and extrapolated based on Q1 2022 numbers through March 17, 2023 (the end date for a damages award set forth in the ruling based upon the original expected Final Award date). But Smith pivoted in his initial post-*Damages Framework Ruling* report. Instead of extrapolating for the post-April 19, 2022 damages period, he adopted the methodology employed for the earlier damages periods by using *actual* transaction data for the entire 2022 calendar year (data that obviously was not available at the time of the Phase II hearing).[63] He then used an extrapolation methodology for the period of January 1, 2023 through March 17, 2023 using data from the fourth quarter of 2022. As a result of this change in methodology, Smith's Rebuttal Report calculated a dramatically reduced damages number for April 20, 2022 through March 17, 2023 of $34,245,569 (for both Humana and member damages). (Exh. 870 at ¶¶ 7, 26-37). According to Smith, this was approximately *$64 million* less than the damages that would be calculated by extrapolating from Q1 2022. *Id.* at ¶ 7.  He attributed this significant differential to price increases on PSC drugs throughout 2022 (reflected in the formularies) that caused the extrapolation methodology based on earlier, lower PSC prices to overstate damages. *Id.* at ¶¶ 26-37. For example, Smith observed that for 10 of the 11 drugs responsible for the highest extrapolated damages numbers in the first quarter of 2022, Walgreens raised prices on those drugs in mid-February 2022, thus eliminating further damages for transactions involving those drugs. But extrapolating from the pre-increase prices for the remainder of 2022 rather than using actual transaction data led to damages for just those drugs alone of over $33 million. *Id.* at ¶ 29.

---

[62] There did not appear to be a dispute between the experts that transactions at acquired Rite Aid store after March 28, 2018 *were* included in the damages calculation. Thus, the only issue is whether the transactions in dispute should have been considered pre- or post-acquisition purchases.

[63] Unlike the period through April 19, 2022, however, this analysis was based on *Walgreens'* data on transactions with Humana members rather than Humana's transaction data for the same sales, which was the basis for the prior analyses by both experts. (Exh. 870 at ¶ 32). This followed the Arbitrator's ruling, at Humana's urging, to reject Walgreens' request to require Humana to produce *its* transaction data for the post-April 20, 2022 time period.

Petron responded to this analysis in his Post-Damages Framework Ruling Extrapolation Rebuttal Report. Using the same Walgreens data set relied upon by Smith, Petron calculated total Humana and member damages for the period from April 20, 2022 through March 17, 2023 to be $35,587,660. (Exh. 873 at ¶ 5).[64] Thus, as of the February 15 hearing, the difference between the two experts based on actual damages through 2022 and extrapolated damages for the remainder of the period was $1,342,091, a difference of just under 4%. Neither expert was able to explain the reasons for that difference. (Feb. 15 Tr. at 83:11-86:16).

Based on the evidence and analyses produced by both experts, using actual rather than extrapolated data for calendar year 2022 provides a far more accurate and reliable measure of damages. Although Humana objected to the late change in methodology, it does not seriously dispute this point. Nor has it shown that the Walgreens' data used by Smith and thereafter reviewed by Petron is unreliable. To the contrary, validation work by both experts demonstrated that while the data sets for overlapping periods were not perfectly aligned, they matched each other closely.[65] Accordingly, actual damages should be used for the period through December 31, 2022 and extrapolated damages based on Q4 2022 data is the appropriate basis for measuring damages from January 1 through March 17, 2023.

Another dispute also arose during the post-*Damages Framework Ruling* expert analyses as to the proper calculation of damages. In his rebuttal report, Smith raised for the first time an issue regarding the calculation of damages based on partially filled prescriptions. Smith's rebuttal report, as amplified in his testimony at the expert convocation, stated that in both his and Petron's initial reports damages amounts were overstated in situations where a Humana member had a "partial fill" (*i.e.* only a fraction of the prescribed quantity was provided initially) and the remaining quantity necessary to complete the prescription was furnished to the member in a subsequent transaction. (Exh. 872). Smith testified that Walgreens would only bill Humana for the full fill after it was completed. According to Smith, the Walgreens' data used to calculate damages for the post-April 19, 2022 time period reflected only the transaction that was used to complete the fill. He offered as an example from the data a prescription for Entresto. The data used to calculate damages showed that 120 pills were dispensed in that transaction. Based on a per unit PSC formulary price of $11.29, Smith's initial damages analysis assumed that the total prescription was for 120 pills and thus calculated the PSC price for that quantity. However, Smith's corrected analysis determined that because the 120 pills was a completion fill, and the original intended (and dispensed) quantity was actually 180 pills, the calculated PSC price for 120 pills substantially understated the actual PSC price for the full completed prescription. This

---

[64] Petron also calculated damages using the extrapolation methodology for the post-April 19, 2022 period originally contemplated in the *Damages Framework Ruling* based upon damages from Q1 2022 and determined damages using that methodology to total $94,959,583. (Exh. 872 at ¶ 3(ii)). That is very close to the $64 million differential identified by Smith between the use of actual and extrapolated data.

[65] To test the validity of the Walgreens data, Smith compared the two data sets for the first quarter of 2022 and was able to find matches for 99.2% of the transactions. (Exh. 870 at ¶ 34). Using Smith's approach for the period of March 1 through April 19, 2022, Petron was able to match 96.8% of the claims between the Humana and Walgreens transaction data. (Exh. 873 at ¶ 13(ii)). While unsurprisingly the Walgreens and Humana data sets do not align perfectly, the differences are not significant and Walgreens' actual claims data for April 20, 2022 through December 31, 2022 is a more reliable basis upon which to measure Humana's damages than the extrapolation methodologies originally proposed by the experts and originally contemplated in the *Damages Framework Ruling.*

had the effect of increasing the damages calculation. (Feb. 15 Tr. 105:7-106:9).[66] Although Petron pointed to some data inconsistencies with respect to this issue, he conceded that he identified only about 160 anomalous transactions out of a data set of 29 million (Feb. 15 Tr. 11:12-112:13).[67] Taking into account this issue, Smith's revised calculation of damages for the post-April 19, 2022 time period was $21,168,568 in Humana damages and $2,391,289 in member damages for a total of $23,559,857. (Exh. 872 at ¶ 16).

After overruling Humana's objection to introduction of the partial fill analysis but ordering Walgreens to produce additional information for Petron to investigate that issue, Humana submitted the Post-Damages Framework Ruling Supplemental Expert Report of Michael Petron Responding to Partial Fill Data. (Exh. 875). Although noting certain data validation concerns, his report essentially concurred with Smith's analysis regarding the partial fill issue. *Id.* at ¶¶ 5-13. Accordingly, he revised his damages estimates and concluded that for the post-April 19, 2022 time period, Humana's damages were $22,411,953 and the members' damages were $1,490,225 for total damages of $23,902,177. Thus, the total difference between the experts' final calculations is $342,320, a less than 1.5% difference.

Finally, in Smith's initial post-*Damages Framework Ruling* report, he noted that Walgreens and Humana had entered into a contract amendment on November 17, 2022 that purportedly introduced a new reimbursement structure for generic drugs referred to as the Pharmacy Services Generic Reimbursement Guarantee ("NADAC GER") beginning in 2023. (Exh. 870 at ¶¶ 38-39). According to Smith, the amendment provides that Humana guarantees Walgreens a payment, *in the aggregate,* of 100% of the National Average Drug Acquisition Cost plus a $7.00 dispensing fee on all generic drugs over the Guarantee Period, which is defined as a calendar year.[68] Smith contended that because there is an annual reconciliation after each calendar year, the NADAC GER "could ultimately reduce or eliminate any damages for generic drugs for the January 1 to March 17, 2023 damages period." *Id.* at 39. Walgreens contends that as a result of the amendment any 2023 damages are speculative. Humana objected to this evidence on the grounds that this issue had heretofore never been raised. The Arbitrator concluded in a telephonic hearing that the evidence would not be considered. However, even if the amendment were taken into account it would not reduce the damages awardable. This award concludes that Walgreens is obligated to submit its PSC price as its usual and customary charge (where it is lower than its standard retail price) for each transaction with a Humana member utilizing their insurance and Humana is then to pay Walgreens based on the contractual "lesser of" formula. The fact that an end-of-year reconciliation could mean that in the aggregate Humana may owe Walgreens some amount does not change that obligation or the fact that Humana and its members are damaged at the time of the transaction. Furthermore, insofar as the damages award is intended to replicate how payments should be processed in accordance with the 2009 Pharmacy Agreement, nothing bars those damages amounts from being factored into

---

[66] Smith explained that this was an issue for post-April 19, 2022 damages periods and only where the records had a partial fill code of "C," which reflects the completion of a partial fill. (Feb. 15 Tr. 109:11-17).

[67] Petron also identified an additional 9,700 transactions that "have partial fill codes that aren't even represented in the data dictionary." (Feb. 15 Tr. 112:15-21). However, Smith testified that the adjustments to the damages calculations he made did not include those transactions and instead were limited to partial fill codes that were marked as a completion of a fill by the notation of "C." (Feb. 15 Tr. 114:11-18).

[68] The amendment was identified by Smith as a document relied upon for his opinion but was not submitted as an exhibit to his report.

the GER reconciliation process for 2023 (and it is expected that they would be). Accordingly, damages for the 2023 damages period for the specific claims identified by the experts are awardable and are not speculative.

Based upon the foregoing, the calculation of damages in the Post-Damages Framework Ruling Supplemental Expert Report of Michael J. Petron Responding to Partial Fill Data (Exh. 875) establishes Humana's and its affected members' damages with "reasonable certainty" under Kentucky law. The damages incurred by Humana for the period of April 20, 2022 to March 17, 2023 total $22,411,953 and the member damages for that period total $1,490,225.

## H. Prejudgment Interest

### 1. Is Humana Entitled To Prejudgment Interest And If So At What Rate, For What Time Periods And Shall Interest Be Simple Or Compounded?

 Under Kentucky law, an award of prejudgment interest at a rate of 8% is mandatory in the case of liquidated damages. *Osborn v. Griffin,* 865 F.3d 417, 456 (6th Cir. 2017). The Kentucky Supreme Court has stated that a damages claim is liquidated if it is "'of such nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values.'" *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist.,* 174 S.W.3d 440, 450 (Ky. 2005)(quoting 22 Am.Jur.2d DAMAGES § 469 (2004). Examples include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price." By contrast, unliquidated damages are claims which have "'not been determined or calculated, . . . not yet reduced to a certainty in respect to amount." *Ford Contracting, Inc. v. Ky. Transp. Cabinet,* 429 S.W.3d 397, 414 (Ky. Ct. App. 2014)(quoting *Nucor Corp. v. General Elec. Co.,* 812 S.W.2d 136, 141 (Ky. 1991)). Thus, the first question that must be answered is whether the damages suffered by Humana were liquidated or unliquidated.

The Arbitrator finds that the damages incurred by Humana were unliquidated under Kentucky law. That conclusion is borne out by the fact that not only were there competing analyses between the parties about how to calculate damages at the time of the Phase II hearing that differed by over *$1.5 billion*; Humana *itself* presented varying methodologies in multiple separate reports for determining what damages it incurred in this case. (Exh. 471, 835, 863). As just one example, Humana's expert originally calculated damages based on all "cash" prices in Walgreens' transaction data and only offered as an alternative an analysis based solely on PSC prices. Thus, Humana is wrong when it says that the presence of the "lesser of" formula for reimbursements brings this within the definition of liquidated damages, because it begs the question that has been at the heart of this case: what constitutes the "usual and customary" amount that is part of that formula. In addition, even after adopting the Petron III analysis as the starting point for determining damages, it became necessary for the Arbitrator to decide whether certain reductions or offsets to the calculated amounts were warranted based upon the competing expert analyses and whether an allocation of membership fees should be included in determining the PSC price. *See, e.g., Jackson v. Tullar,* 285 S.W.3d 290, 299 (Ky. Ct. App. 2007)("[D]amages that were established by proof offered during the trial are unliquidated and

not subject to prejudgment interest."); *Osborn v. Griffin,* 865 F.3d 417, 456 (6th Cir. 2017)("Plaintiffs were only able to establish entitlement to their claims by providing expert testimony at trial, a strong indication that the claims were not for liquidated sums.").

The Kentucky Supreme Court has stated that when damages are unliquidated, "[t]he award of interest is left to judicial discretion . . . in light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." *Nucor, supra* at 144 (citing *Restatement (Second) of Contracts § 354). Ford Contracting, supra,* at 414 (amount of prejudgment interest, if any, is subject to weighing of equitable considerations). Therefore, the next step in the analysis is to decide whether the Arbitrator should exercise his discretion to award prejudgment interest, and if so in what amount and for what time period. In addition, the Arbitrator must decide whether to award simple or compound interest. Walgreens asserts that prejudgment interest should be denied altogether based on the same arguments it has raised regarding its two affirmative defenses and based on the doctrine of laches. Under Kentucky law, "[t]he plaintiff's delay in bringing suit is a valid consideration in balancing the equities and is certainly a consideration given the circumstances of this case. . . . " *Journey Acquisition-II, L.P. v. EQT Production Co.,* 2015 WL 3916353 (E.D. Ky. June 25, 2015) at *15. But Humana's damages have already been eliminated in this ruling for the period after it was found to have constructive knowledge of Walgreens' improper submissions but before it formally invoked the contractual dispute resolution process. The calculus as to the issue of prejudgment interest changes once Humana concluded there was a possible breach of the Pharmacy Agreements and put Walgreens on notice through the December 2017 Notice Letter. This was the very "U&C risk" Walgreens knowingly assumed when it decided to pursue a two-tier pricing system without coming clean to Humana about what it was doing so that it could "have its cake and eat it too." Walgreens has already retained and consumed several slices of that cake through application of the 2009 Agreement's two-year lookback period and the voluntary payment doctrine. But once confronted directly with the 2017 Notice Letter, Walgreens refused to provide Humana with the data it requested despite its contractual obligation to furnish information and has continued ever since to submit its retail cash prices as its U&C charges, even after the *Interim Award* concluded over one year ago that its submissions violated the 2009 Agreement. There is no reason under these circumstances why Walgreens should reap the benefit of having enjoyed the use of the overpaid amounts during the course of the dispute resolution process, especially insofar as it always had it within its power to submit its PSC prices as its U&C charge during that time.[69] *University of Louisville v. RAM Engineering & Const., Inc.,* 199 S.W.3d 746, 748 (Ky. Ct. App. 2005)("[E]quity and justice demand that one who uses money or property of another . . . should at least pay interest for its use in the absence of some agreement to the contrary . . . . This principle applies whether or not the amount owed to another is liquidated or unliquidated.")(internal quotations and citation omitted); *Journey Acquisition II, supra* at *18 (awarding interest and finding defendant "could

---

[69] Alternatively, it could have, and apparently in some cases did, increase PSC prices for certain drugs, which had the effect of reducing the amounts that otherwise would have been awarded as damages and associated prejudgment interest. The most appropriate inference is that, even with full knowledge that it faced a risk of a liability and damages award (especially after issuance of the *Interim Award*), Walgreens concluded that it was nonetheless in its interest to continue submitting its retail cash prices as its U&C charge and continue to offer discounted prices through the PSC.

have stopped the running of interest at any point by complying with its contractual duty" especially after "plaintiff made a formal demand.").

In view of the totality of the evidence, and in exercise of the discretion granted under Kentucky law to award prejudgment interest for unliquidated damages, the Arbitrator finds that Humana is entitled to an award of prejudgment interest. Interest shall be calculated on a claim-by-claim basis, accruing from the date Walgreens received each overpayment. *See, e.g., University of Louisville, supra.*  Interest shall be awarded as follows: (1) for damages relating to overpayments under the 1998 Pharmacy Agreement, from the date of the overpayment through December 9, 2011, and then again from December 19, 2017 through March 28, 2023[70]; and (2) for damages under the 2009 Pharmacy Agreement, from December 19, 2017 through March 28, 2023. Under Kentucky law, pre-judgment interest has traditionally been simple interest, but there is no bar to compound interest. *Reliable Mechanical, Inc. v. Naylor Indus. Services, Inc.,* 125 S.W. 3d 856, 858 (Ky. Ct. App. 2003)(deciding to award compound pre-judgment interest); *Travelers Property Cas. Co. of America v. Hillerich & Bardsby Co., Inc.,* 598 F.3d 257 (6th Cir. 2010)(under Kentucky law, default is simple interest; principles of equity used to determine whether compound interest is appropriate).  Based upon the reasoning articulated by the courts in *Reliable Mechanical* and *Journey Acquisition-II,* interest shall be compounded. Prejudgment interest is awarded pursuant to the discretion granted the Arbitrator under Kentucky law at a rate reflecting the average yield for 10 Year Treasury Securities (1) for the initial interest period for the 1998 Pharmacy Agreement overpayments for the period November 2007 through December 2011; and (2) for the re-commencement of interest for 1998 Pharmacy Agreement and all damages under the 2009 Pharmacy Agreement, the period of December 2017 through March 28, 2023. Kentucky Rev. Stat. § 360.040.[71]

## 2.  <u>What Amount Of Prejudgment Interest Is Humana Entitled To Recover?</u>

The experts' calculations of prejudgment interest based upon the foregoing findings are as follows:

- Humana Interest:
    - Smith: $45,648,844
    - Petron: $48,463,014

- Member Interest:
    - Smith: $1,482,744
    - Petron: $1,470,112

---

[70] In other words, interest under the 1998 Agreement ceases to accrue on December 9, 2011, the date determined to be the point at which Humana is charged with constructive knowledge as to Walgreens' breach, and then commences accruing again on December 19, 2017. Although the *Damages Framework Ruling* originally directed the parties to calculate interest through March 17, 2023 (the originally anticipated date for a Final Award), interest is awarded through the date of this Award.

[71] Both experts used the applicable 10 Year Daily Treasury Par Yield Curve Rate in their calculations. (Exh. 875 at n. 13)(Petron); (Exh. 876 at n. 2)(Smith).

- Total Interest:
  - Smith: $47,131,588
  - Petron: $49,933,126

Thus, the total differential in the calculation of prejudgment interest between Humana's and Walgreens' experts is $2,801,538.

The post-*Damages Framework Ruling* expert reports and testimony revealed methodological differences between the parties that appear to account for most of the variance in the calculations of prejudgment interest. The most significant difference is that Petron calculated interest on each claim *before* accounting for the offset for the Rx Quality Network Program withholding. (Feb. 15 Tr. 87:6-88:5). As a result, he calculated interest even on claims in which his own analysis showed there were zero damages. (Feb. 15 Tr. 89:4-15). Smith opined that the offset should be applied first to determine the damages amount and interest should then be applied to that (lower) amount. (Feb. 15 Tr. 88:7-89:3). The Arbitrator finds that Smith's approach is the correct one and the one most aligned with the *Damages Framework Ruling*, because the amount of damages is reduced to the extent there would have been a different withholding amount if Walgreens had reported its PSC prices as its U&C charges. Although not limited to this scenario, there is certainly no basis upon which to award interest on claims for which the damages equal zero.

Based on the foregoing, the Arbitrator finds that Smith's methodology for calculating interest is the more appropriate one. Furthermore, although there is not a complete explanation for every dollar of discrepancy, it appears that almost the entire difference is attributable to Petron's improper application of interest before accounting for deductions for the Rx Quality Network Program withholding. Smith opines that by calculating interest after rather than before accounting for that withholding, Petron's interest calculation would be reduced by $2,735,541 through March 17, 2023. That would reduce the difference between the experts to $66,000, just about one tenth of one percent. For these reasons, the Arbitrator concludes that the Petron calculations, subtracting the amount attributable through March 17, 2023 to the improper calculation of the withholding in proportionate amounts to Humana and member interest, shall be the basis for calculating prejudgment interest.[72] Accordingly, prejudgment interest on Humana's damages is $45,809,540 and prejudgment interest on member damages is $1,388,046.

---

[72] In other words, because 97% of Petron's calculation of interest is allocated to Humana and 3% to members, the reduction in interest of $2,735,541 shall be allocated in equal proportion to each category. After reducing Petron's interest calculation by that amount, the total difference between the experts' damages calculations for all of the Humana and member damages and prejudgment interest is approximately one tenth of one percent.

# IV.
# <u>CONCLUSION</u>

For all the foregoing reasons, the Arbitrator hereby finds and concludes as follows:

1. Humana proved by a preponderance of the evidence that Walgreen Co. breached the 1998 and 2009 Pharmacy Agreements by failing to submit PSC prices as its U&C charge for drugs sold to Humana members.

2. Humana failed to prove by clear and convincing evidence that Walgreen Co. engaged in fraud in violation Kentucky law.

3. Humana failed to prove by clear and convincing evidence that Walgreen Co. engaged in negligent misrepresentation in violation of Kentucky law.

4. Humana is not entitled to an award on its claim for unjust enrichment under Kentucky law because its rights are governed by the terms of the Pharmacy Agreements.

5. Humana failed to prove its claims against Walgreen Boots Alliance, Inc. by a preponderance of the evidence.

6. Walgreens failed to prove by a preponderance of the evidence that Humana breached the covenant of good faith and fair dealing.

# V.
# <u>FINAL AWARD</u>

1. Respondent Walgreen Co. shall pay Humana $572,690,662 in damages and $45,809,540 in prejudgment interest.

2. Respondent Walgreen Co. shall pay Humana $22,792,205 in damages and $1,388,046 in prejudgment interest for damages incurred by Humana members. Humana shall distribute the damages and interest to the affected members within 180 days of a judgment confirming the Final Award. Payments to members who cannot be located by the distribution date and to members who do not cash their payments within 180 days of the distribution date shall be returned to Walgreen Co.

3. Each side shall bear its own attorney fees and costs. The fees and costs of the Arbitrator shall be borne equally. The administrative and other fees of the AAA shall be borne as incurred.

This Final Award is in full settlement of all claims submitted by the parties in this Arbitration. All claims not expressly granted herein are hereby denied.


Dated:  April 5, 2023                                   _____

                                                        Elliot K. Gordon, Arbitrator