# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WALGREEN CO. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-307-ACR |
| | ) | |
| | ) | Oral Argument Requested |
| HUMANA HEALTH PLAN, INC. | ) | |
| HUMANA INSURANCE COMPANY, and | ) | |
| HUMANA PHARMACY SOLUTIONS, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED PETITION TO VACATE ARBITRATION AWARD

## <u>TABLE OF CONTENTS</u>

**Page**

THE PARTIES................................................................................................................ 6

JURISDICTION ............................................................................................................. 6

FACTUAL BACKGROUND ......................................................................................... 6

I.      The Agreements Between Walgreens And Humana ........................................... 6

II.     Walgreens' U&C Submissions To Humana ....................................................... 7

III.    The Prescription Savings Club........................................................................... 9

IV.     Walgreens' Relationship With Crowell And Crowell's Pitch To Humana ..................... 10

PROCEDURAL HISTORY.......................................................................................... 11

GROUNDS REQUIRING THE AWARD TO BE VACATED .................................... 19

I.      The Arbitrator Exceeded His Authority By Making Multiple Errors By Ignoring
        The Contract And Applicable Law .................................................................... 22

        A.      The Arbitrator Rewrote The Contract By Applying Language From A
                Court Decision Rather Than The Parties' Agreed Definition.............................. 22

        B.      The Arbitrator Compounded His Errors By Adopting A Damages Model
                That Is Completely At Odds With The Parties' Contractual U&C
                Definition ................................................................................................ 29

        C.      The Arbitrator's Application Of The Voluntary Payment Doctrine In The
                Framework Ruling Further Compounded The Errors In His Prior Rulings ........ 31

                1.      The Arbitrator's Findings As To Humana's Knowledge In The
                        Framework Ruling Are Inconsistent With His Earlier Findings .............. 33

                2.      The Same Findings In The Framework Ruling Are Also Logically
                        Inconsistent With the Arbitrator's Timeframes Ruling ........................... 36

        D.      The Arbitrator Exceeded His Mandate By Disregarding Kentucky Law
                That Limited The Timeframes As To Which Humana Could Recover
                Damages.................................................................................................... 37

        E.      The Arbitrator Exceeded His Mandate By Awarding Prejudgment Interest ........ 39

II.     The Arbitrator's Acceptance Of Six Other Appointments Involving Crowell
        During The Pendency Of The Arbitration Deprived Walgreens Of An Impartial
        Arbitrator.................................................................................................................... 40

III.    Crowell's Ethical Violation Resulted In An Award Procured By "Undue Means" ......... 43

CONCLUSION ............................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. L. Pickens Co. v. Youngstown Sheet & Tube Co.*,
    650 F.2d 118 (6th Cir. 1981) ...................................................34

*Andersons, Inc. v. Horton Farms, Inc.*,
    166 F.3d 308 (6th Cir. 1998) ...................................................20

*ARMA, S.R.O. v. BAE Sys. Overseas*,
    961 F. Supp. 2d 245 (D.D.C. 2013) .................................21, 43

*Billips v. Hughes*,
    259 S.W.2d 6 (Ky. 1953) .........................................................34

*Davis v. Chevy Chase Fin., Ltd.*,
    667 F.2d 160 (D.C. Cir. 1981) ..................................................5

*Davis v. Norton Healthcare*,
    No. 2020-CA-0151-MR, 2021 Ky. App. Unpub. LEXIS 54 (Ky. App. Jan. 22, 2021) .........31

*Ford v. Ratliff*,
    183 S.W.3d 199 (Ky. App. 2006) ............................................22

*United States ex rel. Garbe* v. *Kmart Corp.*,
    73 F. Supp. 3d 1002 (S.D. Ill. 2014), *amended by* 2015 U.S. Dist. LEXIS 73520
    (Jan. 12, 2015), *aff'd in part, rev'd in part*, 824 F.3d 632 (7th Cir. 2016) ..................23

*United States ex rel. Garbe* v. *Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) .......................................4, 23, 29

*United States ex rel. Gathings v. Bruno's Inc.*,
    54 F. Supp. 2d 1252 (M.D. Ala. 1999) ...................................27

*Hanger v. Hanger*,
    205 S.W. 2d 321 (Ky. App. 1947) ...........................................22

*Holland v. Trinity Health Care Corp.*,
    791 N.W.2d 724 (Mich. Ct. App. 2010) ..................................27

*Howard Univ. v. Metro. Campus Police Officer's Union*,
    519 F. Supp. 2d 27 (D.D.C. 2007), *aff'd by*, 512 F.3d 716 (D.C. Cir. 2008) .........21

*Life & Cas. Ins. Co. v. Metcalf*,
    42 S.W.2d 909 (Ky. App. 1931) ..............................................26

*Matteson v. Ryder Sys. Inc.*,
  99 F.3d 108 (3d Cir. 1996) ...................................................................................5

*Nw. Nat'l Ins. Co. v. Insco, Ltd.*,
  No. 11 Civ. 1124, 2011 U.S. Dist. LEXIS 113626 (S.D.N.Y. Oct. 3, 2011) ............................1

*Osborn v. Griffin*,
  865 F.3d 417 (6th Cir. 2017) ........................................................................40, 42

*PMA Cap. Ins. Co. v. Platinum Underwriters Berm. Ltd.*,
  400 F. App'x 654 (3d Cir. 2010) ..............................................................5, 19, 29

*U.S. ex rel. Proctor v. Safeway*,
  30 F.4th 649 (7th Cir. 2022), *writ of certiorari granted by* 143 S. Ct. 643 (2023) .......4, 27, 28

*Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*,
  125 S.W.3d 856 (Ky. App. 2003) ...............................................................40

*Republic of Arg. v. AWG Grp.*,
  894 F.3d 327 (D.C. Cir. 2018) ................................................................19, 20, 31, 39

*Republic of Arg. v. AWG Grp. Ltd.*,
  211 F. Supp. 3d 335 (D.D.C 2016) ...............................................................19

*Safeway Stores, Inc. v. United Food & Com. Workers Union, Loc. 400*,
  621 F. Supp. 1233 (D.D.C. 1985) ...............................................................5

*U.S. ex rel. Schutte v. SUPERVALU, Inc.*,
  9 F.4th 455 (7th Cir. 2021), *writ of certiorari granted by* 143 S. Ct. 644 (2023) .........4, 27, 28

*United States ex rel. Schutte v. SuperValu, Inc. et al.*,
  No. 11-3290, 2020 WL 3577996 (C.D. Ill. July 1, 2020), *aff'd*, 9 F. 4th 455
  (2021), *cert. granted*, 143 S. Ct. 644 (2023) ...............................................................28

*Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) .................................................................19, 20, 31, 39

*Thomas Kinkade Co. v. White*,
  711 F.3d 719 (6th Cir. 2013) ........................................................................20, 41

*United States v. W. Elec. Co.*,
  592 F. Supp. 846 (D.D.C. 1984) ...............................................................22

*Univ. of Louisville v. RAM Eng'g & Constr., Inc.*,
  199 S.W. 3d 746 (Ky. App. 2005) ...............................................................40, 43

*Washington v. CVS Pharm., Inc.*,
  No. 21-16162, 2022 U.S. App. LEXIS 33547 (9th Cir. Dec. 6, 2022) ...................................24

*White v. Four Seasons Hotel & Resorts,*
     244 F. Supp. 3d 1 (D.D.C. 2017) ............................................................21

**Statutes**

9 U.S.C. § 10 .............................................................................................6

28 U.S.C. § 1332 ........................................................................................6

42 U.S.C. § 1320a-7(b)(6)(A) ..................................................................27

FAA § 10(a)(1) .....................................................................................21, 43

FAA § 10(a)(2) .................................................................................20, 40, 43

FAA § 10(a)(3) .................................................................................20, 40, 43

FAA § 10(a)(4) ................................................................................... *passim*

Ky. Rev. Stat. § 304.17A-708(3)(a)-(b) ...................................................38

Ky. Rev. Stat. § 304.17A-708(3)(b) .........................................................39

Ky. Rev. Stat. § 304.17A-714(1) .........................................................38, 39

Ky. Rev. Stat. § 304.17A-726 ...................................................................38

Ky. Rev. Stat. § 413.090 ...........................................................................38

**Rules**

AAA Commercial Rule R-19(a) ................................................................12

**Regulations**

74 Fed. Reg. 54,634, 54,666 (Oct. 22, 2009) ...........................................27

## EXHIBIT INDEX

| Exhibit Number | Exhibit Title |
|---|---|
| Exhibit 1 | Email from R. Robinson to K. Harrison & A. Portnoy, dated Feb. 10, 2021 (<u>Feb. 10, 2021 Email</u>) |
| Exhibit 2 | Email from R. Robinson to S. Clayton, dated Feb. 26, 2021 (<u>Feb. 26, 2021 Email</u>) |
| Exhibit 3 | Phase I Hrg. Tr. |
| Exhibit 4 | First Am. Compl. at 20 (Apr. 6, 2021), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021CA000861B (Sup. Ct. D.C.) (<u>Sup. Ct. D.C. First. Am. Compl.</u>) |
| Exhibit 5 | Pharmacy Provider Agreement (the <u>1998 Agreement</u>) |
| Exhibit 6 | National Chain Pharmacy Provider Agreement (the <u>2009 Agreement</u>) |
| Exhibit 7 | Final Award (<u>Award</u>) |
| Exhibit 8 | Excerpts of Caremark Corporate Dep. in *Russo v. Walgreen Co.*, No. 1:17-cv-02246 (N.D. Ill.) |
| Exhibit 9 | Excerpts of ESI Corporate Dep. in *Russo* |
| Exhibit 10 | Excerpts of Optum Corporate Dep. in *Russo* |
| Exhibit 11 | Decl. of S. Couffer (Mar. 1, 2021) |
| Exhibit 12 | Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021) |
| Exhibit 13 | Crowell New Client/New Matter Form |
| Exhibit 14 | Crowell October 2008 Bill for "Usual and Customary Issue" |
| Exhibit 15 | Crowell November 2008 Bill for "Usual and Customary Issue" |
| Exhibit 16 | Pitch Document |
| Exhibit 17 | Email from E. Gordon to S. Burris Clayton & D. Bender, dated Oct. 10, 2022 |
| Exhibit 18 | December 2017 Notice Letter (the <u>Notice Letter</u>) |
| Exhibit 19 | Interim Award |
| Exhibit 20 | Ruling on Walgreens' Dispositive Motion on Humana's Failure to Satisfy Condition Precedent Before Initiating Arbitration (the <u>Condition Precedent Ruling</u>) |
| Exhibit 21 | Ruling on Parties' Cross-Dispositive Motions on Respondent Walgreen Co.'s Counterclaim (the <u>Counterclaim Ruling</u>) |
| Exhibit 22 | Letter dated April 8, 2021 |
| Exhibit 23 | Letter dated August 11, 2021 |

| Exhibit 24 | Email from S. Coleman to S. Clayton dated Mar. 30, 2021 (<u>Mar. 30, 2021 Email</u>) |
| Exhibit 25 | Email from S. Coleman to S. Clayton dated Nov. 17, 2022 |
| Exhibit 26 | Mot. for Leave to Amend, attaching Second Am. Compl. (April 28, 2023), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021 000861 B (Sup. Ct. D.C.) |
| Exhibit 27 | Ruling on Timeframes Damages (Amended) (the <u>Timeframes Ruling</u>) |
| Exhibit 28 | Phase II Damages "Framework" Ruling (the <u>Framework Ruling</u>) |
| Exhibit 29 | Second Supplemental Expert Report of Michael J. Petron ¶¶ 10-12 (Sept. 26, 2022) (<u>Petron Expert Report</u>) |
| Exhibit 30 | Scheduling Order No. 1 |
| Exhibit 31 | Ruling on Walgreen Co.'s Request for Leave to File Motion for Reconsideration of Interim Award, Ruling on Damages Timeframes and Ruling on Damages Framework (<u>Ruling on Application</u>) |
| Exhibit 32 | Decl. of M. Engel (Apr. 8, 2021) |
| Exhibit 33 | Email from R. Robinson to D. Schnorrenberg dated Feb. 16, 2021 (<u>Feb. 16, 2021 Email</u>) |
| Exhibit 34 | Decl. of D. Bender (May 19, 2023) |
| Exhibit 35 | *Humana v. CVS* Final Award |
| Exhibit 36 | Phase II Damages Framework Expert Rebuttal Report of J. Smith (Feb. 10, 2023) |
| Exhibit 37 | Crowell September 2008 Bill for "Discount Card Programs" |

1.      This arbitration began in betrayal and ended in a miscarriage of justice.

2.      In the late 2000s, the law firm of Crowell & Moring LLP (Crowell) advised Walgreen Co. (Walgreens) on whether offering a pharmacy savings club might affect the usual and customary (U&C) prices Walgreens reported to insurers like Humana Health Plan, Inc., Humana Insurance Company, and Humana Pharmacy Solutions, Inc. (Humana).  Then, in 2017, Crowell sent Humana a "pitch" document arguing that Walgreens and other pharmacies had overcharged Humana by not treating their savings club prices as their "usual and customary" prices when seeking reimbursement.  Crowell convinced Humana, which had known it was not receiving Walgreens' savings club prices for years before receiving Crowell's pitch letter and had done nothing about it, to hire it to bring that claim, and in 2019, Crowell filed an arbitration demand against Walgreens.  Crowell's decision to switch sides and solicit (and then pursue) litigation against its former client on the subject of its former advice was unconscionable and a blatant violation of ethical rules.  Although Walgreens asked it to withdraw, Crowell, with Humana's support, refused to do so.  Walgreens told Humana and Crowell that Crowell's participation in the arbitration would irrevocably taint those proceedings and reserved its right to seek all appropriate relief.[1]  Because enforcement of attorney ethics falls within the expertise and competence of courts, not arbitrators,[2] Walgreens filed suit against Crowell in D.C. Superior Court, seeking damages and equitable relief based on its violations of its ethical obligations (the D.C. Superior Court Action).[3]

---

[1] *See* Ex. 1, Email from R. Robinson to K. Harrison & A. Portnoy, dated Feb. 10, 2021 (Feb. 10, 2021 Email); Ex. 2, Email from R. Robinson to S. Clayton, dated Feb. 26, 2021 (Feb. 26, 2021 Email); Ex. 3, Excerpt of Phase I Hrg. Tr. at 11:2-13.

[2] *See, e.g.*, *Nw. Nat'l Ins. Co. v. Insco, Ltd.*, No. 11 Civ. 1124, 2011 U.S. Dist. LEXIS 113626, at *15 (S.D.N.Y. Oct. 3, 2011).

[3] Walgreens seeks to recover its costs and expenses for defending the Humana arbitration, indemnification from Crowell for any arbitral award, costs and expenses related to that action, disgorgement of profits, punitive damages, and an injunction that Crowell stop breaching its

After the denial of Crowell's motion to dismiss in that case, discovery is well underway.

3.      To make matters worse, over the course of the arbitration, the arbitrator (the Arbitrator) serially disclosed that he had accepted appointments to serve as either an arbitrator or a mediator in *six other cases* in which Crowell was counsel.  Whether or not this was an intentional effort by Crowell to curry favor, these serial appointments raised serious questions about the Arbitrator's neutrality.  The disclosures came as the arbitration was increasingly advanced: the first disclosure was in June 2020 (almost a year into the proceedings), the second in July 2020, the third in January 2021, the fourth in March 2021, the fifth in August 2021, and the sixth in November 2022.  After the fourth disclosure, Walgreens raised concerns with the American Arbitration Association (the AAA).  Despite knowing of these concerns, Crowell kept appointing the Arbitrator, and the Arbitrator kept accepting those appointments.  This conduct put Walgreens in an untenable position: at the time of the Arbitrator's fourth disclosure, the Phase I hearing on liability[4] was roughly three months away, there was no reason to believe the Arbitrator would agree to step aside (while asking him to do so created a significant risk of prejudice), and restarting the arbitration with a new arbitrator was not a practical option.  The pattern of appointments—and the questions it raises—is deeply troubling.

4.      Perhaps this conduct would be less troubling if the Arbitrator had gone on to construe the actual contracts between Walgreens and Humana (the Parties).  He did not.  The

---

fiduciary duty.  Ex. 4, First Am. Compl. at 20 (Apr. 6, 2021), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021CA000861B (Sup. Ct. D.C.) (Sup. Ct. D.C. First. Am. Compl.).

[4] The Arbitrator previously bifurcated the proceedings into a liability phase (Phase I) and a damages phase (Phase II).  The Arbitrator issued an Interim Award at the conclusion of Phase I.  This amended petition supersedes Walgreens' original petition to vacate the Arbitrator's November 2021 interim award (the Interim Award), which is incorporated in the Award.  To the extent that the Court finds that the Interim Award is not superseded in full by the Award, Walgreens also petitions to vacate the Interim Award for the same reasons stated in this petition.

contracts at issue require that, when Walgreens submits a reimbursement claim to Humana for a prescription drug dispensed to a customer insured by Humana, Walgreens must report its "usual and customary" price for that drug.[5]  Does that mean the price Walgreens would normally charge a customer with no insurance or other benefits, or does it mean the lower price available only to customers who pay an annual fee to join Walgreens' Prescription Savings Club (PSC) to obtain lower club prices?  Walgreens correctly concluded that "usual and customary," as used in the Parties' contracts, means standard retail prices, not special rates available only to members of a fee-based savings club.  For roughly a decade, Humana apparently agreed: it was aware of PSC and its lower prices, but reimbursed Walgreens, without any complaint, based on Walgreens' reporting of its retail prices, not PSC prices, as its U&C prices.

5.       The relevant provision defines the "usual and customary" price for a drug as the amount "charged to a cash customer by the Participating Pharmacy at the time of dispensing," which "may vary by geography."  Ex 6, 2009 Agreement § 1.27.  That text has two unmistakable clues that it refers to retail prices, not special rates available only to club members.  First, it refers to the price "charged to a cash customer."  *Id.*  The most natural reading of that language—and the one the industry consistently follows for similar terminology—is the price for a customer who pays the retail price for a drug.  It does not mean the price for someone who uses insurance or other benefits, or who paid to join a special club.  Second, it recognizes that the U&C price depends on the "Participating Pharmacy" and can "vary by geography," because Walgreens' retail prices do, in fact, vary from one pharmacy to the next.  *Id.*  By contrast, PSC prices are uniform: PSC members receive the same PSC price for a given drug at every Walgreens pharmacy, regardless of

---

[5] Walgreens contracted with Humana for reimbursement of prescription drugs it dispensed to those insured by Humana.  *See* Ex. 5, Pharmacy Provider Agreement (the 1998 Agreement); Ex. 6, National Chain Pharmacy Provider Agreement (the 2009 Agreement) (together, the Agreements).

what retail price that pharmacy would otherwise charge.

6.      The Arbitrator did not take *any* of that into account.  He did not begin his analysis with the Parties' actual contract language.  Instead, he began with the Seventh Circuit's decision in *United States ex rel. Garbe* v. *Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016).  In *Garbe*, the court considered whether Kmart violated the federal False Claims Act and analogous state laws by not reporting its own pharmacy club prices as its U&C prices to government payers, and interpreted the phrase "usual and customary" for purposes of federal healthcare program requirements.  In that context, the court held that "usual and customary" meant "the lowest prices for which [Kmart's] drugs were widely and consistently available" to the general public, which the court determined, based on the record before it, were Kmart's pharmacy club prices.  *Id*. at 645.  Here, the Arbitrator treated *Garbe* "as a 'default' rule" of contract interpretation that the Parties had to prove they had contracted out of, and imported the *Garbe* "rule"—first announced in 2016—into the Parties' Agreements.  Award at 20.  One obvious and significant problem with this analysis is that *Garbe* was decided seven years *after* the Parties signed the agreement at issue, so there could not have been any such "default" rule at the time of the 2009 Agreement, much less the 1998 Agreement.

7.      Moreover, the way the Arbitrator applied his so-called "default" rule entirely ignored other rulings from the Seventh Circuit recognizing that "usual and customary" was subject to multiple reasonable interpretations before *Garbe,* as well as statements from the federal government refuting the existence of any such default rule in 2009.  *U.S. ex rel. Proctor v. Safeway*, 30 F.4th 649, 659 (7th Cir. 2022), *writ of certiorari granted by* 143 S. Ct. 643 (2023); *U.S. ex rel. Schutte v. SUPERVALU, Inc*., 9 F.4th 455, 469-72 (7th Cir. 2021), *writ of certiorari granted by* 143 S. Ct. 644 (2023); *see* below ¶ 65.  Perhaps most critically, the Arbitrator ignored the fact that the Parties *did* contract out of *Garbe*.  Indeed, the Parties specifically defined "usual and

customary" to be a geography- and pharmacy-specific price actually charged to a cash customer. The Arbitrator did not seriously grapple with that definition, and neither the Arbitrator nor Humana offered any persuasive reading of the actual text of the Parties' contract.

8.      Walgreens acknowledges that the bar for vacating an arbitral award is high.  It is not insurmountable, however.  *Davis v. Chevy Chase Fin., Ltd.*, 667 F.2d 160, 164 (D.C. Cir. 1981) ("Federal courts are empowered under section 10 of the [FAA] to vacate arbitration awards" under certain conditions); *Safeway Stores, Inc. v. United Food & Com. Workers Union, Loc. 400,* 621 F. Supp. 1233, 1237 (D.D.C. 1985) ("The courts' deference to arbitration awards . . . does not grant to arbitrators unrestrained authority."); *PMA Cap. Ins. Co. v. Platinum Underwriters Berm. Ltd.*, 400 F. App'x 654, 655 (3d Cir. 2010) ("[T]he courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators") (quoting *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996)).  The Arbitrator ignored key contractual language and set up an impossibly anachronistic standard: Walgreens could not contract out of a so-called default rule that did not yet exist.  Nor should this arbitration have happened in the way it did.  Crowell should not have represented Humana against Walgreens, its former client, on the subject of its earlier advice.  And Walgreens should not have had to face its former counsel representing an adversary before an Arbitrator who had since accepted at least *six other matters* with Crowell.  In short, the Arbitrator exceeded his authority by failing to interpret the Parties' contracts reasonably, and the arbitration was marred by serious irregularities that further warrant vacating the Award.

9.      The result is that, because the Arbitrator improperly compared the prices Walgreens charged Humana to prices that were neither "usual" nor "customary," Walgreens has been ordered to pay the staggering sum of *$642 million—more than a half a billion dollars—*when no ordinary reader of the contract at issue would find that Walgreens had done anything wrong, and when the

evidence showed Humana was fully aware of Walgreens' approach and did nothing until solicited by conflicted counsel.  This miscarriage of justice should not be permitted to stand.

## THE PARTIES

10.     Walgreens is an Illinois corporation and maintains its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015.  Walgreens is one of the largest retail pharmacy chains in the United States.  With a presence in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, Walgreens operates nearly 9,000 retail pharmacies and interacts with approximately 8 million customers in stores and online each day.

11.     Humana Health Plan, Inc. is a health maintenance organization incorporated in Kentucky with its principal place of business at 500 W. Main Street, Louisville, Kentucky 40202.

12.     Humana Insurance Co. is an insurance company incorporated in Wisconsin that maintains its principal place of business at 500 W. Main Street, Louisville, Kentucky 40202.

13.     Humana Pharmacy Solutions, Inc. is a pharmacy benefit manager incorporated in Kentucky with its principal place of business at 500 W. Main Street, Louisville, Kentucky 40202.

## JURISDICTION

14.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity exists among the Parties and the matter in controversy exceeds $75,000.

15.     Venue is proper within this district pursuant to 9 U.S.C. § 10 because the place of the arbitration was deemed to be in Washington, D.C., as set forth on page 2 of the Award.

## FACTUAL BACKGROUND

### I.     The Agreements Between Walgreens And Humana

16.     This case arises from Walgreens' longstanding contracts with Humana to reimburse Walgreens for prescription drugs it dispensed at its pharmacies to people insured by Humana.  Under the Parties' Agreements, one metric that set a ceiling on the reimbursement that Humana

would pay Walgreens for prescription drugs was its U&C price.  Ex. 7, Final Award (<u>Award</u>) at 9,

13; *see also* Ex. 6, 2009 Agreement, Ex. D(1)-(2); 1998 Agreement, Ex. D(1)-(2).

17.     The 1998 Agreement did not define U&C; however, the 2009 Agreement expressly

defines U&C as "the amount submitted by the Participating Pharmacy to a third-party payor, in

the usual and customary field in the latest [National Council for Prescription Drug Programs]

format, and charged to a cash customer by the Participating Pharmacy at the time of dispensing,

excluding sales tax.  The Parties agree the Usual and Customary Charge may vary by geography."

Ex. 6, 2009 Agreement § 1.27; Ex. 7, Award at 9-10, 14.

18.     Although its U&C definition does not refer to "discount card programs" or

Walgreens' pharmacy club, PSC, the 2009 Agreement expressly addresses "discount card

programs" in at least three other places.  Ex. 6, 2009 Agreement § 1.19, Ex. I(4), and Ex. I(14).

## II.     Walgreens' U&C Submissions To Humana

19.     For decades, Walgreens reported its retail prices as its U&C prices on claims it

submitted to Humana for reimbursement.  *See* Ex. 7, Award at 11.  Retail price are prices charged

to customers who do not present insurance or use any other benefit, such as PSC or a third-party

discount card, to obtain a lower price for a prescription drug.  Consistent with the undisputed

evidence from the arbitration, the pharmacy and pharmacy benefits industries understand the term

"cash customer" to refer to a customer who pays a pharmacy's retail prices.  *See* below ¶¶ 20, 64.

Indeed, the undisputed evidence in Phase I reflected a broad industry understanding that "cash

customer" does *not* include customers who are enrolled in any sort of savings club or discount

program, a view shared by Humana's own Director of Pharmacy Audit.  *See* Ex. 7, Award at 26-

29, 40 ("Wehneman [who previously worked at Kmart], as Director of Pharmacy Audit [for

Humana], apparently carried with him from Kmart the belief that he testified to in *Garbe* that

'enrollment in a plan of any sort or a third-party plan, [or] discount card agreement' means the

'prescription is no longer considered a cash customer prescription.'") (citation omitted).

20.    Apart from Humana's contemporaneous understanding, the evidence presented in the arbitration showed that pharmacy benefit managers (PBMs) that process and adjudicate reimbursement claims for an overwhelming majority of prescriptions dispensed nationwide have long uniformly agreed that U&C prices do *not* include club prices or other prices that require the customer to take an affirmative action to obtain them.  *See* Ex. 7, Award at 26-29.  Highlights of testimony from three of the nation's largest PBMs—companies that, as of 2020, processed approximately 77% of all managed prescription claims in the United States—included:[6]

- Caremark, LLC (Caremark) testified that "paying cash" refers to a customer "that did not have a funded benefit or an unfunded benefit," with a funded benefit referring to a benefit where a third party pays for part or all of the claim, and an unfunded benefit including "consumer card program[s] that members enroll in to get a particular . . . set of benefits, one being discounts on the prescription drugs."  As to a PSC customer, Caremark "did not consider that a cash-paying customer," including after first learning about PSC.  Caremark also confirmed that it knew in 2008 that Walgreens did not report its PSC prices as U&C, and never objected because club prices "didn't fit our definition of usual and customary."[7]

- Express Scripts, Inc. (ESI) testified that the U&C price is understood as "the cash price that any patient or consumer would pay, absent presenting a benefit or participating in some type of program," and is synonymous with the "retail price."  ESI also testified that the term "cash transaction" is "synonymous with U&C, meaning the price that a patient or consumer would pay, if they accessed a retail pharmacy without utilizing either their insurance benefit or some type of other program," including a club like PSC.  ESI would not consider a club price to affect U&C, because it "requires some type of action to participate[.]"  ESI testified that in 2009, when it entered an agreement with Walgreens, it understood that the PSC price "was not included in the usual and customary price."[8]

- OptumRx, Inc. (Optum) testified that a "cash paying customer" did not refer to PSC members, who enrolled in the program and paid a fee.  Optum explained that "a cash paying customer is one that doesn't have any other benefits."  Further, Optum testified that from

---

[6] *The Top Pharmacy Benefit Managers of 2020: Vertical Integration Drives Consolidation*, DRUG CHANNELS (Apr. 6, 2021), https://www.drugchannels.net/2021/04/the-top-pharmacy-benefit-managers-pbms.html.

[7] Ex. 8, Excerpts of Caremark Corporate Dep. in *Russo v. Walgreen Co.*, No. 1:17-cv-02246 (N.D. Ill.) at 75:12-76:3, 197:6-198:5, 207:5-209:13.

[8] Ex. 9, Excerpts of ESI Corporate Dep. in *Russo* at 67:18-68:3, 68:14-20, 98:20-99:4, 113:1-9.

the time PSC was introduced, Optum was aware that Walgreens was not submitting PSC prices as U&C prices based on transaction data, and Optum never objected because this reporting practice "aligned with Optum's understanding of what U&C pricing was."[9]

21.     As the Arbitrator acknowledged, "Humana did not introduce any contrary testimony or declarations from representatives of PBMs regarding their interpretation of the Agreements, which can be construed as at least a tacit admission that it would be unable to dispute the purported industry understanding (at least the PBM industry) [proffered] by Walgreens."[10]  Ex. 7, Award at 27 n.24 (emphasis omitted).

### III.     The Prescription Savings Club

22.     Well before the Parties entered into the 2009 Agreement, Walgreens began publicly piloting PSC, a fee-based pharmacy savings club designed to give the uninsured and underinsured access to lower prices.  PSC has an annual membership fee of $20 per individual or $35 per family, and members must meet eligibility criteria and agree to abide by the terms and conditions of participation, such as agreeing to purchase drugs covered by PSC without the use of insurance (e.g., payment by Humana or other insurers).  Customers who do not join PSC, pay the fee, and satisfy all other conditions of membership continue to pay Walgreens' retail prices rather than its club prices.  *See* Ex. 7, Award at 11.

23.     Walgreens introduced an enormous amount of evidence showing that, in 2009, Humana was well aware of pharmacy savings programs, including PSC.  *See* Ex. 7, Award at 30. PSC was no secret—Walgreens has published information about PSC on its public website for

---

[9] Ex. 10, Excerpts of Optum Corporate Dep. in *Russo* at 192:24-193:13, 198:12-199:7.

[10] The Arbitrator rejected this uniform industry evidence based primarily upon unfounded concerns that PBMs have certain financial and legal incentives to assert that "cash prices" do not encompass pharmacy club prices and because the industry evidence was developed in other litigation.  Ex. 7, Award at 26-29.  The Arbitrator did not identify any basis to believe that any of the PBM witnesses who provided such testimony perjured themselves.

years, including the requirements to join.  *See id.* at 41.  The Arbitrator expressly found that, by *no later* than 2011, Humana had at least constructive knowledge that Walgreens was not submitting PSC prices as its U&C prices, yet did not file its arbitration demand until mid-2019. *See* below ¶ 47.  Before being solicited by Crowell, Humana never claimed that PSC prices should be viewed as U&C prices under the Agreements.  To the contrary, for a decade or more, Humana continued to reimburse Walgreens based on U&C prices that did not take PSC prices into account.

## IV.     Walgreens' Relationship With Crowell And Crowell's Pitch To Humana

24.     In 2008 and 2009, before the Parties signed the 2009 Agreement, Walgreens retained Crowell to provide legal advice about PSC.  Ex. 11, Decl. of S. Couffer ¶¶ 4-8 (Mar. 1, 2021); Ex. 12, Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021).  Over approximately nine months, Crowell provided Walgreens with advice on the very topic that would be the subject of Humana's claim against Walgreens a decade later.  That advice included whether PSC and similar programs might impact U&C prices reported to third-party payers (like Humana) and helping Walgreens respond to an inquiry from a third-party payer about Walgreens' U&C reporting practices.[11]

25.     Then, in 2017, Crowell switched sides and specifically targeted Walgreens in a pitch to Humana.  In the pitch, Crowell offered "an opportunity for Humana to recover significant overcharges . . . from certain other retail pharmacies that offered deep discounts on generic drugs to cash customers through prescription savings clubs or other similar programs, but failed to include these cash sales in reporting its U&C prices."  Ex. 16, Pitch Document at HUM-861-

---

[11] Ex. 11, Decl. of S. Couffer ¶¶ 4-8 (Mar. 1, 2021); Ex. 12, Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021); Ex. 13, Crowell New Client/New Matter Form at 1371 ("Matter Description: Advise client on responding to Connecticut Medicaid agency's inquiry regarding usual and customary rate and any subsequent inquiries from other state agencies.") (emphasis omitted); *see also* Ex. 14, Crowell October 2008 Bill for "Usual and Customary Issue" at 1356; Ex. 15, Crowell November 2008 Bill for "Usual and Customary Issue" at 1364.

00000021.[12]  Crowell offered, at no charge, to "collect and analyze Humana's contracts with its PBMs and specific retail pharmacies, including, but not limited to *Walgreens* and Kmart."  *Id.* (emphasis added).  The Rules of Professional Responsibility in the District of Columbia, like many jurisdictions, preclude counsel from representing a party in a substantially related matter in which that party's interests are materially adverse to a former client, absent consent of the former client. Crowell never sought, much less received, Walgreens' consent.

## PROCEDURAL HISTORY

26.     As late as March 2017, Humana confirmed in internal communications that it knew that "prices reflective in pharmacy 'club'/'discount' programs . . . are not being offered as U&C to health plans," and proposed to address this issue by exercising a contractual right to impose a Maximum Allowable Charge (MAC) on certain pharmacy reimbursement claims.  *See* Ex. 7, Award at 59 (citing Ex. 199).  But in December 2017, after Crowell's solicitation, Humana asserted for the first time that Walgreens should have reported prices available only to PSC members as its U&C prices on its claims submitted to Humana.  *See* Ex. 18, December 2017 Notice Letter at 1-2 (the Notice Letter).  In January 2018, Walgreens responded that, consistent with its contractual obligations, it properly reported its retail prices, rather than PSC prices, as its U&C prices. Notably, Humana never requested that Walgreens refund any specific overpayments, which Section 5.3 of the 2009 Agreement expressly requires before pursuing arbitration.  *Id.* at 1-4.

27.     Instead, on August 12, 2019, Humana filed an arbitration demand (the Demand) with the AAA against Walgreens claiming (i) breach of contract, (ii) negligent misrepresentation,

---

[12] Walgreens did not learn about this document until late in the arbitration in the fall of 2022 when Humana filed it on the public docket in the D.C. Superior Court Action.  *See* Ex. 17, Email from E. Gordon to S. Burris Clayton & D. Bender, dated Oct. 10, 2022.

(iii) unjust enrichment, and (iv) fraud.  Ex. 7, Award at 3.[13]

28.      The 2009 Agreement provides for arbitration before one arbitrator appointed in accordance with the AAA's Commercial Arbitration Rules, which provide that "[a]ny arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith."  AAA Commercial Rule R-19(a).  Walgreens accepted the Arbitrator having noted that he did not disclose any ongoing relationship or pending appointments with Humana or Crowell.

29.      Following the Arbitrator's appointment, Walgreens promptly objected to arbitral jurisdiction because Humana had failed to satisfy the condition precedent required under Section 5.3 of the 2009 Agreement of making a specific demand for reimbursement before filing the Demand.  Ex. 20, Ruling on Walgreens' Dispositive Motion on Humana's Failure to Satisfy Condition Precedent Before Initiating Arbitration at 1-2 (the <u>Condition Precedent Ruling</u>).  In a March 2020 decision, the Arbitrator excused Humana's failure to comply with a specifically agreed-upon notice requirement and other requirements of Section 5.3.  *Id.* at 7.  In doing so, however, the Arbitrator concluded that the December 2017 Notice Letter Humana sent to Walgreens did *not* qualify as a request for refund of overpayments under Section 5.3.  *Id.* at 5.

30.      In June 2020, three months after the Condition Precedent Ruling, Walgreens received a supplemental disclosure from the AAA stating that the Arbitrator had been appointed as arbitrator in another case in which Crowell was counsel.  Then, just one month later, the Arbitrator disclosed yet another appointment as arbitrator in a Crowell case.

31.      On January 4, 2021, after expending significant financial resources to defend

---

[13] The Demand also named Walgreens Boots Alliance (<u>WBA</u>) as a defendant.  In the Interim Award, the Arbitrator found that "Humana failed to prove by a preponderance of the evidence that [WBA] has successor liability for the conduct of Walgreen Co."  Ex. 19, Interim Award at 39; Ex. 7, Award at 41.  That ended WBA's involvement in the arbitration.

against Humana's fraud claim, Walgreens sought leave to file a counterclaim because discovery had revealed that Humana had breached the implied covenant of good faith and fair dealing by asserting its fraud claim in bad faith.  *See* Ex. 7, Award at 4.  The counterclaim asserted that Humana's fraud allegation was never sustainable because Humana knew about PSC as early as 2009 and acquiesced to Walgreens' clear contractual interpretation that PSC prices did not qualify as U&C prices; Humana knew and accepted the fact that, for a decade or more, Walgreens had not been reporting PSC prices as its U&C prices; and Humana took no action to address that fact, even though Humana was fully capable of doing so and, in fact, did so with respect to other pharmacies.

32.     The counterclaim set forth the evidence that Humana produced from its own files showing that Humana knew, willfully ignored, or recklessly disregarded that it could not sustain its fraud claim as a matter of fact and law at the time it commenced the arbitration.  Nevertheless, Humana asserted a claim for fraud solely in an effort to circumvent a provision of the 2009 Agreement that limited Humana's ability to recover to a period of two years absent a finding of fraud.  *See* Ex. 6, 2009 Agreement, § 5.3.

33.     In January 2021, days after Walgreens sought leave to assert its counterclaim, the Arbitrator disclosed a third new appointment as arbitrator in a Crowell case.

34.     Although the Arbitrator permitted Walgreens to bring this claim, he granted Humana's motion to dismiss it in May 2022.  Ex. 21, Ruling on Parties' Cross-Dispositive Motions on Respondent Walgreen Co.'s Counterclaim at 9 (the Counterclaim Ruling); Ex. 7, Award at 5.  By the time of this ruling, the Arbitrator had accepted two additional appointments to preside over additional matters in which Crowell was involved, bringing the total to *five* new appointments.  *See* Ex. 22, Letter dated April 8, 2021 at 1-2; Ex. 23, Letter dated August 11, 2021.

35.     In March 2021, a month before the Arbitrator denied its dispositive motion on

Humana's fraud claim, Walgreens received the fourth disclosure of the Arbitrator being appointed by Crowell. Walgreens requested additional information regarding these appointments. Ex. 24, Email from S. Coleman to S. Clayton dated Mar. 30, 2021 (Mar. 30, 2021 Email). In correspondence to the AAA dated March 30, 2021, Walgreens explained that, although it "had no concerns about [the Arbitrator] serving in one or two additional matters with Crowell . . . [Walgreens did] have concerns with his participation in five pending cases [including the arbitration] with our opposing counsel." *Id.*

36.     Walgreens did not receive any information about the compensation the Arbitrator received in connection with those matters. Ex. 23, Letter dated August 11, 2021. Thus, Walgreens can only speculate as to the amount of that compensation, which he may continue to receive, from Crowell or its clients from these successive appointments, not to mention any additional appointments that have followed. These appointments make it highly unlikely that the Arbitrator could objectively have considered Walgreens' counterclaim because Crowell, whose conduct was directly implicated in the counterclaim, apparently is a source of significant past, present, and future income for the Arbitrator. The Arbitrator may have believed that Crowell would no longer seek to appoint him in connection with additional matters if he ruled against its client, Humana.

37.     Apart from the troubling nature of the Arbitrator's financial entanglements with Humana's counsel, the timing of the fourth disclosure put Walgreens in an untenable position. During the 18 months leading up to that disclosure, Walgreens had expended enormous resources responding to the Demand and in discovery, and the June 2021 Phase I hearing on liability was approaching. There was no reason to believe the Arbitrator would voluntarily step aside, and a request to disqualify him could further impact his impartiality. And starting the arbitration with a new arbitrator at that late date was not a practical option. Thus, Walgreens reluctantly allowed the

arbitration to continue despite the Arbitrator's deepening financial ties to Crowell.[14]

38.     At the start of the Phase I hearing, Walgreens also notified the Arbitrator that in February 2021, as a result of its discovery of Crowell's conflict of interest, Walgreens had commenced the D.C. Superior Court Action against Crowell for breaching its fiduciary duty of loyalty.  *See* Ex. 4, Sup. Ct. D.C. First. Am. Compl. ¶ 2.  In that action, Walgreens sought a preliminary injunction precluding Crowell from continuing its representation of Humana.  The court denied that motion, but that decision is currently on appeal.[15]  The court also denied Crowell's motion to dismiss the rest of the case, and discovery is ongoing.[16]

39.     In the interim, Walgreens had no choice but to continue with the arbitration involving both conflicted counsel and an Arbitrator who had decided to take on numerous contemporaneous appointments involving that counsel.  From June 21-29, 2021, the Parties engaged in the Phase I liability hearing.  Ex. 7, Award at 4.

40.     On November 8, 2021, the Arbitrator issued the Interim Award sustaining Humana's breach of contract claim.  Ex. 19, Interim Award at 39-40; Ex. 7, Award at 4.  In doing so, the Arbitrator ignored the Parties' actual contract language and the overwhelming and undisputed Phase I evidence of course of performance and usage of trade in the industry, finding that Walgreens should have reported PSC prices as its U&C prices to Humana.  In doing so, the

---

[14] The Arbitrator subsequently accepted still more appointments from Crowell.  Walgreens noted its concern for the record, but also noted that it had no practical choice but to continue in light of the advanced stage of the proceedings, as the hearing on Phase II post-hearing briefs was imminent. *See* Ex. 25, Email from S. Coleman to S. Clayton, dated Nov. 17, 2022.

[15] *Walgreen Co. v. Humana Health Plan, Inc.*, No. 21-CV-370 (D.C. May 28, 2021).

[16] On April 28, 2023, Walgreens filed a motion for leave to amend its complaint in the D.C. Superior Court Action to, among other things, add an aiding and abetting claim against Humana for its role in encouraging Crowell to continue to ignore its ethical obligations to Walgreens.  *See* Ex. 26, Mot. for Leave to Amend at 1-2, attaching Second Am. Compl. (April 28, 2023), *Walgreen Co. v. Crowell & Moring LLP*, Civil Action No. 2021 000861 B (Sup. Ct. D.C.).

Arbitrator declared the Parties' actual agreements ambiguous and then imported a completely new U&C term drawn from the Seventh Circuit's decision in *Garbe*, issued years after the Parties entered into the 2009 Agreement.

41.     On February 4, 2022, Walgreens filed its original petition to vacate to preserve its right to contest the finding of a breach of contract in the Interim Award.  *See* Dkt. 1, ¶ 2. At Walgreens' request, the Court stayed the case until the issuance of a final award.  *See* Dkt. 6.

42.     During Phase II of the arbitration, the Parties briefed the temporal scope of Humana's purported damages.  On April 26, 2022, the Arbitrator issued a ruling allowing Humana to recover damages from two periods: (1) November 2007 to December 1, 2009 under the 1998 Agreement; and (2) December 19, 2015 to present under the 2009 Agreement.  Ex. 7, Award at 5; *see also* Ex. 27, Ruling on Damages Timeframes (Amended) at 10 (the <u>Timeframes Ruling</u>).

43.     These timeframes made no sense.  The Arbitrator's ruling effectively reversed his prior finding in the Condition Precedent Ruling, *see* above ¶ 29, that Humana never sent a proper request for reimbursement that could have triggered a two-year repayment period under the 2009 Agreement.  Because of this abrupt reversal, the Arbitrator held that damages would commence December 19, 2015 (two years prior to the date of the Notice Letter) through the present.  Ex. 27, Timeframes Ruling at 10.  If the Arbitrator had remained consistent with his earlier ruling, damages would not have commenced until August 2017, two years prior to the filing of the Demand.  In addition, the Arbitrator disregarded Kentucky statutes that specifically limit the time period for collection of overpayments, or the retroactive denial of claims between an insurer and healthcare provider, to two years. [17]  Despite these statutes, the Arbitrator found that Humana could

_____

[17] The 1998 Agreement contains an express choice of law provision stating that it is to be construed and enforced in accordance with the laws of the State of Kentucky.  *See* Ex. 7, Award at 16. Although the 2009 Agreement does not include a governing law provision, the Arbitrator found

recover damages from November 2007 to December 2009 under the 1998 Agreement because of Kentucky's general 15-year statute of limitations.  Ex. 27, Timeframes Ruling at 3, 10.

44.     The Phase II Hearing took place in Washington, D.C. from August 15-18, 2022. Ex. 7, Award at 6.

45.     In November 2022, before he issued the Award, the Arbitrator disclosed yet another appointment involving Crowell, his sixth since taking on the Humana-Walgreens arbitration.

46.     On December 30, 2022, after post-hearing briefs and oral argument, the Arbitrator issued the Phase II Damages "Framework" Ruling (the <u>Framework Ruling</u>), which set forth a methodology for the Parties' experts to use to calculate damages under the Award.  *See* Ex. 28, Framework Ruling at 3.  The Arbitrator adopted a damages model and made rulings on Walgreens' affirmative defenses that favored Humana in ways that exposed additional errors and revealed inconsistencies among the Interim Award, the Timeframes Ruling, and the Framework Ruling.

47.     For example, in concluding that the voluntary payment doctrine barred Humana from recovering damages from December 2015 to December 2017, the Arbitrator found that Walgreens had proven that, by December 2011, "Humana clearly had constructive knowledge" that Walgreens was not reporting PSC prices as its U&C prices, Ex. 28, Framework Ruling at 34, and that Humana was only "awakened . . . from its slumber" to take action after Crowell "approached [it] with a tantalizing offer."  *Id*. (citing the Pitch Document).  Of course, the only reasonable inference one could draw from Humana's years of inaction despite that knowledge is that it shared Walgreens' belief, consistent with the prevailing belief across the entire industry, that it was not contractually entitled to receive PSC prices, which also happened to be fully

---

that Kentucky law also governs claims under the 2009 Agreement.  *Id*.  Moreover, the 2009 Agreement expressly obligates Walgreens and Humana to comply with all applicable federal and state laws.  *See* Ex. 6, 2009 Agreement §§ 2.5 and 3.2.

consistent with indisputable course of performance evidence the Arbitrator should have considered when interpreting the Agreements. The Arbitrator failed to recognize and address these irreconcilable inconsistencies.

48.     Second, the Arbitrator ignored the unambiguous contract language by adopting a damages model proposed by Humana's expert (the Petron Model).  Ex. 28, Framework Ruling at 22-23.  The Petron Model calculates damages on the basis of prices Walgreens listed on its internal PSC price lists from January 1, 2018 forward, rather than on transaction data reflecting prices Walgreens actually "charged" any customer at any pharmacy, as the 2009 Agreement specifies. *See* Ex. 29, Second Supplemental Expert Report of Michael J. Petron ¶¶ 10-12 (Sept. 26, 2022). The Arbitrator's adoption of the Petron Model conflicted with his Ruling on Damages Timeframes and exacerbated his errors in the Interim Award.  *See* below ¶¶ 74-75.

49.     Walgreens sought leave to move for reconsideration under the required procedure, which limited requests for leave to three pages.  Ex. 30, Scheduling Order No. 1, ¶ 6(a).  Despite acknowledging that reconsideration may be "appropriate where various rulings in an arbitration are inconsistent[,]" the Arbitrator denied Walgreens an opportunity to file a full-length brief and refused to reconsider the Framework Ruling or his other prior rulings.[18]  Ex. 31, Ruling on Walgreen Co.'s Request for Leave to File Motion for Reconsideration of Interim Award, Ruling on Damages Timeframes and Ruling on Damages Framework at 2 & n.1 (Ruling on Application).

50.     The Parties exchanged expert reports, and, on February 15, 2023, the Arbitrator held a hearing with the experts, also in Washington D.C.  Ex. 7, Award at 8.

---

[18] This is not the first time that the Arbitrator declined to correct errors.  When Walgreens brought errors and inconsistencies in the Timeframe Ruling to the Arbitrator's attention by filing a motion for reconsideration, the Arbitrator summarily rejected each of Walgreens' substantive arguments and corrected only a typographical error.  *See* Ex. 7, Award at 5.

51.     On March 28, 2023, the Arbitrator issued the Award, granting Humana over $642 million in damages and prejudgment interest.  As set forth below, the Award conflicts with the Parties' agreed-upon U&C definition and the Arbitrator's own rulings as to Humana's knowledge of Walgreens' U&C reporting practices.  The Award represents the culmination of the Arbitrator's repeated, erroneous decisions exceeding his mandate.

## GROUNDS REQUIRING THE AWARD TO BE VACATED

52.     The Court should vacate the Award for three primary reasons.

53.     First, the Arbitrator exceeded his authority by effectively re-writing the operative provisions of the Agreements to insert a term to which the Parties did not agree. This warrants vacating the Award under § 10(a)(4) of the FAA, which "authorizes vacatur of an arbitration award 'where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'"  *Republic of Arg. v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 357 (D.D.C 2016) (quoting 9 U.S.C. § 10(a)(4)), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018).   A party can "succeed in vacating an award under § 10(a)(4)" if it "demonstrate[s] that the 'arbitrator strayed from interpretation and application of the agreement and effectively dispensed his own brand of industrial justice.'"  *Id.* (quoting *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)) (alterations omitted).  The Arbitrator failed to interpret or apply the actual language the Parties agreed upon, instead applying very different language from a court decision issued seven years after the Parties finalized the 2009 Agreement (and 18 years after they finalized the 1998 Agreement).  *See PMA Cap.*, 400 F. App'x at 656 (affirming judgment vacating arbitral award when the arbitrators "went beyond the scope of their authority" by "rewriting material terms of the contract they purported to implement").  Instead of interpreting or applying the U&C definition the Parties agreed on, the Arbitrator supplanted the

contractual language with a retroactive "default" U&C definition created by a court decision that did not exist at the time of contract, even though the facts of that case differed materially from those before the Arbitrator, and even though the so-called "default" definition bears no resemblance to the contractual definition the Parties chose to use. By ignoring the Parties' express contractual terms, the Arbitrator exceeded his authority and dispensed "his own brand of industrial justice." *AWG Grp.*, 211 F. Supp. 3d at 357 (quoting *Stolt-Nielsen*, 559 U.S. at 671).

54.     Second, the Arbitrator's acceptance of at least *six* other appointments involving Crowell during the arbitration warrants vacating the Award under §§ 10(a)(2) and (3) of the FAA, which permits vacatur "where there was evident partiality" in the arbitrator. The D.C. Circuit has recognized that "[i]mpartiality of the arbitrators is a cardinal feature of fair adjudication." *Republic of Arg. v. AWG Grp.*, 894 F.3d 327, 333 (D.C. Cir. 2018). A party challenging an award under § 10(a)(2) can satisfy its burden by presenting "specific facts that indicate improper motives on the part of an arbitrator." *Id*. at 335 (citation omitted); *see also Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998) (the standard under § 10(a)(2) "requires a showing greater than an appearance of bias, but less than actual bias.") (citation omitted) (internal quotation marks omitted). The Arbitrator's serial acceptance of at least six other matters involving Crowell, coupled with his refusal to provide any information on the fees he earned in those matters and with his rulings ignoring the Parties' Agreements to Humana's benefit, should result in vacatur of the Award under § 10(a)(2). *See Thomas Kinkade Co. v. White*, 711 F.3d 719, 724-25 (6th Cir. 2013) (affirming vacatur of an arbitration award when "nearly five years into th[e] arbitration . . . the purportedly neutral arbitrator's law firm . . . was hired by one party's arbitrator-advocate . . . and then again by that same party . . . for engagements that by all appearances would be substantial"). Likewise, the Court should vacate the Award under § 10(a)(3), which applies where the arbitrator

engages in "misbehavior by which the rights of any party have been prejudiced." When evaluating this type of challenge, courts must determine whether "the [a]rbitrator's actions deprived [a party] of a fundamentally fair hearing." *White v. Four Seasons Hotel & Resorts*, 244 F. Supp. 3d 1, 5 (D.D.C. 2017). Among other things, a "fundamentally fair hearing" requires "that the decision makers are not infected with bias." *Howard Univ. v. Metro. Campus Police Officer's Union*, 519 F. Supp. 2d 27 (D.D.C. 2007) (citation omitted) (alteration omitted), *aff'd by*, 512 F.3d 716 (D.C. Cir. 2008). Because the Arbitrator's financial relationship with Crowell, which developed over the course of the arbitration, tainted the proceedings in Humana's favor and deprived Walgreens of an impartial arbitrator, the Award should be vacated.

55.     Finally, Crowell's violation of its ethical obligations to Walgreens as its former client, including soliciting Humana to bring a claim against Walgreens on the very same issue on which Crowell previously advised Walgreens, falls well within § 10(a)(1) of the FAA, which authorizes a court to vacate an arbitration award procured by "undue means." *ARMA, S.R.O. v. BAE Sys. Overseas*, 961 F. Supp. 2d 245, 254 (D.D.C. 2013) ("undue means" requires "nefarious intent or bad faith, or conduct that is immoral, if not illegal") (internal citations omitted) (alterations and internal quotation marks omitted). Crowell must have known its representation of Humana violated its ethical duties to Walgreens, Ex. 11, Decl. of S. Couffer ¶¶ 4-8 (Mar. 1, 2021); Ex. 12, Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021); *see also* Ex. 32, Decl. of M. Engel ¶ 4 (Apr. 8, 2021), and Humana has known this since at least February 2021, when Walgreens brought this issue to the attention of Crowell and the AAA.[19] Ex. 1, (Feb. 10, 2021 Email); Ex. 33, Email from

---

[19] Although Crowell began acting adversely to Walgreens no later than in 2017, Crowell did not reveal to Walgreens its role as Humana's counsel until August 2019, when it filed the Demand against Walgreens. By that time, the only remaining Walgreens employee who had previously interacted with Crowell had changed her job function and had no reason to have been apprised of the Demand or the identity of the firm that had filed it. Ex. 11, Decl. of S. Couffer ¶¶ 4-8 (Mar. 1,

R. Robinson to D. Schnorrenberg dated Feb. 16, 2021 (Feb. 16, 2021 Email); Ex. 2, Feb. 26, 2021

Email.  Yet Humana directed Crowell to continue to act as its counsel, even after the Arbitrator

observed that it would be operating "under some cloud" that Walgreens may challenge any arbitral

award.[20]  Ex. 34, Decl. of D. Bender ¶¶ 8-9 (May 19, 2023).

## I.     The Arbitrator Exceeded His Authority By Making Multiple Errors By Ignoring The Contract And Applicable Law

56.     The Arbitrator exceeded his authority by rewriting the Agreements with a

materially different U&C definition drawn from an out-of-circuit court decision that post-dated

the Parties' contract by years, instead of the U&C definition on which the Parties actually agreed.

57.     It is axiomatic that "[i]n construing contracts the primary purpose of the Court is to

determine the intention of the parties at the time and place the contract was made[.]"  *Hanger v.*

*Hanger*, 205 S.W. 2d 321, 324 (Ky. App. 1947); *United States v. W. Elec. Co.*, 592 F. Supp. 846,

859 n.47 (D.D.C. 1984) ("the overriding purpose in construing a contract is to give effect to the

mutual intent of the parties at the time the contract was made") (citation omitted).  It is similarly

well-settled that he starting point for determining such intentions is the plain language of the

contract.  *Ford v. Ratliff*, 183 S.W.3d 199, 203 (Ky. App. 2006).

### A.     The Arbitrator Rewrote The Contract By Applying Language From A Court Decision Rather Than The Parties' Agreed Definition

58.     Rather than interpret the express language of the U&C definition agreed upon by

---

2021); Ex. 12, Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021).  As a result, Walgreens did not recognize Crowell's conflict until February 9, 2021, when its outside counsel happened to come across documents related to Crowell's prior legal advice to Walgreens while reviewing documents in connection with a different litigation matter.  Ex. 32, Decl. of M. Engel ¶ 4 (Apr. 8, 2021).

[20] As explained in greater detail in the accompanying Motion for Partial Stay, because Walgreens seeks relief for Crowell's ethical misconduct in the D.C. Superior Court Action, for considerations of comity and judicial efficiency the Court should defer ruling on this basis for vacatur and stay any enforcement of the Award until after the D.C. Superior Court has issued a final ruling on Crowell' misconduct in that related case.

the Parties as set forth in the 2009 Agreement, the Arbitrator imported a U&C definition from *Garbe*, a federal court decision issued seven years *after* the Parties entered the 2009 Agreement—and 18 years after they entered into the 1998 Agreement—that involved different parties and very different law, facts, and contractual terms.  *See* Ex. 7, Award at 17-20.

59.     *Garbe* involved allegations that Kmart violated the federal False Claims Act and analogous state laws by not reporting its pharmacy club prices as its U&C prices to government payers.  In ruling, however, the court expressly recognized that contractual U&C definitions would control the parties' U&C reporting obligations.  Indeed, the district court concluded, in a finding the Seventh Circuit did not disturb, that "[i]t would be nonsensical to find that [contractual] definitions would not control the specific contracts or agreements with these specific payers." *United States ex rel. Garbe* v. *Kmart Corp.*, 73 F. Supp. 3d 1002, 1015-16 (S.D. Ill. 2014), *amended by* 2015 U.S. Dist. LEXIS 73520 (Jan. 12, 2015), *aff'd in part, rev'd in part*, 824 F.3d 632 (7th Cir. 2016).  Because there was no applicable contract language before it, the Seventh Circuit looked to federal regulations rather than contracts with payers like Humana, and determined that, because Kmart's savings club prices were "the lowest prices for which its drugs were widely and consistently available" to the general public, those prices were Kmart's U&C prices.  *Garbe*, 824 F. 3d at 645.

60.     The Arbitrator believed that *Garbe* created "what can best be described as a 'default' rule: the usual and customary price is the lowest price made widely and consistently available to the general public, unless the parties 'further define' the definition of U&C contractually." Ex. 7, Award at 20.  That is, instead of interpreting what the Parties actually agreed to and the course of their actual performance over decades, the Arbitrator flipped the inquiry on its head, requiring Walgreens to prove it had expressly contracted out of the *Garbe* "default"

definition of U&C price (a definition that did not exist until *seven years after the Parties signed the 2009 Agreement*).   *See id.* ("[I]t is necessary to next address the parties' evidence and arguments regarding the pricing provisions of the Pharmacy Agreements, and whether the parties negotiated to 'further define' usual and customary and thereby exclude PSC prices from the calculation of the usual and customary price for prescription drugs").[21]

61.   The U&C definition the Arbitrator imported into the Agreements from *Garbe* bears no resemblance to the actual U&C definition to which the Parties agreed in the 2009 Agreement. *Garbe* referred to the "lowest price" made "widely and consistently available" to the "general public."  The Parties agreed U&C definition does not contain anything like this phrase, as even the Arbitrator acknowledged.  Ex. 7, Award at 16.  Instead, the 2009 Agreement refers to:

> the amount submitted by the Participating Pharmacy to a third-party payor, in the usual and customary field in the latest [National Council for Prescription Drug Programs] format, and *charged to a cash customer* by *the Participating Pharmacy at the time of dispensing*, excluding sales tax. The Parties agree the Usual and Customary Charge *may vary by geography*.

Ex. 6, 2009 Agreement § 1.27 (emphasis added).  That is, the 2009 Agreement's definition refers to the price "*charged to a cash customer* by the Participating Pharmacy at the time of dispensing," not the "lowest" price.  The contract also refers to "charged" prices, not "available" prices.  In

---

[21] The Arbitrator's decision is also at odds with other recent decisions.  An arbitrator in a separate arbitration regarding U&C prices and pharmacy club prices involving Humana and CVS found *Garbe* irrelevant.  *See* Ex. 35, *Humana v. CVS* Final Award ¶ 83.  The inconsistent ruling between the CVS arbitration and this arbitration makes it difficult for the pharmacy industry to proceed with confidence regarding whether *Garbe* supplants agreed-upon contractual terms.  Further, in a class action lawsuit against CVS that alleged improper U&C reporting where CVS did not report its pharmacy club prices as its U&C prices, a jury found in favor of CVS on all claims, which was affirmed on appeal.  *See Washington v. CVS Pharm.*, Inc., No. 21-16162, 2022 U.S. App. LEXIS 33547, at *1-4 (9th Cir. Dec. 6, 2022).  This landscape of inconsistent rulings from arbitrators and federal juries regarding whether pharmacy savings clubs affect U&C prices has left the pharmacy industry adrift in uncertainty and threatens the industry's ability to assist the uninsured and underinsured with purchasing drugs at affordable prices.

addition, the contractual definition makes no mention of prices that are "*widely and consistently available.*"  *Id.*  Moreover, the actual definition sets a temporal limitation that requires reference to the "time of dispensing," something not found in *Garbe*.  The 2009 Agreement also defines the term "Participating Pharmacy," which refers to a specific, individually licensed Walgreens pharmacy, not the entire Walgreens chain of nearly 9,000 stores.  *Id.* § 1.13.  The contractual definition further specifies that the U&C price "may vary by geography," indicating that U&C may not be uniform across the country.  This aligns with the definition stating that U&C is specific to individual pharmacies because the retail prices Walgreens reported as U&C do, in fact, vary from pharmacy to pharmacy (whereas PSC prices are set nationally).

62.     By importing and retroactively applying *Garbe*'s "default rule" and ignoring the actual contract language, so that PSC prices—set nationally—were deemed to be every individual pharmacy's U&C prices, no matter whether those prices were actually charged at that location (or at any location) at the time of dispensing (or at any time), the Arbitrator effectively wrote the phrases "charged," "cash customer," "Participating Pharmacy," "at the time of dispensing," and "may vary by geography" out of the 2009 Agreement.  He also effectively added the phrase "widely and consistently available" into the contract.

63.     The below chart shows the key differences between the 2009 Agreement's actual U&C definition and the *Garbe* "default rule" the Arbitrator installed in its place:

| Key Terms from 2009 Agreement's U&C Definition | The Arbitrator's Replacement U&C Definition |
|---|---|
| • Charged<br>• Cash customer<br>• Participating Pharmacy<br>• At the time of dispensing<br>• Vary by geography | • Lowest price<br>• Widely and consistently available<br>• General public |

64.     The Arbitrator also ignored a mountain of undisputed evidence from industry

participants that "cash customer" means a customer paying a pharmacy's retail price, not the price offered through a special program like PSC.  In Phase I, he discounted that undisputed evidence (*see* Ex. 19, Interim Award at 22-25), although he was required by law to review industry evidence of the meaning of the term of art "cash customer" (a term in the 2009 Agreement's U&C definition) *before reviewing parol evidence* as to the Parties' negotiating history.  *Life & Cas. Ins. Co. v. Metcalf*, 42 S.W.2d 909, 910 (Ky. App. 1931) (reciting the "general rule at common law 'that all words and phrases should be construed and understood according to the common and approved usage of language but technical words, phrases and such others as may have acquired popular and appropriate meaning should be construed and understood according to such meaning'").  The industry understanding of this term of art, including the testimony of Humana's own Director of Pharmacy Audit, shows that "cash customer" refers to a customer who paid the same retail prices Walgreens reported as its U&C prices.  *See* above ¶¶ 19-20; Ex. 7, Award at 40.

65.    Critically, *Garbe*'s so-called "default" rule was not the "default" rule when the Parties negotiated the 2009 Agreement, and not just because *Garbe* would not be decided for many years after that agreement.  Indeed, several governmental authorities demonstrate that there was no "default" rule in 2009 that required reporting club prices as U&C prices.  For example, in August 2009—just three months before the 2009 Agreement—the Department of Health and Human Services Office of Inspector General (the OIG) stated that, "[i]f the pharmacy charges a fee to join their discount generic program, CMS [the Centers for Medicare & Medicaid Services, which administers the Medicare program] does not have a stated policy as to whether the prices charged under that program would meet the definition of a usual and customary charge[.]"[22]  The

---

[22] HHS-OIG, A COMPARISON OF MEDICAID FEDERAL UPPER LIMIT AMOUNTS TO ACQUISITION COSTS, MEDICARE PAYMENT AMOUNTS, AND RETAIL PRICES 7 n.26 (2009) (emphasis added), https://oig.hhs.gov/oei/reports/oei-03-08-00490.pdf.

OIG also made clear as early as April 2000 that the regulatory prohibition on a provider charging Medicare more than its "usual" price[23] would not be triggered by charges to the types of uninsured and underinsured patients for whom pharmacies designed pharmacy clubs.[24]  Before the Parties entered into the 2009 Agreement, the government also recognized that pharmacies may offer "a non-U&C special discounted price."  74 Fed. Reg. 54,634, 54,666 (Oct. 22, 2009).

66.    Moreover, *Garbe's* purported "default rule" contravened not only industry understanding and government guidance, but also prior court rulings.  One federal court viewed it as "apparent" that U&C price is "the retail price of the drugs" or "shelf price," while observing that "[n]either the federal nor state regulations expressly define [general public]."  *United States ex rel. Gathings v. Bruno's Inc.*, 54 F. Supp. 2d 1252, 1257-58 (M.D. Ala. 1999).  Another court thought it would be sensible to read "usual and customary charges" to exclude discounts.  *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 726-28 (Mich. Ct. App. 2010).

67.    Moreover, since *Garbe*, the Seventh Circuit has issued two rulings making clear that its earlier ruling was not to be applied retroactively.  *See Schutte*, 9 F.4th at 469-72; *Proctor* 30 F.4th at 653, 659-663.[25]  As Walgreens pointed out to the Arbitrator, in both cases the Seventh Circuit upheld district court rulings that the U&C definitions in those cases were ambiguous and

---

[23] 42 U.S.C. § 1320a-7(b)(6)(A).

[24] *See* Letter from Kevin G. McAnaney, Chief, Industry Guidance Branch (Apr. 26, 2000), http://oig.hhs.gov/fraud/docs/safeharborregulations/lab.htm.   A provider's or supplier's "usual charges" ***need not*** include "free or substantially reduced charges" to (i) uninsured patients or (ii) underinsured patients who are self-paying," and reaffirmed this policy after deciding not to issue a final regulation on "usual" charges.  HHS-OIG, Opinion Letter on Hospital Discounts Offered to Patients Who Cannot Afford to Pay Their Hospital Bills 2 (Feb. 2, 2004), https://oig.hhs.gov/documents/other-guidance/908/FA021904hospitaldiscounts.pdf.

[25] The issue as to which the Supreme Court granted *certiorari* concerns the legal significance of the fact that there were multiple, reasonable interpretations of the term "U&C," not the Seventh Circuit's finding that that there were, in fact, multiple reasonable interpretations of that term.

open to multiple interpretations, at least until the 2016 *Garbe* decision, meaning the pharmacies reasonably interpreted those definitions as not requiring them to report membership club prices as their U&C prices. *Schutte*, 9 F.4th at 469-72; *Proctor*, 30 F.4th at 659-663. The Arbitrator ignored this point from later case law interpreting the very case on which he purported to rely.

68.     That is, the Seventh Circuit held that the law surrounding U&C pricing was ambiguous before *Garbe*. "Federal regulations do not elaborate beyond [a] cursory definition" of "charges to the general public" or "guide pharmacies on identifying the 'general public' when they charge customers various prices for the same prescription." *Schutte*, 9 F.4th at 469. Thus, "the U&C price definition is open to multiple interpretations." *Id.* The Seventh Circuit rejected the relators' attempt to "overexten[d]" *Garbe*, which "did not hold" that its interpretation "was the only objectively reasonable interpretation." *Id.* at 470. The Arbitrator, however, refused to acknowledge the possibility that Humana and Walgreens could have held a different, yet equally reasonable, understanding of what U&C meant when they contracted in 1998 and 2009. This is particularly surprising because the Arbitrator referred to *Schutte* in the Award, noting that, before *Garbe*, "the issue was one 'as to which there is substantial ground for difference of opinion.'" Ex. 7, Award at 18, n.11 (quoting *United States ex rel. Schutte v. SuperValu, Inc. et al.*, No. 11-3290, 2020 WL 3577996 (C.D. Ill. July 1, 2020), *aff'd*, 9 F. 4th 455 (2021), *cert. granted*, 143 S. Ct. 644 (2023)). In other words, there was no "default rule" prior to *Garbe*.[26]

69.     For the Arbitrator, *Garbe*, not the actual U&C definition, was the sun around which the entire arbitration orbited and was the lens through which he evaluated the evidence. Indeed, the Arbitrator admitted the significance of *Garbe* to his breach of contract finding, stating "[t]he Interim Award, [was] based largely upon the Seventh Circuit's holding in *United States ex rel*

---

[26] Nor did *Garbe*'s out-of-circuit rule apply, especially when the Parties had contracted otherwise.

*Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016)[.]"[27]  Ex. 27, Timeframes Ruling at 3.

70.     By supplanting the Parties' contractual U&C definition with *Garbe*'s U&C definition, the Arbitrator exceeded his authority.  *See PMA Cap.*, 400 F. App'x at 656 (affirming district court judgment vacating arbitral award that was "completely irrational because it wrote material terms of the contract out of existence").  In so doing, the Arbitrator improperly shifted the burden to Walgreens to prove it negotiated out of a "default" U&C term that is nowhere in the Parties' Agreements (and, it bears repeating, did not exist at the time of either of the Agreements). *See* Ex. 7, Award at 33 ("While *Garbe* acknowledges that parties can negotiate out of the default rule, the evidence, viewed in its entirety, does not support an argument that this occurred").

71.     The Arbitrator likewise exceeded his authority under the 1998 Agreement, which does not define U&C.  One cannot credibly contend that the Parties intended in 1998—a decade before pharmacy clubs like PSC even existed and 18 years before *Garbe*—for *Garbe*'s so-called "default rule" to have any impact on the meaning of U&C in the 1998 Agreement.  As set forth in detail above, the evidence—industry understanding, government guidance, prior court decisions, etc.—overwhelmingly shows that when the Parties contracted, U&C referred to retail prices (i.e., the price charged a "cash customer"), not club prices.

72.     Because the Arbitrator's decision emanates not from the U&C definition in the 2009 Agreement, but from his arbitrary adoption of an extraneous term interpreted by an out-of-circuit federal court decision issued years after the fact, the Court should vacate the Award.

### B.     The Arbitrator Compounded His Errors By Adopting A Damages Model That Is Completely At Odds With The Parties' Contractual U&C Definition

---

[27] Although the Arbitrator incorporated large portions of the Timeframes Ruling into the Award, this particular statement is conspicuously absent.  The Arbitrator appears to have understood that his reliance on *Garbe* would be a subject of Walgreens' petition to vacate, and his decision to leave this statement out of the Award speaks volumes and supports further scrutiny.

73.     After he brushed aside the U&C language the Parties actually agreed to, the Arbitrator compounded his errors by adopting a damages model that further ignored the agreed-upon U&C definition.  The result was that the Arbitrator awarded a massive windfall to Humana.

74.     As set forth above, the Arbitrator adopted the Petron Model, which entirely ignored the contract terms.  *See* Ex. 28, Framework Ruling at 22-23.  This caused the Arbitrator to award damages to Humana based on PSC prices that were never actually "charged" to *any* customer at *any* Walgreens pharmacy at *any* time, much less by the Participating Pharmacy at the time of dispensing the same drug to a Humana insured.  *See* Ex. 29, Petron Expert Report ¶¶ 10-11; Ex. 28, Framework Ruling at 22-23; Ex. 7, Award at 63.  Instead, the Petron Model based damages on PSC price lists from January 1, 2018 onwards, not on transaction data reflecting prices actually charged.  *See* Ex. 29, Petron Expert Report ¶¶ 10-11.  The price lists at the heart of the Petron Model are lists of prices for prescription drugs that Walgreens provides to the PBM that administers PSC.  But the mere fact that a drug was assigned a PSC price on a price list does not mean Walgreens ever "charged" that PSC price to anyone at any Walgreens pharmacy.  In fact, the transaction data revealed *thousands* of instances in which the Petron Model assigned damages based on PSC prices that were never "charged."  *See* Ex. 36, Phase II Damages Framework Expert Rebuttal Report of J. Smith ¶ 45 (Feb. 10, 2023).  Put simply, if nobody paid a given price for a given drug, that price is not a "charged" price for that drug.

75.     Further, although Walgreens has always made PSC prices for certain "value priced" drugs available on its website,[28] it has *never* advertised or made public the PSC prices for thousands of other drugs.  The Arbitrator's reliance on never-advertised PSC prices to calculate

---

[28]     *See, e.g., Value Priced Medication List*, WALGREENS, https://www.walgreens.com/images/adaptive/pdf/psc/Value-Priced-Medication-List-English.pdf (last revised July 25, 2022).

damages stands in stark conflict with his own ruling that damages should only commence if and when PSC prices were *widely* advertised.  *See* Ex. 27, Timeframes Ruling at 4.[29]

76.     The Arbitrator's reliance on PSC price lists is also contrary to the contractual U&C definition, which includes references to: (1) "Participating Pharmacy"; (2) "may vary by geography"; and (3) "at the time of dispensing."  In contrast to this definition, which provides for variances in prices at different pharmacies at different times (which is true of Walgreens' retail prices), PSC prices are set nationally and do not vary from pharmacy to pharmacy.

77.     Because the Arbitrator ignored the contract language, he exceeded his mandate under the 2009 Agreement and dispensed his "own brand of industrial justice" to award Humana massively outsized damages.  *AWG Grp.*, 211 F. Supp. 3d at 357 (quoting *Stolt-Nielsen*, 559 U.S. at 671).  Accordingly, the Court should vacate the Award under Section 10(a)(4) of the FAA.

C.     **The Arbitrator's Application Of The Voluntary Payment Doctrine In The Framework Ruling Further Compounded The Errors In His Prior Rulings**

78.     In barring some of Humana's damages under the voluntary payment doctrine,[30] the Arbitrator made two findings regarding Humana's knowledge of Walgreens' U&C reporting practices that contradicted two of his prior rulings.  In the Framework Ruling, the Arbitrator found:

- "Based on the totality of the evidence, Walgreens has *proven* by a preponderance of the evidence that as of December 9, 2011 (Exh. 25), Humana *clearly* had constructive knowledge under Kentucky law of all the facts that rendered Walgreens' claims submissions to be in violation of its contractual obligations."  Ex. 28, Framework Ruling

---

[29] Ultimately, the Arbitrator granted Humana over $642 million in damages based on a U&C definition to which the Parties never agreed.  And while Walgreens believes the Arbitrator erred in finding any breach, even under the interpretation of the Agreements most generous to Humana, the Arbitrator awarded over a **half a billion** more in damages than if he had applied the actual U&C definition agreed to by the Parties.

[30] Under this doctrine, a party may not recover for breach of contract when it pays a claim "with full knowledge of all the facts which render the demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention or to prevent an immediate seizure of his person or property . . ."  *Davis v. Norton Healthcare*, No. 2020-CA-0151-MR, 2021 Ky. App. Unpub. LEXIS 54, at *4-5 (Ky. App. Jan. 22, 2021) (citation omitted).

at 34 (emphases added) (footnote omitted).

- "Not only did [Humana] possess enough information that would have led it to discover the truth had it even engaged in a 'cursory examination or investigation'; as of that time some of its key employees *believed* or at a minimum *assumed* they were *not* getting the benefits of PSC pricing but did nothing to confirm that or take action in response. . . . Yet it would be another six years – and only after Humana was approached with a tantalizing offer by a law firm that apparently awakened it from its slumber – before it acted on that constructive knowledge." *Id.* (emphasis in original) (citations omitted).

79.     These findings (the <u>Framework Findings</u>) confirm that Humana never viewed Walgreens' practice of reporting its retail prices as its U&C prices as a breach of contract until it "was approached with a tantalizing offer by a law firm" to bring this case against Walgreens.[31]

80.     Yet at least two of the Arbitrator's other rulings were based on the now-disproven notion that Humana did not know, or lacked the information to know, that Walgreens reported its retail prices, not PSC prices, as its U&C prices.  First, in the Framework Findings, the Arbitrator credited course of performance evidence while ignoring that same evidence in finding that PSC prices should be U&C prices.  Second, the Framework Findings are logically inconsistent with the Timeframes Ruling that Humana lacked the information needed to properly contest claims under the 2009 Agreement.[32]

---

[31] The Framework Findings are also logically inconsistent with the Arbitrator's rejection of Walgreens' counterclaim.  He found that Humana had a duty to conduct a reasonable investigation before bringing the fraud claim against Walgreens and that it could "have concluded that it still had some modicum of a chance of proving reasonable reliance in the face of" the evidence Walgreens proffered demonstrating Humana's knowledge of Walgreens' U&C reporting practices. *See* Ex. 21, Counterclaim Ruling at 4-5, 9.  Yet in the Interim Award, the Arbitrator found that, "[d]espite ample warning signs and knowledge on its part, Humana failed to take the 'opportunity to make a cursory examination or investigation,' despite having both the authority and means to do so."  Ex. 19, Interim Award at 36.  Even with these findings in the Interim Award and the Framework Findings, the Arbitrator did not make Humana (or its counsel that filed the arbitration) bear the consequences of its actions by finding for Walgreens on its counterclaim.

[32] As explained above at ¶ 49, when Walgreens brought these inconsistencies to the Arbitrator's attention, he denied Walgreens the opportunity to brief these inconsistencies fully, but then attempted in the Award to reconcile the inconsistencies Walgreens had pointed out.

1.      **The Arbitrator's Findings As To Humana's Knowledge In The Framework Ruling Are Inconsistent With His Earlier Findings**

81.      Walgreens presented the Arbitrator with many internal Humana documents showing that Humana had long understood that Walgreens did not report PSC prices as its U&C prices.  Therefore, the course of performance showed that Walgreens' U&C reporting practices were exactly what the Parties expected under the Agreements and were not a breach of those Agreements.  Ex. 19, Interim Award at 26-28.  Despite this, in the Interim Award the Arbitrator concluded that the course of performance evidence "is sufficiently ambiguous that it cannot serve to mandate a different conclusion regarding the meaning of the contract than that derived from the evidence of the contract negotiation itself *and the default rule established by Garbe*."  *Id.* at 28 (emphasis added).[33]  In the Framework Ruling, however, the Arbitrator relied on much of this same evidence to find that Walgreens proved that "Humana clearly had constructive knowledge" and, thus, the voluntary payment doctrine barred the recovery of some of Humana's damages because Humana had made repeated payments to Walgreens "believing" or "assuming" that Walgreens did not report PSC prices as U&C.  *See* Ex. 28, Framework Ruling at 31, 34-35.  By juxtaposing these two rulings, it becomes obvious that the Arbitrator's erroneous conclusion in Phase I that *Garbe* is a "default rule" tainted his evaluation of the course-of-performance evidence which should have been sufficient to defeat liability.

82.      Nor does the Arbitrator's finding as to the ambiguity of the U&C term in the Agreements explain relying on *Garbe*.  *See* Ex. 7, Award at 16.  Under Kentucky law, courts must give great weight to the parties' course of performance in interpreting an ambiguous contract.  *See*

---

[33] The Arbitrator's reliance on *Garbe* as establishing a default rule also tainted his view of the course of performance evidence, given that he viewed that evidence through the prism of whether the Parties had negotiated out of *Garbe.*

- 33 -

*A. L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1981) ("[C]ourts are required to give great weight to the interpretation which the parties have placed on an ambiguous contract" and "[t]he construction of the parties is best evidenced by their conduct with respect to the agreement") (quoting *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky. 1953)); *see also* Restatement (Second) of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."). The course of performance showed the Parties' shared understanding that U&C meant retail prices, not PSC prices, and that Humana changed its view only after conflicted counsel pitched an alternative with promises of a large recovery. *See* Ex. 28, Framework Ruling at 33-34 ("[S]ome of [Humana's] key employees *believed* or at a minimum *assumed* they were *not* getting the benefits of PSC pricing but did nothing to confirm that or take action in response. . . . Yet it would be another six years . . . before it acted on that constructive knowledge.") (emphasis in original). The Arbitrator did not properly account for this evidence when considering the Parties' intent, likely because of his erroneous conclusion that *Garbe* established a default rule.

83. Further, when confronted with his logical inconsistencies, the Arbitrator refused to correct his errors or even allow Walgreens to brief the issue fully. *See* Ex. 31, Ruling on Application at 2. Instead, he issued an Award giving Humana damages on its breach of contract claim, even though his own findings demonstrate no breach occurred.[34]

84. Moreover, despite having deprived Walgreens of an opportunity to brief in full the

---

[34] Although the Arbitrator attempted to reconcile these inconsistencies in the Award, *see* page 58 n.56, they remain irreconcilable, and it was inappropriate for the Arbitrator to attempt to resolve this issue *sua sponte* after depriving Walgreens of an opportunity to brief in full the issue.

errors and inconsistency in his rulings, in the Award the Arbitrator offered entirely new reasoning, which appears nowhere in his ruling denying Walgreens' Application for Reconsideration, purporting to show how these inconsistencies could be reconciled. *Compare* Ex. 31, Ruling on Application at 1-2 *with* Ex. 7, Award at 58 n.56.

85.     That the Arbitrator would deny Walgreens an opportunity to brief in full a motion for reconsideration on a key inconsistency that goes to the core of his liability finding, but later deem the same issue significant enough to warrant an attempt at reconciling the inconsistency in the Award, not only underscores the critical importance of the inconsistency, but also the impropriety of the Arbitrator's decision to deny Walgreens the opportunity to brief the issue in full. *See* above ¶ 84.  This alone raises serious issues under § 10(a)(3).

86.     In the Award, the Arbitrator also attempted to walk back several key statements he had previously made, such as omitting the word "clearly" before describing how Walgreens proved Humana's constructive knowledge (*compare* Ex. 28, Framework Ruling at 34 to Ex. 7, Award at 55); changing the statement that Humana was "*apparently* awakened . . . from its slumber" by a "tantalizing offer by a law firm" to this "*may have been* what awakened" Humana (*compare* Ex. 28, Framework Ruling at 34 to Ex. 7, Award at 55) (emphases added); and changing the phrasing that it was "incumbent upon [Humana] to at least make a 'cursory examination or investigation' as to whether Walgreens was submitting its PSC prices as its usual and customary charge" to omit the reference to it being "incumbent upon" Humana to take any action (*compare* Ex. 19, Interim Award at 33 to Ex. 7, Award at 38).

87.     Given the inconsistencies between the Arbitrator's findings in the Interim Award and the Framework Ruling as to Humana's knowledge of Walgreens' U&C reporting practices, as well as the Arbitrator's refusal to allow Walgreens to brief in full the significance of those

inconsistencies, the Court should vacate the Award as irrational under Section 10(a)(4) of the FAA.

### 2. The Same Findings In The Framework Ruling Are Also Logically Inconsistent With the Arbitrator's Timeframes Ruling

88.     The Arbitrator's finding in the Timeframes Ruling that an "information imbalance" existed between Humana and Walgreens is irreconcilable with the Framework Findings.  In the Timeframes Ruling, the Arbitrator agreed with Humana's assertion that an "information imbalance" existed in the time between Humana's December 2017 Notice Letter and its August 2019 Demand because Humana needed access to Walgreens' transaction data before it could properly contest or seek refunds on any specific claims under the procedures laid out in Section 5.3 of the 2009 Agreement.  *See* Ex. 27, Timeframes Ruling at 9.  Section 5.3 requires that, before submitting an overpayment claim to arbitration, the Parties must follow certain procedures.  Ex. 6, 2009 Agreement § 5.3.  Further, this section states: "Notwithstanding the forgoing or any provision in this Agreement to the contrary, neither party may be obligated to pay any overpayment or underpayment to the other party that is not requested within two (2) years of the date that the original claim was submitted for payment."  *Id.*

89.     Despite the fact that the Notice Letter never directly claimed that Humana had made any overpayments and never requested a refund from Walgreens for any overpayments (*see* Ex. 18, Notice Letter at 1-4), the Arbitrator found that "the Notice Letter was sufficient to constitute a 'contest[ing]' of Walgreens' payments that commenced the two-year lookback period" under Section 5.3 because Humana lacked information it needed to do more.[35]  Ex. 27, Timeframes Ruling at 9.

---

[35] This ruling is also in conflict with a ruling from Phase I, in which the Arbitrator found that this same Notice Letter did *not* constitute a request for refund for overpayments as required by Section 5.3.  Ex. 20, Condition Precedent Ruling at 5.

90.     By contrast, in his later Framework Ruling, the Arbitrator found that Humana had known for *years* that Walgreens did not submit PSC prices as its U&C prices.  This knowledge was sufficient to allow Humana to make a direct request for a refund in compliance with Section 5.3.  Therefore, the two-year lookback period for assessing damages, if any, should have started, at the very earliest, on the date Humana filed its Demand.

91.     What is more, Humana itself changed course in its assertion of an "information imbalance" by calculating damages based on price lists, a damages model the Arbitrator adopted. *See* Ex. 29, Petron Expert Report ¶¶ 10-11; Ex. 28, Framework Ruling at 22-23; Ex. 7, Award at 63.  Under this model, Humana did not require *any* Walgreens transactional data to make a refund demand.  All it needed to do was compare publicly available PSC prices with its own data showing what it had reimbursed Walgreens for the listed drugs, something Crowell offered in the pitch document to do for Humana on its "own nickel."  Ex. 16, Pitch Document at HUM-861-00000021. There was no "information imbalance" preventing Humana from making a refund demand in its Notice Letter.  Humana simply did not do so.[36]

92.     These inconsistent rulings render the Award irrational under § 10(a)(4) of the FAA.

**D.     The Arbitrator Exceeded His Mandate By Disregarding Kentucky Law That Limited The Timeframes As To Which Humana Could Recover Damages**

93.     In addition to disregarding the language of the 2009 Agreement and making inconsistent rulings, the Arbitrator also exceeded his authority by refusing to apply binding Kentucky statutes.  Kentucky law requires "all health care claims incurred after July 14, 2000, and contractual agreements between insurers and providers regarding the payment of health care claims entered into after July 14, 2000," to comply with certain statutes, which include certain

---

[36] And again, if damages were calculated based on prices that were not advertised or charged, no damages were appropriate.

procedural requirements regarding the collection of overpayments and the retroactive denial of claims. Ky. Rev. Stat. § 304.17A-726. Further, this law provides that "[a]n insurer *shall not* request or require a provider to *pursue any other course of action* regarding the payment of health care claims outside of the provisions set forth in KRS 304.17A-700 to 304.17A-730 and KRS 205.593, 304.14-135, and 304.99-123." *Id.* (emphasis added).

94. The Kentucky statutes on the collection of overpayments and the retroactive denial of claims limit the lookback period to recouping or denying these claims to two years. *See* Ky. Rev. Stat. §§ 304.17A-714(1), 304.17A-708(3)(a)-(b). An insurer cannot ignore these provisions and rescue untimely claims merely by asserting breach of contract claims that rely on Kentucky's general statute of limitations. Ky. Rev. Stat. § 413.090 (providing a 15-year statute of limitations for contract claims). To do so would require a provider to pursue "[an]other course of action," which the statute expressly prohibits. Ky. Rev. Stat. § 304.17A-726. Moreover, the statutes expressly apply to pharmacy claims and are incorporated by law into the 2009 Agreement. *Id.* ("[C]ontractual agreements between insurers and providers regarding the payment of health care claims entered into after July 14, 2000, shall conform to KRS 304.17A-700 to 304.17A-730 ").

95. Yet, in the Timeframes Ruling, the Arbitrator disregarded these Kentucky laws and found that Humana could recover damages from November 2007 to December 2009 under the Parties' 1998 Agreement—roughly a decade prior to the date Humana sent its Notice Letter and even longer from the date it filed its Demand—under Kentucky's general 15-year statute of limitations. Ex. 27, Timeframes Ruling at 2-3.

96. Moreover, these statutes further demonstrate that the 2017 Notice Letter was an inappropriate starting date for the commencement of a two-year lookback period for Humana's recovery of damages under the 2009 Agreement. The overpayment statute requires an insurer to

provide written or electronic notice that either *requests a refund* from the provider or indicates that if the insurer does not receive notice of a dispute from the provider, the insurer will recoup the overpayment from future payments.  *See* Ky. Rev. Stat. § 304.17A-714(1).  The retroactive denial of claims statute also states that the insurer "shall give the provider a written or electronic statement *specifying the basis* for the retroactive denial."  Ky. Rev. Stat. § 304.17A-708(3)(b) (emphasis added).  Humana failed to do any of this.  The 2017 Notice Letter made no specific request for refund and did not even directly assert that Humana had made any overpayments.  *See* Ex. 18, Notice Letter at 1-4.  Thus, the Notice Letter did not comply with the Kentucky statutes and should not have been the starting date for the two-year lookback period.

97.     The Arbitrator claimed that no legislative history indicates that these statutes "create a two-year statute of limitations for breach of contract claims[.]"  Ex. 27, Timeframes Ruling at 2.  Under this reasoning, however, all a party need do to avoid the two-year lookback period instituted by the Kentucky Legislature is to file a breach of contract claim.  That is nonsensical.  The Arbitrator should not have allowed Humana to bypass these statutory limitations on its claims.

98.     By allowing Humana to recover damages over a greater time period than authorized by the Kentucky statutes, the Arbitrator exceeded his powers and "dispense[d] his own brand of industrial justice."  *AWG Grp.*, 211 F. Supp. 3d at 357 (quoting *Stolt-Nielsen*, 559 U.S. at 671); Ex. 27, Timeframes Ruling at 2-3; Ex. 7, Award at 42-43.  Thus, the Court should vacate the Award under Section 10(a)(4) of the FAA.

### E.     The Arbitrator Exceeded His Mandate By Awarding Prejudgment Interest

99.     The Court should also vacate the Award because the Arbitrator acted irrationally by awarding prejudgment interest on an unliquidated claim and then exacerbated that error by compounding that interest.  "Kentucky courts rarely award prejudgment interest on unliquidated

claims[,]" *Osborn v. Griffin*, 865 F.3d 417, 456 (6th Cir. 2017) (emphasis added) (citation omitted), and "the amount of prejudgment interest, if any, is a matter for the trial court weighing the equitable considerations[.]" *Univ. of Louisville v. RAM Eng'g & Constr., Inc.*, 199 S.W. 3d 746, 748 (Ky. App. 2005). Humana's claims were plainly unliquidated. *See* Award at 68. Further, under Kentucky law "pre-judgment interest has traditionally been simple interest[.]" *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 858 (Ky. App. 2003).

100.    Here, where the Arbitrator found that Humana had long been aware of Walgreens' U&C reporting practices, the Arbitrator acted irrationally by rewarding Humana's delay in bringing this case by granting Humana compound prejudgment interest.

## II.    The Arbitrator's Acceptance Of Six Other Appointments Involving Crowell During The Pendency Of The Arbitration Deprived Walgreens Of An Impartial Arbitrator

101.    The Arbitrator's decision to take on numerous appointments as arbitrator or mediator for Crowell during the pendency of the arbitration, together with his erroneous rulings in Humana's favor, demonstrates "evident partiality" or "misbehavior by which the rights of any party have been prejudiced," which warrants vacatur under §§ 10(a)(2) and (3) of the FAA.

102.    At the outset of the arbitration, the Arbitrator committed to remain impartial and independent. Yet after his August 2019 appointment through issuing the Award, the Arbitrator accepted appointments as arbitrator or mediator in at least *six other matters involving Crowell*. As Crowell's financial relationship with the Arbitrator deepened over the years, Walgreens was placed in an untenable position. Walgreens could have (i) proceeded as it did by raising its concerns to the AAA regarding the Arbitrator's acceptance of appointment after appointment involving Crowell and continuing to proceed with a conflicted arbitrator, (ii) objected and potentially caused the Arbitrator to forgo fees in other cases, risking him holding it against Walgreens since it would be obvious which party objected, or (iii) picking up with a new arbitrator after most of the evidence

had been presented.  Walgreens should never have been put into this compromised position.

103.    As the Sixth Circuit explained in affirming vacatur of an award under similar circumstances, "one major benefit of arbitration is that it allows parties to exercise some control over who will resolve their disputes" and "[d]isclosures at the outset of an arbitration allow a party to reject an arbitrator as ethically encumbered" if such disclosures reveal connections with the parties or counsel.  *Thomas Kinkade*, 711 F.3d at 724 (internal citation omitted).  But "[w]hen the neutral arbitrator engages in or attempts to engage in mid-arbitration business relationships with non-neutral participants, it jeopardizes what is supposed to be a party-structured dispute resolution process."  *Id.* at 724-25 (citation omitted) (observing that "[a] party who pays a neutral arbitrator to prepare for, and then sit through, nearly 50 days of hearings over a five-year period, deserves better treatment than this[,]" after the purportedly neutral arbitrator's law firm was hired nearly five years into the arbitration by one party's arbitrator-advocate and then again by that same party).

104.    The situation was made even worse by the fact that, by the time he accepted his fourth, fifth and sixth appointments from Crowell, the Arbitrator was well aware that Walgreens had objected to Crowell continuing as counsel in the arbitration due to its breach of fiduciary duty.

105.    The Arbitrator's financial ties to Crowell, which developed over the course of the arbitration, deprived Walgreens of its right to a fair proceeding before an impartial arbitrator.  In the midst of the case, the Arbitrator and Crowell (which had already ignored its fiduciary duty to its former client by switching sides) decided at least *six times* to deepen their financial relationship.  Those decisions tainted the arbitration proceedings even beyond the stain of Crowell's own ethical conflict.  *See Thomas Kinkade*, 711 F.3d at 724 (affirming vacatur of arbitration award under § 10(a)(2) and agreeing with the district court's finding that, "[w]hen the neutral arbitrator engages in or attempts to engage in mid-arbitration business relationships with non-neutral participants, it

jeopardizes what is supposed to be a party-structured dispute resolution process.").

106.     Moreover, the Arbitrator's evident partiality in favor of Crowell and its client Humana permeated his rulings as their relationship expanded.  The Arbitrator's financial interests may explain why he went to such lengths to rewrite the Agreements to find in favor of Humana on its breach of contract claim, as described above in paragraphs 58-77.  But the Arbitrator's financial relationship with Crowell also explains later rulings, in which he put his thumb on the scale for Humana by deviating from judicial norms and adopting a damages model that bore no relationship to the Parties' U&C definition, thus maximizing Humana's damages.  For example, the damages model the Arbitrator adopted ignores the language of the 2009 Agreement's U&C definition and awards damages that fall well outside the scope of that definition, which defines U&C as the amount "*charged* to a cash customer by the *Participating Pharmacy* at the time of dispensing."   2009 Agreement at § 1.27 (emphasis added).   Indeed, many PSC prices on Walgreens' internal PSC price lists were rarely charged, and *some were never charged*.  Yet, the Arbitrator awarded over $70 million in damages and prejudgment interest connected to PSC prices *no Walgreens pharmacy ever charged*.  *See* Ex. 36, Phase II Damages Framework Expert Smith Rebuttal Report App. A, ¶ 45 (Feb. 10, 2023).  Moreover, the Arbitrator's award of prejudgment interest is unmoored from norms under Kentucky law: "Kentucky courts *rarely award prejudgment interest on unliquidated claims*[,]" *Osborn*, 865 F.3d at 456 (emphasis added) (citation omitted), and "the amount of prejudgment interest, if any, is a matter for the trial court weighing the equitable considerations." *RAM Eng'g & Constr., Inc.*, 199 S.W. 3d at 748 (citations omitted).  Although the Arbitrator held that Humana's damages were unliquidated, he awarded prejudgment interest.  Worse yet, despite recognizing that, "[u]nder Kentucky law, pre-judgment interest has traditionally been simple interest," *see* Ex. 7, Award at 70, the Arbitrator further

bucked norms of Kentucky law and awarded Humana millions of dollars in *compound interest.*[37]

107.    The Arbitrator's financial relationship with Crowell is an independent basis, pursuant to §§ 10(a)(2) and (3), for why this Court should vacate the Award.

### III.    Crowell's Ethical Violation Resulted In An Award Procured By "Undue Means"

108.    Finally, Crowell's violation of its ethical obligations to Walgreens as its former client, including soliciting Humana to bring a claim against Walgreens on the very same issue on which Crowell previously advised Walgreens, falls within § 10(a)(1) of the FAA, which authorizes a court to vacate an arbitration award procured by "undue means."  *See ARMA,* 961 F. Supp. 2d at 254.  Courts may vacate an arbitration award under § 10(a)(1) under these conditions: (1) "the party seeking vacatur must demonstrate by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration"; (2) "the movant must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence"; and (3) "the alleged misconduct must materially relate to an issue in the arbitration." *Id.* at 254 (alterations omitted) (citations omitted).

109.    First, if the Superior Court finds that Crowell breached its duty of loyalty to its former client by representing Humana in the arbitration, then that ruling, when coupled with the Arbitrator's finding that Crowell's pitch aroused Humana from its slumber, would provide clear and convincing evidence that the Award was obtained by "undue means."  *Id.* at 254 ("undue means" requires "nefarious intent or bad faith, or conduct that is immoral, if not illegal") (alterations omitted) (citations omitted).[38]  Evidence produced in the D.C. Superior Court Action

---

[37] Awarding pre-judgment interest is particularly egregious in light of the Arbitrator's observation in the Framework Ruling that Walgreens "had every right not to [modify its U&C submissions] until the Arbitrator ruled . . . ." Ex. 28, Framework Ruling at 42 n.51.

[38] The Court should stay consideration of this ground for vacatur for the reasons stated in Walgreens' motion for a partial stay.

shows Crowell advised Walgreens on U&C issues in connection with pharmacy club programs, such as PSC.[39]  These are substantially the same issues at the heart of the arbitration—whether, under the Agreements, Walgreens properly reported its retail prices rather than its PSC prices.

110.    This unethical side-switching rendered the arbitration unfair by forcing Walgreens to face its former counsel in this arbitration.  Crowell has always known that its representation of Humana violated its ethical duties to Walgreens, and Humana has known this since at least February 2021, when Walgreens brought this issue to the attention of Crowell and the AAA.  *See* above ¶¶ 2, 55.  Yet Humana directed Crowell to continue to act as its counsel, even after the Arbitrator observed that it would be operating "under some cloud" that Walgreens may challenge any arbitral award.  Ex. 34, Decl. of D. Bender ¶¶ 8-9 (May 19, 2023).  Moreover, the Arbitrator recognized that this solicitation—from conflicted counsel—is what roused Humana from its slumber after years of knowledge and inaction as to Walgreens' U&C practices.  Award at 55.

111.    Second, this conduct was discovered and raised during the course of the arbitration, and Crowell and Humana have been well aware for the last two years that Crowell's ethical conflict could taint the enforceability of any arbitration award.  Ex. 32, Decl. of M. Engel ¶ 4 (Apr. 8, 2021); Ex. 1, Feb. 10, 2021 Email; Ex. 33, Feb. 16, 2021 Email; Ex. 34, Decl. of D. Bender ¶¶ 5-9 (May 19, 2023).  Being on notice, Humana could have had different counsel represent it (such as the firm that served as co-counsel to Crowell throughout the arbitration) or asked the Arbitrator to stay the matter until the issue was resolved in the D.C. Superior Court Action.  At its own peril,

---

[39] *See* Ex. 11, Decl. of S. Couffer ¶¶ 4-8 (Mar. 1, 2021); Ex. 12, Supp. Decl. of S. Couffer ¶ 2 (Apr. 30, 2021); Ex. 13, Crowell New Client/New Matter Form at 1371 ("Matter Name: Usual and Customary Issue") (emphasis omitted); Ex. 37, Crowell September 2008 Bill for "Discount Card Programs" at 1347 ("Analysis and call regarding usual and customary issues affecting discount card program . . . Review issues associated with usual and customary fee calculation."); *see also* Ex. 14, Crowell October 2008 Bill for "Usual and Customary Issue" at 1356; Ex. 15, Crowell November 2008 Bill for "Usual and Customary Issue" at 1364.

it chose to do neither.

112.    Third, Crowell's ethical conflict materially relates to the main issue in the arbitration—whether Walgreens properly reported its retail prices, not its PSC prices, as its U&C prices to Humana—because Crowell provided Walgreens with advice directly related to whether pharmacy clubs may affect U&C prices.[40] *See* above ¶ 24.  That is, Crowell not only had a conflict by representing its former client's opponent, but also provided legal advice to Walgreens that went to the heart of the legal claims that Crowell urged Humana to bring against Walgreens.

113.    The Court need not decide the effect of the conflict at this time.  Rather, as set forth in Walgreens' separate motion for partial stay, the Court should stay resolution of this petition on this ground pending final resolution of the D.C. Superior Court Action.  To the extent that court sustains Walgreens' claim as to Crowell's breach, however, this improper conduct would serve as a separate and independent basis for vacating the arbitral award.

## **CONCLUSION**

114.    For the reasons set forth above, the Court should vacate the Award.

---

[40] In the event this Court does not stay this ground for vacatur, Walgreens requests that it be allowed to submit additional exhibits from the D.C. Superior Court Action.  These exhibits are currently under protective order restrictions and thus, Walgreens would need to work with Humana and Crowell to determine what can be presented in this case.

Dated: May 19, 2023                    Respectfully submitted,

                                       WALGREEN CO.

                                       By */s/ Frederick Robinson*
                                       Frederick Robinson (D.C. Bar No. 367223)
                                       Selina P. Coleman (D.C. Bar No. 991740)
                                       David A. Bender (D.C. Bar No. 1030503)
                                       T: 202-414-9200
                                       REED SMITH LLP
                                       1301 K Street N.W.
                                       Suite 1000 – East Tower
                                       Washington, D.C. 20005

                                       *Counsel to Walgreens*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of May, 2023, a true and correct copy of this petition to vacate was filed via the Court's CM/ECF system, and will be served on Humana's counsel via email at the following email addresses:

Keith Harrison
kharrison@crowell.com

Aryeh Portnoy
aportnoy@crowell.com

Jed Wulfekotte
jwulfekotte@crowell.com

Justin Kingsolver
jkingsolver@crowell.com

Robert Gilmore
rgilmore@steinmitchell.com

/s/ *Frederick Robinson*
Frederick Robinson