# Exhibit 28

***Walgreen Co. v. Humana et al.***
**Case No. 22-cv-307-ACR**

**Redacted**

AMERICAN ARBITRATION CASE NO. 01-19-0002-5131

**HUMANA HEALTH PLAN, INC.,**
**HUMANA INSURANCE COMPANY,**
**and HUMANA PHARMACY SOLUTIONS, INC.,**

      **Claimants,**

**and**

**WALGREEN CO. and WALGREENS**
**BOOTS ALLIANCE, INC.,**

      **Respondents.**

---

## PHASE II DAMAGES "FRAMEWORK" RULING

### I.
### PROCEDUDRAL BACKGROUND

On March 26, 2020, the Arbitrator granted Walgreens' motion to bifurcate the liability and damages phases in the Arbitration (and the discovery related to each of those phases). *See Ruling on Walgreens' Motion to Bifurcate Liability and Defer Damages Discovery.* Following the Phase I hearing on liability conducted via Zoom from June 21-29, 2021 and a round of post-hearing briefing and oral argument, the Arbitrator issued an Interim Award on November 8, 2021 finding in Humana's favor on its breach of contract claim and in Walgreens' favor on Humana's negligent misrepresentation and fraud claims. (Exh. 495). Following the issuance of the Interim Award, the parties commenced the discovery process relating to the damages phase.

Pursuant to a stipulated schedule, the parties exchanged their initial expert reports on May 26, 2022. Humana submitted a single expert report from Michael Petron ("Petron"), the Managing Director and President of Disputes, Compliance and Investigations for Stout Risius Ross, LLC. His report presented an opinion as to the damages Humana suffered and described the data and methodology used to calculate those damages. (Exh. 471). Walgreens submitted an alternative damages analysis prepared by its Phase I data expert Jed Smith ("Smith"), a Senior Managing Director at Ankura Consulting, Inc. (Exh. 472). Both Petron and Smith have substantial experience conducting damages analyses in healthcare disputes, and neither party challenged their respective qualifications to serve as an expert. In addition, Walgreens submitted an expert report by economist Kelly Lear Nordby, Ph.D. ("Nordby"), who also is a Managing Director at Ankura. (Exh. 474). Her report opined that the usual and customary price from which damages should be measured should include an allocated amount for the enrollment fee paid by PSC members. Finally, Walgreens submitted the expert report of its Phase I industry expert Donald Dietz. (Exh 473). Dietz opined that (1) even under the Interim Ruling, for the PSC price to be the U&C price for a Humana transaction, there must have been a PSC transaction for the same drug, in the same strength, dosage form and quantity in the same Walgreens pharmacy on the same day; (2) the phrase "at the time of dispensing" in the 2009 Pharmacy Agreement means

the day upon which a particular pharmacy charged the cash price; and (3) Humana could have mitigated its damages by "MACing" (meaning adjusting its maximum allowable cost) multisource generic drugs to match pharmacy club prices. On June 23, 2022, Petron and Smith each submitted reports rebutting the other's initial reports. (Exhs. 475 (Petron) and 480 (Smith)). In addition, Humana submitted expert reports from two additional rebuttal witnesses: Dr. Kenneth Schafermeyer, Ph.D. ("Schafermeyer"), a Professor of Pharmacy Administration at the University of Health Sciences and Pharmacy in St. Louis (Exh. 476), and Bob Beckley ("Beckley"), an independent consultant who previously served, *inter alia*, as a Board member of NCPDP (Exh. 477). Dietz and Nordby also submitted rebuttal reports. (Exhs. 478, 479). Beckley's report rebutted Nordby's opinion that the PSC price should be inclusive of an allocated amount to account for the enrollment fee and Dietz's opinion that the NCPDP defines the "U&C" amount as prices actually charged to customers at a given store on a given day. The Schafermeyer report contained three opinions rebutting various elements of the Dietz report. Following the submissions of the initial and expert rebuttal reports, the parties took the depositions of each of the designated expert witnesses. Walgreens also filed a motion to strike the Schafermeyer expert report and exclude his testimony on the grounds that his report and the Beckley report were redundant and cumulative. Following the filing of the motion, Humana withdrew Schafermeyer's third opinion regarding Dietz's opinion that a damages award must add the cost of PSC membership fees to the PSC price whenever PSC prices should have been submitted as its U&C. After a review of the parties' briefing, the Arbitrator denied Walgreens' motion. *See Ruling on Motion to Exclude Expert Witness Report and Testimony.*

The expert reports did not stop with the initial and rebuttal reports. On July 29, 2022 both Petron and Smith submitted Supplemental Expert Reports (Exhs. 835, 836). Finally, on August 5, 2022, Smith submitted an Addendum to the Supplemental Expert Rebuttal Report (Exh. 854).

 The parties filed pre-hearing briefs on August 8, 2022. The Phase II hearing was conducted in person in Washington, D.C. from August 15-18, 2022. Each of the parties' experts testified in person or via Zoom (due to COVID-19 related issues). In addition, Walgreens presented the testimony of one percipient witness, Henry Thompson, the current senior director of Walgreens' consumer paid-prescription business. (Phase II Tr. 948:1-4). At the conclusion of the presentation of evidence in the Phase II hearing, the parties discussed with the Arbitrator the possibility that a Phase II ruling might not adopt the entirety of any of the expert reports and that it might not be possible for the Arbitrator to re-calculate the damages in such an event based on the evidence in the record, given the quantity and complexity of the reimbursement and cash transaction data relied upon by both side's experts in formulating their damages analyses. Accordingly, the parties agreed they would submit post-hearing briefs and present closing argument, after which the Arbitrator would prepare a ruling adopting the framework for the damages analysis. It was further agreed that after this framework ruling was issued, the parties' damages experts would then prepare new damages reports based upon that ruling.

On September 26, 2022, Humana submitted a Second Supplemental Report prepared by Petron. (Exh. 863). In general, it presented a revised damages analysis that purport to respond to and take into account critiques by Walgreens' expert Smith of Petron's earlier reports and hearing testimony. Humana refers to this as the Updated PSC Only + Retail Cash Adjustment methodology. (Humana Post-Hearing Br. at 1). Among other things it adjusted some of Petron's

earlier assumptions and calculations to account for Smith's critiques. Walgreens objected to admission of this report.  On September 29, 2022, the Arbitrator conducted a telephonic conference with the parties. Thereafter, the Arbitrator issued an order admitting the Second Supplemental Expert Report into evidence, with the exception of the actual dollar calculations, and ordered Humana to deliver to Walgreens a letter identifying those issues on which it was conceding and no longer disputing with respect to the expert analyses.[1] *Order Regarding Humana's Second Supplemental Expert Report of Michael J. Petron and Post-Hearing Briefing and Argument.* On September 30, 2022, Humana complied with the order via e-mail correspondence and stated that for purposes of this Arbitration it was (1) removing eight types of transactions from the transaction set used to calculate the "true U&C price" for damages; and (2) taking into account changes in amounts that would have been withheld pursuant to the Humana Rx Quality Network Program during the damages timeframe from the damages recoverable by Humana. On October 6, it submitted a revised e-mail letter stating that it was also agreeing to use the "payable metric quantity" field rather than the "quantity dispensed" field for purposes of identifying the proper PSC price for the Humana transactions.

On October 21, 2022, the parties submitted their opening post-hearing briefs and on November 8, 2022 the parties submitted their post hearing reply briefs, each in accordance with the agreed upon schedule and other terms for the post-hearing briefing. On November 15, 2022, closing argument for the Phase II evidentiary hearing was conducted in person before the Arbitrator in Washington, D.C.

Per the agreement with the parties, this ruling constitutes the Arbitrator's determination as to the proper framework for calculating damages. Specifically, it adopts one of the expert damages reports as the starting point for the calculation of damages and identifies adjustments and offsets that should be made to the damages calculations. In so doing, it also resolves the affirmative defenses asserted by Walgreens to eliminate or reduce the damages awardable based on the Interim Award. Per the agreement of the parties, the next step in this Arbitration is for the parties to submit expert reports containing updated damages calculations based upon the findings and conclusions in this ruling, to be followed by an evidentiary hearing regarding those reports scheduled for February 15, 2023.

## II.
## THE EXPERT REPORTS AND CRITIQUES

At the Phase II hearing, the parties presented through their respective experts three fundamentally different damages analyses. Each of the analyses used data from the same data sets: (1) the Humana transaction data for the damages period, which included approximately 302 million transactions in which Humana members purchased drugs at Walgreens pharmacies; (2) Walgreens' "cash transaction" data, which included cash purchases by customers, including PSC transactions, during the damages period. In addition, for one of the analyses, Walgreens' formularies reflecting PSC prices for all drugs that could be purchased through the program from

---

[1] This was ordered because the Second Supplemental Expert Report was unclear as to whether Humana was conceding certain points or was simply offering new calculations in the event the Arbitrator accepted Walgreens' criticisms of Petron's earlier analyses.

January 1, 2018 to April 19, 2022 were considered as well. According to Petron, there were approximately 302 million transactions for which Humana and its members reimbursed Walgreens a total of over $26 billion during the damages timeframes. Humana paid 85% of that total (approximately $22 billion) and its members paid the remainder (approximately $4 billion) in the form of copayments or coinsurance. (Exh. 471 at Exh. 3). Of the $26 billion total, approximately $1.7 billion was paid under the 1998 Pharmacy Agreement and the remainder was paid under the 2009 Pharmacy Agreement. *Id.* Of the 293 million cash transactions in the data produced by Walgreens, Petron calculated that approximately 236 million were "retail cash" transactions and another 57 million were PSC purchases. (Exh. 471 at ¶¶ 38-40).

### A. Humana's PSC and Cash Analysis ("Petron I")

Petron's initial damages analysis started with the approximately 302 million Humana insured transactions with Walgreens during the damages period and looked to see if there were corresponding transactions at either cash or PSC prices.[2] Petron determined that over 99% of these Humana transactions did not have a corresponding cash or PSC transaction at the same store on the same day for the same drug and quantity. (Exh. 471 at ¶ 61). Therefore, the Petron I analysis looked at a broader range of transactions to determine the lowest widely and consistently available cash price. First, because of the infrequency of corresponding cash or PSC transactions for a particular drug and quantity on the same day and in the same store as a given Humana transaction, he broadened his analysis to include all cash/PSC transactions in the same *calendar month* as a Humana transaction. (Exh. 471 at ¶55(ii)). He justified the choice of calendar month on the basis that such a time frame would allow for a sufficient population of prices but would be limited enough that significant price changes due to the passing of time would not be expected. *Id.* Second, Walgreens' cash prices varied by so called "compete levels." Specifically, each Walgreens pharmacy was assigned to one of five compete levels, depending on the unique demographic, economic and competitive conditions of its location. (Exhibit 471 at ¶ 55(i)).[3] Therefore, Petron compared each Humana transaction to any cash purchases of the same drugs in the same quantity at any Walgreens pharmacy with the same compete level as the store with the corresponding Humana transaction.[4] (Exh. 471 at ¶ 55(i)*; Phase II Tr. 62:1-62:20). Third, because PSC prices were consistent nationwide, he included any PSC transactions within the calendar month at any Walgreens pharmacy for the same drug and quantity as the Humana transaction. (Exh. 471 at ¶ 55(i); Phase II Tr. 62:21-63:4).

---

[2] For convenience, the terms "cash" and "PSC" are identified as separate categories in this ruling even though the Interim Award found that Walgreens regularly referred to its PSC prices as "cash" prices.

[3] As a result, two Walgreens' stores just blocks from each other geographically could be assigned to different compete levels and thus have different retail cash prices for the same drugs. However, as discussed *infra*, they would offer the same PSC prices.

[4] Petron elected to *exclude* from his analysis cash transactions that involved the use of manufacturer coupons or third-party discount cards, although Walgreens' expert asserted that in some instances the Petron I analysis inadvertently included coupon transactions. Walgreens strongly criticized that methodology because it contradicted the opinions of Humana's Phase I experts. But the damages experts for *both* sides were obliged to base their opinions on the Interim Award and the Ruling on Damages Timeframes, regardless of the testimony of their Phase I experts. For Humana's damages expert to base his analysis on Phase I expert opinions rejected by the Arbitrator would have been irresponsible. Indeed, Walgreens' expert Smith's damages analysis was inconsistent with his *own* Phase I opinion (also rejected by the Arbitrator) that "the correct data to use to assess the U&C price are transactions for uninsured members who do *not* use PSC . . . ." (Exh. 323 at ¶ 14(a)).

After identifying all the cash/PSC purchases that corresponded with each Humana transaction (*i.e.* all PSC transactions at *any* Walgreens pharmacy nationwide and all other cash transactions at pharmacies with the same compete level, each in the same calendar month), Petron included all of those cash/PSC sales into a "cohort" arrayed from lowest to highest price. He then identified the prices at the tenth and twenty-fifth percentiles of the array and deemed these to be what he dubbed the "true U&C price" for each Humana transaction. (Exh. 471 at ¶¶ 48, 53-70; Phase II Tr. 173:2-175:10). Petron used the tenth and twenty-fifth percentiles, which he characterized as a "conservative" formula, out of a recognition that "one-time lowest cash prices" might not necessarily be ones that are "widely and consistently available." (Exh. 471 at ¶ 55(iii)). Although Petron asserted that the tenth percentile price (or even a lower cash price) was a legitimate "true U&C" that could be used for a damages determination, he also included in his analysis a damages calculation assuming that the cash or PSC price at the twenty-fifth percentile was the "true U&C."[5] (Exh. 471 at ¶ 55(iii)). For each transaction for which the "true U&C" would have been the reimbursable amount, damages were deemed to be the difference between the paid amount and the "true U&C." (Exh. 471 at ¶ 69). The model included amounts allegedly overpaid both by Humana and its members.

As part of his data analysis and methodology, Petron excluded certain prices or transactions from his cohorts to come up with what he considered to be a "conservative" estimate of damages. These included (1) assuming no damages for approximately 24 million Humana transactions (about 8% of the total) where he found insufficient "available cash pricing" data (Exh. 471 at ¶¶ 63-64); (2) excluding any cash transaction paid at less than $1.00 from consideration as the "true U&C" (Exh. 471 at ¶ 57); (3) assuming no damages if there was only one cash transaction from which to calculate the "true U&C" (Exh. 471 at ¶ 58); and (4) excluding the lowest-price transactions for cohorts with fewer than ten cash transactions (Exh. 471 at ¶ 59). Importantly, as to the cash (*i.e.* non-PSC) transactions, Petron assumed – without making a specific "determination" – that each cash transaction was for a price that was widely and consistently available and therefore was eligible to be the "true U&C" under the Interim Award. (Phase II Tr. 370:21-371:19). The Petron I analysis concluded that the total damages (including both Humana and member damages) through April 19, 2022 equaled $1,529,899,909 at the tenth percentile, and $1,140,906,603 at the twenty-fifth percentile. (Exh. 471 at Fig. 7).[6] Although no Humana member is a party to this Arbitration, Petron justified the inclusion of member damages on the basis that Section 5.3 of the 2009 Agreement provides as follows: "Provider further acknowledges that in the even such overpayment recovery described in this paragraph is imposed and results in Member overpaying his/her copayment obligation, Humana may collect such Member overpayment from Provider and refund said amount to Member." (Exh. 471 at ¶ 12 n.4).[7]

As a final step in the damages calculation, Petron extrapolated past damages to determine the amount of damages incurred between April 20, 2022 and the first day of the Phase II hearing,

---

[5] In some cases, the tenth percentile and twenty-fifth percentile were the same dollar amount. (Phase II Tr. 81:18-82:12), in which case the damages amount for a given Humana transaction would be the same regardless of which of those percentiles were used to calculate damages.

[6] Petron asserted, without refutation, that the Walgreens retail cash and PSC data productions only included data through April 1, 2022.

[7] Petron included member damages relating to breaches of the 1998 Pharmacy Agreement as well, even though that contract does not contain similar language. (Exh. 471 at ¶¶ 66-70).

August 15, 2022. His extrapolation methodology involved (1) determining the total of damages for the twelve-month period April 20, 2021 through April 19, 2022; (2) dividing that total to derive an average monthly damages amount; and (3) multiplying the average monthly damages amount for the period from April 20, 2022 through August 15, 2022. That analysis yielded additional damages of $94,101,870 at the tenth percentile and $63,946,255 at the twenty-fifth percentile. (Exh. 471 at ¶¶ 71-73). Including the extrapolated damages, the Petron I analysis concluded that Humana and its members suffered actual damages totaling **$1,624,001,779** at the 10th percentile (on over 47 million claims) and **$1,204,852,859** at the 25th percentile (on almost 42 million claims). (Exh. 471 at ¶ 77).)

Finally, the Petron I analysis added one final step: a calculation of "prejudgment" interest owed on the damages. The analysis included a calculation of interest at 8% annually compounded interest, the statutory amount under Kentucky law for liquidated damages. As an alternative, the Petron I analysis also included an estimate of interest at 6% in the event the Arbitrator determined that the damages were unliquidated and then exercised discretion under Kentucky law to award an amount less than 8%. (Exh. 471 at ¶¶ 74-76). The calculated interest amounts were as follows:

- 8% interest at 10th percentile: $593,241,070
- 8% interest at 25th percentile: $463,449,277
- 6% interest at 10th percentile: $414,310,541
- 6% interest at 25th percentile: $322,759,551

**B. Walgreens' Critique of the Petron I Analysis**

Walgreens and its expert witness Smith challenged the Petron I analysis on multiple grounds, including the following:

1. The Petron I analysis ignored the provisions of the Pharmacy Agreements to the effect that the U&C price must be one charged at the same store on the same day as the Humana insured transaction by considering prices charged at *other* stores and transactions that took place during an *entire month.* (Exh. 480 at 17).

2. The Petron I analysis included (and often found to be the "true U&C price") cash prices that were not widely and consistently available but instead were "one off price adjustments" (Exh. 480 at ¶ 101) and therefore fall outside the scope of the Phase I ruling. This includes approximately 1.9 million transactions that Smith concluded involved a payment made at the cash register of a Walgreens pharmacy for an amount other than Walgreens' "list" retail price for the store in question.[8] These included (but were not limited to):

    a. Partially filled prescriptions: Smith provided an example of the cohort for NDC 51248015101 (quantity 30) for December 2016. According to Smith, the data field demonstrated that both the lowest price and the "true U&C price" reflected partially

---

[8] Petron acknowledged that one-time special prices were not necessarily widely and consistently available. (Exh. 471 at ¶ 55(iii)).

filled prescriptions and thus substantially lower charged amounts than both the cash and PSC prices for that drug and quantity for that compete level. (Exh. D13 at 25).

b. <u>Employee or professional discounts</u>: For the Petron I cohort for NDC 69547035302 (quantity 2, October 2021), the "true U&C" was $129.19. With one exception reflecting a "register adjustment," the remaining transactions were at $135.99. Smith's data analysis revealed that the "true U&C" amount in fact reflected a discount available only to Walgreens employees and certain healthcare professionals.

c. <u>Manufacturer coupon transactions</u>: The Petron cohort for NDC 0000603530 (quantity 30) for April 2017 showed two transactions of $90, which was determined to be the "true U&C." (Exh. 480 at ¶¶ 47-48). All the remaining transactions were either at retail cash prices of $369.99 or PSC prices of $341.71. *Id.* According to Smith, further analysis of the data demonstrated that $90 corresponded to the manufacturer coupon price at the time for the drug in question, as revealed by multiple transactions involving the same customers' prescriptions filled at the same stores in the months both preceding and following the transactions in Petron's cohort. Thus, Walgreens asserts, these prices should not have been included in the Petron I analysis, especially because Petron affirmatively chose to *exclude* coupon transactions from his analysis.

d. <u>Matches to Third Party Transactions</u>: Smith presented an analysis of the Petron I cohort for NDC 61958250101 (quantity 30, Rx Compete Level 440 for December 2020). The fill retail price for the drug and the fill label price were $3888.09. The tenth and twenty-five percentile "true U&C prices" were $33.00. According to Smith, data analysis showed that for the specific prescription and store number corresponding to that "true U&C," $33.00 was the exact amount paid two months later by that customer and reflected the member's out of pocket responsibility for an insured transaction. Smith also presented an example of the flaws in the Petron I analysis caused by the inclusion of copay prices. For the cohort with NDC 65702040810 (quantity 200, Compete Rx Level 330, fill sold month July 2016), the "true U&C" was determined to be a cash transaction of ███. According to Smith, the data show that this was in fact the copayment amount paid by a Humana member in a transaction for which Humana's own records show it paid ████████████ ███████████████. Petron calculated over $2.5 million in damages for this cohort alone. Smith estimated that this error caused damages in the Petron I Analysis to be overstated by $35 million at the 25th percentile and $48 million at the 10th percentile. (Exh. 480 at ¶¶ 53-54).

3. Even assuming it was proper to consider prices at stores other than the one in which a Humana transaction took place, the Petron I analysis was flawed because it ignored so-called "price exception groups," which were stores that were permitted to deviate from

the retail cash prices otherwise designated for their compete level. (Exh. 480 at ¶¶ 68-69 and Appendix 3.1a and 3.2a).

4. Even assuming it was proper to use compete levels, the Petron I analysis improperly compared stores based on their current compete level, rather than the compete level they were in at the time of a given Humana transaction for which damages were being calculated.[9] (Exh. 480 at ¶¶ 12-14).

5. The Petron I analysis improperly included cash prices that were only available at so-called "worksite pharmacies" housed on or near the premises of employers who negotiated discount prices for drugs. For example for the Petron cohort with NDC 43598057330 and quantity of ten in November 2019, the 10th percentile price was determined to be $7.57 based on two charges of that amount at one pharmacy, even though all the cash transactions in the cohort at other stores in the same month were for $537.09. The $7.57 transaction was at a "worksite pharmacy" and there is no evidence that this highly discounted price was widely and consistently available at other Walgreens stores to which the general public had access.

6. Even assuming it was proper to consider prices other than those charged on the same day as a Humana transaction, the use of data by calendar month was flawed because it included prices that were the result of mid-month prices changes and were not in fact available on the same day as the corresponding Humana transaction. For example, Humana paid Walgreens ███ for two Bisacodyl EC 5 mg tablets sold on January 25. Even though the retail price at that store as of that date was $7.99, because the retail price earlier in January 2019 was $2.25, the Petron I analysis concluded that Humana had incurred ███ in damages. Similarly, for 50 metroprolol tablets, Humana paid Walgreens ███ for a sale on August 9, 2008, on which date the PSC price was $19.99 (*i.e. more* than what Humana paid in accordance with the lesser of three formula in the 1998 Agreement). However, because the PSC price was reduced to $16.17 *after* the Humana transaction but in the same calendar month, the Petron I analysis concluded that Humana had suffered ███ in damages. According to Smith, this error caused damages to be overstated by approximately $20 million. (Exh. 480 at ¶¶ 17, 72-75).

7. The Petron I analysis improperly excluded cash sales involving discount cards and manufacturer coupons from the cohorts. Smith contends that these should have been included because they are other forms of self-pay transactions. According to Smith, this caused damages to be overstated by $158 million. (Exh. 472 at Appendix 1 and Exh. 480 at Appendix 3.2a).[10]

---

[9] It appears that Humana did not have historical compete level information reflecting changes from one compete level to another for a particular store but that it received such information after receiving Smith's Rebuttal Report, and Petron submitted revised calculations reflecting that information.

[10] Smith's report asserts that the breakdown of self-pay transactions during the entire damages period was as follows: Retail Cash (47%), discount cards (41%), PSC (11%) and coupons (2%).

8.  The Petron I analysis erroneously calculated damages relating to COVID vaccines, even though pharmacies were required to provide vaccines without charge, the 2009 Pharmacy Agreement did not cover COVID-19 vaccines, and Humana paid only administrative fees that were not based on the U&C price. Smith asserts that the Petron I analysis overstated damages by $11.7 million because of this error. (Exh. 480 at ¶¶ 78- 79).

9.  The Petron I analysis overweighted PSC prices because his cohorts included cash prices only from transactions at stores in the same compete level as the store with the corresponding Humana transaction but included *all* PSC transactions nationwide for the same drug and quantity in the same calendar month. Smith asserts that this error caused damages to be overstated by $138 million at the 10th percentile and $148 million at the 25th percentile. (Exh. 480 at ¶ 11).[11]

10. The Petron I analysis improperly used PSC prices found in the Fill Sold Dollar fields rather than in the fields containing the prices that the PBM administering the PSC program would instruct the pharmacy to collect. (Exh. 480 at ¶ 77). As just one example, Smith demonstrated that Petron identified as the tenth percentile price what he determined was a PSC price of $141 even though every other PSC transaction during that month for the same drug and quantity was $1,517 or more. (Exh. 480 at ¶ 85).

11. The Petron I analysis erroneously failed to allocate the PSC enrollment fee to the drug purchases for which damages were calculated, thus overstating the damages. According to Smith (basing his analysis on the expert report of Walgreens' expert economist Nordby), the effective PSC prices were not just the prices paid at the cash register but included a portion of the enrollment fee that customers had to pay in order to get access to the discounted PSC prices. Smith calculated that Petron's failure to allocate the enrollment fee caused Humana's damages under the Petron I analysis to be overstated by approximately $84 million at the twenty-fifth percentile and $90 million at the tenth percentile.

12. The Petron I analysis improperly included damages incurred by Humana's members as well as Humana itself. Smith calculated that this overstated damages by $78 million at the 25th percentile and $110 million at the tenth percentile. (Exh. 480 at ¶¶ 20, 111-112 and Appendix 3.1-3.2).

13. The Petron I analysis failed to reduce damages to account for changes in the amounts that Humana would have withheld from Walgreens under Humana's Rx Quality Network Program. (Exh. 480 at ¶¶ 91-94). Under this program, which began in 2017, Humana withheld amounts otherwise payable to Walgreens and the pharmacy could recover those amounts only if it met certain agreed-upon quality metrics. According to Smith, if Walgreens had reported its PSC prices instead of its retail cash prices as the U&C amount in its claims submissions, it would have reduced the amounts withheld under that program. Therefore, damages should be reduced by the difference between what Humana

---

[11] Insofar as Smith took issue with the Petron I analysis using cash prices at all, and given that PSC prices were the same nationwide, it is unclear why Smith would fault Petron I for a methodology that increased the likelihood that a PSC price rather than a cash price would be identified as the "true U&C price."

withheld based on the higher reimbursement amounts and what it would have withheld had Walgreens submitted the PSC price as its U&C charge.[12] For example, if in the 2017-18 time period Humana paid ▮▮▮▮ for a claim that was not paid using the reported U&C price and withheld $5 under the program, then if the correct reimbursement amount based on the PSC price was $13.37, Humana would not have withheld the $5 under the Rx Quality Network Program during that time period (because there was no withholding for U&C-priced claims). Because Humana held back those $5, damages based on Humana's failure to report the PSC price would have to be reduced by that amount. (Exh. 472 at ¶¶ 51-52 and Table 22; Exh. 480 at ¶¶ 91-94; Exh. 836 at ¶¶ 23-31 and Exhibits 6, 12). According to Smith, this error in the Petron I Analysis caused damages to be overstated by $73 million at the 25th percentile and $95 million at the 10th percentile.

14. Walgreens argues that Humana could have mitigated its damages by adjusting its Maximum Allowable Costs ("MAC") on multi-source generic drugs to the PSC prices. Had it done so, Walgreens argues, it could have avoided paying the U&C price for those drugs because, under the lesser of three payment methodology, those transactions would have been paid at the MAC instead. According to Smith, the failure to account for damages that could have been mitigated by using the MAC caused the Petron I analysis to overstate damages by $107 million at the 25th percentile and $110 million at the 10th percentile. (Exh. 480 at ¶¶ 22, 111-112 and Appendix 3.1b, 3.2).

Smith's analysis also asserted that as a result of Petron's erroneous use of the data, nearly forty percent of Humana's total alleged damages involved "true U&C prices" that appeared only once in a cohort. (Exh. 480 at ¶ 33). Smith provided specific examples as to each of these errors and how they caused a substantial and unwarranted inflation of damages.

## C. Walgreens' Damages Analysis ("Smith Analysis")

Although Walgreens contends that no damages are owed, it presented an alternative damages analysis in Phase II through its expert Jed Smith (the "Smith analysis"). The Smith analysis takes a dramatically different approach to the calculation of damages than does the Petron I Analysis. Thus, while the Petron I analysis concludes that Humana's damages exceed $1 billion (and indeed approach $2 billion with the inclusion of interest), the Smith analysis comes up with damages of approximately $336,000 (or put another way, about one three-thousandth of the damages amount in the Petron I analysis). It is probably fair to say that few cases have seen such a wide disparity in experts' damages calculations using the same data sets.

The first step in the Smith analysis was to evaluate whether Walgreens should have reported "an alternate U&C price" to the retail cash price that was submitted to Humana. This involved two sequential analyses. First, for each Humana transaction, Smith (based on Dietz's report and opinion) looked to see if there was a "self-pay" transaction for the same drug in the same quantity on the same day and in the same store. (Exh. 472 at ¶ 9; Phase II Tr. 650:19-

---

[12] The methodology for withholding changed over time. In 2017-18 it was a flat $5 per prescription but excluded claims paid at the U&C rate. In 2019-21, Humana withheld 8% of the reimbursement amount. That was increased to 10% in 2022. The parties agree that Walgreens never satisfied the program criteria for receiving any of the withheld amounts.

653:19). Second, if there were any such transactions, then he would determine whether PSC purchases made up the plurality of those same drug, same store, same day transactions. If – and only if – they did, then the Smith analysis readjudicated the Humana claim using the PSC price as the U&C price. Put another way, the Smith analysis assumes Humana incurred damages *only* where (1) there was a cash sale (whether retail cash, PSC, coupon or discount card) of the same drug in the same quantity at the same store and on the same day as any Humana transaction; and (2) PSC purchases constituted the *plurality* of any such transactions. For example, if a Humana customer purchased a 30 day supply of atorvastatin at a particular store on February 15 for which Humana paid $50 and there were no cash purchases of the same NDC and quantity at the store that day, but a PSC purchase was made the following day of the same drug in the same store for $10, Humana would be deemed not to have incurred any damages with respect to the previous day's transaction. If the same Humana transaction took place and there were five cash purchases at the same store on the same day, three discount card transactions for $15 and two PSC transactions for $10, there would also be no damages associated with that transaction because PSC purchases did not make up the plurality of cash purchases. And if a PSC transaction for the same drug and quantity took place on the same day at a Humana store one mile away from where the Humana transaction took place, there would be no damages associated with that transaction. Smith's rationale for limiting damages to those situations in which there were cash purchases on the same day in the same store for the same drug and quantity is that this is the definition contained in the 2009 Pharmacy Agreement of the U&C price. With respect to the limitation of damages to those situations in which PSC transactions were the *plurality* of cash purchases, Smith relied on instructions from Walgreens' counsel to use that methodology and offered no other rationale for that constraint. Consequently, Smith calculated the total damages based on the readjudication of the identified claims to be $1,003,910. (Exh. 480 at ¶ 108).

Once the universe of transactions that were readjudicated using the PSC drug price was identified, Smith then added an additional amount to the price by allocating an amount to account for the enrollment fee paid by PSC members. The rationale for this was the expert opinion testimony of Nordby. According to Nordby, the PSC program was an example of "conditional pricing." (Exh. 474 at ¶ 12). In particular, the PSC involved "two-part pricing," in which it charged customers a fixed fee (the PSC enrollment fee) for the right to purchase its goods at a discount to the retail cash price. In other words, payment of the fee was a "condition" of the right to access PSC prices. Nordby opined that the PSC created a "*de facto* quantity discount" to its members because the price per drug purchase, which would include the enrollment fee, decreases as the amount of the annual fee is spread across more drug purchases. (Exh. 479 at ¶ 13). For example, if the enrollment fee was $20 and the PSC member purchased only one drug in a calendar year for $50, then the real (or "effective") cost of the drug to the member was $70. However, if the same member purchased the same drug in the same quantity each month, then the cost of the drug per purchase was $51.67 because the enrollment fee was spread over twelve purchases. Thus, as a matter of economics, the "effective" cost of the drugs purchased by PSC members for each drug purchased was the prorated per purchase membership fee plus the PSC formulary price. (Exh. 479 at ¶ 16). In addition to being based in economic theory, Nordby also relied for her opinion on the language in the Seventh Circuit's *Garbe* decision, in which the court stated that "[f]or [club members], the program fee is part of the cash price" and "[f]or people who fill more than one prescription, the [annual membership] fee would need to be allocated in some sensible way." 824 F.3d 632, 643-44 (7th Cir. 2016). Relying on the

Nordby report and the language in *Garbe,* Smith calculated a "per transaction" enrollment fee by dividing the total number of PSC transactions in a year by total enrollment fees received. (Exh. 472 at ¶¶ 31-40). Importantly, in so doing, Smith determined that virtually all enrollment fees, in the amount of $20 per individual and $35 per family per year, were collected in those amounts for each member who used the PSC to purchase drugs in a given year. (Exh. 854 at ¶¶ 1-5 and Exh. 2).[13] On average during the 2015-2021 damages timeframe, Smith concluded that the average enrollment fee per transaction was $2.44 and ranged from $2.25 to $2.65. (Exh. 480 at Table 11). In calculating damages, Smith used the actual average applicable to the year of each Humana transaction for which an alternate U&C charge was calculated for the 2015-2021 time period. He used the average for 2022 as well as for 2007-09, periods for which he did not have sufficient data to conduct a similar analysis. (Exh. 480 at ¶ 39).

The Smith analysis then made several additional reductions to the initial damages amount. For the reasons discussed in Section II(B), *supra,* Smith lowered his damages calculation to account for (1) the removal of that portion of alleged overpayments that was borne by Humana's members; (2) the reduction in Quality Rx Program withholdings that would have occurred had Walgreens reported the PSC price as its U&C on the Humana transactions falling within the damages calculation; (3) the damages Walgreens argues Humana could have mitigated by "MACing" multisource generic drugs starting in 2011; and (4) the impact of including discount cards and manufacturer coupons in the damages analysis. After these reductions were factored into the analysis, Smith concluded that the damages suffered by Humana with respect to the 302 million transactions during the approximately nine year damages timeframes totaled **$336,332**. (Exh. 472 at ¶ 58).

### D. Humana's Critique of the Smith Analysis

Humana leveled multiple criticisms at the Smith analysis, which are embodied in the Petron Rebuttal Report. (Exh. 475). Most important was the critique of Smith's use of the "same day, same store" criterion, which Petron calculated meant that only 0.3% of all Humana transactions had any damages associated with them. (Exh. 475 at ¶ 48). Petron asserted that this standard was unduly restrictive for several reasons, including the following:

1. The Smith analysis improperly replaced the "widely and consistently" *available* standard under *Garbe* and in the Interim Award with an "actually transacted price" standard. And it ignored the fact that there had to be a U&C price on every transaction, regardless of whether a cash purchase was made of the same drug and quantity in the same store and on the same day. (Exh. 475 at ¶¶ 50- 51).[14] The Petron Rebuttal Report calculated that on 99.5% of Humana transactions, Walgreens submitted a price it did not charge to any cash customer using the same day, same store, same quantity standard used by Smith. Petron further ascertained that on 70.6% of Humana transactions, Walgreens submitted as its U&C price an amount that it never charged to any cash customer during the damages

---

[13] According to Smith, the data showed that while over 375,000 enrolled PSC members did not pay enrollment or renewal fees (out of a cumulative total of almost seven million during the damages timeframes), virtually all PSC members who actually made drug purchases had paid the fee. **(**Exh. 854 at Exh. 2).

[14] Petron pointed to two provisions in the 2009 Pharmacy Agreement expressly requiring that every claim submitted include the pharmacy's usual and customary charge. (Exh. 11 at Exhibit C, § 5 and Exhibit E, § 11).

timeframe who purchased that drug and quantity at the same store as a Humana transaction, and that in over half of the Humana transactions, Walgreens submitted a cash retail price that it did not charge any customer in any of its pharmacies for that drug and quantity on the same day. (Exh. 475 at ¶ 47). Humana asserts that this methodology is unsupported in the evidence and was constructed solely to severely limit the awardable damages.

2. Walgreens' own pricing activity did not conform with the Smith analysis. Prices were set (subject to the pricing group exceptions) based on compete level, not the individual store level. (Exh. 475 at ¶ 45). And PSC prices were national, and thus any transaction anywhere in the United States for the same drug and quantity on the same day would have reflected the price available at the store where a Humana transaction took place.

3. Using the "same day" criterion was too narrow – and utilized solely to further reduce damages – because Walgreens did not change its prices daily and in some cases prices remained unchanged for months. (Exh. 475 at ¶ 46 and Figure 1).

4. Smith's use of the "plurality standard" (under which damages would be calculated only if PSC transactions were the plurality of cash transactions of a drug in the same store and say as a Humana transaction) is inconsistent with the Interim Award's finding that the proper standard is "whether the prices charged were the lowest widely and consistently available, not the prices most frequently charged." (Exh. 475 at ¶ 42).[15] Petron further noted that Smith offered no support for the plurality standard other than that it was done at the instruction of Walgreens' counsel. (Exh. 475 at ¶ 43). Petron also faulted Smith for including manufacturer coupon and discount card transactions when determining whether PSC transactions satisfied the plurality standard, but not assigning any damages where those transactions constituted the plurality of purchases of the same drug and quantity in the same store on the same day, even if those prices were widely and consistently available and less than the retail cash price reported as Walgreens' U&C price. (Exh. 475 at ¶ 52).

5. Smith's increase to the PSC price to include an allocation of the membership enrollment fee was improper because (1) the PSC membership provides valuable benefits (such as store credits on non-drug purchases) that were not factored into the calculation of the per transaction fee; (2) it does not factor in enrollment fees that may have been returned by members who exercised the right to quit the club and get a refund; (3) Walgreens possessed insufficient historical data to accurately calculate and apply the enrollment fee; and (4) thousands of PSC members were able to join the program without ever paying the fee. (Exh. 475 at ¶¶ 24-25 28-30; 32-33).

---

[15] Petron concluded that even before applying the plurality standard, Smith's use of the same drug, quantity, day and store methodology matched only 1.6% of all Humana transactions to a corresponding cash purchase. (Exh. 475 at ¶ 48).

### E. <u>Humana's PSC Only Analysis ("Petron II")</u>

Following the exchange of initial and rebuttal expert witness reports, Petron issued a Supplemental Expert Report that abandoned the Petron I methodology that considered cash as well as PSC transactions. (Exh. 835). Instead, he presented a so-called "Alternative PSC Only Analysis" that compared what Humana and its members paid for prescriptions with the PSC prices for those drugs and quantities. This analysis was predicated on the finding in the Damages Timeframe Ruling that "the preponderance of the evidence establishes that the PSC program and its discount prices were widely and consistently available to the general public staring in November 2007." *Damages Timeframe Ruling* at 4. The Petron II analysis is methodologically much simpler than Petron I because it excludes all non-PSC cash prices and as a result avoids many of the criticisms leveled at the earlier analysis by Walgreens' expert that related to non-PSC cash prices. For Humana transactions dated January 1, 2018 or later, Humana was provided with formularies that allowed Petron to determine Walgreens' established PSC price on a given day, and these were the prices he used to determine damages incurred during that timeframe. (Exh. 835 at ¶¶ 17, 29). However, for earlier Humana transactions, due to the infrequent occurrence of same day, same store transactions, the Petron II analysis followed the Petron I methodology and included in each cohort all PSC transactions in the same month at all Walgreens pharmacies (since PSC prices were consistent nationwide regardless of the compete level). (Exh. 835 at ¶¶ 18, 29). Petron then took the difference between the amount paid by Humana and its member for a given drug and quantity in that month and compared it to the first and tenth percentile PSC prices within each cohort (as opposed to the Petron I analysis which used the tenth and twenty-fifth percentiles). The difference constitutes the damages.[16] (Exh. 835 at ¶ 30). The Petron II analysis concluded that total damages (including extrapolated damages through August 15, 2022) at the first percentile were **$916,163,073** and at the tenth percentile were **$872,322,830**. (Exh. 835 at ¶¶ 31-32).

### F. <u>Walgreens' Critique of the Petron II PSC-Only DamagesAnalysis</u>

As noted, the switch to a PSC-only analysis avoided several of the grounds for attack on Petron I regarding the use of cash prices that Walgreens asserted were not widely and consistently available (and the criticism that it *failed* to include coupon and discount card transactions). Nonetheless, Smith critiqued certain aspects of the Petron II analysis as well with respect to how PSC prices were determined. (Phase II Tr. 627:8-642:14). In particular, Smith faulted Petron for determining the PSC price by relying on the "fill sold dollars" field in Walgreens' cash transaction data (which reflects the amount actually charged at the register) rather than the "plan return cost dollars" field, which reflects the price that the PBM responsible for administering the PSC program would have returned to the pharmacy as part of the transaction processing. For example, for PSC transactions for 60 Eliquis 5 mg tablets in December 2017, there were two transactions for the same prescription at a single store in which the "plan return cost dollars" reflecting the PSC formulary price reported by the PBM was $431.99 but the "fill sold dollars" field reflected a cash register price of $3.00. All of the nearly one hundred other transactions for the same drug and quantity during that month in all other

---

[16] Due to differences in plan terms, including copay amounts and coinsurance, as well as whether a member had met their deductible at the time of a transaction, the actual dollar amount of damages can vary for each Humana transaction corresponding to a particular damages cohort.

Walgreens stores had "fill sold dollars" and "plan return cost dollars" fields that both equaled $435.99 (when also adding the $4 administration fee). The Petron II analysis treated the $3 as the correct amount from which to estimate damages despite what appears to be a data error and/or a price that was not "widely and consistently available." This resulted in an estimate of over $3 million in damages for that cohort alone. (Phase II Tr. 628:4-630:10). In addition to criticizing Petron II for using incorrect, "one off" and inflated PSC prices, Smith also faulted it for (1) using non-existent PSC prices; (2) using a rounded quantity to calculate drugs rather than the "payable metric count"; (3) using improper unit prices; and (4) using prices on a calendar month basis. (Phase II Tr. 633:1-642:3).   In addition, Smith leveled the same criticism as he did at the Petron I analysis for failing to include offsets. (Phase II Tr. 642:4-14).

### G. Humana's Second Supplemental Damages Analysis (Petron III)

Following the Phase II hearing, Humana submitted the Second Supplemental Expert Report of Michael J. Petron ("Petron III "), which seeks to address some of Smith's criticisms of his earlier methodology. (Exh. 863). Petron III has two components – a revised PSC Only analysis and revised PSC + Cash analysis. Walgreens objected to the admission of the new expert report into evidence. After considering the arguments of the parties, and in view of the fact that the new report narrowed the differences between the two experts on several issues, the Arbitrator admitted the report, with the exception of the actual damages calculations. *See Order Regarding Humana's Second Supplemental Expert Report of Michael J. Petron* (October 3, 2022). With respect to the former, it included the following modifications from his earlier analyses where PSC transaction prices (as opposed to PSC formulary prices) were used to determine the "true U&C" price (Exh. 863 at ¶ 10):

1. In lieu of the previous "calendar month" methodology, which grouped PSC cash transactions by month and assessed prices at certain percentiles, Petron adopted a "lookback" methodology for those instances prior to January 1, 2018 where there was no PSC transaction on the same date and for the same drug and quantity as a Humana transaction. Under the lookback methodology, Petron used the PSC price at which a particular drug and quantity was sold at any Walgreens pharmacy on the date closest to (but not after) the Humana transaction for which damages were being calculated. Petron performed calculations using 30, 60 and 90-day lookback windows. This methodology "conservatively" calculated zero damages where there was not a PSC transaction within the lookback window or where the most recent transaction was outside the damages timeframe. (Unlike the Smith lookback analysis, however, it looked to the most recent PSC transaction and did not calculate zero damages where there was an even more recent retail cash, third-party discount, or manufacturer coupon transaction).

2. In lieu of using the "Fill Sold Dollar" field, which reflected the price collected at the cash register (and which Smith contended was often an unreliable metric), it used the PBM Returned Price, which Smith argued was the more appropriate metric. In so doing, the analysis addressed Smith's criticism that the earlier analyses improperly treated one-time special prices as PSC prices.

3. It excluded partial fill transactions.

4.  It excluded employee, professional, and senior discounts.

5.  It excluded "closed door" worksite pharmacy and e-commerce pharmacy transactions.

6.  It excluded compound and non-system drugs.

7.  It used the "payable metric quantity" field in the Humana claims data rather than the "quantity dispensed" field in order to avoid rounding up of quantities. In addition, it did not attempt to match Humana transactions to the next-highest quantity when an exact-quantity match was not available.

8.  While expressly disagreeing with Smith on this issue, the Petron III analysis also dropped the use of a new VPG tier pricing system implemented in 2022 to calculate damages.

9.  Because the PSC formularies for the period of January 1, 2018 and after were used in lieu of transaction data, and because COVID-19 vaccines are not on the formularies, claims relating to those vaccinations were removed from the Petron III Analysis. (Exh. 863 at ¶ 23(xi)).

      In addition to the modifications to his earlier analyses listed above, Petron III also applied two "potential offsets" to the PSC Only damages. First, it calculated a reduction in damages to account for the Rx Quality Network Program withheld amounts that would have changed had Walgreens submitted its PSC prices as its usual and customary prices.[17] Second, it provided a calculation for the removal of member damages associated with the 1998 Pharmacy Agreement.[18] Finally, the Petron III analysis adopted (without conceding) Smith's position that extrapolation of damages for claims after April 20, 2022 (the day after the last produced Humana transaction) should be calculated based on average monthly damages from Q1 2022 rather than through the 365-day lookback employed by Petron in his earlier calculations. (Exh. 863 at ¶ 15).

      Petron's Second Supplemental Report also included a separate "Retail Cash and PSC Damages Model Methodology" that included "millions of Walgreens-identified retail cash transactions sold at prices below Walgreens' 'reported' retail price." (Exh. 863 at 26 and n.77). This was similar to his previous model that included cash as well as PSC prices but was modified to address some of Smith's critiques of that framework. The analysis used the PSC Only model as its starting point but then looked to see whether there were any cash transactions at a price lower than the PSC price using the same drug (*i.e.* NDC), quantity and Rx Compete Level. This approach included the following modifications from his previous analyses:

---

[17] Humana formally acknowledged the appropriateness of such a reduction in a letter dated September 30, 2022.

[18] As discussed in more detail *infra*, the primary basis for Humana's argument that it is entitled to recover damages incurred by its members is language in Section 5.3 of the 2009 Pharmacy Agreement. There is no equivalent language in the 1998 Pharmacy Agreement and therefore Petron III accounts for the possibility that the Arbitrator will not include member damages for the damages timeframe covered by that contract.

1. It used the "lookback" approach used in the Petron III PSC Only analysis in lieu of his prior calendar month approach.

2. As with the PSC Only analysis, it excluded transactions related to partial fills, employee/professional/senior discounts, transactions at worksite and e-commerce pharmacies, and non-system and compound drugs.

Although disagreeing with Smith's critique regarding some of the retail cash prices included in his prior analyses, the Petron III Retail Cash and PSC analysis also indicated that, depending on determinations of the Arbitrator, the following retail cash prices could be excluded from the damages calculation:

1. Retail cash transactions that matched coupon prices for the same drug and quantity.

2. Retail cash transactions that matched copay amounts for the same drug and quantity.

3. Retail cash transactions that matched other customer payment amounts on so-called "SDL" transactions.

Finally, although Petron pointed out that Smith offered no explanation for the numerous retail transactions that Smith lumped together as "other register adjustments" and thus no basis for excluding them from the analysis, he indicated that these could also be excluded from the damages calculation depending on the Arbitrator's conclusion as to whether they were prices that under the Interim Award should have been reported as Walgreens' usual and customary prices.

The Petron III analysis calculated damages based on the methodology described above. However, because the damages calculations were not admitted into evidence, they are not presented here.

## III.
## ANALYSIS AND FINDINGS

### A.  What Is The Standard of Proof For Contract Damages?

Under Kentucky law, Humana is entitled to recover the difference between the amounts it paid Walgreens and the amounts it would have paid had Walgreens complied with its contractual obligations and reported the proper U&C price on its claim submissions. *See, e.g., Comprehensive Pharmacy Services, LLC v. Highlands Hosp. Corp.,* 2021 WL 1169897 at * 5 (E.D. Ky. 2021)(damages should put injured party in position it would have been in had contract not been breached); *Hogan v. Long,* 922 S.W.2d 368, 371 (Ky. 1995)(same). Humana is not obligated to prove the quantum of damages with exact precision. Rather, the law requires that it prove its damages with "reasonable certainty." *Id; Pauline's Chicken Villa, Inc. v. KFC Corp.,* 701 S.W.2d 399, 401 (Ky. 1985)(applying Restatement (Second) of Contracts § 352); *Kellerman v. Dedman,* 411 S.W.2d 315, 317 (Ky. 1967)(where damages are not capable of "exact" proof evidence is sufficient to support an award of damages where it provides "a

foundation which will enable the trier of facts to make a fair and reasonable estimate" and "the plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.")(citation omitted); *Illinois Valley Asphalt, Inc. v. Harry Berry, Inc.,* 578 S.W.2d 244 (Ky. 1979)(plaintiff seeking contract damages must provide sufficient evidence on which a reasonable inference as to the amount of damages can be based). Under Restatement (Second) of Contracts, followed by Kentucky courts, "[d]oubts are generally resolved against the party in breach," because "'[a] party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred." (Restatement (Second) of Contracts § 352, cmt. A). By contrast, an award of damages cannot be based on evidence that is "too remote, conjectural, and speculative." *Insight Ky. Partners II, L.P. v. Preferred Auto Servs., Inc.,* 514 S.W.3d 537, 553 (Ky. Ct. App. 2016)(quoting *Ky. Utilities Co. v. Warren Ellison Café,* 21 S.W. 976, 978 (Ky. 1929)).

**B.   What is the Proper Starting Analysis for Calculating Humana's Damages?**

As discussed above, the Petron I analysis calculates damages based not only on PSC prices but also on other cash prices found in Walgreens' cash transaction data. Thus, in many instances, the "true U&C" price determined by Petron is not a PSC price but another cash price. But in Phase I, Humana did not establish that Walgreens had cash discount programs other than the PSC that offered widely and consistently available prices lower than its "standard" retail cash price. Nor did its post-Phase I arguments assert that any such prices existed. And that is not surprising. The Demand for Arbitration itself is manifestly all about the PSC program and says nary a word about any other cash discount programs. Thus, the Petron I analysis relies upon cash prices never proven to have been Walgreens' usual and customary prices. And even if the Arbitrator were to consider the data presented in Phase II, Humana's evidence still falls short. The Petron I analysis, with limited exceptions, treated certain prices as the "true U&C price" *regardless* of how many transactions at that price took place and regardless of whether those prices were ever available – much less widely and consistently so – at the store in which the allegedly corresponding Humana transaction took place. (Or indeed anywhere except the store where the cash transaction did take place). In fact, Petron acknowledged that his analysis essentially *assumed* that *all* the cash prices used in his cohorts to determine the "true U&C" were widely and consistently available. (Phase II Tr. 370:21-371:19).[19] But Humana did not offer sufficient evidence to prove by a preponderance of the evidence that this was in fact the case.[20] Because Humana did not prove that any of the non-PSC cash prices upon which Petron relied as the "true U&C" were widely and consistently available, Humana failed both in Phase I and Phase II to prove that Walgreens breached the Pharmacy Agreements by failing to submit any of the non-PSC "true U&C prices" as its usual and customary prices. That conclusion is further bolstered by the multiple flaws identified in the Smith Rebuttal Report and his Phase II

---

[19] This is in direct contrast to Humana's assertion on the first page of its Phase II Post-Hearing Brief that Petron "determined which prices were the 'lowest' Walgreens made 'widely and consistently available to the general public' . . . ."

[20] Humana uses some sleight of hand to argue that because these prices were retail cash prices, and Walgreens has argued that its retail cash prices were widely and consistently available, then it is proper to include all these prices in the analysis. (Phase II Closing Argument Tr. 22:8-24:12). But Walgreens has conceded only that its standard retail rates were widely and consistently available, not that any cash purchase found in the transaction data reflected a widely and consistently available price. (Phase II Closing Argument Tr. 193:15-195:1).

testimony with respect to many of the cash prices identified as the "true U&C" and therefore used as the basis for calculating Humana's damages. These included, as discussed above, prices that appeared to reflect copayments (or adjustments by pharmacists to mirror a customer's co-payment amount for a particular drug), charges based upon manufacturer coupon prices, other third-party transactions, one-time adjustments or simply data input errors. Petron conceded that while one-time special cash prices might not meet the definition of usual and customary, he did include in his cohorts prices he only found were charged once, so long as they were not the lowest one-time price. (Phase II Tr. 63:22-64:6). And even as to those prices that did not fall into one of the aforementioned categories, Humana failed to prove by a preponderance of the evidence that those prices were *widely and consistently* available such that they should have been reported as the usual and customary prices on Humana transactions. Accordingly, the Petron I analysis suffers from multiple flaws making it an inappropriate framework from which to calculate damages in this case.

But while many of Smith's criticisms of the Petron I analysis are persuasive, his own alternative damages analysis is not. The most fundamental flaw in his methodology, and the one with the greatest impact on the damages totals, was his decision – based upon the opinion of Walgreens' expert Donald Dietz – to consider only those Humana transactions that had a corresponding PSC purchase of the same drug and quantity in the same store on the same day. (Exh. 472 at ¶¶ 9-10; Phase II Tr. 650:19-653:19). Petron offered evidence that *over 99%* of Humana transactions at issue did not have a corresponding retail cash sale of the same drug in the same quantity at the same store on the same day. Smith adopted a methodology – albeit one purportedly grounded in the Pharmacy Agreements themselves – that exploited this fact to eliminate virtually every Humana transaction as one for which damages could be awarded. And even as to the small number of instances in which such sales did occur, he reduced the damages amount further by calculating damages – for no reason other than because he was instructed to do so by Walgreens' counsel – *only* where PSC transactions constituted the *plurality* of cash sales for that drug and quantity on that day in that store. (Exh. 472 at ¶ 10). Adopting these two conditions for eligibility for damages meant that the initial damages calculations, before making any other reductions, was only *$1 million* for the nearly 302 million Humana transactions during the damages timeframe. Further reductions to that amount brought Smith's estimate of Humana's total damages down to approximately $336,000.[21]

At its core, Walgreens' Phase II approach is to re-litigate Phase I. But having failed in its effort to obtain a ruling that PSC members were not "cash customers," Walgreens now focuses on the language in the definition of U&C (and language in the NCPDP standards) to argue that PSC prices could only be the U&C price where they were actually "charged" to a cash customer on that day in that store. What's the problem with this argument? Well, for starters both aspects of Smith's methodology fly directly in the face of the Interim Award. The Interim Award concluded, drawing from both *Garbe* and its progeny and the Pharmacy Agreements themselves (and the negotiation history of the 2009 Agreement) that PSC prices should have been reported as U&C (at least where they were less than the retail cash prices) because they were the lowest prices widely and consistently *available.* Dietz, the expert retained by Walgreens to endorse its interpretation, admitted that he could not cite to any article, journal, treatise, government report,

[21] By way of contrast, in 2012, Walgreens estimated that if it were to lower its cash pricing to current PSC levels, it stood to lose over $3 billion *annually* in third party profits. (Exh. 7 at 4).

or peer-reviewed literature to support his proposed "actually charged" standard. (Phase II Tr. 912:17-913:1). Nor was he able to identify any PBM, regulatory agency, or contract (other than his personal construction of the 2009 Pharmacy Agreement) that required cash prices to be actually charged at a given store on a given day in order to be considered the pharmacy's usual and customary price for a particular drug. (Phase II Tr. 909:5-910:13). In fact, he conceded that the retail cash price is typically what pharmacies report as the U&C even where "there may not have been a transaction on that day." (Phase II Tr. 910:14-911:1; 871:9-872:14). In essence, Dietz conjured up a standard directly at odds with the Interim Award that caused the language "charged" in the 2009 Pharmacy Agreement to have two different meanings; namely, that the PSC price was the U&C charge only if it was actually charged on the same day in the same store for the same drug and quantity, even if that price was *available* at that store on that day, but that Walgreens' standard retail price was the U&C price regardless of whether it was actually charged under the same conditions. (Phase II Tr. 900:18-901:16). The position that PSC prices could or should be reported as U&C only where they were the *plurality* of cash purchases of a given drug on a given day and in a given store is equally problematic. Under this theory, if a Humana transaction at a given store occurred on the same day as 51 retail cash transactions and 49 PSC transactions, the PSC price would not be considered the U&C price and Humana would be deemed to have suffered no damages. (Phase II Tr. 704:4-15)(Smith). This further limitation, which served to reduce Smith's initial damages calculation by one-third, was the brainchild of counsel, and Walgreens' expert was unable to offer any persuasive justification for adding this condition. (Phase II Tr. 699:1-8). It is inconsistent not only with the Interim Award but also with the finding in *United States v. Supervalu, Inc.,* 2019 WL 3558483 at *7 (C.D. Ill. Aug. 5, 2019), which rejected the argument that discounted prices needed to be the most frequently charged prices in order to qualify as "usual and customary" under the standards established by the Seventh Circuit in *Garbe*.

Walgreens' argument also directly contradicts how it *actually reported* U&C prices under the Pharmacy Agreements. If a Humana member purchased a drug at a Walgreens pharmacy, it reported its retail cash price as its U&C *even if* no customer purchased that drug and quantity at that price on that day and in that same store. (Phase II Tr. 883:12-884:21)(Dietz). In fact, Petron put forth evidence that in 99.5% of the Humana transactions at issue, that is exactly what Walgreens did. (Exh. 475 at ¶ 47). Simply put, throughout the entirety of the damages timeframes in this case, Walgreens did – and said it had the right to do – exactly what it says Humana cannot do in its damages analysis, which is to consider as the U&C price the amount Walgreens *would have charged* in that store on that day. (*See also* Exh. 142 at 41:25-42:18)(Schuler Depo.); Phase II Tr. 676:14-21)(Smith) . Indeed, it is impossible to discern how pharmacy claims submissions could work any other way. Walgreens offers no convincing rationale for why it was not required to report the widely and consistently available PSC prices that would have been charged on a given day in a given store but was obligated (or entitled) to report the standard retail cash price even absent such a retail cash transaction. While Walgreens now quibbles with Humana's expert witnesses as to the meaning of "charged" (Walgreen's Post-Hearing Br. at 28-30), its own conduct throughout the entire time period of this case was fully consistent with those experts' interpretations as to the meaning. If Walgreens' interpretation of the contract is correct and the U&C was the amount actually charged at the same store on the same day for the same drug and quantity, then why did it report in the vast majority of submissions a U&C price that did not comport with that contractual requirement? And finally,

Walgreens' approach makes no sense as a practical matter. As pointed out by Humana's expert Beckley, if a Humana transaction *preceded* a PSC purchase in the same store on the same day for the same drug/quantity, then Walgreens would have to reverse its submission that designated its retail cash price as its U&C and replace it with a new submission using the PSC price. (Phase II Tr. 1337:4-1339:6). The Arbitrator rejects Walgreens' argument that the term "charged" now means something completely different from what the pharmacy itself treated it as meaning during the entire damages timeframe. In sum, as with Petron I, the Smith analysis suffers from significant flaws that preclude it from serving as the basis for a damages calculation in this case.

Presumably recognizing the flaws in Petron I and wanting to provide an alternative approach for the Arbitrator's consideration, Humana produced the Petron II PSC Only analysis as a supplemental expert report after receiving the Smith Rebuttal Report. After the Phase II hearing, Humana submitted the Petron III PSC Only analysis contained in the Second Supplemental Expert Report. (Exh. 863). As discussed above, these analyses addressed many of Smith's criticisms of Petron's earlier methodologies.[22] The Arbitrator finds that the Petron III PSC Only analysis is the most appropriate starting point for calculating Humana's damages. This analysis most closely adheres to the findings in the Interim Award, which concluded that Walgreens' PSC prices were widely and consistently available and therefore under the terms of the Pharmacy Agreements should have been reported as its U&C prices in its claim submissions to Humana during the damage timeframes. It does not include other cash sales, which Humana failed to prove were at prices that were widely and consistently available. While the Petron III PSC + Retail Cash Analysis addressed some of the criticisms directed at some of the cash prices used in the earlier analyses, it still failed to demonstrate that the prices that it identified as usual and customary prices were in fact widely and consistently available. Walgreens points out correctly that approximately 1.9 million transactions out of 236 million that were coded as retail cash (less than one percent of the total) were at prices less than its standard retail cash price. (Exh. 480 at ¶ 44). These included transactions that appeared to match manufacturer coupon prices (which Petron would have excluded had they been designated as such), sales in which the cash price mirrored what the member would have paid as a co-payment under their Humana plan and so-called SDL transactions which reflect insured claims. (Exh. 480 at ¶ 45). Admittedly, that still left over one million cash transactions less than the standard cash retail price. Smith testified persuasively that if he had claims data from other insurers, it is likely that many of those transactions would have been discovered to be insured co-payments similar to those found that tracked to Humana. (Phase II Tr. 1124:5-22). Regardless, it is not Walgreens' burden to prove that the claims in question were not widely and consistently available. It is Humana's burden to prove they were. That is particularly the case where, as Smith points out, "[t]hese small number of transactions have an outsized impact on Mr. Petron's damages calculation." (Exh. 480 at ¶ 10). Smith's evidence and testimony cast sufficient doubt as to whether these claims reflected retail cash prices that were widely and consistently available, and Humana failed to present persuasive evidence to the contrary. The Petron III PSC Only Analysis is also consistent with the testimony of Smith that "the PSC program was one national pricing formulary" that "did not frequently change day by day" and Walgreens' corporate representative's testimony that the pharmacy set its PSC prices on a "chain-wide basis." (Phase II Tr. 689:1-4 (Smith); 1010:2-5(Thompson)). Nor did Rx Compete Levels impact PSC pricing (Phase II Tr. 709:3-6), and

---

[22] Petron III identifies thirteen criticisms by Smith of his earlier methodologies and how he has addressed them in the PSC Only analysis. (Exh. 863 at ¶ 23).

Walgreens did not present evidence that PSC prices were impacted by so-called Price Exception Groups.[23]

Based on the Interim Award and assuming perfect information, the starting point for calculating damages in this case should be the difference between what Humana paid to Walgreens for a given transaction and what it would have paid for the same transaction had Walgreens reported its then applicable PSC price as its U&C instead of its retail cash price. This is what Petron III measures. In an ideal world, Walgreens would have produced data showing the applicable nationwide PSC price on each day of a comparable Humana transaction. But neither it nor, apparently, its PBMs administering the program retained the PSC formularies for the period prior to January 1, 2018. Accordingly, Petron III used the formularies for the period from January 1, 2018 through April 19, 2022 and used transaction data for all prior damages periods. While Walgreens challenges the use of the formularies because the correct U&C price should be the price "charged" (Walgreens Phase II Post Hearing Br. at 27) – even though those are the very prices Walgreens itself instructed its PSC PBM to report to pharmacies – it does not contest their accuracy. (Phase II Closing Argument Tr. 199:19-200:3). To the extent there was not a PSC transaction for the same drug on the same day as a Humana transaction, Petron adopted a "lookback" methodology to find PSC prices for dates relatively close in time to a given Humana transaction for which damages are being calculated. This is an appropriate methodology for establishing damages with reasonable certainty. Such an approach is not a shortcoming in Humana's damages analysis; it's a reasonable means of addressing a deficiency in Walgreens' data. Surely the party breaching the Pharmacy Agreements should not benefit from the fact it did not retain data or documents that would have allowed for an even more refined damages calculation. In fact, both Smith and Walgreens' witness Thompson conceded that using both formularies and calculating a proxy for the PSC price using transaction data would be a reasonable approach. (Exh. 484 at 216:3-217:4; Phase II Tr. 1075:5-19 (Smith); 1024:12-1025:1)(Thompson). [24] In sum, although its methodology had to account for the fact that it lacked the desired perfect information with respect to the lowest widely and consistently available price "at the time of dispensing," the Petron III analysis most closely approximates the proper measure of damages. The Arbitrator rejects as unsound Walgreens' argument through its expert Smith that if a retail cash transaction for the same drug and quantity was more recent than a PSC transaction then no damages should be awarded. As Humana correctly notes, under Smith's analysis if a disputed Humana transaction occurs on January 31, there are no damages if there was a retail cash transaction on January 30, even if there were PSC transactions for the same drug and quantity on January 25-29 and even if there was a PSC price available on January 30. (Humana Post-Hearing Br. at 19; Phase II Tr. 705:2-706:14 (Smith)).[25] There is no analytic support for such an approach. The Petron III Analysis used three alternative "lookback" periods in order to define the PSC price by which damages should be measured: 30, 60 and 90 days. (Exh. 863 at ¶ 10(i)). The Arbitrator finds – consistent with the acknowledgment by Humana's

---

[23] This also addresses Walgreens' argument that the usual and customary price has to be focused on a particular pharmacy, not Walgreens as a whole. Because PSC pricing was uniform throughout Walgreens, those widely and consistently available prices did not vary from pharmacy to pharmacy.

[24] Smith acknowledged that if a PSC analysis of the type described in Petron III was the basis for calculating damages, "[e]ither looking at what the PSC price is from the formularies or calculating a proxy of the PSC price from the claims data, either one of those approaches would make sense . . . ." (Exh. 484 at 216:3-217:4).

[25] Smith acknowledged that "[j]ust because the price wasn't charged, doesn't mean it's not available." (Phase II Tr. 706:15-21).

counsel at closing argument – that a lookback approach of up to thirty days allows for a reasonable estimate of damages incurred for those situations in which there is no data for same day sales.[26] (Phase II Closing Argument Tr. 17:14-18:15). And for the reasons discussed above, this lookback methodology is more reliable than Smith's because it does not employ the artificial "plurality" analysis.

Given that the Petron III PSC Only analysis should serve as the starting point for calculating damages, the next task is to determine what modifications to it are appropriate, if any.

## C. What Adjustments Should Be Made To The Petron III PSC Only Analysis To Address Any Data Or Methodological Flaws?

While the Petron III PSC Only analysis is the appropriate starting point for calculating damages, Walgreens has raised criticisms regarding some of its methodologies, which in turn may have led to overstated damages calculations. These include (1) using PSC prices that were the result of sales taxes in a limited number of jurisdictions; (2) using incorrect PSC prices; and (3) calculating member damages based on incorrect measures.

### 1. Taxes

Walgreens argues that because a small number of jurisdictions impose sales tax on prescription medications and the pharmacy would identify a lower PSC price for those drugs to account for that tax, Petron III's use of those lower prices on a nationwide basis causes damages to be overstated. (Phase II Closing Argument Tr. 219:2-220:16; Walgreens' Phase II Post-Hearing Br. at 24). Thus, to use an example presented at post-hearing argument, if the PSC price for a drug is $5 and there is a 17 cent sales tax, Walgreens would not charge the customer the additional 17 cents; rather, that amount would be paid from the $5 charge. However, because of the manner in which usual and customary prices are reported under NCPDP standards, the 17 cent tax would be removed from the usual and customary field in the claims submission. As a result, the usual and customary price would show up as being $4.83. Because Petron uses the lowest PSC price in his damages model where there is more than one PSC price on a given day (and presumably because it is possible that in the lookback approach the PSC price chosen could be one where there was only one transaction, and that was in a taxing jurisdiction), Walgreens argues that Petron assigned the lower price in the taxing jurisdiction to transactions where there was no tax. Thus, for example, if the reported PSC price would have been $4.83 in Louisiana, that price was applied to a Humana transaction in New York even though the PSC price that would have been charged in New York was $5.00. While there is some lack of clarity as to whether the Petron III analysis actually utilized this methodology, Humana agreed that this issue could be addressed by the experts in the next stage of the proceedings. (Phase II Closing Argument Tr. 244:17-245:6). Accordingly, the Arbitrator finds that to the extent the Petron III analysis includes damages based on PSC prices that are attributable to tax issues, the model should be adjusted accordingly.

---

[26] Petron III found that the difference between using a 30 day and 90 day lookback period was approximately $11 million, about 1.4 % of the total calculated damages. (Exh. 863 at Figure 1).

### 2. **PSC Prices**

At the Phase II hearing, Smith stated that some of the PSC prices that Petron was using for his PSC Only model in his Supplemental Report were not in fact PSC prices. (D13 at 84). Petron has responded by saying that Smith provided only one example, which itself was inaccurate. (Exh. 863 at ¶ 24(v)). To the extent this remains an issue, the damages calculations should be adjusted accordingly. Similarly, to the extent there was more than one PSC price matching particular Humana transactions using cash transaction data for pre-2018 purchases, the experts should include in their reports the appropriate methodology for choosing the PSC price to be used for the purpose of calculating damages.

### 3. **Member Damages**

For the reasons set forth in Section III(E), *infra*, Humana is entitled to recover and refund damages amounts attributable to member overpayments under the 2009 Pharmacy Agreement. However, Walgreens has criticized Petron's methodology on the basis that it assumes every member contribution was a fixed copayment rather than coinsurance. The damages model should accurately reflect the actual member responsibility for each transaction. Accordingly, the forthcoming expert reports should reflect that as well as address what methodology to use where it is not possible to determine the source of member responsibility. (*See, e.g.,* Exh. 472 at ¶¶ 42-49; Phase II Tr. 606:5-606:21).

### D. **Should The Enrollment Fee Be Included In Determining the PSC Price For Purposes of Damages Calculations?**

As discussed above, Walgreens presented the testimony of an economic expert, Dr. Kelly Nordby, who opined that the PSC program is a form of "conditional" two-tier pricing in which members had to pay an enrollment fee to access PSC's discounted drug prices. (Exh. 474).[27] Thus, to determine "effective" (another way of saying "true") usual and customary charge of the drugs to PSC members requires including the enrollment fee in some way. (Exh. 474 at ¶¶ 13, 37). She further opined that an "economically sound" approach to doing so would be to allocate the membership fee on a per drug purchase basis. (Exh. 474 at ¶¶ 13, 41-42). Walgreens' damages expert Smith performed just such an analysis by calculating the total enrollment fees for each member from 2015 through 2021 and dividing that by the number of PSC transactions in that year. That resulted in an average amount per PSC purchase ranging from $2.25 and $2.65 and averaging $2.44 over the entire period for which data was available. (Exh. 472 at ¶¶ 11-13, 31-40; Phase II Tr. 601:2-602:19; 603:10-604:3)). For the years 2015 through 2021, Smith added the average amount to the PSC price. For other periods in the damages timeframe, he applied the average $2.44 amount.[28] Smith characterized his methodology as "conservative" because it assumed only a $20 enrollment fee even for family memberships if only one member of the family purchased a prescription drug, and it further reduced the membership fee by assuming

---

[27] The type of two-part pricing employed by Walgreens in the PSC is a form of quantity discount in which the average price of drugs, either individually or in the aggregate, decreases with the number of purchases. (Exh. 474 at ¶¶ 32-36).

[28] Smith testified that PSC membership data was not available for the 2007-09 damages period. (Phase II Tr. 601:2-13).

that every PSC member who did not achieve their enrollment fee in savings would have applied for and obtained the savings guarantee fund offered to PSC members during at least a portion of the damages period. (Phase II Tr. 602:12-19). Relying on the Nordby report and testimony, Walgreens contends that for purposes of calculating damages, that amount should be added to the PSC formulary or transaction price for each Humana transaction.[29] Presumably, not including those amounts would in effect give Humana a better deal than PSC members because it did not have to pay enrollment fees for its members to get the benefit of PSC prices. In this regard, Walgreens contends that the following language in the Seventh Circuit's *Garbe* decision "requires" an allocation of the PSC membership fee (Walgreens Phase II Post Hearing Br. at 37): "[f]or [club members], the program fee is part of the cash price" and "[f]or people who fill more than one prescription, the [annual membership] fee would need to be allocated in some sensible way." 824 F.3d 632, 643-44 (7th Cir. 2016).

Humana makes multiple arguments as to why the membership fees should not be the basis for an "offset" of damages. (Humana Phase II Post Hearing Br. at 28-30).[30] First and foremost, it contends that the NCPDP definition of U&C as the "[a]mount charged cash customers for the prescription *exclusive of sales tax and other amounts claimed"* expressly excludes incorporation of membership fees. (Exh. 552 (NCPDP 1999 Data Dictionary) at 71; Exh. 41 (NCPDP Reference Manual, Ch. 3: NCPDP Flat File Format, Oct. 2005) at 3-72)(emphasis supplied); Phase II Tr. 1305:3-19)(Beckley). Second, it asserts that Walgreens' witness Thompson acknowledged that (1) the pharmacy does not charge membership fees to third-party payers in order to access its U&C prices; (2) to do so would require an agreement between the parties; and (3) Humana did not agree to pay any type of fee for its members to access Walgreens' usual and customary prices. (Phase II Hearing Tr. at 994:21-995:3; 998:16-1001:4; 1001:5-10). Third, it points out that both Smith and Thompson testified that Walgreens does not include enrollment fees as part of the PSC prices in the PSC formularies or its transaction data. (Phase II Tr. at 1106:5-1107:19)(Smith); Exh. 832 at 57:17-25)(Thompson). Fourth, Humana argues that the Pharmacy Agreements require that Humana and its members get the benefit of the PSC prices and that there is no requirement that Humana members pay enrollment fees in order to do so; rather, their "access" to PSC prices was through payment of their premiums. Finally, Humana asserts that by allocating the entire enrollment fee to PSC transactions, Smith ignored the facts that club members got other benefits for their enrollment fee, could obtain a refund of their enrollment fee within 30 days, and in some instances obtained the benefits of the PSC without ever paying the fee.

As a matter of pure economic theory, there is no question that Nordby's opinion is correct: the true cost of drugs purchased through the PSC included the membership fee customers had to pay to access those drugs. The question that now must be answered is whether it is appropriate and consistent with the Pharmacy Agreements to include an allocated amount of the fee to the PSC prices to determine the correct U&C charge for purposes of calculating damages. Humana relies primarily on the argument that the NCPDP definition of "usual and customary" – at least as of 2003 – expressly excluded "other amounts claimed" and asserts that

---

[29] Nordby testified that Smith's allocation methodology was consistent with her opinion. (Phase II Tr. 474:10-20).
[30] Inclusion of the enrollment fee is not accurately characterized as an "offset" to damages. Rather, as Smith explains in his rebuttal report, the PSC enrollment fee is more accurately characterized as "part of the price a customer must pay when purchasing a drug using the PSC." (Exh. 480 at ¶ 90).

this language precludes an allocation of the membership fee to the usual and customary charge. As a starting point, it is important to point out that at the time the 1998 Pharmacy Agreement was entered into, the "other amounts claimed" exclusion did not yet exist. With respect to the 2009 Pharmacy Agreement, the Interim Award, based on the district court's decision in *Garbe,* found that payors and pharmacies may define usual and customary in a way that varies from the definition set forth above. (Interim Award at 15; *Garbe v. Kmart Corp.,* 73 F. Supp. 3d 1002, 1014 (S.D. Ill. 2015). That contract's definition of "usual and customary" does not contain the NCPDP exclusion for "other amounts claimed." But even if either or both of the Pharmacy Agreements did incorporate that provision, Humana's argument *assumes* that an allocation of the membership fee to determine the U&C amount for a drug would constitute "other amounts claimed." The NCPDP defines "Other Amount Claimed Submitted" as the "amount representing the additional incurred costs for a dispensed prescription of service." (Exh. 41 at 37). This appears to refer to additional *costs incurred by the pharmacy* in connection with dispensing drugs, a conclusion supported by the examples such as delivery cost, shipping cost, postage cost and administrative cost. (Exh. 41 at 38).[31] While that list is not exhaustive, it does focus on costs borne by the pharmacy. In arguing for inclusion of an allocated amount of the membership fee, Walgreens is not seeking to add additional costs it incurred to the usual and customary charge; rather, it contends that the "amount charged" should include an appropriate portion of the membership fee in determining what the usual and customary charge is. Viewed in this context, the exclusion from the U&C definition of "other amounts claimed" is not dispositive. Moreover, the NCPDP has explained that U&C is the "value that a pharmacist is willing to accept as their *total* reimbursement for dispensing the product/service to a cash-paying customer." (Exh. 22 at 39)(emphasis supplied). This is consistent with inclusion of an allocated amount of the membership fee in the usual and customary charge because Walgreens, with exceptions Humana has not shown to be material, would not accept PSC prices as reimbursement for drugs without a membership fee being paid.[32] Put differently, the Interim Award concluded that PSC prices were widely and consistently available, but they were "available" only through the club's "conditional pricing system."

Humana's argument that Walgreens does not charge third party payers membership fees to access discounted prices and that it negotiated for its members to get the benefit of the PSC prices without the membership fee also falls short. While there was some evidence introduced in Phase I regarding discussions about Humana members joining the PSC, a precondition of membership to access Walgreens' discounted prices is an issue separate and apart from the question of whether the usual and customary price under the Pharmacy Agreements could encompass an allocated amount to reflect the conditional pricing. For example, requiring every Humana member to purchase (or for Humana to pay on their behalf) the full membership fee could lead to a situation in which Humana members who never purchased a prescription drug would still be charged (or Humana would have been required to pay) for a membership fee. But Walgreens is not arguing that the damages must be reduced by the amount that Humana would

---

[31] The previous version of the NCPDP definition expressly excluded "postage." That was removed and replaced with the "other amounts claimed" language.

[32] While the evidence established the possibility that in certain limited circumstances individuals may have been able to join the PSC without paying a fee, the weight of evidence supported the proposition that this was the exception not the rule and that members who did not pay the fee rarely if ever actually purchased prescription drugs at PSC prices. (Exh. 854).

have had to pay for membership for each and every one of its members (which it could not have done for at least a portion of the damages period anyway insofar as membership for Medicare members was unlawful) regardless of whether they purchased a single drug during the year. So too, the argument that Humana members have already paid premiums to access discounted prices is beside the point; the question presented here is how to calculate the discounted U&C price to which they are entitled. The evidence of the negotiations over the 2009 Pharmacy Agreement revealed that Humana rejected Walgreens' proposed exclusion of discounts from the definition of U&C because "it would mean that uninsured customers could be better off than its insured members, something Humana deemed unacceptable." (Interim Award at 16-17). But Humana now posits a definition of usual and customary that would reward *its* members with *better* prices than those that were available to individuals who joined the PSC, because it disregards the true cost of those drugs. The fact that Humana never agreed to pay an "access fee" for its members does not preclude a determination that the usual and customary charge for prescription drugs included an amount allocated based upon a reasonable methodology for the purpose of determining what Humana itself refers to as the "true U&C."[33]

Finally, Humana argues that the language in the Seventh Circuit's *Garbe* opinion does not support Walgreens because it refers to allocating membership fees to the PSC members, not to the calculation of the usual and customary amount. That the reference is to PSC members rather than insureds is true. But there is no apparent reason why an allocation would be discussed at all *except* for the purpose of determining the "true U&C" price. Prior to that discussion, the court had already described the membership fee as "nominal." To be sure, Walgreens overreaches when it states that *Garbe* "requires" the conclusion for which it advocates. But while it is undisputed that the quoted language is *dicta* and the Seventh Circuit was not deciding damages issues, the most reasonable interpretation of the cited language is that the court recognized the very point made by Walgreens; that it is appropriate to use a reasonable allocation methodology to incorporate the membership fee to obtain the true "lowest widely and consistently available" price for drugs.[34]

For all the foregoing reasons, the Arbitrator finds that including an allocation of the PSC membership fee in determining the usual and customary charge for each Humana transaction for purposes of calculating damages is consistent with the Interim Award and the Pharmacy Agreements. The Arbitrator further finds that Smith's methodology was reasonable and should be applied in the final calculation of damages.[35]

---

[33] For the same reason, Section 2.2 of the 2009 Pharmacy Agreement does not bar an allocation of the membership fee in determining the usual and customary charge; it only places a limit on "collect[ing] additional amounts" above and beyond the U&C amount for the drug. (Exh. 11 at § 2.2).

[34] It is not necessary to enter a time machine to determine how Walgreens *would* have gone about such a process in order to report its U&C prices. Rather, it is sufficient to conclude that the methodology presented by Smith was a reasonable one that permits the Arbitrator to calculate a "fair and reasonable estimate" of Humana's damages. *Kellerman v. Dedman, supra,* at 317.

[35] Humana has argued that Smith's analysis fails to take into account other PSC benefits, including $50 coupon books, $20 gift cards, 10% discounts on certain non-prescription drug products, PSC members who obtained refunds by cancelling their membership or instances where enrollment fees were not charged. (Humana Post Hearing Brief at 30). But Humana failed to present any alternative analysis that took these into account or demonstrate that these were material. And in any event, what limited evidence there was on these issues establish that the described benefits did not exist, were extremely limited in scope or were not material financially. (Phase II Tr. 604:16-605; 1115:3-13 (Smith); 968:16-969:12 (Thompson).

E. **Should The Damages Award Include Amounts Attributable To Member Overpayments?**

The damages Humana seeks to recover in this Arbitration include not only those borne by Humana itself but also damages allegedly incurred by members who paid excess amounts in the form of copayments or coinsurance as a result of Walgreens' breach of the Pharmacy Agreements. (Exh. 471 at ¶¶ 66-69). It argues that it is entitled to be awarded these amounts under Section 5.3 of the 2009 Pharmacy Agreement, which provides as follows: "[Walgreens] further acknowledges in the event such overpayment recovery described in this paragraph is imposed and results in Member overpaying his/her Copayment obligation, Humana may collect such Member overpayment from Provider and refund said amount to Member." (Exh. 11 at § 5.3). Humana further contends that it is entitled to recover member overpayments under the 1998 Agreement as well because the parties agreed in the 2009 Agreement to arbitrate any disputes under the terms of the latter's arbitration provision. (Exh. 11 at § 12.2). In response, Walgreens argues with respect to the 1998 Pharmacy Agreement that there is no language providing for it to recover overpayments made by members and that the arbitration provisions in the 2009 Pharmacy Agreement did not extend the provisions of Section 5.3 to disputes arising under the earlier contract.[36] With respect to the 2009 Pharmacy Agreement, Walgreens argues that the right to recoup overpayments made by members is limited to situations in which the parties "in an informal mechanism decide[], across the table from each other, that Walgreens should return money to Humana and its members that that money, the member's part, will be returned to the members." (Phase II Post Hearing Argument Tr. 164:22-165:6). It further argues that the arbitration provision's bar on Humana representing a class also forecloses Humana from recovering member overpayments. (Walgreens Phase II Post Hearing Br. at 41-42).

With respect to the 1998 Agreement, Humana has not cited any provision of that contract analogous to Section 5.3 of the 2009 Pharmacy Agreement that authorizes it to recover overpayments allegedly made by its members. Rather, it relies upon the provisions of Section 12.2 of that Agreement, which govern arbitrations and superseded the 1998 Pharmacy Agreement's dispute resolution provision. But Humana improperly conflates the substantive provisions of Section 5.3, including the provision regarding recovery of member overpayments, with the procedural provisions of Section 12.2 governing how arbitrations are to be conducted. There is not even the slightest hint that the parties intended that Section 12.2 would somehow incorporate the *substantive* provisions of the 2009 Pharmacy Agreement (including but not limited to the language at issue contained in Section 5.3) to disputes arising under the earlier contract. Section 12.2 says nothing at all about Section 5.3. Furthermore, Humana has not presented any other legal argument that gives it legal standing or authority to recover such amounts in this Arbitration. Thus, Humana offers no persuasive legal basis for the inclusion of

---

[36] Ironically, this is the exact *opposite* of the position Walgreens took in connection with its dispositive motion arguing that Humana failed to satisfy conditions precedent to initiating arbitration. Then, when it is was in its interest to do so, it argued that "the most logical interpretation of the language in Section 12.2 is that the parties must follow the same requirements laid out in Section 5.3 of the 2009 Contract to any dispute arising under the 1998 Contract." (Walgreens' Motion at 8-9). The Arbitrator rejected that argument when Walgreens made it, and now rejects it again in response to Humana's similar contention. *See Ruling on Walgreens' Dispositive Motion on Humana's Failure to Satisfy Condition Precedent Before Initiating Arbitration* at 7-8.

damages allegedly incurred by its members as part of the compensatory damages award under the 1998 Pharmacy Agreement.

As for the 2009 Pharmacy Agreement, this is hardly the first time the Arbitrator has been called upon to interpret the scope and meaning of the "lengthy and densely worded" (and perhaps one should add "sometimes abstruse") Section 5.3. In fact, Walgreens points to language in the *Ruling on Damages Timeframes* to the effect that "[t]he clear purpose of Section 5.3 is to provide a process for one party to put the other on notice if it has made overpayments (or been underpaid) and for the parties to have an opportunity to escalate those differences to senior management for possible resolution prior to the commencement of an arbitration, and to put a time limit on how far back in time recoveries may be had." But Walgreens takes that language completely out of context, insofar as it was written in connection with the issue of whether Humana had properly invoked that provision when a member of its legal department sent a letter to the pharmacy in December 2017. Ignoring that context, Walgreens argues that the language quoted above, translated into "other words," means that "Section 5.3 is an informal mechanism for recovery; it does not state the parties' rights with regard to arbitration." (Walgreens' Phase II Post Hearing Br. at 41). But that is inconsistent with the actual language of Section 5.3, which expressly states that if the dispute resolution process between the parties relating to overpayments does not result in an agreement, "the matter may be submitted to arbitration in accordance with Section 12.2, *Agreement to Arbitrate,* of this Agreement." In fact, Walgreens' key witness at the Phase I hearing, Scott Schuler, testified that the dispute resolution process engaged in by the parties pursuant to Section 5.3 was "part of the protocol of the arbitration." (Phase I Tr. 1477-1483). In short, arbitration is the final contractual step in the process set forth in Section 5.3 for recovering overpayments. Indeed, the language in question refers to situations in which an "overpayment recovery described in this paragraph is *imposed,"* which is inconsistent with the idea that it is limited to negotiated agreements. (Emphasis supplied). This language is fully consistent with a resolution of an overpayment dispute in arbitration.[37]

Walgreens next argues that Humana is barred from recovering member overpayments because the 2009 Pharmacy Agreement's arbitration provision states that "Any arbitration under this Arbitration Agreement shall be solely between Humana and Provider . . . and may not be maintained on behalf of any purported class." (Exh. 11, § 12.4). But Humana does not purport to be bringing separate legal claims on behalf of a class of members; rather, it is invoking its *own* contractual right to recover overpayments made by members and refund them to those members. This also addresses the concerns about the "due process" rights of Humana members Walgreens expressed at the closing argument. This ruling is not intended to constitute a determination as to any legal claims that may be possessed by Humana members and as such it is difficult to see how it binds members in a way that threatens their legal interests. Finally, with respect to Walgreens' concern over the potential for a "double recovery" by members, any refunds Humana members obtain from an award in this case and subsequent distribution by Humana would obviously be an offset to any judgment Walgreens might face in the litigation formerly known as *Forth,* or any other similar proceedings brought on behalf of Humana members.

---

[37] Unlike the language regarding the two-year lookback period, there was no testimony as to the negotiations that led to this language.

Finally, Walgreens has objected to Humana recovering member overpayments in this Arbitration on the grounds that it has failed to describe the methodology or process by which it will refund overpayments to its members. This is a legitimate concern and one that must be addressed by Humana. However, one thing is clear: to the extent that Humana is unable to process refunds for certain members whose claims are encompassed by an award in this Arbitration, such amounts must be returned to Walgreens.

For all the foregoing reasons, the damages award in this Arbitration shall include member damages resulting from overpayments under the 2009 Pharmacy Agreement only. In order to ensure clarity regarding the damages amounts, the forthcoming expert reports shall expressly delineate those damages amounts that relate to overpayments by Humana and those relating to overpayments by Humana's members and should include specific amounts that constitute member overpayments to be refunded with respect to each member whose claims fall within the scope of this Arbitration under the 2009 Pharmacy Agreement.

F.  **Do Walgreens' Affirmative Defenses Bar Humana's Recovery Of Damages In Whole Or In Part?**

1.  **Does the Voluntary Payment Doctrine Bar The Recovery Of Any Otherwise Awardable Damages?**

Walgreens argues that the "voluntary payment doctrine" bars Humana from recovering damages after January 2009, when CVS, a different pharmacy chain, purportedly told Humana that it was not reporting its club prices as its usual and customary charges and Humana became aware that it rarely paid either of those pharmacies' claims based on usual and customary prices. (Humana Phase II Post-Hearing Br. at 1). The voluntary payment doctrine has "ancient, common-law roots," and its contours have changed over the centuries. *Randazzo v. Harris Bank Palatine, N.A.,* 262 F.3d 663 (7th Cir. 2001). Although the case law is sparse, Kentucky courts recognize the doctrine, which provides that "[w]here one pays an illegal demand with full knowledge of the facts which render the demand illegal, without an immediate and urgent necessity therefor . . . the payment is voluntary." *City of Morganfield v. Wathen,* 261 S.W. 12, 14 (Ky. 1924). [38] *See also Causey v. Cohron,* 287 S.W. 544, 545 (Ky. 1926)("One cannot voluntarily become the creditor of another so as to enforce his claim in a court."). According to Westlaw, with only a few exceptions, neither of these nearly century-old cases has been cited by another Kentucky appellate court since the 1950s, and even prior to then the body of case law considering the doctrine was meager. Nonetheless, last year the Kentucky Court of Appeals rejected entreaties to follow other states and abandon or narrow the doctrine and instead affirmed its vitality, citing and quoting from *Wathen and Cohron. Davis v. Norton Healthcare, Inc.,* 2021 WL 223528 at *1-2 (Ky. Ct. App. Jan. 22, 2021). Although presented with the opportunity to take the case up and toss the doctrine overboard, the Kentucky Supreme Court declined discretionary review of that decision. Walgreens also argues that the voluntary payment bars recovery when a plaintiff "'knows *or ought to know* the facts' and does not avail himself of the

---

[38] The *Wathen* case also involved a pharmacy (specifically, a pharmacy challenging a tax on the sale of whisky prescribed by physicians during Prohibition) but arose under what has been described as the "peculiar context of . . . illegal tax cases." *Restatement (Third) of Restitution and Unjust Enrichment, § 5, Comment g.*

means which the law affords him to resist the demand . . . ." *Chris Albritton Constr. Co. v. Pitney Bowes, Inc.,* 304 F.3d 527, 532 (5ᵗʰ Cir. 2022)(emphasis supplied; internal citation omitted); *see also Ergo v. International Merchant Services, Inc.,* 519 F. Supp. 2d 765, 774 (N.D. Ill. 2007)(the "failure to recognize error in making a voluntary payment" does not overcome the doctrine "when the relevant facts were not obscured or inaccessible."). Walgreens acknowledges that the voluntary payment doctrine is an affirmative defense and that, as such, it bears the burden of proving the elements of that defense by a preponderance of the evidence. *St. Augustine Sch. v. Cropper,* 533 S.W.3d 186, 188 (Ky. 2017).[39]

    The crux of Walgreens' argument is that for over a decade before it commenced this Arbitration, Humana knew, or at a minimum should and with minimal effort could have known, that the pharmacy was not submitting its PSC prices as its usual and customary charges and that by failing to take any action Humana should be found to have been voluntarily paying those claims. Walgreens goes even one step further, arguing that despite Humana giving notice of its intent to pursue the issue in December 2017 and filing its Demand for Arbitration in 2019, the voluntary payment doctrine bars its claims right up through today because Humana has continued to pay those claims rather than rejecting them and/or changing its maximum allowable charge ("MAC") to match Walgreens' PSC prices. In arguing for application of the voluntary payment defense, Walgreens relies primarily on the same evidence that formed its (unsuccessful) argument that the parties' course of conduct defeated Humana's contract claim and its (successful) argument that Humana had not met its burden of proving that it had "reasonably relied" on the pharmacy's representations regarding its usual and customary prices. (Walgreens Phase II Post Hearing Br. at 3-11; Walgreens' Oral Argument on Phase II Post-Hearing Briefing Demonstrative at 2-28; Interim Award at 25-28; 33-37). In the Interim Award, after reviewing all the evidence, the Arbitrator found that (1) over the years, and in various contexts, issues around PSC, or pharmacy U&C reporting and pricing more generally, were the subject of attention within Humana"; (2) "there was sufficient information in Humana's possession that it became incumbent upon it to at least make a 'cursory examination or investigation' as to whether Walgreens was submitting its PSC prices as its usual and customary charge"; (3) Humana ignored other "warning signs," such as the existence of the *Garbe* district court and Seventh Circuit decisions, and six decisions issued by the district court in the *Corcoran v. CVS* U&C overpayment case, despite that fact Humana employees were aware of the *Garbe* case as early as 2013 and despite Humana's status as "one of the largest Medicare Part D sponsors in the country, running its own pharmacy and emphasizing its responsibility as the 'first line of defense' to prevent fraud, waste and abuse"; and (4) Humana "always had the ability to ascertain from publicly available information and its own claims data that it was not getting the benefit of Walgreens' PSC prices" and that "it could have conducted just such an assessment at *any* time between the launch of the PSC and the time it finally did so." (Interim Award at 33-36). In addition to the evidence introduced during Phase I, Walgreens now also argues that factual findings contained in an arbitration award in a case between Humana and CVS on issues similar to this case decided earlier this year demonstrates that CVS expressly informed Humana after forming its own pharmacy club that it did not consider its club prices to be its usual and customary responses and that Humana raised no objections. (Exh. 864 at ¶¶ 31-38). According to

---

[39] However, it also argues that once it does so, the burden shifts to Humana to prove that any of the exceptions to the doctrine apply. The Arbitrator agrees and Humana contends that it has met its burden. (Humana Phase II Reply Br. at 7)("Humana has proved both falsity and duress.").

Walgreens, this information from CVS "should have caused Humana to investigate what other pharmacies were doing" but that instead, "it did nothing other than to continue to pay claims as submitted." (Walgreens Phase II Post Hearing Br. at 6).

Humana raises three primary arguments in response to the voluntary payment defense. First, it argues that under Kentucky law the voluntary payment doctrine does not extend to situations in which a party paying another should have known the demand was unlawful; rather, it is limited to circumstances involving *actual* knowledge, which it claims it did not have. Second, it contends that it did not have "full knowledge of the facts" rendering the pharmacy's claims submissions violative of the Pharmacy Agreements because it did not know the correct U&C price on *each* claim submission and thus whether or not any given claim was "unlawful." Third, it asserts that the "fraud" and "duress" exceptions to the voluntary payment doctrine preclude application of the doctrine in this case to deny it damages. Finally, and more generally, it argues that under the Restatement (Third) Restitution and Unjust Enrichment, the voluntary payment doctrine "must be treated with caution" in business settings and "its operation must be realistic rather than artificial." *Restatement § 6, Comment e.* Each of Humana's arguments is addressed in turn.

First, Humana contends that Walgreens improperly relies on certain out-of-state authorities for the proposition that the voluntary payment doctrine extends to situations in which a paying party *should have* known of certain facts. It argues that under Kentucky law, the doctrine applies only where there is actual knowledge. It further cites to the Restatement, which states that the doctrine does not extend to payments that "were actually the consequence of negligence or inadvertence." But in *Davis,* which just last year reaffirmed Kentucky's recognition of the defense, the Court of Appeals *expressly adopted* a standard that incorporated both actual *and* "constructive knowledge." 2021 WL 223528 at *1-2. "Constructive knowledge" has a clear and recognized meaning under Kentucky law: it is "a legal concept by which notice of some fact is imputed to one who, by his knowledge of other facts, should have expected the fact in question to be true, or at least have conducted further inquiry." *Village Square Shopping Center, LLP v. Hyde,* 2021 WL 4228482 at *3 n. 4 (Ky. Ct. App., Sept. 17, 2021)(*citing Bennett v. Nicholas,* 250 S.W.3d 673, 677 (Ky. Ct. App. 2007)). This definition was in effect at the time that both the *Wathen* and *Causey* voluntary payment doctrine cases were decided. *See Mitchell v. First Nat. Bank of Hopkinsville,* 263 S.W. 15, 17 (Ky. Ct. App. 1924)("One who has reasonable grounds for suspecting or inquiring ought to suspect and ought to inquire, and *the law charges him with the knowledge which the proper inquiry would have disclosed.* If a person has knowledge of such facts as would led a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry, and he fails to do so, *he is chargeable with the knowledge which by ordinary diligence he should have acquired."*)(emphasis supplied). Accordingly, and contrary to Humana's argument, Kentucky law as articulated just one year ago is in accord with the out-of-state authorities relied upon by Walgreens for the same proposition.[40] *See, e.g., Chris Albritton Constr. Co. v. Pitney Bowes, Inc.,* 304 F.3d 527, 532 (5th Cir. 2002)("When . . . the party paying knows or ought to know the facts and does not avail himself of the means which the law affords him to resist the demand, he has not taken due care.")

[40] To the extent that the constructive knowledge standard adopted in *Davis* conflicts with the more generalized language of the Restatement regarding "negligence or inadvertence," the former must control.

Second, Humana asserts that because it has not "taken the position that Walgreens overcharged Humana on every claim," the "Arbitrator would seem to have to analyze each claim, one-by-one, to determine whether payment on *that* claim was voluntary, with full knowledge." (Humana Phase II Post Hearing Br. at 43). That is incorrect. It is true that Humana did not suffer damages on many claims because under the lessor of formula it would not have been adjudicated even at the PSC price. But that does not change the fact that Walgreens was contractually obligated to submit the correct U&C price on every claim, and thus *every* submission containing the standard retail cash price violated the terms of the Pharmacy Agreements regardless of whether it caused Humana damages. Once Humana knew (as defined under Kentucky law) that Walgreens was not submitting its PSC prices as its usual and customary prices, it possessed "knowledge of all the facts that render[ed]" Walgreens' claims submissions unlawful. And had it conducted a cursory investigation or examination based upon the information before it, it would quickly have discovered that Walgreens *never* submitted its PSC prices as its usual and customary charges and *always* submitted its standard retail rates instead.

The principle underlying the voluntary payment doctrine is that parties should raise issues when they know about them and not let damages accumulate. The consequence of failing to do so is losing the right to recover payments made that were not in fact due. The question then becomes when Humana had constructive knowledge of Walgreens' non-compliance with contractual obligations. Walgreens argues that dates from approximately January 2009, when according to the findings of another arbitration in a similar case against CVS, Humana was informed by that pharmacy that its club program prices would not be its U&C prices. (Exh. 864). The Arbitrator declines to adopt as evidence in this proceeding factual findings in another arbitration that were based on inferences drawn in the absence of direct evidence.[41] In any event, while it may well have behooved Humana at that juncture to see what other pharmacies were doing with their clubs, even if such information was conveyed to Humana by CVS, that does not by itself rise to the level of constructive knowledge as to Walgreens' activities.

There is no obvious "bright line" as to when Humana had enough information in its possession to rise to the level of constructive knowledge for purposes of the voluntary payment doctrine. As the Interim Award found, there were hints as far back as 2009 that Humana could have followed up on – and would have obtained actual knowledge of what Walgreens was doing had it done so. (Exhs. 24, 224, 232, 244). However, there can be little question that by December 2011, it clearly knew or should have known it was not getting the benefits of its bargain. Between April 2010 and December 2011 (1) Humana's Director of Network Contracting, Laura White (who participated in the 2009 negotiations) emailed another employee regarding the fact that their review of Walgreens data should reflect PSC charges at a particular rate and in fact included a reference to the pharmacy's PSC price look up tool (Exh. 24); (2) Humana employee Ted Nime had conducted a pricing analysis to determine if Humana beneficiaries would get better pricing if they joined the PSC, something that would not have made sense if Humana and its members were already getting the benefit of those prices (Exh. 25); (3) Humana's CFO challenged Jay Ecleberry, Humana's Market Vice President for Pharmacy Networks, to ask Walgreens to enroll Humana's member in the PSC so that Humana could get the benefit of the

---

[41] Walgreens' argument on this score suggests that it now wants to be rewarded for its own lack of transparency by bootstrapping itself onto what the arbitrator in the CVS matter found to be that pharmacy's fully transparent approach to the impact of its pharmacy club on U&C pricing.

PSC pricing (Exh. 237); and (4) Laura White requested that a Walgreens MAC analyst send her a list of drugs advertised through the PSC in Excel format. (Exh. 81). Because White could not recall during her testimony why she had made the request, the Arbitrator found that "two possible conclusions can be drawn: Walgreens refused to give it to her, which should have aroused suspicions as to why, or she got it, in which case she would have been even better equipped to determine whether Walgreens was reporting its club prices as its usual and customary charges. (Interim Award at 35). Based on the totality of the evidence, Walgreens has proven by a preponderance of the evidence that as of December 9, 2011 (Exh. 25), Humana clearly had constructive knowledge under Kentucky law of all the facts that rendered Walgreens' claims submissions to be in violation of its contractual obligations.[42] Not only did it possess enough information that would have led it to discover the truth had it even engaged in a "cursory examination or investigation" (Interim Award at 36); as of that time some of its key employees *believed* or at a minimum *assumed* they were *not* getting the benefits of PSC pricing but did nothing to confirm that or take action in response. As the Interim Award found, the information in Humana's possession that called upon it to inquire further only grew larger from there. (Interim Award at 35-36). The Interim Award further concluded that Humana always had the ability to ascertain from publicly available information that it was not getting the benefit of Walgreens' PSC prices or at a minimum that there was a good possibility that it might not be. *Id.* Yet it would be another six years – and only after Humana was approached with a tantalizing offer by a law firm that apparently awakened it from its slumber – before it acted on that constructive knowledge. (Exh. 866).

Finally, Humana has failed to establish that the "fraud" and "duress" exceptions to the voluntary payment doctrine preclude its application on the facts of this case. There is even less judicial guidance in Kentucky on these exceptions than on the voluntary payment doctrine as a whole. Indeed, neither *Wathen, Causey* nor *Davis* even mention a fraud exception at all. The only Kentucky case cited by Humana for that proposition is *Amer. Nat. Assur. Co. of St. Louis, Mo. v. Ricketts,* 19 S.W.2d 1071 (1929), which described the voluntary payment doctrine as follows: "'[A] party cannot, by direct action . . . recover money voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed." A Westlaw search reveals that only three Kentucky cases have ever cited *Ricketts* in the nearly one hundred years since it was decided, and not one of them addresses the fraud exception. Nor have the parties provided any helpful judicial guidance.[43] In any event, the Interim Award already expressly found that Humana had *failed* to prove its claim of fraud. Therefore, that exception is not a barrier to application of the voluntary payment doctrine. Humana also argues that it was under duress to continue paying Humana's wrongfully inflated claims. More specifically, it contends that had it terminated its contract with Walgreens that could have led to it failing to satisfy its network adequacy requirements under the Medicare

---

[42] Insofar as that timeframe falls outside any damage periods in this case, it is not necessary to pinpoint the moment of constructive knowledge with greater specificity. However, by December 2015, the beginning of the damages timeframe under the 2009 Agreement, there is no question that Humana had constructive knowledge that Walgreens was not reporting its PSC prices as its usual and customary charges.

[43] Humana cites to *Flournoy v. Ameritech,* 814 N.E.2d 585, 589 (Ill. Ct. App. 2004). But that case does not help its cause. It did nothing more than hold that at the motion to dismiss stage a claim could not be defeated by the voluntary payment doctrine because the plaintiff had *alleged* fraud. If there is anything to be implied from the decision relevant to this case, it is that a party would ultimately have to prove fraud to avoid application of the doctrine.

Part D program. But it offered no persuasive evidence supporting such an inference. But it is conceivable that had Humana discontinued paying Walgreens' claims, as Walgreens suggests it should have to avoid the voluntary payment doctrine, it potentially could have led to Walgreens' termination of the 2009 Pharmacy Agreement. Section 8.7 of the 2009 Agreement provides that Walgreens had the right to terminate the contract on 30 days' notice if it "reasonably determines that Humana . . . has failed to timely pay claims for Covered Services," subject to a 30-day cure process. (Exh. 11). Thus, if Humana elected to cease paying claims or in Walgreens' view was underpaying them based on what Walgreens believed to be an inaccurate U&C, this could have had a significant adverse impact on its members who rely on it for prescription drug coverage. That may well be true, but it does not give Humana a pass to simply ignore the information in front of it and take no action at all. That is particularly the case here, where the 2009 Pharmacy Agreement spells out a process for addressing overpayment disputes, and in fact is the very process Humana eventually followed starting at the end of 2017. Accordingly, the Arbitrator finds that the voluntary payment doctrine forecloses Humana from recovering damages between December 19, 2015 and December 18, 2017.[44] However, for the reasons set forth below, the voluntary payment doctrine does *not* bar Humana from recovering damages for the period after it commenced the dispute resolution process and availed itself of the very recourse the parties agreed to follow. *See, e.g., Chris Albritton Constr. Co., supra* (voluntary payment doctrine applies where party knew or ought to know the facts "*and does not avail himself of the means which the law affords him to resist the demand."* (Emphasis supplied).

On December 19, 2017, Humana sent Walgreens a letter expressing concern that the pharmacy may have been overpaid for certain claims based upon the pharmacy's failure to report PSC prices as its U&C prices on Humana transactions. (Exh. 15). As of that time, Humana had conducted an investigation and concluded that from all appearances it was not getting the benefit of discounted PSC prices. (Exh. 15). While it is true that it may not have known with certainty what the PSC prices (or more generally, the lowest widely and consistently available cash prices) were for each transaction, it was quite apparent by then that Walgreens was not reporting the PSC prices as its U&C. Walgreens now argues that any subsequent payments to it were voluntary in light of Humana's knowledge of this fact. However, there are two reasons why the voluntary payment doctrine does not bar recovery of overpayments made by Humana as of that time and through the present. First, Section 35(1) of the Restatement (Third) Restitution and Unjust Enrichment provides that if a party to a contract demands performance that is not in fact due under the applicable agreement (precisely the situation here based on the inflated U&C charges that form the basis for its billings), under circumstances making it reasonable to accede to the demand rather than insist on an immediate test of the disputed obligation, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement. The Restatement describes this as a "common-sense solution" that "promotes justice and efficiency." That precisely describes the situation here. Aware that there appeared to be falsely inflated U&C charges but uncertain as to what the "true" U&C was (an issue not resolved until issuance of this ruling), rather than simply ceasing payments and risking disruption for millions of customers, "guessing" what the correct amount

---

[44] In so finding, the Arbitrator has been mindful of – and adhered to – the general principle set forth in the Restatement (Third) Unjust Enrichment and Restitution and quoted by Humana that the voluntary payment doctrine should be applied with "caution" in business settings.

was on each transaction as it was submitted from the pharmacy[45], or terminating the contract (with all the risks and adverse consequences associated with doing so) Humana utilized the contractual provision expressly designed to deal with disputes over overpayments. Pursuing this avenue to contest Walgreens' conduct is entirely consistent with the pharmacy's own statement that Humana "had to take *some* action to avoid voluntary payment," including "invok[ing] Section 5.3 of the 2009 Agreement . . . ." (Humana Phase II Reply Br. at 9).[46] In fact, while the voluntary payment doctrine is intended to accelerate the resolution of disputes rather than letting them linger, the 2009 Agreement provided for a dispute resolution procedure that would precede– and where the parties could reach agreement could completely avoid – the filing of an arbitration demand. Taking such an approach – continuing to pay claims while putting Walgreens on notice of the dispute – would avoid multiple risks attendant to the other alternatives suggested by the pharmacy as to the measures to be taken. Indeed, little would be gained in the eyes of the law by taking actions that would simply shift the identity of claimant and respondent, or at a minimum generate counterclaims for underpayments. And in all likelihood that is exactly what would have happened, insofar as far from acknowledging that it was violating the contract Walgreens not only rejected such a proposition but even refused to provide the cash transaction data that Humana sought to determine whether it was getting the discounts to which it was entitled. And Humana's action was not only reasonable from that standpoint. It also avoided a risk that its millions of members who relied on it for prescription drug coverage would get caught up in the dispute and possibly even be forced to find new pharmacies from which to obtain their prescription medications if Humana began to underpay claims or refuse to pay them altogether over years of litigation and Walgreens responded by terminating the 2009 Agreement. As the Restatement instructs, the application of the voluntary payment doctrine should be "realistic, and not artificial." That instruction rings very true here: Humana's decision as to how to proceed not only followed the instructions of the contract's dispute resolution process for alleged overpayments; it avoided a situation in which it would potentially be generating underpayment claims and even risking a termination of the contract with its attendant impact on millions of Humana members. Accordingly, the voluntary payment doctrine does not bar Humana from recovering overpayments made from December 19, 2017 forward.

For all the foregoing reasons, the voluntary payment doctrine bars Humana from recovering damages from December 19, 2015 through December 18, 2017.

---

[45] Humana's PBM presumably had to price claims in real time in order to determine a member's copayment or coinsurance at the point of sale.

[46] The letter expressly stated it was invoking Section 5.3's dispute resolution mechanisms (doing so in bold typeface) and that it intended to "resolve" any discrepancies regarding usual and customary pricing. As the Arbitrator previously concluded, "[t]hat the Notice Letter was couched in diplomatic language (befitting the parties important and longstanding relationship) does not alter the fact that Humana was putting Walgreens on clear 'notice' (a word used in the letter heading itself) that it believed it may have overpaid claims based on false reporting of usual and customary prices and that it would seek to recover overpayments its suspicions proved true." *Ruling on Damages Timeframes* at 8.

**2.**   <u>**Should Humana's Damages Be Reduced Because It Failed To Mitigate Its**</u>
<u>**Damages By "MACing" Certain Drugs?**</u>

Walgreens has asserted as one of its affirmative defenses that Humana failed in its
obligation to mitigate some of its damages. Specifically, it asserts that Humana could have, but
did not, change its Maximum Allowable Cost ("MAC") for multi-source generics to match
Walgreens' PSC prices. (Walgreens Phase II Post Hearing Br. at 43-47; Exh. 473 at ¶¶ 52-61).
Had it done so, Walgreens argues, it would have ended up reimbursing the pharmacy for certain
claims based on its PSC prices rather than the higher retail cash prices that were submitted as the
U&C charge. Walgreens argues that Humana's damages award should be reduced by the
amounts it could have avoiding paying by "MACing" the drugs in question.

Kentucky law provides that an injured party is obligated take reasonable steps to mitigate
its damages. *Jones v. Marquis Terminal, Inc.,* 454 S.W.3d 849, 852 (Ky. Ct. App. 2014);
*Monties Resources, LLC v. Emeco Equip., LLC,* 2012 WL 95427 at *9 (Ky. Ct. App. 2012). A
non-breaching party "'cannot stand idly by and permit the loss to accrue or increase, then hold
him who breached it liable for the loss which he might have prevented by the use of reasonable
efforts, expense, and diligence to prevent, or arrest, the loss.'" Conversely, the law does not
require "enhanced or particularized efforts" and the injured party is not obligated to take "unduly
risky, expensive, burdensome, or humiliating" steps to mitigate its damages. *Id.; Comprehensive
Pharmacy Servs., LLC v. Highlands Hospital Corp.,* 2021 WL 1169897 (E.D. Ky. Mar. 26,
2021); *BB&T Co. v. Pac. Life. Ins. Co.,* 645 F. App'x 387, 391-92 (6th Cir. 2016). Failure to
mitigate damages is an affirmative defense and therefore the burden of proof is on Walgreens.
*Jones v. Marquis Terminal, Inc.,* 454 S.W.3d 849, 852 (Ky. Ct. App. 2014)("The party
committing the breach bears the burden of proving that the plaintiff failed to mitigate his
damages."). Because (1) the mitigation of damages defense has an underlying premise that a
party is aware it has been wronged; (2) the Arbitrator has found that Humana did not have actual
or constructive knowledge of a breach until after expiration of the 1998 Pharmacy Agreement;
and (3) this ruling has limited the time period for damages under the 2009 Agreement to the
period from December 19, 2017 to the present, the question becomes whether Walgreens has
proved that Humana failed to meet its mitigation duty as of that time and through the present.

In support of this affirmative defense, Walgreens argues that Humana had the ability to
determine PSC prices for multi-source generics and then set its MAC to that amount (subject to a
████████ set forth in the 2009 Pharmacy Agreement). Obtaining PSC prices could have been
done by a variety of means, including but not limited to the use of so-called Retail Pharmacy
Prices Surveys. (Exh. 473 at ¶¶ 52-56).[47] In fact, Walgreens presents evidence that Humana not
only could have set its MAC at PSC prices (subject, again, to the contractual floor) but that it
actually considered doing so. For example, in February 2009, the possibility of lowering MAC
prices to move in line with U&C submitted prices by pharmacies with $4 generic programs was
the subject of internal communications within Humana's pharmacy division. (Exh. 225). Two
years later, Humana Pharmacy Solutions employee Ted Nime sent an e-mail in December 2011
musing about the possibility of MACing certain drugs at discount program prices if the drug
"hits say 5 or more of these [9 national discount program] lists." (Exh. 25). In March 2017,

---

[47] However, Walgreens' expert Dietz acknowledged that a retail pharmacy price survey would not include PSC
pricing. (Exh. 481 at 195:16-23).

Bryan Duke sent an internal email stating that "prices reflective in pharmacy 'club'/'discount' programs . . . are not being offered as U&C to health plans" and that Humana had the "potential opportunity to capitalize and drive MAC prices lower to ensure we are being offered similar discounts as advertised by these providers to the public through these discount programs." (Exh. 199). Walgreens' expert Dietz also noted that Humana's letter in December 2017 stated that it had compared Walgreens' published PSC lists of cash prices to those prices paid by Humana to Walgreens for certain prescription drugs and that its subsequent Demand for Arbitration also contained a comparison of PSC drug prices with reported U&C prices for the same drugs. (Exh. 473 at ¶¶ 54-55). And Dietz also pointed to internal Humana communications in 2017 with respect to the potential for setting MAC prices to address pharmacy club pricing. (Exh. 473 at ¶¶ 56-57). In fact, an August 2017 e-mail from Jay Ecleberry, Humana's Director of Pharmacy Networks, stated that the company was going through the process of updating MAC prices and in fact had already done so for K-mart and Rite Aid and was "working on others (CVS included) to make sure that we are setting MAC prices no higher than what we see published by these retailers in their programs." (Exh. 32). According to Dietz, re-setting MAC prices was a type of remedy "that PBMs routinely exercise if they believe they may be overpaying under their pharmacy contracts." (Exh. 473 at ¶ 61).

There is no real dispute in this case that Humana had the contractual right, subject to the aforementioned price floor, to reduce its MAC on certain drugs. The question presented, however, is not whether it had the *right* to do so but rather whether by not doing so it failed to meet its legal *obligation* to mitigate damages and thereby relinquished the right to recover overpayments (in whole or in part) for multi-source generic drugs from Walgreens in this Arbitration. Based on the evidence presented, there are a number of reasons to conclude that Walgreens has failed to sustain its burden of proving this affirmative defense.

First, contrary to what Walgreens suggests, this Arbitration has proven that Humana had insufficient information to do what Walgreens said it should have. Walgreens relies on the fact that it advertised its value priced generic drugs publicly. But it did not establish that it placed new advertisements each time any VPG drug prices changed, thus allowing Humana to set a MAC at the then-applicable PSC price. In fact, as discussed above, Walgreens' expert Smith criticized the initial Petron analyses on the grounds that they used transactions for a calendar month, contending that this improperly caused damages to be based on mid-month price changes. Furthermore, the evidence established that the prices of many of the drugs covered by the PSC that might have been subject to "MACing" were not publicly advertised or available, at least until 2020. Walgreens provides no support for its proposition that Humana's mitigation obligation extended to utilizing the personal access information of Humana employees who just happened to be Walgreens PSC members in order to gain access to the so-called "look up tool" during periods when it was not publicly available.

Second, some of the very internal documents that Walgreens relies upon for its mitigation defense support the proposition that a decision to MAC drugs at any particular price points was a complicated and multi-factored one and that as such Humana should not have been obligated to modify business practices that affected its relationships with numerous other pharmacies by setting universal MAC prices to address Walgreens' wrongdoing. For example, in 2009, an internal discussion revealed that there would be "pros [and]cons" to moving MAC prices in line

with $4 U&C prices submitted by some pharmacies and that it was necessary to consider the submissions of multiple pharmacies, not just one, in order to assess where the overall market was. (Exh. 225). Furthermore, those decisions would have to be made on a drug-by-drug basis, not some overall adjustment for all drugs that were being priced at discounted rates. *Id.* Similarly, the Ted Nime email Walgreens has repeatedly pointed to from 2011 also reflects the fact that the prices of multiple pharmacies must be taken into consideration in determining MAC prices. Beyond that, however, it went on to warn that there could be problems with taking such action, observing that the "strategy would only work if we could get retailers not to complain about the overall effective rate increasing when these highly discounted generics start hitting the guarantees because they moved from U&C to MAC." (Exh. 25). In fact, the 2009 Pharmacy Agreement itself states as follows: "Humana represents and warrants that it has one (1) MAC list applicable to all providers and that each retail pharmacy provider is reimbursed at the same reimbursement level under the MAC list . . . ." (Exh. 11, § 1.10). Thus, under the 2009 Pharmacy Agreement, Humana would have had to consider not only the impact of changes to its MAC on its relationship with and reimbursements to Walgreens, but that of all other retail pharmacies with which it did business as well. The pharmacy offers no support for the proposition that the obligation to mitigate extends to actions that would violate the contract between the parties by creating a stand-alone Walgreens MAC.[48] The complexity of making decisions about what prices to set maximum allowable charges for with respect to prescription drugs was also acknowledged by Walgreens' own expert. Dietz agreed that there are multiple factors involved in establishing a MAC price and that a plan or PBM should "look at as many and wide factors as you can. And if there's areas where you can't do something because of state law, you don't do that." (Exh. 481: 175:17-176:9; 184:12-185:19). *See also* Exh. 205 (discussing the complex factors relating to MAC); Exh. 740 (anticipating adverse reaction from pharmacy to reduction in MAC).

Third, even assuming that none of the aforementioned problems existed, the duty to mitigate obligates an injured party to take *reasonable* efforts, not necessarily the efforts that in retrospect the wrongdoer likes best. Walgreens' own expert Dietz acknowledged at the Phase II hearing that Humana took reasonable steps – consistent with the terms of the 2009 Pharmacy Agreement – to address the overpayment issue. Thus, while arguing that Humana could have mitigated its damages by "MACing" multi-source generics, he admitted that sending the notice letter to Walgreens in 2017 was a "reasonable step," albeit one he believed should have been taken sooner (a proposition with which the Arbitrator agrees). (Phase II Tr. 829:9-830:9). Similarly (again with the caveat something should have been done sooner), Dietz also admitted that it was reasonable for Humana to follow the dispute resolution process outlined in the 2009 Pharmacy Agreement to address its concerns regarding Walgreens' U&C pricing and mitigate any damages. (Phase II Tr. at 830:20-831:15). In fact, at his deposition he conceded that once the issue was raised with Walgreens and Walgreens rejected the position that its PSC prices were its usual and customary charges, the most appropriate approach would be to follow the dispute resolution process. (Exh. 481 at 207:24-208:14). At the hearing, he confirmed that view, acknowledging that the more reasonable, better option than unilaterally MACing drugs would

---

[48]There was some limited evidence that in recent years Humana may have set separate MACs for certain other pharmacies. (Exhs. 32 and 740). But at the Phase I hearing, Bryan Duke testified that in 2017, as Humana was focusing on this issue, it considered but rejected adjusting its MAC pricing to address the problem it was identifying with Walgreens, at least in part based upon issues regarding the floor pricing. (Phase I Tr. 244:16-246:1). Walgreens did not refute this evidence or the reasonableness of such a decision.

have been to go through the dispute resolution process; that, he said, was his "preferred choice." (Phase II Tr. at 837:3-7). Insofar as Humana's damages under the 2009 Pharmacy Agreement are limited to the period after the December 2017 notice (and Walgreens has not shown that Humana had actual or constructive knowledge of breaches of the 1998 Agreement until after its expiration) these admissions alone are sufficient to undermine Walgreen's mitigation affirmative defense.

Finally, Kentucky courts consider whether a mitigation defense should prevail where the breaching party "had an opportunity to mitigate damages itself." *Jones*, 454 S.W.3d at 852. *See also Monties, supra,* 2012 WL 95427 at *9. Here, Walgreens always had the ability to simply do what the contract required of it – report the correct U&C price under the terms of the Pharmacy Agreement to Humana and receive reimbursement accordingly. As of the date of Humana's letter of December 2017, Walgreens was plainly on notice that Humana was contesting its U&C reporting and it could have avoided the current situation by modifying its reporting practices. Instead, it elected to double down on its U&C risk not only by accepting the payments understanding that they were being contested in accordance with the Pharmacy Agreement but by continuing to earn money on those payments (or otherwise deploy them to Walgreens' benefit) during the pendency of the dispute resolution process. Under these circumstances, Walgreens' "failure to mitigate" affirmative defense falls flat.[49]

For all the foregoing reasons, Walgreens did not meet its burden of proving that Humana failed to fulfill its obligation to mitigate its damages.

### G.   Is Humana Entitled To Prejudgment Interest And If So At What Rate And For What Time Period?

Under Kentucky law, an award of prejudgment interest at a rate of 8% is mandatory in the case of liquidated damages. *Osborn v. Griffin,* 865 F.3d 417, 456 (6th Cir. 2017). The Kentucky Supreme Court has stated that a damages claim is liquidated if it is "'of such nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certain, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values.'" *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist.,* 174 S.W.3d 440, 450 (Ky. 2005)(quoting 22 Am.Jur.2d DAMAGES § 469 (2004). Examples include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price." By contrast, unliquidated damages are claims which have "not been determined or calculated, . . . not yet reduced to a certain in respect amount." *Ford Contracting, Inc. v. Ky. Transp. Cabinet,* 429 S.W.3d 397, 414 (Ky. Ct. App. 2014)(quoting *Nucor Corp. v. General Elec. Co.,* 812 S.W.2d 136, 141 (Ky. 1991)). Thus, the first question that must be answered is whether the damages suffered by Humana were liquidated or unliquidated.

The Arbitrator finds that the damages incurred by Humana were unliquidated under Kentucky law. That conclusion is borne out by the fact that not only were there competing

---

[49] It is also worth noting that Humana has done nothing to cause the damages to *grow*. For each claim submission, the damages amount is fixed in time, with the exception of the prejudgment interest that Humana seeks to compensate it for the loss of the use of that money; use that Walgreens has enjoyed in the interim.

analyses between the parties about how to calculate damages that differed by over *$1 billion*; Humana *itself* presented multiple methodologies in three separate reports for determining what damages it incurred in this case. (Exh. 471, 835, 863). Thus, Humana is wrong when it says that the presence of the "lesser of" formula for reimbursements brings this within the definition of liquidated damages, because it begs the question that has been at the heart of this case: what constitutes the "usual and customary" amount that is part of that formula. In fact, Humana emphasizes that it need not prove its damages with precision and that it is only obligated to present evidence sufficient to calculate damages with reasonable certainty. (Humana Pre-Hearing Br. at 5, 24). In addition, even after adopting the Petron III analysis as the starting point for determining damages, it became necessary for the Arbitrator to decide whether certain reductions or offsets to the calculated amounts were warranted based upon the competing expert analyses. *See, e.g., Jackson v. Tullar,* 285 S.W.3d 290, 299 (Ky. Ct. App. 2007)("[D]amages that were established by proof offered during the trial are unliquidated and not subject to prejudgment interest."); *Osborn v. Griffin,* 865 F.3d 417, 456 (6th Cir. 2017)("Plaintiffs were only able to establish entitlement to their claims by providing expert testimony at trial, a strong indication that the claims were not for liquidated sums."). Having determined that the damages in this case are unliquidated, the next step in the analysis is to decide whether the Arbitrator should exercise his discretion to award prejudgment interest, and if so in what amount and for what time period. In addition, the Arbitrator must decide whether to award simple or compound interest.

The Kentucky Supreme Court has stated that when damages are unliquidated, "[t]he award of interest is left to judicial discretion . . . in light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." *Nucor, supra* at 144 (citing *Restatement (Second) of Contracts § 354). Ford Contracting, supra,* at 414 (amount of prejudgment interest, if any, is subject to weighing of equitable considerations). Walgreens asserts that prejudgment interest should be denied based on the same arguments it has raised regarding its two affirmative defenses. There is merit – up to a point – in Walgreens' argument.  "The plaintiff's delay in bringing suit is a valid consideration in balancing the equities and is certainly a consideration given the circumstances of this case. . . . " *Journey Acquisition-II, L.P. v. EQT Production Co.,* 2015 WL 3916353 (E.D. Ky. June 25, 2015) at *15. But Humana's damages have already been eliminated in this ruling for the period after it was found to have constructive knowledge of Walgreens' improper submissions but before it formally invoked the contractual dispute resolution process. The calculus as to the issue of prejudgment interest changes once Humana concluded that there was a possible breach of the Pharmacy Agreements and put Walgreens on notice through the December 2017 letter. This was the very "U&C risk" Walgreens knowingly assumed when it decided to pursue a two-tier pricing system without coming clean to Humana about what it was doing (unlike, purportedly, CVS) so that it could "have its cake and eat it too." Walgreens has already retained several slices of that cake through application of the 2009 Agreement's two-year lookback period and the voluntary payment doctrine. But once confronted directly with Humana's 2017 notice, Walgreens refused to provide it with the data it requested despite its contractual obligation to furnish information and has continued ever since to submit its retail cash prices as its U&C charges, even after the Interim Award concluded over one year ago that its submissions violated the 2009 Agreement. There is no reason under the circumstances why Walgreens should reap the benefit of having had the use of the overpaid amounts during the course of the dispute resolution process, especially insofar as it always had it within its power to submit its PSC prices during that time. *University*

*of Louisville v. RAM Engineering & Const., Inc.,* 199 S.W.3d 746, 748 (Ky. Ct. App. 2005)("[E]quity and justice demand that one who uses money or property of another . . . should at least pay interest for its use in the absence of some agreement to the contrary . . . . This principle applies whether or not the amount owed to another is liquidated or unliquidated.")(internal quotations and citation omitted); *Journey Acquisition II, supra* at *18 (awarding interest and finding defendant "could have stopped the running of interest at any point by complying with its contractual duty" especially after "plaintiff made a formal demand.").

        In view of the totality of the evidence, and in exercise of the discretion granted under Kentucky law to award prejudgment interest for unliquidated damages, the Arbitrator finds that Humana is entitled to an award of prejudgment interest. Interest shall be calculated on a claim-by-claim basis, accruing from the date Walgreens received each overpayment. *See, e.g., University of Louisville, supra.*  Interest shall be awarded as follows: (1) for damages relating to overpayments under the 1998 Pharmacy Agreement, from the date of the overpayment through December 9, 2011, and then again from December 19, 2017 through March 17, 2023[50]; and (2) for damages under the 2009 Pharmacy Agreement, from December 19, 2017 through March 17, 2023.[51] Under Kentucky law, pre-judgment interest has traditionally been simple interest, but there is no bar to compound interest. *Reliable Mechanical, Inc. v. Naylor Indus. Services, Inc.,* 125 S.W. 3d 856, 858 (Ky. Ct. App. 2003)(deciding to award compound pre-judgment interest); *Travelers Property Cas. Co. of America v. Hillerich & Bardsby Co., Inc.,* 598 F.3d 257 (6th Cir. 2010)(under Kentucky law, default is simple interest; principles of equity used to determine whether compound interest is appropriate).  Based upon the reasoning articulated by the courts in *Reliable Mechanical* and *Journey Acquisition-II,* interest shall be compounded. Prejudgment interest is awarded pursuant to the discretion granted the Arbitrator under Kentucky law at a rate reflecting the average yield for 10 Year Treasury Securities (1) for the initial interest period for the 1998 Pharmacy Agreement overpayments for the period November 2007 through December 2011; and (2) for the re-commencement of interest for 1998 Pharmacy Agreement and all damages under the 2009 Pharmacy Agreement, the period of December 2017 through December 2022. Kentucky Rev. Stat. § 360.040. *See https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_long_term_rate&field_tdr_date_value=2022*

---

[50] In other words, interest under the 1998 Agreement will cease accruing on December 9, 2011, the date determined to be the point at which Humana is charged with constructive knowledge as to Walgreens' breach, and then shall commence accruing again on December 19, 2017.

[51] While Walgreens has complained about Humana's delay in bringing its Demand for Arbitration, once it was informed by Humana in 2017 that in its view the jig was up, Walgreens could at any time have modified its U&C submissions. While it had every right not to do so until the Arbitrator ruled, that should not come at Humana's expense. Moreover, at least part of the time that has passed in this case is attributable to Walgreens' request, granted by the Arbitrator over Humana's objection, to bifurcate the liability and damages phases of the Arbitration because it did not want to produce several years' worth of data.

## IV.
## CONCLUSION AND SUBSEQUENT PROCEEDINGS

Based upon the foregoing, the Arbitrator makes the following findings regarding the award of damages in this Arbitration:

1. The Petron III PSC Only analysis shall serve as the foundation for the calculation of damages, including but not limited to (1) its use of formulary data to determine PSC prices for transactions for the period of January 1, 2018 through April 19, 2022 and cash transaction data for prior periods using the described 30 day lookback period; and (2) a reduction in damages to account for changes in Humana's Retained Rx Quality Network Program withholdings that would have occurred if Walgreens had submitted the PSC price instead of the retail cash price as the U&C amount during the damages period. To the extent there was more than one PSC price associated with Humana transactions for which damages are awarded, or Walgreens asserts that certain PSC prices used in Petron III based on cash transaction data were non-existent or otherwise inaccurate, the expert reports shall include opinions as to the correct price(s) to use in the damages calculation.

2. Damages shall be calculated in a manner that takes into account and adjusts for sales taxes in order to avoid using PSC prices reflecting a reduction for such taxes except with respect to Humana transactions in those taxing jurisdictions.

3. The usual and customary price shall include an allocated amount for the enrollment fee based upon the Smith analysis.

4. Damages amounts shall be calculated to include and specifically identify by amount overpayments incurred by Humana members for claims under the 2009 Pharmacy Agreement. No member damages shall be included for claims under the 1998 Pharmacy Agreement. Calculations shall be conducted in a manner that ensures appropriate accounting for the differences between co-payments and co-insurance. For each Humana transaction, the experts shall calculate the Humana and member damages separately.

5. The damages incurred based on the foregoing shall be extrapolated for the period April 20, 2022 (the day after the last produced Humana transaction) through March 17, 2023 using average monthly damages (less offsets) for the first quarter of 2022. (Exh. 863 at ¶ 15 and n. 32).

6. Humana's damages are unliquidated. Pursuant to the discretion accorded to the Arbitrator under Kentucky law, prejudgment interest is awarded (1) from November 1, 2007 through December 9, 2011 at the average rate for 10 Year U.S. Treasury Securities for the period of November 2007 through December 2011; and (2) from December 19, 2017 through March 17, 2023 at the average rate for 10 Year U.S. Treasury Securities for the period of December 2017 through December 2022. Interest shall be compounded. To the extent the parties are unable to agree on the interest rate based on the above criteria,

FILED UNDER SEAL

that shall be one of the subjects of the forthcoming expert reports to be presented in accordance with the following paragraph.

Per prior agreement of the parties in consultation with the Arbitrator, the parties' experts shall produce new damages analyses and calculations based upon these findings. The Arbitrator further requests that the parties agree upon a protocol pursuant to which the parties' respective experts can (1) meet and confer with each other in advance of producing their analyses to seek agreement on appropriate methodologies in forming their calculations and/or (2) meet and confer with each other after producing their analyses for the purpose of attempting to reconcile any differences in the calculations produced. Finally, to the extent the parties disagree on the amount of damages and the rate of prejudgment interest to be awarded based upon this ruling, the parties shall submit expert reports and rebuttals to the Arbitrator addressing any differences and a hearing shall be conducted thereafter at which the experts shall offer testimony and respond to the Arbitrator's questions regarding their methodologies and conclusions. Per agreement of the parties, an in-person hearing shall be conducted on **February 15, 2023** in Washington, D.C. for purposes of examining the experts regarding their respective reports. The protocols for the hearing shall be the subject of a conference with the Arbitrator and counsel to be scheduled at a mutually convenient time.

Dated: December 30, 2022

_____
Elliot K. Gordon, Esq.,
Arbitrator